## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF TREO NOAL GP
S.À R.L. FOR AN ORDER TO OBTAIN
DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS FROM WEIL, GOTSHAL &
MANGES LLP PURSUANT TO 28 U.S.C.
§1782

Case No. 21:25-mc-133

**MEMORANDUM OF LAW IN SUPPORT OF TREO NOAL GP S.À R.L.'S *EX PARTE*
APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. ii

Table of Authorities ........................................................................................................ iii

Preliminary Statement ...................................................................................................... 1

Factual Background .......................................................................................................... 3

    I.   Relevant Parties .................................................................................................... 7

        A.  The Fund and related persons and entities ................................................ 7

        B.  The Fund's "alternative investment fund manager" ................................. 8

        C.  The Founders ............................................................................................. 9

        D.  Weil's Ties to the Founders ..................................................................... 10

    II.  The Founders' Dispute and the GP's Ouster ...................................................... 10

        A.  The dispute ............................................................................................... 10

        B.  Novalpina GP's last-minute abuses: Ernst & Young's inflated
            valuation report ...................................................................................... 12

        C.  The Proceedings ...................................................................................... 14

    III. The Petitioner Uncovers Questionable Transactions ......................................... 14

        A.  NSO ......................................................................................................... 14

        B.  LXO Bribe ............................................................................................... 16

        C.  Maxbet Deceit ......................................................................................... 18

        D.  Legal Proceedings for Which Evidence is Sought .................................. 19

Legal Argument .............................................................................................................. 20

    I.   The Petition Meets All Three Statutory Requirements of 28 U.S.C. §
       1782 ................................................................................................................... 20

        A.  Weil is Found in the Southern District of New York ............................. 21

        B.  The Discovery Sought is "For Use" in a Foreign Proceeding ............... 22

        C.  Petitioner is an "Interested Person" Under Section 1782 ...................... 23

    II.  The Court Should Exercise Its Discretion to Grant this Petition ....................... 23

        A.  Weil is Not a Participant in the Foreign Proceedings ............................ 23

        B.  The Foreign Tribunal Would Be Receptive to the Requested
            Discovery. ................................................................................................ 24

        C.  The Application Is Made in Good Faith and Does Not Circumvent
            Any Proof-Gathering Restrictions .......................................................... 25

        D.  The Requests Relate to Discrete, Recent Actions over a Short Time
            Period ...................................................................................................... 26

Conclusion ...................................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*
   673 F.3d 80 (2d Cir. 2012) ........................................................................... 20, 21, 26

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ................................................................................................ 21

*Euromepa S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995) ............................................................................... 20, 24

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010) .................................................................................................. 21

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017) ................................................................................... 22

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
   121 F.3d 77 (2d Cir. 1997) ..................................................................................... 23

*In re Application of Auto-Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*,
   No. 12-mc-221 (RPP), 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ..................... 25

*In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L&M Galleries*,
   249 F.R.D. 96 (S.D.N.Y. 2008) .............................................................................. 22

*In re del Valle Ruiz*,
   939 F.3d 520 (2d Cir. 2019) ................................................................................... 21

*In re Edelman*,
   295 F.3d 171 (2d Cir. 2002) ................................................................................... 20

*In re Joint Stock Co. Raiffeinsenbank*,
   No. 16-mc-80203-MEJ, 2016 WL 6474224 (N.D. Cal. Nov. 2, 2016) ............... 25, 26

*In re Metallgesellschaft*,
   121 F.3d 77 (2d Cir. 1997) ................................................................................. 20, 26

*In re Steinmetz*,
   No. 20-mc-212, 2022 WL 170851 (S.D.N.Y. Jan. 19, 2022) .................................. 21

*In re Valla PTC Ltd.*,
   No. 20-mc-223 (PGG), 2023 WL 3160117 (S.D.N.Y. 2023) .................................. 23

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ........................................................................................ passim

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ......................................................................... 22, 25, 26

**Statutes**

28 U.S.C. § 1782 ................................................................................................ 1, 6, 27

28 U.S.C. § 1782(a) .......................................................................................... 21, 23, 26

1.    Petitioner TREO NOAL GP S.à r.l. ("NOAL GP" or "Petitioner"), pursuant to 28 U.S.C. § 1782, hereby petitions for an order authorizing Petitioner to obtain certain limited, but critical, discovery (the "Requested Discovery") from Weil, Gotshal & Manges LLP ("Weil" or "Respondent") for use in a civil proceeding pending before the Luxembourg District Court (the "Proceedings" or "Summons 4").

2.    In support of its Application, Petitioner submits a Memorandum of Law and attaches various exhibits, including the Declarations of Christopher Hilton, Gavin Farrell, Helene Arvis, and Karl Koenen. A proposed Order is attached as Exhibit 1 to the Hilton Declaration, and the proposed subpoena *duces tecum* to be served on Weil is attached as Exhibit 2 to the Hilton Declaration.

## PRELIMINARY STATEMENT

3.    This Application concerns the leadership and valuation of a private equity fund called Novalpina Capital Partners I SCSp (the "Fund").[1] Under the direction and control of its founders, Stefan Kowski, Bastien Lueken and Stephen Peel (the "Founders"), the Fund made a series of disastrous investments that damaged the Fund's value, and the Fund's proper valuation is currently being disputed in the Proceedings. As the main legal advisor to the Fund, Weil advised the Fund on each of these investments. Weil therefore possesses evidence central to the Fund's proper valuation—and consequently, to the claims and defenses at issue in the Proceedings.

4.    Most relevant here are three flawed Fund acquisitions: NSO, LXO, and Maxbet.

---

[1] Novalpina Capital Partners I SCSp has since been renamed NOAL SCSp.

5.    **NSO**: Weil advised the Fund on its €218.5 million acquisition of a group of companies referred to as the NSO Group. NSO is the maker of Pegasus spyware, which is designed to remotely and covertly conduct surveillance of targets' cell phones. Pegasus is the infamous spyware that has allegedly been used by authoritarian governments to spy on political opponents and human-rights activists. Pegasus has also been linked to the murder of Saudi journalist Jamal Khashoggi. The acquisition was premised on the Founder- and NCL-led due diligence and investment recommendation, which documented that NSO had a governance or compliance controls that were "best in class." This recommendation concealed the true nature of NSO's unsavory business. Weil was involved in conducting NSO due diligence. *See infra* ¶¶ 14, 42-45.

6.    **LXO:** Weil also conducted the legal due diligence and advised the Fund on the purchase of French pharmaceutical company LXO in 2020. Shortly after the transaction closed, a Fund-related entity paid a €1 million "service fee" to a company with ties to a banker representing LXO shareholders in the sale—strongly suggesting that the payment was a bribe or a secret commission to him. The alleged bribe's damage to LXO's reputation and business led to the sale of the company before the Fund was able to realize its growth opportunities. *See infra* ¶¶ 14, 46-52.

7.    **Maxbet:** Weil was the legal advisor on the Fund's acquisition of Maxbet, a gambling business based in Malta and Romania. Two separate draft due-diligence reports, prepared by two different firms, suggested that Maxbet was covertly owned by Mikhael Mirilashvili, a Russian-Georgian businessman. But documents show that Weil was involved in the process of removing references to Mirilashvili from these reports. The Fund's claim is that Kowski was the ringleader for the investment advisors and that his intention was to conceal

the uncertainty about the ownership of Maxbet. NOAL GP believes that losses arising out of the acquisition—which never would have happened if Kowski and the Fund's investment advisors had not concealed the full form due diligence reports and the information contained in them—will likely run into the tens of millions of Euros. *See infra* ¶¶ 14, 59-64.

8.    A grant of this Application, to obtain Weil's documents on these and other transactions, is proper under the requirements of Section 1782. First, Weil "reside[s] or [is] found" in the Southern District of New York because it is headquartered here. Second, the discovery sought by NOAL GP is highly material and relevant to the issues at stake in the Proceedings. Third, the discovery sought here satisfies the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004): Weil is not a party to the foreign proceedings; the courts of Luxembourg will be receptive to discovery that NOAL GP seeks; the Application does not circumvent foreign proof-gathering restrictions and is made in good faith; and the discovery sought is neither unduly intrusive nor burdensome. Accordingly, NOAL GP respectfully requests that the Court grant this Application and permit service of the Subpoenas on Weil.

## FACTUAL BACKGROUND

9.    The Requested Discovery sought by this Petition concerns investments made by the Fund, which was managed by Novalpina Capital Partners I GP S.à r.l. ("Novalpina GP"), until it was replaced by Petitioner, and the resulting litigation. Declaration of Gavin Farrell ("Farrell Dec.") ¶ 4 (attached as Exh. B); Summons, *Novalpina Capital Partners I. S.à. r.l. et al. v. BRG NOAL GP S.à. r.l. et al.*, No. TAL-2022-03617 (Feb. 25, 2022) ("Summons

4"/the "Proceedings") (initial pleading commencing litigation) (attached as Exhibit 6 to the Farrell Dec.); *infra* ¶¶ 59.

10.    The Fund was founded, and the shares of Novalpina GP were indirectly owned by, the Founders. Farrell Dec., Exh. B, ¶ 4. The Founders raised approximately € 1 billion of commitments for the Fund based on their investment experience and their prospective stewardship of the Fund, which was effected through the Founders' ownership and control of Novalpina Capital LLP ("NCL") and Novalpina Capital Management LLP ("NCMI"). *Id.* ¶¶ 6-7. Prior to the removal of Novalpina GP, NCL and NCMI acted as the investment advisors to the Fund (the "Investment Advisors" and, together with Novalpina GP and its parents and affiliates, the "Novalpina Entities"). *Id.* Notwithstanding the Fund's complex structure, the Fund's investment strategy was under the Investment Advisors' complete control, who also managed the Fund's investments on a day-to-day basis (i.e., acted as the ownership representatives of the investments). *Id*. ¶¶ 18-20.

11.    An internal dispute among the Founders arose in late 2020, likely a result of strain from the spectacular failure of Fund's NSO Group investment. Farrell Dec., Exh. B, ¶ 27. Witnessing the ensuing disarray, 99.6% of the limited partners (the Fund's investors, referred to as "LPs") took the highly unusual but necessary action of voting to remove Novalpina GP (the "Removal"). *Id.* ¶¶ 27, 32, 41. The LPs appointed Petitioner as replacement general partner of the Fund (which also resulted in the replacement of the Investment Advisors by affiliates of Petitioner). *Id.* ¶¶ 53-54.

12.    The financial consequences of the Removal have been the subject of no fewer than six lawsuits in Luxembourg initiated by Kowski-controlled entities. Declaration of Helene Arvis ("Arvis Dec.") ¶ 8 (attached as Exh. C). In short, Novalpina GP claims that it and its

associates are entitled to a sponsor commitment and/or removal entitlement (*i.e.*, a carried interest in the purported profits of the Fund). *See* Farrell Exh. 6. This claim is based on a critically flawed and radically inflated valuation, commissioned in the final days of Novalpina GP's control over the Fund while it had a conflict of interest (*i.e.*, after becoming aware that the LPs had voted to remove it). *See* Submission, NOAL GP SARL *et al.*, No. TAL-2022-03617, ¶ 101 (Mar. 17, 2023) ("Molitor Brief") (attached as Exh. D).

13.   After Petitioner's appointment as replacement general partner, and while performing its due diligence into the Fund's investments, Petitioner learned that Novalpina GP materially misrepresented the circumstances of the Fund and its investments. Farrell Dec., Exh. B, ¶¶ 80, 92-93, 96.

14.   Further investigations have identified a widespread pattern of deceit and concealment that was organized by the Novalpina Entities and the Founders while in control of the Fund. This has resulted in numerous lawsuits including (a) proceedings in the Commercial Court of England and Wales against the Founders claiming damages for conspiracy (*inter alia*) arising out of the Fund's investment in the NSO Group; (b) a lawsuit in the same court for an alleged € 1 million bribe made to a U.A.E. company in connection with the Fund's investment in LXO; and (c) in Luxembourg against Kowski and the Investment Advisors seeking damages for the deliberate concealment of information identified in due diligence prior to the Fund's acquisition of a company called Maxbet. *See generally* Particulars of Claim, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2023-000851 (England and Wales Commercial Court Nov. 25, 2024) ("NSO POC") (attached as Exh. E); *Treo Noal GP S.à r.l. et al. v. Kowski et al.*, No. CL-2022-000664 (England and Wales Commercial Court Dec. 12, 2022) ("LXO POC") (attached as Exh F); OEGH Holdings S.à r.1. *et al.*

Summons to Novalpina Capital Management Int'l LLP *et al.*, 307289 / SaPa A77965 (District Court of and in Luxembourg, July 19, 2024) ("Maxbet Deceit Summons") (attached as Exh. G).[2]

15.    Weil, and particularly Gerhard Schmidt, co-managing partner of Weil's German offices, was the Fund's key legal advisor when under Novalpina GP's control, including for all major acquisitions undertaken by the Fund (including NSO, LXO and Maxbet). Farrell Dec., Exh. B, ¶¶ 25-26.

16.    Accordingly, Weil was responsible for conducting due diligence, negotiating, financing assistance, drafting transaction documentation, and supporting NCL in the management of Fund investments. *See* NSO POC, Exh. E, ¶ 102.2; LXO POC, Exh. F, ¶ 27; Defense Brief, *Kowski v. Maximus BidCo I S.à r.l. et al.*, No. 2023-09684, ¶ 39 (District Court of and in Luxembourg, Oct. 8, 2024) (attached as Exh. H). Schmidt managed the Fund's investments by acting as a director in various Novalpina and Fund entities, and was one of the directors responsible for the Fund's governance of NSO. Farrell Dec., Exh. B, ¶¶ 25-26, 56, 75.

---

[2] Treo Asset Management LLC ("Treo AM"), a U.S.-based SEC-registered investment advisor and the investment advisor to Petitioner, is currently the subject of a discovery request in a separate action pending in this District and commenced pursuant to 28 U.S.C. § 1782, *In Re Petition of Novalpina Capital Partners I GP S.à r.l. for Judicial Assistance Pursuant to 28 U.S.C. § 1782*, No. 23-mc-00025 (S.D.N.Y.) (PGG). In that matter, Novalpina GP has sought documents and testimony from Treo AM pursuant to Section 1782, and Treo AM has opposed such relief on the grounds unrelated to this proceeding. In particular, and unlike in this application, Treo AM opposed the petition there on, among other grounds, that it "seeks what is for all intents and purposes party discovery that is obtainable from [Novalpina GP]'s litigation adversaries in Luxembourg and that can and should be handled by the courts of Luxembourg." (Dkt. 17 at 18.) Treo AM's motion to quash in that proceeding remains pending.

Treo AM and Petitioner are also intervenors in another, substantially similar proceeding brought by Novalpina GP pursuant to Section 1782 and seeking discovery from Petitioner's largest investor, the Oregon Public Employees Retirement System (OPERF), pending in the United States District Court for the District of Oregon, *Novalpina Capital Partners I GP S.A.R.L. v. Read et al.*, No. 3:23-mc-00082 (D. Ore.) (IM). There too, Petitioner and Treo AM opposed relief on grounds not relevant here, namely that Novalpina GP did not satisfy the statutory factors and impermissibly sought "discovery from [Novalpina GP]'s litigation adversaries who are within the reach of the Luxembourg courts." (Dkt. 28 at 8.) The district court granted the Petition there. Treo AM and Petitioner are currently appealing a denial of a motion for reconsideration.

Therefore, Weil should have documents relevant to the circumstances of the acquisition and subsequent management of each of the Fund's investments, which are directly relevant to the valuation of the Fund's investments as of the Removal—the primary issue at dispute in the Proceedings and the focal point of the Requested Discovery.

17.     Moreover, Petitioner is entitled to the Requested Discovery. The discovery is simply Fund entities' client files held by Weil relating to the NSO, LXO, and Maxbet investments. Weil advised the Fund and relevant Fund entities in relation to these investments. *Id.* ¶¶ 25-26.

## I.   Relevant Parties

### A.  The Fund and related persons and entities

18.     Petitioner NOAL GP replaced Novalpina GP as, and remains, the manager (*gérant*) and general partner (*associé commandité*) of the Fund. *See id.* ¶ 8.

19.     The Fund was established by the Founders as a way for institutional and high-net-worth investors to focus on mid-market European investments, as described in a Private Placement Memorandum dated November 15, 2017 ("PPM"). *See* Farrell Exh. 1. It was the responsibility of Novalpina GP (or, in the European Union, of the AIFM using information supplied by Novalpina GP) to market the Fund. NSO POC, Exh. E, ¶ 23. The majority of the LPs (by asset volume) were pension funds, other large institutional investors, and family offices. *Id.* ¶ 28.

20.     The Founders established (or caused to be established) the Fund and the Novalpina Entities. *Id.* ¶ 10.1. The Novalpina Entities were owned by the three Founders equally, who each held a one-third share in Novalpina GP's ultimate parent, Novalpina Capital Group S.à r.l. ("Topco"). *Id.* ¶ 18. Topco owned Group GP, which was the direct parent of Novalpina GP. *Id.* ¶ 18.1. The Founders are, thereby, the ultimate controllers of Novalpina GP.

21. At all material times, the Founders controlled the Fund through their ownership of Topco and by acting as managers of Topco and Group GP. Novalpina GP had "independent" managers, but they were accustomed (whether obliged or otherwise) to seek approval or input for Novalpina GP's action from the Founders. *Id.* ¶ 18. From the Fund's 2017 inception until the Removal in 2021, Novalpina GP managed the Fund. Molitor Brief, Exh. D, ¶¶ 9, 79.

**B. The Fund's "alternative investment fund manager"**

22. As explained in the Declarations of Gavin Farrell and Helene Arvis, the Fund is an "alternative investment fund" or "AIF." *See* Farrell Dec., Exh. B, ¶ 11-15; Arvis Dec., Exh. C, ¶¶ 5-7. Luxembourg regulations require the Fund, as an AIF, to have an alternative investment fund manager ("AIFM"), which itself is regulated under Luxembourg law. Arvis Dec., Exh. C, ¶ 5. At all relevant times, the Fund's AIFM was Luxembourg Investment Solutions S.A. ("LIS"). NSO POC, Exh. E, ¶ 13.

23. Under the advisory model, the AIFM receives "advice" on what investments to direct the Fund to make. Arvis Dec., Exh. C, ¶ 6. That advice comes from Fund sponsors acting as "investment advisors" (here, NCL and NCMI). *Id.* These Investment Advisors (whose extensive role is described in the IAA, *see generally* Farrell Exh. 9) sourced the relevant investments, conducted due diligence, negotiated the deal and transaction documentation, and then, when the Founders wanted the Fund to effectuate the investments, presented the deal to the AIFM with a recommendation to invest. Arvis Dec., Exh. C, ¶ 6. The AIFM then considered that advice and, if it agreed based on the provided information, directed the Fund to effectuate the investments. *Id.* The AIFM could not direct the Fund to effectuate investments other than those recommended to it by the Investment Advisors, as the AIFM

had no independent capability to identify or negotiate potential investments for the Fund (which was controlled completely by the Founders acting through the Novalpina Entities, *i.e.*, the private equity "sponsor"). *Id.*

### C. The Founders

24. The Fund was set up on the basis that the Founders would play a key role in its management, exercising day-to-day practical control over Novalpina GP and the Fund's Investment Advisors. Farrell Dec., Exh. B, ¶ 16. The Founders were thus in ultimate control of the advice and information to be provided to the Fund and those advising it, including Weil. NSO POC, Exh. E, ¶ 17.

25. The Investment Advisors each had a management committee consisting of the three Founders. *Id.* ¶ 19.2. It was the Investment Advisors that issued recommendations to LIS, following a decision of its management committee. *Id.* ¶ 16. Any such management committee decision required unanimity among the Founders. *Id.* ¶ 18.6. Otherwise, Founder control of the Fund was primarily exercised through their indirect ownership of Novalpina GP, giving them effective power to appoint and remove the managers of Novalpina GP, and thus the Fund entities, at will. *Id.* ¶ 18.5.

26. The combination of Founder control and the AIFM model meant that the AIFM had no substantive contact with either the Investment Advisors' service providers (including Weil) or the counterparties to the various transactions—and that the AIFM was fully reliant on the representations incorporated into the Investment Advisors' recommendation being full, fair and truthful. Nevertheless, each of the Founders have now attempted to distance themselves from their involvement in the alleged wrongdoing, and instead point to third-

party advisors who were involved in the relevant acquisitions, including Weil, or deflect responsibility on to the Fund holding companies themselves.[3]

### D. Weil's Ties to the Founders

27. Weil had a preexisting relationship with the Founders, specifically Kowski. Farrell Dec., Exh. B, ¶ 23. Schmidt's relationship to Novalpina was so close that he was appointed by the Founders to be the Chairman of the board of managers of Topco and thus intimately involved in the management of the Novalpina Entities (and a central figure in the internal dispute that arose at Novalpina). *See Id.* ¶ 24.

28. Given the extent of Schmidt's relationship with the Founders, it is unsurprising that Weil advised the Fund on every major portfolio-company acquisition that occurred prior to the removal of Novalpina GP—including the notorious Israeli spyware developer NSO Group, which Schmidt directly managed after his appointment as a manager. *See id.* ¶ 25.

## II.  The Founders' Dispute and the GP's Ouster

### A. The dispute

29. The Founders appear to have fallen out in late 2020 (or, more accurately, Kowski and Lueken fell out with Peel). *See* Novalpina Capital Partners I SCSp Minutes of the Extraordinary General Meeting at 7 (July 9, 2021) (attached as Exh. O) (stating that "the Founding Partners have been in dispute for six months"). Although Petitioner does not

---

[3] *See* Defence of the First Defendant, *TREO NOAL GP S.à r.l. et al.*, No. CL-2023-000851,¶¶ 23.2, 66-72, 124 (England and Wales Commercial Court Jan. 24, 2025) (attached as Exh. I); Defence of Second Defendant, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2023-000851, ¶¶ 37, 127, 128, 221 (England and Wales Commercial Court Jan. 24, 2025) (attached as Exh. J); Defence of the Third Defendant, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2023-000851, ¶ 83.2 (England and Wales Commercial Court Jan. 24, 2025) (attached as Exh. K); Amended Defence of the First Defendant, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2022-000664, ¶¶ 28, 31 (England and Wales Commercial Court Oct. 10, 2023) (attached as Exh. L); Re-Amended Defence of the Second Defendant, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2022-000664, ¶ 46 (England and Wales Commercial Court Nov. 17, 2023) (attached as Exh. M); Defense Brief, *Kowski v. OEGH Holdings S.à r.l. et al.*, No. 2024-07800, ¶¶ 24, 25, 27, 41, 51, 92-95 (District Court of and in Luxembourg, Feb. 24, 2025) (attached as Exh. N).

know the genesis of the Founders' dispute, media reports linked it to the Fund's investment in the NSO Group. *See* Farrell Dec., Exh. B, ¶ 26 & Exh. 10 (collecting articles).

30.    The dispute between the Founders led to a practical deadlock of the Fund's governance due to the unanimity requirement, which resulted in Kowski and Lueken causing the suspension of Peel's voting rights in Topco. Farrell Dec., Exh. B, ¶ 27. Once in control of Topco, Kowski and Lueken caused the removal, in July 2021, of Gaëtan Dumont and Allen Foley as directors of Novalpina GP, and the appointment of Michael Zini and Stefano Pileri in their stead. Molitor Brief, Exh. D, ¶ 51; Farrell Dec., Exh. B, ¶ 35.

31.    These events are alleged to be an abuse of rights of the other independent directors and Kowski, Lueken, and Schmidt are now subject to a criminal investigation in Luxembourg based on these allegations. Molitor Brief, Exh. D, ¶ 34. The Founders' dispute was also the subject of litigation before the Luxembourg courts from the beginning of 2021, including over the purported suspension of Peel's voting rights on January 10, 2021. *Id.* ¶¶ 32-34.

32.    As the dispute and deadlock continued, the LPs concluded that the only solution to save the Fund from irreparable harm was to replace Novalpina GP as general partner. Molitor Brief, Exh. D, ¶ 39. Pursuant to Section 20.2 of the LPA, the general partner could be dismissed "without cause" after the second anniversary of the "First Closing Date" pursuant to a "Special Consent" taken by the LPs convened to a general meeting in accordance with clause 10.13 of the LPA. *Id.* ¶ 41.

33.    Following the unsuccessful attempts to broker a conciliation among the Founders, on June 25, 2021, the LPs asked Novalpina GP to convene a meeting of the LPs to examine and vote on the removal of Novalpina GP without cause, in accordance with clause 20.2 of the LPA. *Id.* ¶ 42; Farrell Dec., Exh. B, ¶ 32. Near unanimously, the LPs voted to remove

Novalpina GP as Fund general partner and appoint Petitioner as new general partner of the Fund. Farrell Dec ¶ 53; Molitor Brief, Exh. D, ¶ 107.

**B. Novalpina GP's last-minute abuses: Ernst & Young's inflated valuation report**

34. On the eve of the Removal, it is alleged that Novalpina GP abused its powers as general partner of the Fund by taking several actions favoring its personal interests (and those of the broader Novalpina Entities) to the detriment of the Fund and of its LPs. *See* Molitor Brief, Exh. D, ¶ 47; Farrell Dec., Exh. B, ¶¶ 34-39 (describing the situation in full).

35. First, Novalpina GP deliberately delayed announcing the results of the LPs' near-unanimous vote to remove Novalpina GP. Farrell Dec., Exh. B, ¶ 44.

36. Second, Petitioner believes that Novalpina GP and Zini and Pileri took advantage of that delay by obtaining a valuation report from Ernst & Young Luxembourg (the "EY Report"). Farrell Dec., Exh. B, ¶ 44. Petitioner believes that Kowski, as well as other self-interested Investment Advisor employees, acted for Novalpina GP under the pretext of Zini and Pileri's direction and caused EY Luxembourg to produce a valuation over a period of less than three weeks. Farrell Dec., Exh. B, ¶ 44. The valuation was baseless. Molitor Brief, Exh. D, ¶ 101.

37. Novalpina GP and its affiliates had ample reason to obtain an inflated valuation. The dismissal of Novalpina GP "without cause" meant that:

   a. Kowski and others[4] would receive a payout pegged to the amount it would have received, if any, had the Fund terminated (and its assets sold) at the time of the dismissal (the "Removal Entitlement"). *See* Molitor Brief, Exh. D, ¶ 84(ii); LPA, Farrell Exh. 4, § 20.3.

---

[4] The amount is payable to the "Carried Interest Partner," here Novalpina Capital Partners I FP SCSp ("Novalpina FP"),, which Kowski controls. Molitor Brief, Exh. D, ¶ 8.

b. The new general partner also had to acquire (or have acquired by a third party) the "Sponsor Commitment" of Novalpina FP, Group GP and Clarendon Trust if so requested—an amount also related to the Fund's valuation. *See* Molitor Brief, Exh. D, ¶ 84(iii); LPA, Farrell Exh. 4, § 20.3.5.

38. Therefore, while knowingly in a position of conflict, and after deliberately delaying news of the Removal, Kowski, acting through "independent" directors Zini and Pileri, commissioned an unaudited valuation report that falsely asserted that the Fund owed Novalpina GP almost € 300 million in removal payments pursuant to the LPA (the "Removal Payments"). Molitor Brief, Exh. D, ¶ 448-457. In fact, commissioning the valuation report should have been impossible, since neither Novalpina GP, nor Zini and Pileri, had any knowledge about Fund investments on which a valuation would need to be prepared. Molitor Brief, Exh. D, ¶ 62. But by commissioning a fraudulent, conflicted valuation in their last days of control, Novalpina GP sought to benefit from its own internal strife and ultimate ouster. Farrell Dec., Exh. B, ¶ 45.

39. The EY Report differed drastically from the Fund's recent financials. A few months earlier, the Investment Advisors and Novalpina GP had prepared and approved, respectively, the Fund's audited financial statements for the fiscal year end 2020. *See id.* ¶ 46. These financial statements, audited by Price Waterhouse Coopers, reflected the official position of the Founders and Novalpina GP at the time: there were *de minimis* profits in the Fund's investment portfolio, and Novalpina GP would be theoretically entitled to a carried interest of € 21.5 million. *See id*. This carried interest entitlement modestly increased to € 23.2 million by March 31, 2021. Molitor Brief, Exh. D, ¶ 451. Then, only *three months later*,

and in the absence of any major positive event, the carried interest jumped to € 282,925,248—a twelvefold increase, resulting solely from the EY valuation. *Id.*

### C. The Proceedings

40.    Naturally, Petitioner was reluctant to participate in a valuation process while material information about Fund investments was still concealed or otherwise unavailable. Molitor Brief, Exh. D, ¶¶ 368-91. As a result, Novalpina GP and related entities brought the Proceedings in the district court of Luxembourg against Petitioner, the Fund and certain Fund LPs. *See* Summons 4, Farrell Exh. 6. The operative pleading in the Proceedings, Summons 4, claims that (a) the appointment of the new general partner (Petitioner) was pre-conditioned on payment of the "Sponsor Commitment" to Novalpina FP following an independent valuation of the same, and (b) neither Petitioner nor the Fund have paid the Sponsor Commitment or "Removal Entitlement." *Id.* ¶¶ 10-22.

41.    All told, Kowski-controlled entities initiated no fewer than six sets of Luxembourg proceedings as a result of the Removal. Arvis Dec, Exh. C, ¶ 8.

### III.   The Petitioner Uncovers Questionable Transactions

### A. NSO

42.    The largest investment made by the Fund while under the control of the Founders was a notorious group of companies referred to as the NSO Group, which developed and sold offensive spyware products (in particular a remote surveillance product known as Pegasus). NSO POC, Exh. E, ¶¶ 35, 36. The acquisition was premised on the Founder- and NCL-led due diligence and investment recommendation which documented a "best in class" governance program. NSO POC, Exh. E, ¶ 90. It is now apparent that such processes appear to only have had the purpose of whitewashing the insidious nature of NSO's

business. Farrell Dec., Exh. B, ¶ 78. The Fund's investment in the NSO Group is the subject
of proceedings in England and Wales. *See generally* NSO POC, Exh. E.

43.    In October 2021, several weeks after Petitioner's appointment (and while delaying
Petitioner's onsite visit in Tel Aviv), NSO management reversed course. Suddenly, NSO
acknowledged its precarious financial position and asked Petitioner for an immediate
$ 10 million cash injection to meet its immediate payroll obligations. *See* Farrell Dec., Exh.
B, ¶ 79. A few days after Petitioner provided funding, on November 3, 2021, the NSO
Group was put on the U.S. Entity List due to evidence that NSO was acting "contrary to
the foreign policy and national security interests of the United States."[5] Petitioner then
engaged with NSO's lender group regarding the dire status of the company's finances.
Farrell Dec., Exh. B, ¶ 79.

44.    After the departure of numerous senior management members following NSO's
blacklisting by the U.S. Government, TREO procured information responsive to long
outstanding information requests relating to customer bookings, historic collections and
various risk measures for the NSO Group's customer base. *Id.* ¶¶ 80, 81. The information
enabled Petitioner to confirm (a) that the NSO Group's ability to sell to new customers was
severely impacted by Pegasus Project and resulting reputational crisis; and (b) the company
was heavily dependent on collections from new sales to high-risk customers (such as Saudi
Arabia). *Id.* This information meant that the Fund's investment in NSO Group had no value
well before Petitioner's appointment, and that the actual circumstances of the company

---

[5] *See* U.S. Dep't of Commerce, Press Release, Commerce Adds NSO Group and Other Foreign Companies
to Entity List for Malicious Cyber Activities, *available at* https://www.commerce.gov/news/press-
releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list (last visited Mar. 24, 2025).
The Commerce Department's Entity List is a published list of "red flag" foreign persons or entities that have engaged in
activities that are "contrary to U.S. national security and/or foreign policy interests." Bureau of Industry and Security
FAQs, *available at* https://www.bis.doc.gov/index.php/cbc-faqs/faq/281 (last visited Mar. 24, 2025).

were materially misrepresented by the Founders and NSO management. *See* NSO POC. Mem. Exh. E, ¶ 87.

45.    Notwithstanding that NSO had significantly underperformed its underwriting expectations, potentially on account of issues relating to the alleged misrepresentations, and was subject to imminent payment default (not to mention blacklisting by the US government), Novalpina GP procured a valuation that suggested that NSO had tripled in value since the end of 2020. Molitor Brief, Exh. D, ¶ 386. The Requested Discovery will assist Petitioner in understanding both the value of NSO as of the date of the Fund's investment in it, and then, subsequently, the value of the Fund's investment in NSO as of the Removal.  Molitor Brief, Exh. D, ¶ 386; Farrell Dec., Exh. B, ¶ 81.

**B.  LXO Bribe**

46.    As described more fully in the Declaration of Gavin Farrell, another of the Fund's major acquisitions was that of a group of companies collectively known as Laboratoire X.O. ("LXO"). It was bought by the Fund using a special purpose vehicle ("Hippocrate FI"). Farrell Dec., Exh. B. ¶ 82. At some point prior to June 2020, the previous shareholders of LXO (the "LXO Sellers") decided to sell their interests in LXO. For this purpose, the Sellers appointed Neuflize OBC ("Neuflize"), a Paris-based private banking subsidiary of ABN AMRO Bank N.V.. LXO POC, Exh. F, ¶ 16.

47.    The team handling the sale of LXO was led by Anthony Gribe, Neuflize Head of Corporate Finance. Gribe is also married to the sister of Mickael Betito, who at all relevant times was an employee of one or both of the Novalpina IAs. LXO POC, Exh. F, ¶ 17. Kowski would have been responsible for the decision of NCL to hire Betito and subsequently worked closely with him and supervised him on the LXO transaction. Farrell Dec., Exh. B. ¶ 85.

48.    On July 2, 2020, Juliette Sourisse of NCMI emailed LIS to indicate that the transaction
team would shortly request approval for the transaction budget from the Novalpina
Investment Committee. Farrell Dec., Exh. B. ¶ 87. On July 6, 2020, a budget was sent to
LIS, which included a € 1 million expense described as a "*Finders Fee.*" LXO POC, Exh.
F, ¶ 23.1. The Fund and relevant Novalpina Entities were advised by Respondent, through
Schmidt, in both conducting the legal due diligence and effectuating the transaction. Farrell
Dec., Exh. B. *Id.*

49.    On October 28, 2020, days before the LXO transaction closed, Hippocrate FI and REEH
Ltd concluded a purported engagement letter in relation to "Services" provided by REEH
Ltd, including:

> assistance and advice to us and Novalpina in relation to the assessment,
> evaluation, structuring, and potentially the negotiation and completion of
> the Investment…Such Services in particular include, inter alia, information
> advice [sic] provided on the pharmaceutical markets in France, information
> and advice on the strategic positioning of the Targets in such markets, value-
> add advice in respect of the Investment and advice on potential bolt-on
> opportunities in respect of the Targets.

Farrell Dec., Exh. B. ¶ 89. Per Clause 2.2 of the letter, it was agreed that the fee for the
Services was a single, fixed fee of € 1 million. LXO POC, Exh. F, ¶ 23.3.

50.    On or around November 4, 2020, Weil prepared a "Funds Flow Document" relating to the
LXO Transaction and included the € 1 million payment. Exh. L ¶ 31.

51.    It is alleged that REEH Ltd was owned and controlled by Gribe. LXO POC, Exh F, ¶ 25.
It is further alleged that the payment to REEH Ltd was a bribe or secret commission and/or
otherwise corrupt and improper and/or not made for services properly rendered. *Id.* ¶ 26.

52.    Notwithstanding that LXO was acquired just eight months before the Removal, Novalpina
GP procured a valuation that suggested that LXO had increased in value threefold since its

acquisition. Farrell Dec., Exh. B, ¶ 93. The Requested Discovery will assist Petitioner in fully understanding the value of LXO as at the date of the Fund's investment in it, and then, subsequently, the value of the Fund's investment in LXO as of the Removal.

### C. Maxbet Deceit

53.  This acquisition was of a group of various Romanian and Maltese companies, collectively known as "Maxbet", that together carried on business in the gaming sector in Romania and online, on April 1, 2021. Farrell Dec., Exh. B, ¶ 94.

54.  The Fund, OEGH Holdings S.à r.l., and NOAL Luxco S.à r.l. have filed a lawsuit in the District Court of Luxembourg, against Kowski and the Investment Advisors (the "Maxbet Deceit Claim"). Arvis Dec., Exh. C, ¶ 12. The Maxbet Deceit Claim relates to due diligence purportedly conducted by the Investment Advisors (as advised by Weil) for the purposes of the Fund's proposed acquisition of Maxbet. *Id.* The nature of the business meant that it was of great importance to ascertain the identity of the ultimate beneficial owner ("UBO") of Maxbet. *Id.*

55.  The crux of the Maxbet Deceit Claim is that Kowski and the Investment Advisors were in possession of information, including due diligence reports prepared by third parties, which evidenced a real and serious possibility that the claimed owner (Vladimir Sadovskii) was not the UBO, and focused on another individual (Mikhael Mirilashvili (an Israeli-Georgian businessman)) (the "Information"). Maxbet Deceit Summons, Exh. G, ¶ 39. The Maxbet Deceit Claim alleges that the Information was deliberately concealed by Kowski and the Investment Advisors, and that the Maxbet acquisition would not have proceeded had the Information been disclosed (irrespective of the truth of the underlying facts). *Id.* ¶¶ 21-24, 40, 58.

56.   As set out more fully in the Declaration of Gavin Farrell, Kowski shifts blame by alleging that it was Weil that was responsible for editing the third-party due diligence reports and that Weil's knowledge of the Information should be attributed to the Fund entities that entered into the transactions (even though it is not alleged that the Information was ever provided to the AIFM or the independent directors of the relevant Fund entities). Farrell Dec., Exh. B, ¶ 97.

57.   The Maxbet investment has proven to be disastrous for the Fund, with losses arising out of the acquisition anticipated to run into the tens of millions of Euros. Farrell Dec., Exh. B, ¶ 101.

58.   Notwithstanding that Maxbet was acquired just three months earlier on April 1, 2021, Novalpina GP procured a valuation indicating the value of the Fund's investment in Maxbet had tripled in just 3 months. Molitor Brief, Exh. D, ¶ 386. The Requested Discovery will assist Petitioner in fully understanding the value of Maxbet as at the date of the Fund's investment in it, and then, subsequently, the value of the Fund's investment in Maxbet as of the Removal.

**D. Legal Proceedings for Which Evidence is Sought**

59.   Petitioner seeks evidence to assist in its defense of the Proceedings. *See* Summons 4, Farrell Exh. 6. Novalpina GP and the other plaintiffs filed suit in the District Court of Luxembourg on February 25, 2022, initiating the Proceedings and alleging that they are owed sums derived from the valuation of the Fund. *See id.*; Arvis Dec., Exh. C, ¶¶ 13-14. In response, Petitioner has so far filed one brief in its defense, in which it vigorously disputes the Summons 4 plaintiffs' asserted Fund valuations. *See id.*; Molitor Brief, Exh. D, ¶¶ 101, 386.

60.    Petitioner's Requested Discovery consists of documents held by Weil relating to the Fund's investments described herein. These investments are relevant to the valuation dispute in Summons 4, and the Requested Discovery will support the Fund's case that: (1) Novalpina GP's valuation of the Fund is wrong; and (2) Novalpina GP is not entitled to any Removal Payments.

**LEGAL ARGUMENT**

### I.    The Petition Meets All Three Statutory Requirements of 28 U.S.C. § 1782

61.    Section 1782 permits federal district courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). Courts "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995); *see also In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and the Second Circuit have acknowledged that the statute seeks to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn v. IKB Deutsche Industriebank AG,* 673 F.3d 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly").

62.    A Section 1782 application must satisfy three statutory requirements: (1) the person from whom discovery is sought "resides or is found" in the district of the district court to which

the application is made; (2) the discovery is "for use in a proceeding in a foreign or international tribunal"; and (3) the application is made by "a foreign or international tribunal or upon the application of any interested person." 28 U.S.C. § 1782(a); *see Brandi-Dohrn*, 673 F.3d at 80. Each of these prerequisites are satisfied here.

### A. Weil is Found in the Southern District of New York

63.     "[Section] 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019). "The constitutional limits of personal jurisdiction allow for a showing of either general or specific jurisdiction over each respondent." *In re Steinmetz*, No. 20-mc-212, 2022 WL 170851, at *3 (S.D.N.Y. Jan. 19, 2022).

64.     The exercise of general jurisdiction over Weil is proper here. The "place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation omitted); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 81, 92-93 (2010) (a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters"). Weil is incorporated in New York,[6] and its New York City office, located at 767 Fifth Avenue, New York, is its "global headquarters" and "the Firm's largest" branch.[7] Thus, because Weil is both incorporated and has its principal place of business in New York, it "resides or is found" here for purposes of Section 1782.

---

[6] *See* Weil Gotshal & Manges LLP, Regulatory Information, *available at* https://www.weil.com/about-weil/regulatory-information (last visited Feb. 28, 2025).

[7] *See* Weil Gotshal & Manges, LLP, New York, *available at* https://www.weil.com/locations/new-york (last visited Feb. 28, 2025).

**B. The Discovery Sought is "For Use" in a Foreign Proceeding**

65.    Petitioner seeks the Requested Discovery "for use" in a foreign proceeding. The "for use" requirement under Section 1782 requires the applicant to show that the requested discovery has some relevance to a pending or anticipated foreign proceeding. Relevance is "broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L&M Galleries*, 249 F.R.D. 96, 106-07 (S.D.N.Y. 2008); *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (discovery need not be "necessary for the party to prevail in the foreign proceeding"). To meet the "for use" requirement, a Section 1782 applicant need establish only that "he or she has the practical ability to inject the requested information into a foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017).

66.    The Requested Discovery more than meets these standards. A key aspect of the Proceedings is the proper valuation of the Fund. Molitor Brief, Exh. D, ¶ 84. The discovery sought from Weil is relevant to the value of the Fund's assets (and thus of the Fund itself), potentially aiding Petitioner's defense against plaintiffs' claims for a large payout under the LPA. *Id.* ¶ 84. Petitioner's entitlement to these documents is doubly certain where, as here, the documents are the Petitioner's own case files held by its attorneys. Because the Requested Discovery will be used in ongoing litigation before a foreign court, Petitioner has satisfied its burden to that the discovery be "for use in a proceeding in a foreign or international tribunal."

### C. Petitioner is an "Interested Person" Under Section 1782

67. Finally, Petitioner is an "interested person" for purposes of Section 1782 because it is a litigant in a foreign proceeding. *See Intel*, 542 U.S. at 256 (observing that litigants are interested persons); *In re Valla PTC Ltd.*, No. 20-mc-223 (PGG), 2023 WL 3160117, at *2 (S.D.N.Y. 2023) ("Petitioner—as a party in ongoing litigation—is an interested party in those proceedings."). Section 1782's "interested person" requirement is plainly satisfied.

### II. The Court Should Exercise Its Discretion to Grant this Petition

68. Assuming that the statutory factors are met, "a district court is free to grant discovery in its discretion." *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 78 (2d Cir. 1997). The Supreme Court has articulated four factors that "bear consideration" on the exercise of that discretion: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65. These discretionary factors support granting this Application.

### A. Weil is Not a Participant in the Foreign Proceedings

69. The first *Intel* factor weighs in favor of granting the Application because the discovery is sought from a non-party to the foreign proceedings and for collecting evidence, the Luxembourg court is limited by its territorial jurisdiction and by the sovereignty of the

foreign state concerned. *See* Arvis Dec., Exh, C, ¶ 18. Weil is not a party to the Proceedings. *See id.* ¶ 13.

70.    Finally, the Requested Discovery is not readily obtainable from a party to the Proceedings. Although it is possible that parties to the Proceedings may possess some of evidence requested here—which cannot be compelled in Luxembourg, *see id.* ¶ 19—much of that evidence is unlikely to have ever been in those parties' custody or control. The evidence sought largely consists of correspondence Weil had with third parties, or documents provided to Weil by third parties, which may not have been disseminated to the plaintiffs in the Proceedings.

71.    Accordingly, the first *Intel* factor thus weighs in favor of granting the Petition.

**B.  The Foreign Tribunal Would Be Receptive to the Requested Discovery.**

72.    The second discretionary *Intel* also favors Petitioner. Under *Intel*, courts may "take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." 542 U.S. at 264. "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa S.A.*, 51 F.3d at 1102.  Courts should deny a Section 1782 application on the basis of lack of receptiveness only where it is provided with "authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id*. at 1100. Courts thus place the burden of proof on the party opposing discovery to deny receptivity and show that "a foreign court would *not* be receptive to this assistance." *In re Application of Auto-Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782,*

No. 12-mc-221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012) (emphasis in original); *In re Bayer AG*, 146 F.3d 188, 196 (3rd Cir. 1998) ("the burden of demonstrating offense to the foreign jurisdiction . . . should rest with the party opposing the application").

73.    Here, there is no indication that the Luxembourgish courts would reject the evidence sought by this Petition. Indeed, Petitioner is entitled to possess the Requested Discovery, as a manager of Fund entities that retained Weil as legal counsel. It is hard to imagine any circumstance under which a party to Luxembourg litigation is not able to produce its own documents in support of its defense.

74.    Moreover, as a member of the Hague Evidence Convention, Luxembourg has historically been receptive to evidence gathered with foreign judicial assistance.[8] *In re Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203-MEJ, 2016 WL 6474224, at *5 (N.D. Cal. Nov. 2, 2016) ("[R]eceptivity of a foreign court to U.S. federal judicial assistance may be inferred from the existence of treaties facilitating such cooperation.").

75.    As such, the second *Intel* factor weighs in favor of granting the Petition.

**C. The Application Is Made in Good Faith and Does Not Circumvent Any Proof-Gathering Restrictions**

76.    The third *Intel* factor directs courts to consider whether a Section 1782 application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 264-65. Notably, this factor does not require the petitioner to first exhaust all other routes of obtaining discovery abroad before utilizing the mechanism provided by Section 1782. *Mees*, 793 F.3d at 303 ("We have rejected such a 'quasi-exhaustion' requirement, reasoning that it finds no support in

---

[8]    *See* Hague Conference on Private International Law, Luxembourg Member Page, *available at* https://www.hcch.net/en/states/hcch-members/details1/?sid=51 (last visited Feb. 28, 2025).

the plain language of the statute and runs counter to its express purposes."); *In re Metallgesellschaft*, 121 F.3d at 79 (same). Nor does the third factor turn on whether the discovery sought exceeds the discovery available in the foreign proceeding as there is no requirement that the discovery sought be proven to be admissible or usable at the present stage of the proceeding. *See Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions— reasons that do not necessarily signal objection to aid from United States federal courts."); *Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the *discoverability* of evidence in the foreign proceeding, we see no reason why it should not extend to the *admissibility* of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement.") (emphasis in original).

77.    Here, there is no reason to believe the discovery sought violates any laws or public policy of Luxembourg in this specific case. Indeed, Petitioner, as the Fund's general partner, merely seeks documents from the Fund's former attorneys. Luxembourg has no public policy of preventing a former legal client from obtain client files from its attorneys; in fact, Luxembourg supports such client access to legal files. Arvis Dec., Exh. C, ¶ 17.

78.    Accordingly, the third *Intel* factor weighs in favor of granting the Petition.

### D.  The Requests Relate to Discrete, Recent Actions over a Short Time Period

79.    Finally, courts assess whether the requested discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65. This inquiry is typically evaluated under the same framework as the one set out in the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1782(a) (referencing the Federal Rules); *In re Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *6; *Mees*, 793 F.3d at 302 ("[A] district court evaluating a § 1782 discovery

request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure.").

80.     Here, the Requested Discovery is not burdensome to produce. To the contrary: Petitioner is only seeking documents that Weil kept for its former clients as part of the matter files. The requests are narrowly tailored and temporally limited, requesting only documents that are maintained in Weil's regular course of business and relevant to the valuation of various fund investments. The Requested Discovery covers specific issues from a period of only three years, with most of the evidence generated over a period of just a few months in the relevant years, all in the files and/or inbox of only certain individuals. Any relevant documents should thus be easily identifiable, readily accessible, and not burdensome for Weil to produce, and whatever burden Weil may incur by producing them is both modest  and  proportional to the needs of Petitioner who cannot otherwise obtain such discovery to further its claims and defenses.

81.     Accordingly, each of the *Intel* factors weighs in favor of granting the Petition.

## CONCLUSION

82.     Because the Petition complies with the requirements of 28 U.S.C. § 1782, and the discretionary factors weigh in favor of it being granted, Petitioner respectfully moves the Court to issue the attached order granting the Petition authorizing the issuance of the subpoena in the form attached hereto as Exhibit 2 to the Declaration of Christopher Hilton.

Dated: March 26, 2025.              Respectfully submitted,

                                    */s/ Christopher D. Hilton*
                                    Christopher D. Hilton (*pro hac vice* application forthcoming)
                                    Michael R. Abrams (*pro hac vice* application forthcoming)
                                    Alithea Z. Sullivan (*pro hac vice* application forthcoming)
                                    **STONE HILTON PLLC**
                                    600 Congress Ave.
                                    Suite 2350
                                    Austin, TX 78701
                                    Telephone: (737) 465-7248
                                    chris@stonehilton.com
                                    michael@stonehilton.com
                                    alithea@stonehilton.com