# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF TREO NOAL GP S.À R.L. FOR AN ORDER TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS FROM WEIL, GOTSHAL & MANGES LLP PURSUANT TO 28 U.S.C. §1782 | Case No. _____ |

## DECLARATION OF GAVIN FARRELL IN SUPPORT OF EX PARTE PETITION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Gavin Farrell, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1. I am a manager of Petitioner TREO NOAL GP S.à r.l. ("NOAL GP" or "Petitioner") and submit this declaration in support of NOAL GP's *Ex Parte* Application and Petition for an Order to Conduct Discovery from Weil, Gotshal & Manges LLP ("Weil") for Use in Foreign Proceedings Pursuant To 28 U.S.C. § 1782 (the "Application"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application and accompanying Memorandum of Law.

2. Unless otherwise indicated, all facts set forth in this declaration are based upon (a) my personal knowledge; and (b) my review of relevant documents, including the proposed subpoenas.

3. All exhibits referenced herein are true and accurate copies, or true and accurate excerpts of those copies provided.

1

EXHIBIT B

**A. The Fund and Related Persons and Entities**

**Overview**

4.  Novalpina Capital Partners I SCSp, now named NOAL SCSp, is a private equity fund (the "Fund"). The Fund was managed by Novalpina Capital Partners I GP S.à r.l. ("Novalpina GP") until August 27, 2021, when it was replaced by Petitioner. The Fund was founded, and the shares of Novalpina GP were indirectly owned by, Stefan Kowski, Stephen Peel, and Bastian Lueken (the "Founders"). I understand that the Founders all worked together at TPG Capital before founding Novalpina GP. See Novalpina Capital Partners I Private Placement Memorandum (Nov. 15, 2017) at 9 ("PPM") (attached as Exh. 1).

5.  The Fund was set up on the basis that the Founders would play a key role in its management. Thus, the Fund's PPM stated that it was the Founders' "48 years in private equity investing" which they were bringing to the Fund. *Id.* at 9. The Founders are investment professionals who each established (or caused to be established) the Fund and the portfolio companies created to hold the Fund's investments (NorthPole Bidco S.à r.l. and Hippocrate FI S.à r.l.). *See* NOAL GP SARL et al. Submission, No. TAL-2022-03617, ¶¶ 5, 16-17 (Mar. 17, 2023) ("Molitor Brief") (attached as Mem. Exh. D). It is fair to say that an investment in the Fund was in effect being sold as an investment in the Founders' experience and an interest in the Founders' future investment returns. *See* PPM, Exh. 1, at 9-11.

6.  Furthermore, once the Fund was set up, the Founders sat on the boards of many of the underlying investments of the Fund, were identified as the "Key Persons" in the limited partnership agreements that were in place until Novalpina GP's removal, and were also members of the UK-based investment advisors appointed by the Fund, namely Novalpina Capital LLP ("NCL") and Novalpina Capital Management LLP ("NCMI") (NCL and NCMI

are, together, the "Investment Advisors"). The PPM stated that "the success of the Fund will be highly dependent on the expertise and performance of the Investment Advisors and their teams and investment professionals." *Id.* at 88. In a letter from his English solicitors dated February 24, 2025, Peel described himself as "a seasoned investment professional, with a career marked by a blend of financial acumen and a commitment to social and policy issues… The investment credentials of Novalpina's co-founders, Mr Kowski and Mr Lueken, are also impressive." *See* letter from White & Case LLP to McDermott Will & Emery LLP and RWK Goodman LLP (Feb. 24, 2025) (attached as Exh. 5).

7.  The Founders raised approximately €1 billion of commitments for the Fund based on their investment experience and their prospective stewardship of the Fund. Their authority was effected through the Founders' ownership and control of the Investment Advisors, Novalpina GP, and its parents and affiliates. The Investment Advisors, Novalpina GP, and its parents and affiliates are referred to herein as the "Novalpina Entities." Notwithstanding the complex structure of the Fund and its governance, the investment strategy of the Fund was under the control of the Investment Advisors.

8.  Court pleadings state that the Founders held and continued to hold economic interests in the Fund through a series of entities organized under Luxembourgish law. *See TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2023-000851, ¶ 10 (England and Wales Commercial Court Nov. 25, 2024) ("NSO POC") (attached as Mem. Exh. E); LXO Particulars of Claim ("LXO POC") ¶ 5 (attached as Mem. Exh. F). Luxembourg private limited companies are administered by their managers (*gérants*), whose position is analogous to that of a director of an American-incorporated limited company. NSO POC, Mem. Exh. E, ¶ 18.7. Novalpina GP was owned by Novalpina Capital Partners I Group GP S.à r.l. ("Group GP"). *Id.* ¶ 18.1. Group

3

GP was owned by Novalpina Capital Group S.à r.l. ("Topco"). *Id.* At all material times, the Founders controlled the Fund through their equal one-third ownership of Topco and by acting as managers of Topco and Group GP. *Id.* ¶ 18.2. Novalpina GP had "independent" managers, but they were accustomed (whether obliged or otherwise) to seek approval or input for Novalpina GP's action from the Founders. *Id.* ¶ 18. Therefore, the Founders were the ultimate controllers of Novalpina GP.

9. The Fund was established by the Founders as a way for institutional and high net-worth investors to participate in the Founders' private-equity investment strategy, focusing on mid-market European investments, as described in the PPM. *See* PPM, Exh. 1, at 12-13 (describing investment strategy). It was the responsibility of Novalpina GP (or, in the European Economic Area, of the AIFM using information supplied by Novalpina GP) to market and encourage investment into the Fund. NSO POC, Mem. Exh. E, ¶ 23. With the PPM, the Founders (through Novalpina GP) marketed the Fund to prospective investors, including the Limited Partners (the "LPs"), as a vehicle for investing in mid-market European investments. *Id.* ¶ 24.

10. Since August 27, 2021, Petitioner NOAL GP has served as manager (*gérant*) and general partner (*associé commandité*) of the Fund, replacing Novalpina GP. *Id.* ¶ 4. The Fund is a Luxembourg special limited partnership (*société en commandite spéciale*) established pursuant to a limited partnership agreement dated August 23, 2017 (the "LPA"), and was originally named "Novalpina Capital Partners I SCSp." *Id.* ¶ 5. The LPs subscribed to the Fund during late 2017 and early 2018, providing a total of approximately €1.03 billion in investment commitments. *Id.* ¶ 27. The majority of the LPs (by asset volume) were pension funds, other large institutional investors, and family offices. *Id.* ¶ 28. After its establishment, investors in the Fund participated by becoming LPs of the Fund.

11. The LPA has been amended and restated on six occasions, most recently on October 17, 2023, and references to the LPA are to the version in force from time to time. *Id*. ¶ 6. Since November 15, 2017 (when the First Amended and Restated LPA was executed), the parties to the LPA have also included the Fund and its LPs. *Id*.

12. From its inception in 2017 until they were removed by the LPs in 2021, the Fund was managed by Novalpina GP, with assistance from the Fund's alternative investment fund manager ("AIFM"), Luxembourg Investment Solutions ("LIS," now called FundRock LIS S.A.), as required by the relevant Luxembourg regulations. *Id*. ¶ 14.

**The Fund's "Alternative Investment Fund Manager"**

13. On November 15, 2017, Novalpina GP and the Fund's AIFM, LIS, entered into an investment advisory agreement with NCL and NCMI (the "IAA," the latest version being dated November 14, 2018). *Id*. ¶ 15; Second Amended and Restated Investment Advisory Agreement of Novalpina Capital Partners I SCSP (Nov. 14, 2018) (attached as Exh. 9). Under the IAA, NCMI and NCL both have extensive duties and responsibilities. NSO POC, Mem. Exh. E, ¶ 16.

14. As explained in the Declaration of Helene Arvis ("Arvis Dec."), the typical model for a Luxembourg domiciled fund structured as a special limited partnership that qualifies as an "alternative investment fund" or "AIF," but that lacks the necessary infrastructure and regulatory licence to appoint an "in-house" AIFM under the Alternative Investment Fund Managers Directive 2011/61/EU, is to appoint a third-party company that provides AIFM services to the AIF (i.e. to effectively outsource the role of AIFM). Arvis Dec. ¶ 5-7 (attached as Mem. Exh. C). This will be a third-party service provider which has the necessary regulatory licence to act as an AIFM for the strategy of the fund, and which (where the AIFM

is located in Luxembourg) is authorized to do so by the Luxembourg regulator (the CSSF). *Id.* ¶ 5. In that model, the AIFM is the body that takes technical responsibility for investment management functions (at a minimum, it must perform portfolio management and risk management) and, *inter alia*, is also responsible for approving the valuations presented to it. *Id*.

15. Under the advisory model, in order to take those investment decisions, the AIFM receives "advice" on what investments to direct the Fund to effectuate because it does not source, investigate or negotiate investment opportunities. *Id*. ¶ 6. Instead, that investment advice comes from the fund sponsor acting in the role as the "investment advisor" (here, the Investment Advisors, NCL, and NCMI). *Id*. In that role, the Investment Advisors (whose extensive role is described in the IAA) sourced or originated the relevant investments, conducted due diligence on them, negotiated the deal and transaction documentation, and then, when the Founders wanted the Fund to effectuate the investments, presented the deal to the AIFM with a recommendation to invest. *Id*. The AIFM would then consider that advice and, if it agreed with it, based on the information it was provided, direct the Fund to effectuate the investments. *Id*. The AIFM could not direct the Fund to effectuate investments other than those recommended to it by the Investment Advisors since the AIFM had no independent authority or capability to identify or negotiate potential investments for the Fund (which was controlled completely by the Founders acting through the Novalpina Entities, *i.e*., the private equity "sponsor"). *Id*. This is illustrated by the Fund documentation; in particular, Section 7.3 of the PPM provides:

> Though there are three formal phases to Novalpina's investment recommendation-making process, discussions regarding this potential opportunity are continuous, iterative and inclusive. It is not normally anticipated that the Investment Committee or the AIFM would reject an

6

opportunity that reaches the Final Review. Rather Novalpina will aim to address any major issues or concerns on an ongoing basis with the relevant Deal Team and the AIFM.

PPM, Exh. 1, § 7.3; Arvis Dec., Mem. Exh. C, ¶ 6.

16. The general partner is the entity that appoints the AIFM by entering into the IAA on behalf of the Fund. Arvis Dec., Mem. Exh. C, ¶ 7. In practice, if the investment advisor and the general partner are under the same common control, the sponsor will ultimately be able to "hire and fire" the AIFM at its discretion, through its (indirect) control of the general partner. *Id*. The entity that will have sight of the implementation of investment/divestment decisions and all the relevant transaction documents and control these, will be the investment advisor. *Id*.

17. Under the IAA, the function of the Investment Advisors was, broadly, to advise on and to investigate investment opportunities, taking them forward as appropriate, and to monitor those investments. Accordingly, a primary task of the Investment Advisors is undertaking due diligence. *See* IAA, Exh. 9, at 17-19 (outlining investment advisory services). If the investment committee of the relevant Investment Advisor, as controlled by the Founders, decided that the Fund should invest in an investment, the Investment Advisor would then make a recommendation to LIS who would consider it in accordance with their independent duties and, relying on the contents of the recommendation being full, fair and truthful, would usually approve it. NSO POC, Mem Exh. E, ¶ 20.

**The role of the Founders**

18. The Fund was set up on the basis that the Founders would play a key role in its management, exercising day-to-day effective practical control and influence over Novalpina GP and over the Fund's Investment Advisors. *Id*. ¶ 17. The Founders were thus in ultimate control of the advice and information to be provided to the Fund and those advising it, including Respondent. *Id*. The Founders are the only "active persons with significant control" identified

at the British Companies House. *See id.* ¶ 19. And the PPM specifically stated that "the success of the Fund will be highly dependent on the expertise and performance of the Investment Advisors and their teams and investment professionals." PPM, Exh. 1, at 88.

19. The Investment Advisors each had a management committee which consisted of the three Founders. NSO POC, Mem. Exh. E, ¶ 19.2. It was the Investment Advisors that issued recommendations to LIS, following a decision of its management committee to do so. *Id*. ¶ 19.3. Any such decision of the management committee required unanimity among the Founders. *Id*. ¶ 19.4. Otherwise, control by the Founders was primarily exercised through their indirect ownership of Novalpina GP, effectively giving them power to appoint and remove the managers of Novalpina GP at will. *Id*. ¶ 18.5. The dispute between the Founders is addressed further below, but I note that the dispute led to a practical deadlock of the Fund's governance while under control of the Novalpina Entities, and this resulted in Kowski and Lueken causing the suspension of Peel's voting rights in Topco. *See* Molitor Brief, Mem. Exh. D, ¶¶ 33-34. Once in control of Topco, Kowski and Lueken caused the removal, in July 2021, of Gaëtan Dumont and Allen Foley as directors of Novalpina GP, and the appointment of Michael Zini and Stefano Pileri. *Id.* ¶ 51.

20. At all material times, the Founders exercised day-to-day effective practical control and influence over Novalpina GP, and exercised control of the Investment Advisors. NSO POC, Mem. Exh. E, ¶ 17. In a letter to Proskauer Rose LLP ("Proskauer"), attorneys for the advisory committee of the Fund's LPs ("LPAC") dated April 16, 2021, Kowski and Lueken stated:

> We together with the investment and operating teams have done and are continuing to do everything we can do [sic] further the interests of the Novalpina Group's funds, companies and partnerships. We dedicated ourselves to build the firm, source and execute accretive investments, create value in the portfolio, which we consider remains in good shape, and protect it from the

impact of the COVID-19 pandemic…The two of us [Kowski and Lueken] have sourced, led the execution of and oversee 98% of the Fund's investments.

Letter from Bastian Lueken and Stefan Kowski to Dorothy Murray and Nigel van Zyl of Proskauer at 1, 2 (Apr. 16, 2021) (attached as Exh. 2).

21. In these circumstances, the Founders were in ultimate control of the sources of advice and the information to be provided to the Fund and those advising it. *See* NSO POC, Mem. Exh. E, ¶ 17. Once an investment recommendation was received by LIS and Novalpina GP from one or both of the Investment Advisors, they would consider that recommendation and then determine whether or not to follow it, relying on the contents of the recommendation being full, fair and truthful. *Id.* ¶ 20.2. If LIS decided to follow the recommendation and/or otherwise approve an investment, that decision would be conveyed to the Fund, acting via its General Partner, and in turn to the relevant underlying companies intended to participate in the investment. *Id*. ¶ 20.3. New investments and acquisitions would usually involve the creation of new subsidiary companies as vehicles for those investments. *Id*. ¶ 21.

22. Only now that the Founders have been accused of being personally involved in the alleged misconduct described below, do they claim that the Fund was actually being controlled by the AIFM. *See generally* Mem. Exhs. I-K. This explanation belies the reality. I understand that the AIFM had no substantive contact with the Investment Advisors' service providers (including Weil), nor the counterparties to the various transactions, and thus the AIFM was fully reliant on the representations incorporated into the Investment Advisors' recommendation being full, fair and truthful. In my view, to suggest that the AIFM was the party ultimately responsible for the various deceit and concealment is especially fanciful considering that the AIFM had no direct economic interest in the success of the investments

9

and relied upon the investment expertise, and interestedness, of the Investment Advisors and the Founders in directing the investment strategy of the Fund.

23. Notwithstanding the foregoing, the Founders seek to distance themselves from any involvement in the wrongdoing alleged in the lawsuits described below, and instead seek to rely on the fact that third party advisors (including the Respondent, Weil) were involved in the relevant acquisitions, or seek to deflect responsibility on to the Fund holding companies themselves. *See* Mem. Exh. I, ¶¶ 66-72, 124; Mem. Exh. J, ¶¶ 37, 127, 128, 221; Mem. Exh. K ¶83.2; Mem. Exh. L ¶¶ 28, 31; Mem Exh. M ¶ 46; Mem. Exh. H; Mem. Exh. N.

24. Kowski, presented with evidence of his personal direction of the Maxbet acquisition, now claims that the Investment Advisors delegated broad discretion to service providers, like Weil, to conduct the investment due diligence. *See* Mem Exh. I. This stands in stark contrast to (i) the obligations of the Investment Advisors under the IAA (*see* Exh. 9, Schedule 1); (ii) evidence that the Fund's service providers (including Weil) acted at the direction of the Investment Advisors (*see, e.g.*, Invoices from Weil to Maximus Bidco I S.à r.l. at 996, 1032 (Oct. 18, 2020) (attached as Exh. 18) (evidencing Weil interacting with Marvin Jung, who was a member of the Investment Advisors); (iii) the Founders' absolute control of the Fund's investment strategy through the Investment Advisors (as described above); and (iv) the Founders' direct personal financial interests in the outcome of the Fund's investments, as compared to the service providers that had none (*see* Mem. Exh. I ¶ 34 (noting Founders invested millions into Fund); Mem. Exh. J ¶ 64.1 (same); Mem. Exh. K ¶ 46.7 (same)).

**Weil's Relationship with the Founders**

25. Weil had a preexisting relationship with the Founders, including specifically Kowski. I understand that Schmidt appointed Kowski as a director in TLG Immobilien AG and that

10

Schmidt is reported to be the godfather of Kowski's child. *See TLG Immobilien AG Announces Resignation of Stefan E. Kowski as Member of the Supervisory Board, Effective 15 May 2019* (May 8, 2019), https://www.marketscreener.com/quote/stock/TLG-IMMOBILIEN-AG-18426379/news/ TLG-Immobilien-AG-Announces-Resignation-of-Stefan-E-Kowski-as-Member-of-the-Supervisory-Board-Effe-34310045/ (last visited March 18, 2025) (reflecting Kowski's Board membership). The relationship is further evidenced by Schmidt's €5 million personal investment in the Fund (through his company, GCS Verwaltungs GmbH) as an "exempt" and "affiliates" investor (*i.e.*, one that was recognized as having an existing relationship with the Founders, such that he was allowed to invest in the Fund without being obligated to pay management fees). *See* Novalpina GP letter to Schmidt of GCS Verwaltungs GmbH (Dec. 20, 2017) (attached as Exh. 8) (designating GCS Verwaltungs GmbH as an "exempt investor" and an "affiliates investor" under the LPA). Schmidt was not only an investor in the Fund, he was also the trusted legal advisor to the Investment Advisors acting through its Founders. *See* PPM, Exh. 1, at 17, 21. His relationship to the Novalpina Entities was so close that Schmidt was appointed by the Founders to be the Chairman of the board of managers of Topco. *See* Novalpina Biography of Gerhard Schmidt (archived website version as of September 30, 2020), https://web.archive.org/web/20200930045326/https:/www.novalpina.pe/team/ gerhard-schmidt/ (describing Schmidt as "Non-Executive Chairman" of Topco). Schmidt was thus intimately involved in the management of the Novalpina Entities (and a central figure in the internal dispute that arose at Novalpina). Following the US Government's Entity listing, effectuating a ban on the Israeli based spyware developer, the NSO Group, I understand that NOAL GP principals were informed by an individual with well-placed connections within the

Israeli government that Schmidt continued to be involved in assisting Kowski in his litigation against the Fund.

26. Given the extent of Schmidt's relationship with the Founders, it is then not surprising that Weil would end up advising the Fund on every major portfolio company acquisition that occurred prior to the removal of Novalpina GP. Those acquisitions include the notorious Israeli spyware developer, the NSO Group, the management of which Schmidt became directly involved through his appointment as a manager (i.e., director). *See* Exh. 22 (listing Schmidt as *gérant* (director) of Square 2); Exh. 20 (listing Schmidt as *gérant* of Triangle Holdings); NSO POC, Mem. Exh. E, ¶¶ 35-37 (explaining Square 2 and Triangle Holdings indirectly owned NSO).

### Background to the Founders' Dispute

27. As set out above, the Founders together controlled Novalpina GP. They appear to have fallen out late in 2020 (or, more accurately, Kowski and Lueken fell out with Peel). *See* Novalpina Capital Partners I SCSp Minutes of the Extraordinary General Meeting at 7 (July 9, 2021) (attached as Mem. Exh. O) (stating that "the Founding Partners have been in dispute for six months"). Although Petitioner does not know the exact genesis of the Founders' dispute, it was suggested in the media that it was linked to the Fund's investment in the NSO Group. *See* Exh. 10 (collecting press reports).

28. The Founders' dispute appears to have become irreconcilable when Kowski, Lueken, and Schmidt summoned Allen Foley and Gaëtan Dumont, two of the independent directors of Topco, to a purported Topco board meeting on January 10, 2021 to remove Peel's voting rights. Molitor Brief, Mem. Exh. D, ¶¶ 33-34. My understanding (from conversations with Foley and Dumont) is that, at this meeting, Schmidt, without advance notice to the other

independent directors, presented a series of resolutions to suspend Peel's voting rights in Novalpina Topco, effectively proposing resolutions that would transition full control over Novalpina GP, via the governance control of Topco, to Kowski and Lueken. Refusing to end the meeting without signed resolutions, I understand that the resolutions were signed by Foley and Dumont subject to the explicit agreement that they would be held in escrow pending the independent directors having the opportunity to hear from Peel about the allegations that purportedly formed the basis for the removal of his voting rights. Subsequent to hearing Peel's defense to the allegations of misconduct, the independent directors made it clear they did not believe that Peel's voting rights should be suspended and thus did not agree to the release of the signed resolutions from escrow. Despite this repeated explicit opposition from the independent directors, I understand that Kowski, Lueken, and Schmidt lifted the escrow and published the resolutions—thereby completing the "coup d'état" over Novalpina GP. These events are alleged to be an abuse of rights of the other independent directors, and Kowski, Lueken, and Schmidt are now subject to a criminal investigation in Luxembourg based on these allegations. Molitor Brief, Mem. Exh. D, ¶ 34.

29. The Founders' dispute led to the paralysis of the Fund's decision-making processes, since unanimous consent of the Founders was required for the Investment Advisors to meet their obligations under the Investment Advisory Agreement. *See id.* ¶ 31; NSO POC ¶¶ 18.6, 19.4. The dispute between the Founders was brought several times before the Luxembourg courts from the beginning of 2021, including over the purported suspension of Peel's voting rights on January 10, 2021. Molitor Brief, Mem. Exh. D, ¶¶ 32-36.

30. The attempt to remove Peel resulted in a bitter struggle between the Founders for control of the Novalpina group, with the dispute unfolding before the investors, who gradually realised

that the personal dispute between the Founders was leading to highly detrimental consequences on the Fund and its assets. *Id.* ¶ 36.

31. It was in this context, and in response to this situation, that eight of the ten members of the Fund's Limited Partner Advisory Committee ("LPAC") instructed Proskauer in early 2021 to advise on the options for the investors/LPs given the deadlock within Novalpina GP, which in their view risked causing serious damage to investors and the Fund as a whole. *Id.* ¶ 37. With this in mind, Proskauer attempted to conduct a conciliation between the Founders by asking them to submit solutions to it in order to try to find a way out of the deadlock. *Id.* ¶ 38. The proposals made by Kowski and Lueken in one camp, and Peel in the other, were based on the withdrawal of the other camp from the management of the Fund. *Id.* ¶ 38. With neither of these proposals being acceptable to the opposite camp, the Founders failed to settle their dispute amicably. *Id.* ¶¶ 37-38.

32. As no solution to the dispute between the Founders emerged, it appeared to the LPs that the only solution to save the Fund from irreparable harm arising out of the Founders' dispute was by the replacement of Novalpina GP as general partner. *Id.* ¶ 39. Pursuant to clause 20.2 of the LPA, the general partner could be dismissed "without cause" after the second anniversary of the "First Closing Date" pursuant to a "Special Consent" taken by the LPs convened to a general meeting in accordance with clause 10.13 of the LPA. *See* Second Amended and Restated Limited Partnership Agreement for Novalpina Capital Partners I SCSP §§ 20.2, 10.13 (attached as Exh. 4); Molitor Brief, Mem. Exh. D, ¶ 41.

33. The LPs representing more than 25% of the "Total Fund Commitments" (as defined in the LPA) asked Novalpina GP on June 25, 2021 to convene a meeting of the LPs of the Fund to

examine and vote on the removal of Novalpina GP without cause, in accordance with clause 20.2 of the LPA. *See* Exh. 4 § 20.2; Molitor Brief, Mem. Exh. D, ¶ 42.

34. I understand that the LPs dismissed Novalpina GP "without cause" because the definition of "cause" under the LPA is defined restrictively, capturing only the most serious allegations, such as fraud, which must be confirmed by a court or by a competent regulatory authority. *See* Molitor Brief, Mem. Exh. D, ¶ 44. At that point, the LPs' priority was to obtain the rapid replacement of Novalpina GP, to safeguard the interests of the Fund. *Id.* ¶ 45.

**Actions taken by Novalpina GP on the eve of its dismissal**

35. On the eve of its removal, however, it is alleged that Novalpina GP abused its powers as general partner of the Fund by taking a number of actions with the exclusive aim of favoring its personal interests (and those of the broader Novalpina Entities) to the detriment of the Fund and of its LPs. *Id.* ¶ 47.

36. It is also alleged that one of the first actions taken by Novalpina GP was to lock the management of a key investment holding parent of the Fund's interests ("Master Luxco"), in order to enable it to retain control of most of the Fund's portfolio companies, even after Novalpina GP's dismissal as general partner pursuant to the terms of the LPA. *Id.* ¶ 49.

37. According to court documents, after the suspension of Peel's voting rights within Novalpina Topco, on July 7, 2021, Kowski and Lueken removed Foley and Dumont as independent directors, and replaced them with Stefano Pileri and Michael Zini (the "Kowski-Appointed Directors"). *Id.* ¶ 51. Following their appointment on 7 July 2021, the Kowski-Appointed Directors immediately appointed themselves as independent directors of NVP 101 S.à r.l., NOAL Luxco North S.à r.l. and NVP 103 S.à r.l., each being wholly-owned subsidiaries of the Fund. *Id.* ¶ 52. The Kowski-Appointed Directors thereby controlled all the shareholders

of Master Luxco. *Id.* ¶ 50-52. They then locked in the management board of Master Luxco by removing Peel as a class A manager, and removing all class B managers, in order to appoint themselves as class B managers alongside Luc Regent. *Id.* ¶ 53.

38. Court documents allege that the Kowski-Appointed Directors surreptitiously also amended the Master Luxco articles of association on July 8, 2021, again on the instructions of Kowski and Lueken, in order to introduce a principle of unanimity for any decision to be taken by the shareholders of Master Luxco, including the removal of directors (the "Veto Right"). *Id.* ¶ 54. This tactic was an attempt to make the directors unremoveable, and give them the power to remove and appoint the directors of the Fund's portfolio companies at will. *Id.* It is alleged that this amendment is the result of a fraud by Novalpina GP. *Id.* ¶ 57.

39. The introduction of the Veto Right in Master Luxco's articles of association has led to a criminal complaint against Kowski, Lueken, Zini and Pileri in Luxembourg. *Id.* ¶ 67. It has also been characterized by a court as "an advantage that [Novalpina GP] should not in principle have" and "not in the interest of the other shareholders." *See Novalpina Capital Partners I GP S.à r.l. et al. v. NOAL Luxco S.à r.l. et al.*, No. TAL-2022-01577, at 24 (Dist. Ct. Luxembourg Oct. 28, 2022) (attached as Exh. 12).

**Other actions taken by the Kowski-Appointed Directors**

40. Novalpina GP and the Kowski-Appointed Directors also did everything possible to disrupt the process to remove Novalpina GP, the vote for which took place at the LPs' meeting of July 9, 2021. Molitor Brief, Mem. Exh. D, ¶ 78. Not only did Novalpina GP make the voting process extremely restrictive for the LPs, but it refused to publish the results of the vote held at that meeting. *Id.* Novalpina GP only published the results when it was ordered to do so by an order of the Presiding Judge of the Luxembourg District Court on July 20, 2021. *Id.*

41. The next day, Novalpina GP provided the Fund's legal counsel with the result of the vote of the LPs' meeting; the removal of Novalpina GP had been adopted by 99.6% of the Fund's LPs. *See id*. ¶ 79 and exhibit 21 thereto. On July 23, 2021 (two weeks after the vote), Novalpina GP finally announced to LPs that the vote had been adopted. *Id*. ¶ 80.

**The legal consequences of the dismissal of Novalpina GP**

42. Pursuant to clause 20.3 of the LPA, the dismissal of Novalpina GP "without cause" had the following consequences relevant to the Proceedings:

   a. The "Carried Interest Partner" (*i.e.* Novalpina Capital Partners I FP SCSp) ("Novalpina FP") was, where applicable, to receive an amount determined by an independent valuer in accordance with clauses 20.3.3 and 20.3.4 of the LPA (the "Independent Valuer"), corresponding to the amount it would have received, if any, had the Fund terminated (and the assets had been sold) at the time of the dismissal (hereinafter the "Removal Entitlement);

   b. The new general partner also had to acquire (or have acquired by a third party) the "Sponsor Commitment" of Novalpina FP, Group GP and Clarendon Trust (the "Sponsor Entities") (clause 20.3.5 of the LPA) if the latter so requested. The Sponsor Commitment was also to be the subject of a valuation report by the Independent Valuer.

   *See* LPA, Exh. 4, §20.3; Molitor Brief, Mem. Exh. D, ¶ 84.

43. It is these provisions (collectively, the "Removal Payments") that gave rise to the disputed valuation as of the Removal that is the subject of the Proceedings. *Id.*

### The obtaining of the EY valuation report

44. It is alleged that while delaying the announcement of the LPs' near-unanimous vote to remove Novalpina GP, and thus in a known position of conflict, Novalpina GP and the Kowski-Appointed Directors engaged EY Luxembourg to prepare a valuation of the Fund (the "EY Report"). *See* Molitor Brief, Mem. Exh. D, ¶¶ 89-102. The valuation of the Fund at removal is the subject of proceedings in Luxembourg. *See generally* Summons, *Novalpina Capital Partners I. S.à. r.l. et al. v. BRG NOAL GP S.à. r.l. et al.*, No. TAL-2022-03617 (Feb. 25, 2022) (the "Proceedings" or "Summons 4") (attached as Exh. 6). By deliberately delaying publishing the result of the LPs' near-unanimous vote for the removal, Kowski—acting through his newly-appointed independent directors, Zini and Pileri—commissioned the unaudited valuation report that falsely asserted that the Fund owed Novalpina GP almost €300 million in Removal Payments. Molitor Brief, Mem. Exh. D, ¶¶ 78, 95-97, 386. I believe that Kowski must have known that he was in a position of conflict here. In fact, commissioning the EY Report should have been impossible, since neither Novalpina GP, nor Zini, nor Pileri had any information or knowledge about the investments held by the Fund on which a valuation would need to be prepared. *Id*. ¶ 62. Instead, Kowski, and other Investment Advisor employees that had an interest in the Removal Payments, acted for Novalpina GP under the pretext of Zini's and Pileri's direction and caused EY Luxembourg to produce, over a period of less than three weeks, a valuation totally disconnected from reality, which marked up the Fund's investments by 3 times as compared to the audited financial statements released only months prior. *Id*. ¶ 101.

45.  In my view, by commissioning a false and conflicted valuation in their last days in control of the Fund, the Founders sought to benefit from its own internal dispute and the necessity of its removal by the LPs.

46.  Novalpina GP approved the Fund's audited financial statements for the fiscal year end 2020. These financial statements, audited by Price Waterhouse Coopers, reflected the official position of the Fund at the time, namely that there were *de minimis* profits in the Fund's investment portfolio and that Novalpina GP would be theoretically entitled to a carried interest of €21.6 million (according to Novalpina GP). *Id.* ¶ 451. This carried interest entitlement first increased to €23.3 million as of March 31, 2021, before reaching, *three months later*, and while no major event likely to positively affect the value of the assets had occurred, €282.9 million—a twelvefold increase. *Id*. Kowski has since claimed that Peel actively sought to "create the perception that the valuations [of the Fund] were low" for his own personal benefit should Novalpina GP be removed. *See* Written Submissions in Response Summarising Counsel's Address, *Novalpina Capital Partners I FP SCSp v. NOAL SCSp*, no. 2467, ¶¶ 13 n.13, 30 (Dist. Ct. of and in Luxembourg, Oct. 16, 2022) (attached as Exh. 7). However, it is my opinion that Kowski's claim is untrue because the valuations prepared and approved by the Novalpina Entities were consistent over the entire history of the Fund, and only changed when the Novalpina Entities became interested in the valuation of the Fund upon Novalpina GP's removal.

**Overview of Luxembourg Valuation-Related Litigation**

47. As noted above, and in the Declaration of Helene Arvis, the financial consequences of Novalpina GP's removal (by near unanimous vote of the Fund's LPs) have been the subject

of no fewer than six sets of proceedings in Luxembourg initiated through Kowski by various

entities which he controls. Arvis Dec., Mem Exh. C, ¶ 8.

48. It is claimed by Novalpina GP in the Proceedings (which is litigation initiated by Novalpina

GP, Novalpina FP and Group GP before the district court of Luxembourg, against Petitioner,

the Fund and certain LPs of the Fund and individuals in their capacity as members of the

LPAC) that the appointment of the new general partner (Petitioner) was pre-conditioned on

payment of the "Sponsor Commitment" to Novalpina FP following an independent valuation

of the same, and that neither Petitioner nor the Fund have paid the Sponsor Commitment or

"Removal Entitlement." *Id*. ¶ 14.

49. In short, Novalpina GP and its associates' alleged entitlement to be paid additional sums is

based on critically flawed and inflated valuation set out in the EY Report. *See* Molitor Brief,

Mem. Exh. D, ¶ 101. Novalpina GP has also attempted to force the payment of these sums by

repeatedly and unsuccessfully challenging the validity of Petitioner's appointment and

seeking freezing order relief to disrupt the management of the Fund. Arvis Dec., Mem. Exh.

C, ¶ 9.

50. Claims have been brought by or on behalf of the Fund against Novalpina GP, Kowski, and

Kowski entities in Luxembourg in response to the litigation initiated by Kowski entities. *Id.*

¶ 10. This includes in respect of an alleged breach of undertakings given by the Founders in

August 2021. *Id.* ¶ 16.

51. The Fund has also issued proceedings challenging the process by which Novalpina GP

unlawfully conferred upon itself the Veto Right. *Id*. ¶ 11.

**The ongoing dispute between the Founders**

52. From court documents, I understand that the dispute between Kowski and Peel is very much

    alive. A "Just and Equitable Winding Up Petition" has been presented to the Grand Court of

    the Cayman Islands by the trustees of Peel's family trust and the Clarendon Trust, against

    Novalpina Vision LP (Kowski's limited partnership). *See* Exh. 13. The focus of the petition

    is the improper use of due diligence to facilitate the expropriation of investor funds. *Id.* ¶¶ 32-

    34. Peel is petitioning the Court in the Cayman Islands to appoint a liquidator to perform an

    independent investigation into the Novalpina Vision Fund and the conduct of its general

    partner, Novalpina Vision GP Limited (which is run by Kowski). *Id.* ¶¶ 38-39.

**The appointment of Petitioner as new general partner of the Fund**

53. Petitioner (at the time called BRG NOAL GP) was appointed as new general partner of the

    Fund in accordance with the "consent forms" that were communicated by the LPs to the

    management board of Novalpina GP on August 9, 2021, by more than 96% of the Fund's LPs

    (which also resulted in the replacement of the Investment Advisors by affiliates of Petitioner).

    Molitor Brief, Mem. Exh. D, ¶¶ 107, 109. The appointment became effective on August 27,

    2021. *Id.* ¶ 215.

54. Petitioner was chosen as an independent professional general partner in order to resume the

    orderly management of the Fund in a context of dysfunction caused by the dispute between

    Founders. *Id.* ¶ 108.

**Fund Investments in Crisis, Petitioner Begins Investigation**

**NSO**

55. The largest investment made by the Fund while under the control of the Founders was a

    notorious group of companies referred to as the NSO Group. The NSO Group is, and has at

all times since 2014 been, a group of companies directly or indirectly owned by OSY
Technologies SARL ("OSY"), engaged in the development and sale of offensive spyware
products. NSO POC, Mem. Ex. E, ¶ 35. The NSO Group's main product is and has at all
material times been Pegasus, an evolving piece or portfolio of software which enables its user
to remotely and covertly collect data from (and access the software installed on) a target's
mobile devices including a smartphone. *Id*. ¶ 36.

56. According to court documents, following its acquisition by the Fund, NSO was controlled by
several of the Founders and other persons affiliated with the Novalpina Entities (including
Schmidt) who acted as directors of the entities within the NSO holding company structure in
which the Fund's control over NSO's governance and business practices was vested. *See id*.
¶ 102. This included control over the mechanisms by which the company made decisions
regarding which elevated risk customers that NSO should sell Pegasus to. *Id*. ¶ 102.

57. By early 2019, NSO had been the subject of sustained public criticism, arising out of concerns
that its Pegasus product had been used and was continuing to be used to surveil political
opponents, human right activists, lawyers, journalists and other civil society actors. *Id*. ¶ 77.
At the time of Novalpina's recommendation for the Fund to invest in NSO, there was well-
publicized scrutiny of the alleged use of Pegasus in the killing of the Saudi journalist, Jamal
Khashoggi. *See id*. Schedule 1 (listing press articles). Several well-known NGOs, such as the
Citizen Lab and Amnesty International, publicly released letters sent to both NSO as well as
Novalpina on the link to the assassination along with detailed questions related to Novalpina's
level of diligence in NSO's past business practices and oversight of the use of its offensive
spyware technology. *Id*.

Docusign Envelope ID: DBA25786-1AEF-4659-AC9B-9F62CE904A57

58. Sales of NSO's Pegasus technology to government customers in countries such as Saudi Arabia, the UAE, Mexico, and Panama were widely reported, and the company was under intense pressure to publicly rebuff increasing allegations of product misuse, especially as it attempted to sell Pegasus to Western governments. *Id*. ¶ 99 (stating that NSO maintained contracts with UAE, Mexico, and Panama), Schedule 1 (listing press articles).

59. Court documents allege that the disclosure of this controversy had impaired NSO's capability to generate new sales and the company would face imminent default from the debt that NCL procured to finance the NSO acquisition—facts of which Petitioner was unaware at the time of its appointment. *Id*. ¶ 87. NSO's problems worsened when it was placed on the Entity List by the Bureau of Industry and Security, an agency of the US Department of Commerce, which prohibited NSO from procuring or selling any US-sourced technology. *See* U.S. Dep't of Commerce, Press Release, Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities, *available at* https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list (last visited Mar. 6, 2025). Novalpina GP's claim for Removal Payments is predicated on NSO being a superlative investment that had more than tripled in value since the December 31, 2020 audited financial statements, from €320 million to €998 million. Molitor Brief, Mem. Exh. D, ¶ 386. Actually, the court pleadings cited above reveal that the investment—the Fund's largest—was collapsing under its failed business model and controversial customer base. *Id.* ¶ 184.

60. The NSO Lawsuit alleges that the Founders were responsible for fraudulent representations, bribery, and breach of duties owed by the Founders to the investment advisors that they controlled. NSO POC, Mem. Exh. E, ¶¶1.1, 1.2. The NSO Lawsuit alleges that the Founders

would have been well aware of NSO's public criticism (and attendant business risk). *Id.* ¶¶ 77-78. Further, it is pleaded that it was obvious and known to the Founders that the question of whether these human rights and reputation concerns were well-founded was critical, not only to the suitability of NSO as a Fund investment, but also to NSO's success and ultimately its survival. *Id.* ¶ 79.

**The NSO Acquisition, in Detail**

61. According to court filings, NCMI submitted its first letter of interest to Francisco Partners (via its agent Francisco Partners L.P.) on May 2, 2018. *Id.* ¶ 40. A further non-binding offer letter was sent on June 24, 2018. *Id.* ¶ 41. This was followed by a further letter on July 23, 2018, to "reconfirm" the offer of June 24, 2018. *Id.* ¶ 43. The July 23 letter names Weil as the firm that NCMI would like to instruct "for all international legal work including documentation." *Id.* On the same day, Kowski sent an email to Schmidt, requesting a call. Schmidt replied to Kowski shortly thereafter commenting on the technology. Declaration of Karl Koenen ¶ 19 ("Koenen Dec.") (attached as Mem. Exh. P). No deal was concluded in the summer of 2018, from which Petitioner infers that Francisco Partners rejected NCMI's offers at this time. NSO POC, Mem. Exh. E, ¶ 43.

62. In January 2019, pursuant to an agreement between NCMI and NSO's CEO (Shalev Hulio), a new offer was made to Francisco Partners to purchase NSO by way of a management buy-out supported by the Fund. *Id.* ¶ 44. The Fund contributed €218.5 million towards the acquisition of NSO in early 2019. *Id.* ¶ 44 (evidencing buy-out around January 2019);¶ 55 (alleging contribution amount).

63. Due diligence on NSO was carried out predominantly during January 2019. *Id.* ¶ 45. I understand the due diligence progressed on a highly accelerated timetable (over the course of

approximately 45 days). Weil was instructed to carry out the legal due diligence, which included reviewing documents provided in a data room and a single "Legal Expert Session" held with NSO management in Tel Aviv. NSO Defence of Kowski, Mem. Exh. I, ¶¶ 67-69.

64. The Legal Due Diligence Report, signed off by Weil (in particular, Schmidt), concluded that the NSO Group had compliance protections that were "best in class." NSO POC, Mem. Exh. E, ¶ 90. This was despite the fact that (according to pleadings) Weil only had access to a very limited number of documents from the NSO Group due to Israeli security laws, *see* NSO POC, Mem. Exh. E, ¶ 100.2; and despite the fact that only a small number of meetings had taken place between them and NSO management, *see* NSO POC, Mem. Exh. E, ¶ 81.1. The NSO Lawsuit pleads that normal and reasonable due diligence by a prospective buyer of NSO at the time would have required; (i) collating and summarising the human rights allegations; (ii) assessing the strength and credibility of those allegations through engagement with key NGOs; (iii) relevant, comprehensive and specific questioning of NSO's management and members of NSO's Business Ethics Committee ("BEC"); and (iv) obtaining the necessary security clearance as required in order to receive relevant due diligence information. *Id*. ¶ 80.

65. Court pleadings allege that none of this was done. *Id*. ¶¶ 81-83. As such, the Founders and the Investment Advisors could not have had a clear understanding of: (i) the existing customer base, including the revenues generated from those customers; (ii) the details of how historical allegations of misuse had been reported, investigated and resolved; or (iii) the decision making of the BEC. *See id*. ¶ 100.2.

66. In addition, the acquisition of the NSO Group took place not long after the public scrutiny of the Pegasus software's role in Khashoggi's murder. This included a publicized open letter to

the Francisco Partners (the seller of NSO) on November 1, 2018 from the NGO Citizen Lab which tied the murder of Khashoggi to the Pegasus software. *See id.* Schedule 1.

67. Petitioner also alleges, in the NSO POC, that several misrepresentations were made by the Founders during and regarding the acquisition of the NSO Group in a series of documents. *Id.* ¶¶ 71-81.

68. The first alleged misrepresentation is that the transaction was suitable for the Fund. *Id.* ¶ 71.1. It is alleged that the Suitability Representation was false because NSO was not a suitable investment for the Fund, given (i) the misuse allegations made in respect of NSO and Pegasus; (ii) the fact that NCMI and the Founders had no reasonable basis for concluding that the misuse allegations were unjustified; and (iii) the risk and reputational profile of the LPs. *Id.* ¶¶ 74-76.

69. The second alleged misrepresentation is that NCMI had "conducted a thorough review of the relevant information to identify material risks" (the "Risk Review Representation"). *Id.* ¶ 71.2. This representation was also found in the Investment Compliance Checklist appended to the Investment Recommendation Letter, referred to above. *Id.* ¶ 68. It is alleged that the Risk Review Representation was false. *Id.* ¶ 87. In addition, it is pleaded that neither NCMI, nor its advisors were allowed access to many key documents, including customer contracts, issued export licences or minutes of the BEC. *Id.* ¶ 81. Instead, NCMI and its advisors, including Weil, were limited (i) to reviewing those documents which NSO did provide; and (ii) to holding a small number of interviews with NSO managers, shareholders and stakeholders, who were unlikely to be impartial or reliable. *Id.*

70. It is pleaded that the Founders well knew (i) what due diligence should have been carried out as part of investigating the potential acquisition of NSO in the circumstances; (ii) what due

diligence had in fact been carried out, and (iii) the difference between the two. *Id.* ¶ 83. Therefore, it is alleged that the Founders well knew that proper and adequate due diligence had not been carried out, let alone due diligence to a high standard and/or to a standard required from an investment in the offensive spyware industry and that it is therefore not true that a thorough review of the relevant information had been undertaken so as to be able to assess the material risks. *Id*.

71. Since the customer list of NSO was subject to secrecy under Israeli law, the Novalpina Investment Advisors—quite incredibly—effectively compelled the Fund to purchase NSO without NCMI having any comfort as to key attributes of the company, including: (i) the existing customer base of the company (*see id.* ¶ 81.4), the revenues generated from individual customers, and whether the company had already saturated the market for high risk non-democratic customers that were willing to pay exorbitantly higher purchase prices for the company's Pegasus system than democratic countries; and (ii) the historical and current allegations of misuse that were reported to NSO and the substance and findings of the investigations undertaken by NSO into that misuse (*see id.* ¶ 82).

72. The third alleged misrepresentation from the NSO POC is that NSO's BEC would only approve sales of the Pegasus product to customers where its members had unanimously approved doing so. *Id.* ¶ 72. The Final Investment Memorandum submitted to LIS and the Investment Committee of NCMI as an exhibit to the Investment Recommendation Letter included, at slide 36, statements that BEC "[a]pprovals will only be given where there is <u>unanimous</u> agreement from all the members present" (emphasis in original) and that "The BEC reviews and approves unanimously (*i.e.* every member has a veto right)." *Id*. It is alleged that this was false because the charter of the BEC was amended in or before January 2019 to

permit approval of a customer by a majority rather than unanimity of the external members of

the BEC. *Id*. ¶ 97. This information was relayed to Weil at the "Legal Expert Session" held in

Tel Aviv on January 20, 2019 (and therefore prior to closing and NCMI's investment

recommendation to LIS).

73. The fourth alleged misrepresentation relates to statements made in a "Notice of Acquisition"

dated February 14, 2019, signed by each of the three Founders that announced the acquisition

of the NSO Group to the LPs. NSO POC, Mem. Exh. E, ¶¶ 89-90. In the Notice of Acquisition,

the Founders represented to the LPs that (i) Novalpina had carried out an "extensive due

diligence" exercise, with a particular focus on misuse allegations; (ii) Novalpina had

scrutinised the claims of misuse made by Amnesty International, the Citizen Lab, the New

York Times and others and been provided with evidence justifying a conclusion that the

reports of misuse were "substantially incorrect"; (iii) NSO's "business ethics practices" were

"best-in-class"; (iv) the BEC would only approve a customer after receiving unanimous

consent from all its members; (v) it was NSO's practice to investigate "all reports alleging

misuse of its technology" by way of an "audit" of its customer's use of the system; and (vi) it

was NSO's practice to terminate any contract with a customer if, following such audit, there

was any residual suspicion of misuse. *Id*. ¶¶ 90-91.

74. It is pleaded that these representations were made deliberately and expressly to assuage any

concerns the LPs might have as to the ESG and/or reputational concerns about an investment

as highly controversial as NSO and its software portfolio, including Pegasus. *Id*. ¶ 93. It is

also alleged that employees of the Investment Advisors were informed that the BEC's

requirement for unanimous voting was no longer in force or, at the very least, that it was about

to be lowered to a majority voting requirement. *See* Claimants' Response to the First

Defendant's Part 18 Request, *TREO NOAL GP S.à r.l. et al. v. Kowski et al.*, No. CL-2023-

000851, ¶¶ 33-34 (England and Wales Commercial Court Nov. 25, 2024) (attached as Exh.

17). Despite this, Weil's legal due diligence report stated that BEC decisions had to be taken

unanimously. *See* NSO POC, Mem. Exh. E, ¶¶ 66, 72. It appears that Weil also included a

recommendation that it was important that the decision-making process of the BEC remained

as effective as it was at the time of the legal due diligence report (which falsely stated the

decisions had to be taken unanimously).

75. Schmidt was appointed to the board of the holding companies of the NSO Group after the

Fund's acquisition. *See* Exh. 22 (listing Schmidt as *gérant* (director) of Square 2 in April

2019); Exh. 20 (listing Schmidt as *gérant* of Triangle Holdings in early 2020); Exh. 14

(evidencing Schmidt's appointment to OSY *gérant* in April 2019). It is my understanding that

he held all of these positions through the rest of that year. *See* Exhs. 15-16. As a member of

this board, he had oversight of the workings of the BEC, and its replacement, the Governance

Risk and Compliance Committee ("GRCC").

76. From April to June 2019, approximately six to eight months after the Khashoggi killing, the

board of one of the parent holding companies within the NSO Group (Square 2 S.à r.l.) took

steps to renew the sale and licencing of Pegasus to Saudi Arabia despite, as noted above,

apparent continuing suspicions of misuse. NSO POC, Mem. Exh. E, ¶ 102. This was despite

the fact that the BEC had expressly declined to take a decision as to whether the sale/licencing

of Pegasus to Saudi Arabia should be permitted. *Id.* The board members who would have been

voting at this time included Schmidt. *See* Exh. 22 (listing Schmidt as *gérant* (director) of

Square 2); Exh. 32 (listing Schmidt ceasing to be a *gérant* (director) of Square 2). I understand

that one of the four independent members of the BEC, Jeremy Bash, resigned as a result of

this decision. NSO POC, Mem. Exh. E, ¶¶ 102.1–102.3. My inference is that the reason for such an about face may have been precipitated by NSO having material liquidity issues; immediately following the acquisition, NSO was highly leveraged, and may have needed the money to meet debt service and operating expenses.

**Petitioner involvement**

77. The Petitioner's involvement with the NSO Group began shortly after the "Pegasus Project," an international investigative journalism initiative, was published. I understand that Petitioner was initially told by NSO management that, notwithstanding the company had significantly underperformed its financial expectations and was undercapitalized, the company had no immediate financial concerns (for example, management had provided Petitioner a forecast showing the company meeting all its debt service obligations on a going-forward basis).

78. However, management was also immediately focused on re-activating NSO's GRCC (which was the governance body that had replaced the BEC shortly after the Fund's acquisition of the NSO Group) in order to approve new sales to high-risk customers. Petitioner, immediately concerned by the fact that NSO's governance practices while under the control of Novalpina were insufficient to insulate the company from the various scandals being disclosed by the Pegasus Project reporting, insisted that the reconstitution of the GRCC was conditional on conducting a corporate governance review.

79. Several weeks after the appointment of Petitioner and while delaying Petitioner's representatives to visit onsite in Tel Aviv, purportedly on the direction of the Israeli government which it said was conducting its own investigations at the time, in October 2021, NSO management suddenly reversed course acknowledging the company's precarious financial position requesting an immediate cash injection of $25 million from Petitioner in

order to meet its payroll obligations at month end. A few days after Petitioner provided a $10 million loan, on November 3, 2021, the NSO Group was put on the US Entity List. *See id*. ¶¶ 87.3-87.4. Petitioner then engaged with NSO's lender group regarding the status of the company's financial position and outlook.

80. After the departure of numerous senior management members following NSO being put on the Entity List, on December 1, 2021, Petitioner procured information from NSO responsive to long outstanding information requests relating to customer bookings, historic collections and various risk measures for the NSO Group's customer base. Molitor Brief, Mem. Exh. D, ¶ 184. The information enabled Petitioner to confirm the following: (i) that the NSO's Group's ability to sell to new customers was severely impacted by the NSO Group's reputational crisis, most recently as perpetuated by the publication of the Pegasus Project; and (ii) the company was heavily dependent on collections from new sales to elevated risk customers (such as Saudi Arabia, as described above). *Id*. As such, Petitioner came to understand that the Fund's investment in NSO Group had no value well before the appointment of NOAL GP, with the actual circumstances of the company being materially misrepresented by the Founders and NSO management. NSO POC, Mem. Exh. E, ¶ 87.6.

81. Notwithstanding that NSO had significantly underperformed its underwriting expectations, potentially on account of issues relating to the alleged misrepresentations, and was subject to imminent payment default (not to mention blacklisting by the US government), Novalpina GP asserts an entitlement to Removal Payments based on the EY Report that unreasonably suggests that the Fund's investment in NSO had tripled in value since its corresponding valuation just a few months earlier in the Fund's audited financial statements as at December 31, 2020. Molitor Brief, Mem. Exh. D, ¶ 386.

**LXO Bribe**

82. As referred to above, the second acquisition relevant to this petition was that of a group of companies collectively known as Laboratoire X.O. ("LXO"). It was bought by the Fund using a special purpose vehicle ("Hippocrate FI"). *See* LXO POC ¶¶ 4, 12-13 (attached as Mem Exh. F).

83. LXO is a French pharmaceuticals company, which together with two other companies, had a focus on the sale of mature drugs into the French and French-speaking markets. *Id.* ¶ 13. LXO does not itself research and develop therapeutic molecules. *Id.* ¶ 14. A significant element of LXO's business model was the acquisition of mature drugs from major pharmaceutical companies (including the marketing authorisations associated with such drugs). *Id.* Major pharmaceutical companies are often incentivised to sell mature drugs when they reach the end of their patent protection and become subject to generic competition, at which time they may exhibit low or negative growth. *Id.* Accordingly, the Fund's investment in LXO contemplated the continuous making of further acquisitions at regular intervals. LXO acted as a "platform company" for these molecules, and was able to generate greater value from the drugs it acquired than the price at which it acquired them. *Id.*

84. Pleadings indicate that at some point prior to June 2020, the previous shareholders of LXO decided to sell their interests in LXO (the "LXO Sellers"). *Id.* ¶ 16. For this purpose, the LXO Sellers appointed Neuflize OBC ("Neuflize"), a Paris-based private banking subsidiary of ABN AO Bank N.V. ("ABN AO"). *Id.*

85. Pleadings also indicate that the Neuflize team handling the sale of LXO was led by a "Mr. Gribe," the Head of Corporate Finance at Neuflize. *Id.* ¶ 17. Gribe is also married to the sister of an employee of one or both of the Investment Advisors (a Mr. Betito). *Id.* I understand

(and Petitioner understands) that Kowski, having "sourced, led the execution of and oversee[n] 98% of the Fund's investments," would have worked closely with Betito and supervised him on the LXO transaction. *See* Letter from Lueken and Kowski, Exh. 2, at 1.

86. Court documents state that on June 22, 2020, Kowski and Betito sent a document entitled "Early Warning Memo – Project Martin" to Novalpina Capital's Investment Committee stating that: (i) ABN AO (possibly Gribe) contacted Betito and/or Kowski to offer them a "first-look at" LXO, before Neuflize began a standard auction process for sale; (ii) that the opportunity to invest in LXO had been introduced to Novalpina Capital by ABN AO (Gribe); and (iii) other financial and logistical details about the proposed transaction. LXO POC, Mem. Exh. F, ¶ 19. The Novalpina Investment Committee (whose members included each of the Founders) elected to proceed with the acquisition. *Id*. ¶¶ 19-20.

87. It is alleged that on July 2, 2020, Juliette Sourisse of NCMI emailed LIS to indicate that the transaction team would shortly request approval for the transaction budget from the Novalpina Investment Committee. *Id.* ¶ 23.1. On July 6, 2020, a budget was sent to LIS, which included a €1 million expense described as a "Finders Fee." *Id*. ¶ 23.1. Weil was involved in the LXO acquisition in both conducting the legal due diligence and effectuating the transaction.

88. A share purchase agreement for the acquisition of LXO was signed on July 30, 2020. *Id*. ¶ 20.

89. On October 28, 2020, days before the LXO transaction closed, Hippocrate FI and REEH Ltd concluded a purported Engagement Letter (the "REEH Engagement Letter"). *Id.* ¶ 23.3. The letter discussed "Services" provided by REEH Ltd, including "assistance and advice to us and Novalpina in relation to the assessment, evaluation, structuring, and potentially the negotiation and completion of the Investment…Such Services in particular include, inter alia, information advice [sic] provided on the pharmaceutical markets in France, information and advice on the

strategic positioning of the Targets in such markets, value-add advice in respect of the Investment and advice on potential bolt-on opportunities in respect of the Targets." *Id.* It fixed the fee for the Services at single fee of € 1 million. *Id.*

90. On or around November 4, 2020, a "Funds Flow Document" was prepared by Weil in relation to the LXO Transaction, and included the €1 million payment. *Id.* ¶ 27.

91. It is alleged that REEH Ltd was owned and controlled by Gribe. LXO POC, Mem Exh. F, ¶ 25. It is further alleged that the payment to REEH Ltd was a bribe or secret commission and/or otherwise corrupt and improper and/or not made for services properly rendered. *Id.* ¶ 26.

92. According to court documents, Petitioner discovered the payment to REEH Ltd in or around May 2022, when representatives for Petitioner reviewed the Funds Flow Document, and shortly thereafter came to understand that Gribe was related to Betito. *Id.* ¶ 27. On June 9, 2022, representatives of NOAL GP spoke to Betito and Gribe separately by phone to seek an explanation of the Payment. *Id.* ¶ 28. Petitioner received conflicting information about the purpose of the payment. *Id.* No sufficient explanation was forthcoming that would have justified the concealment of the payment nor the conflicting accounts about the purpose of the payment from Betito and Gribe.

93. Notwithstanding that LXO was acquired just eight months earlier, Novalpina GP procured a valuation that suggested that LXO had more than tripled in value since its acquisition.

**Maxbet Deceit**

94. The Fund also acquired a group of various Romanian and Maltese companies, collectively known as "Maxbet," that together carried on business in the gaming sector in Romania and online, on April 1, 2021. *See* OEGH Holdings S.à r.1. *et al.* Summons to Novalpina Capital

Management Int'l LLP *et al*., 307289 / SaPa A77965 (District Court of and in Luxembourg, July 19, 2024) ¶ 20 ("Maxbet Deceit Summons") (attached as Mem. Exh. G).

95.  The Fund, OEGH Holdings S.à r.l. and NOAL Luxco S.à r.l. filed the Maxbet Deceit Claim against Kowski and the Investment Advisors. *See id.* The Maxbet Deceit Claim relates to due diligence purportedly conducted by the Investment Advisors (as advised by Weil) for the purposes of the Fund's proposed acquisition of Maxbet. Arvis Dec., Exh. C, ¶ 12. The nature of the business meant that it was of great importance to have certainty as to the identity of the ultimate beneficial owner ("UBO") of Maxbet. *Id*.

96.  The crux of the Maxbet Deceit Claim is that Kowski and the Investment Advisors were in possession of information, including due diligence reports prepared by third parties, which evidenced a real and serious possibility that Vladimir Sadovskii was not the UBO, and focused on another individual, a Mikhael Mirilashvili (the "Information"). *See* Maxbet Deceit Summons, Mem. Exh. G, ¶¶ 38-39. The allegation at the heart of the Maxbet Deceit Claim is that the Information was deliberately concealed by Kowski and the Investment Advisors, and that the revelation (irrespective of the truth of the underlying facts) that there was a real and serious possibility that Sadovskii was not the true UBO should necessarily have been considered a very high-risk factor for the investment and the acquisition would not have proceeded had the Information been provided. *Id*. ¶¶ 40, 58.

97.  Kowski attempts to evade responsibility for the concealment by alleging that it was Weil that was responsible for the editing of due diligence reports on the Maxbet UBOs and that Weil's knowledge of the Information should be attributed to the Fund entities that entered into the transactions, as those entities were Weil's clients (notwithstanding Kowski never alleges that the Information was ever provided to the AIFM or the independent directors of the relevant

Fund entities). Defense Brief, *Kowski v. OEGH Holdings S.à r.l. et al.*, No. 2024-07800, ¶¶ 27, 41, 51, 92-95 (District Court of and in Luxembourg, Feb. 24, 2025) (attached as Mem. Exh. N).

98. Although Petitioner does not have full access to the due diligence and KYC checks that the Investment Advisors obtained in advance of the Maxbet acquisition, it has seen copies of two draft due diligence reports which recognize Mirilashvili's likely connection to the Maxbet business:

    a.  A report from Rödl & Partners ("Rödl"), which referred to the possibility that Sadovskii was a "straw man" for Mirilashvili, and which concluded that Mirilashvili was the presumed UBO of Maxbet. *See* Maxbet Deceit Summons, Mem. Exh. G, ¶¶ 45-47.

    b.  A report from Control Risks dated March 2020, which referred to Mirilashvili and media reports of his ownership of entities that owned the majority of the shares in Maxbet (the "Original Control Risks Report"). The Original Control Risks Report mentioned Mirilashvili over thirty times, including on the question of whether Mirilashvili was the actual UBO of Maxbet. In a revised version of the Control Risks report, Mirilashvili was mentioned only once. *See id.* ¶¶ 43-44.

99. As of the date of this Declaration, NCL has not filed its defense in the Maxbet Deceit Claim. However, Kowski denies any responsibility for the concealment of the Information. In a defensive pleading in related Luxembourg proceedings concerning Kowski's negligence in the Maxbet due diligence process, Kowski claims that (i) he never received a copy of the First Rödl Report; and (ii) the First Rödl Report (the scope of which was subsequently severely restricted so as to remove any mention of Mirilashvili and to shift the focus on two other individuals) was "*commissioned by and sent* to the German counsel for the plaintiffs in this

new summons, namely Weil Gotshal & Manges LLP" (emphasis in original). Defense Brief, *Kowski v. Maximus BidCo I S.à r.l. et al*., No. 2023-09684, ¶ 39 (District Court of and in Luxembourg, Oct. 8, 2024) (attached as Mem. Exh. H). (The plaintiffs to this negligence claim have applied to withdraw that claim, having replaced it with the Maxbet Deceit Claim. Kowski is objecting to the withdrawal of the negligence claim. *See generally id.*)

99. Kowski has asserted that the Original Control Risks Report was "modified on the instructions of the plaintiffs' counsel, Weil Gotshal." Defense Brief, *Kowski v. OEGH Holdings S.à r.l. et al*., No. 2024-07800, ¶ 51 (District Court of and in Luxembourg, Feb. 24, 2025) (attached as Mem. Exh. N). Kowski further asserted that "Weil Gotshal had total control over the entire due diligence process and had complete visibility over the investigations carried out by the consultants (Rödl and Control Risks). Weil Gotshal's decisive role in this process is further reinforced by: the invoice issued by Weil Gotshal and sent to Bidco 1 dated 18 October 2020." *Id*. ¶ 95.

100. However, documents disclosed in proceedings in the Insolvency List of the English High Court relating to the insolvency of NCL appear to show that Weil was acting at the direction of Kowski and NCL in relation to the Fund's acquisition of Maxbet, including in relation to the due diligence purportedly conducted:

a. An email from Piilmann (an employee of NCL acting under the supervision of Kowski) instructed Weil on September 7, 2020 to remove references to Mirilashvili. *See* email from Piilmann to Weil (copying Kowski) (Sept. 7, 2020) (attached as Exh. 21). In my view, that email from Piilmann also demonstrated the known purpose of the Rödl engagement, suggesting that if the amended Original Control Risks Report could not be "be

cleaned up further," then NCL would need to go "full steam with Roedl" to procure a cleansed KYC report. *See id.*

b. An email dated October 8, 2020 from Piilmann to Kowski said: "Loyens, AIFM and all the lenders in the mix [at the moment] have various degrees of questions on sellers. Think we need a KYC wrapper from Weil that brings together: (1) Control Risks report (2) Roedl on Spektor (3) Conclusion that there are no issues progressing with the transaction." Piilmann supplemented that list with "latest question from DB [Deutsche Bank]," which included: "When did current owners buy the company?" "What was the source of funds?" and "no issues identified other than potentially around Spektor historical ownership." *See* Emails between Piilmann and Kowski (Oct. 8-10, 2020) (attached as Exh. 19).

c. These emails between NCL and Weil ultimately led to the memorandum dated October 8, 2020 on NCL letterhead and signed by Kowski on behalf of NCMI, which was provided to the AIFM and potential financing parties. *See* Novalpina Capital memorandum, Project Maximus II - KYC/AML Check (Oct. 8, 2020) (attached as Exh. 11). That memorandum confirmed that "[w]e [i.e., NCL / NCMI] have with the support of various professional service providers performed a KYC check on the basis of which we have gained sufficient comfort to proceed with the Contemplated Transaction." *Id.* at 1.

d. Weil's timesheets show that Weil had a number of calls with Kowski on the same day as calls with Rödl, and exchanged emails with Piilmann in relation to "information requested by Rödl & Partner team." *See* Weil Invoices, Exh. 18, at 935, 939 (Oct. 18, 2020). There is a striking coincidence in timing between Kowski's emails, and calls between Kowski and Schmidt, and the First Rödl Report.

101. The Maxbet investment has proven to be disastrous for the Fund and damages claimed in the Maxbet Negligence Claim total up to approximately € 287 million. Maxbet Deceit Summons, Mem. Exh. G, ¶¶ 132, 141, 148.

102. Notwithstanding that Maxbet was acquired just three months earlier on April 1, 2021, Novalpina GP procured a valuation that suggested that the value of Fund's investment in Maxbet had tripled since its acquisition. Molitor Brief, Mem. Exh. D, ¶ 386.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___3/25/2025___

DocuSigned by:

_____
B989B839B4B3471...

Gavin Farrell