**MOLITOR**

Case list no.:  TAL-2022-03617 and TAL-2022-07672

Chamber:      VI<sup>th</sup> Chamber

Notified on:   17.03.2023

## SUBMISSIONS

**FOR:**    **1. the limited liability company Treo NOAL GP SARL,** formerly BRG NOAL GP, established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered with the Luxembourg Trade and Companies Register under number B 258060, represented by its management board currently in office, or by any other body authorised to represent it legally;

defendant pursuant to a bailiff's writ served by Guy ENGEL, residing at 2, Rue Guido Oppenheim, L-2263 LUXEMBOURG, registered with the District Court of and in Luxembourg, dated 25 February 2022;

**2. the special limited partnership NOAL SCSp,** (formerly Novalpina Capital Partners I SCSp), established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered with the Luxembourg Trade and Companies Register under number B.217.345, represented by its general partner, the limited liability company BRG NOAL GP S.à.r.l, currently in office;

defendants pursuant to a bailiff's writ served by Guy ENGEL, residing at 2, Rue Guido Oppenheim, L-2263 LUXEMBOURG, registered with the District Court of and in Luxembourg, dated 25 February 2022;

defendant for the purposes of a writ of notice of garnishment with a summons for validation served by the bailiff Frank SCHAAL, residing at 65, rue d'Eich, L-1461 LUXEMBOURG, registered with the District Court of and in Luxembourg, dated 3 October 2022;

appearing through the limited liability company MOLITOR Avocats à la Cour S.à r.l., established and having its registered office at 8, rue Sainte-Zithe, L-2763 LUXEMBOURG, registered on list V of the Luxembourg Bar Association Roll, registered with the Luxembourg Trade and Companies Register under No. B 211810, represented in these proceedings by Maître Paulo LOPES DA SILVA, avocat à la cour (court lawyer), residing at the same address;

**AGAINST:**    **1. the limited liability company Novalpina Capital Partners I GP S.à r.l.,** established and having its registered office at L-1148 LUXEMBOURG, 16, rue Jean l'Aveugle, registered with the Luxembourg Trade and Companies Register under number B 217341, represented by its management board currently in office, or by any other body authorised to represent it legally;

plaintiff for the purposes of the aforementioned ENGEL writ;

**EXHIBIT D**

**2. the special limited partnership Novalpina Capital Partners I FP SCSp,** established and having its registered office at L-1148 LUXEMBOURG, 16, rue Jean l'Aveugle, registered with the Luxembourg Trade and Companies Register under number B 217330, represented by its general partner currently in office, Novalpina Capital Partners I GP S.à r.l.;

plaintiff for the purposes of the aforementioned ENGEL writ;

plaintiff for the purposes of the aforementioned SCHAAL writ;

**3. the limited liability company Novalpina Capital Partners I Group GP S.à r.l.,** established and having its registered office at L-1148 LUXEMBOURG, 16 rue Jean l'Aveugle, registered with the Luxembourg Trade and Companies Register under number B 214249, represented by its management board currently in office, or by any other body authorised to represent it legally;

plaintiff for the purposes of the aforementioned ENGEL writ;

represented by *Maître* Nicolas THIELTGEN, avocat à la cour (court lawyer), residing at L-2535 LUXEMBOURG, 16-18, boulevard Emmanuel Servais;

## IN THE PRESENCE OF:

**1. ATRF (CB INTL) Ltd.,** "Alberta Teachers Retirement Fund", established and having its registered office at 600 Barnett House, 11010-142 St. NW, Edmonton, Alberta, T5N 2R1 Canada, registered with the Alberta Trade and Companies Register, Canada under number CAAB2015750926, represented by its body authorised to represent it legally, as represented by Mr Kevin McDowell, on the *Advisory Committee* of NOAL SCSp;

**2. Mr Kevin McDowell,** occupation unknown, residing at 1600 – 10250 101 Street NW, Edmonton, Alberta T5J 3P4 Canada, as appointed by and/or representing ATRF (CB INTL) Ltd. on the *Advisory Committee* of NOAL SCSp;

**3. Lion River I N.V,** established and having its registered office at De Entree 23, Alpha Tower, 1101 BH Amsterdam, the Netherlands, registered with the Netherlands Trade and Companies Register under number KVK 34138847, represented by Assicurazioni Generali S.p.A., itself represented by its body authorised to represent it legally, as represented by Mr Bruno Sollazzo on the *Advisory Committee* of NOAL SCSp;

**4. Mr Bruno Sollazzo,** occupation unknown, residing at Assicurazioni Generali S.p.A, Head Office Piazza Duca Degli Abruzzi 2, 34132 Trieste, Italy, as he is appointed by and/or represents Lion River I N.V on the *Advisory Committee* of NOAL SCSp;

**5. Cardiff Assurance Vie SA,** established and having its registered office at 1, boulevard Haussmann, F-75009 Paris, France, registered with the Paris Trade and Companies Register under number 732 028 154, represented by its body authorised to represent it legally, as represented by Mr Eric Béquet, on the *Advisory Committee* of NOAL SCSp;

**6. Mr Eric Béquet,** occupation unknown, residing at Private Equity & Infrastructure & Private Debt Investment & Asset Management Department, 8, rue du Port, 92728 Nanterre Cedex (France), as he is appointed by and/or represents Cardiff Assurance Vie SA on the *Advisory Committee* of NOAL SCSp;

**7. Centrica Combined Common Investment Fund Limited,** as trustee of Centrica Combined Common Investment Fund, established and having its registered office at Millstream, Maidenhead Road, Windsor, SL4 5GD Berkshire, United Kingdom, registered with Companies House under number 04541886, represented by its body authorised to represent it legally, as represented by Mr Rohit Kapur, on the *Advisory Committee* of NOAL SCSp;

**8. Mr Rohit Kapur,** occupation unknown, residing at Millstream, Maidenhead Road, Windsor, SL4 5GD Berkshire, United Kingdom, as appointed by and/or representing Centrica Combined Common Investment Fund Limited on the *Advisory Committee* of NOAL SCSp;

**9. CNP Assurances SA,** established and having its registered office at F-75716 Paris, Cedex 15, 4, place Raoul Dautry, France, registered with the Paris Trade and Companies Register under number 341 737 062, represented by its body authorised to represent it legally, as represented by Stéphane Trarieux, on the *Advisory Committee* of NOAL SCSp;

**10. Mr Stéphane Trarieux,** occupation unknown, residing at F-75716 Paris, Cedex 15, 4, place Raoul Dautry, France, as he is appointed by and/or represents CNP Assurances SA on the *Advisory Committee* of NOAL SCSp;

**11. Kermadec S.A.,** established and having its registered office at L-2211 Luxembourg, 1, rue de Namur, registered with the Luxembourg Trade and Companies Register under number B 32984, represented by its body authorised to represent it legally, as represented by Mr Benoît ROBERTZ, on the *Advisory Committee* of NOAL SCSp;

**12. Mr Benoît Robertz,** occupation unknown, residing at 12, rue de la Blanche Borne, B-6280 Loverval (Belgium), as he is appointed by and/or represents Kermadec S.A. on the *Advisory Committee* of NOAL SCSp;

**13. MDC Capital Partners II Parallel Fund (SWF), LP,** established and having its registered office at Maples Corporate Services Limited, PO Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands, registered with the Cayman Islands Trade and Companies Register under number 88752, represented by MDC Capital Partners II GP LLC, established and having its registered office at PO Box 45005 Al Mamoura Building A, Intersection of Muroor Road & 15th Street, Abu Dhabi, UAE, or represented by its body authorised to represent it legally, as represented by Mr Antoun GHANEM on the *Advisory Committee* of NOAL SCSp;

**14. Mr Antoun GHANEM,** occupation unknown, residing at PO Box 45005 Al Mamoura Building A Intersection of Muroor Road & 15th street, Abu Dhabi, UAE, as he is appointed by and/or represents MDC Capital Partners II Parallel Fund (SWF) on the *Advisory Committee* of NOAL SCSp;

**15. MDC CAPITAL PARTNERS II PARALLEL FUND (NON-US), LP,** established and having its registered office at Maples Corporate Services Limited, PO Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands, registered with the Cayman Islands Trade and Companies Register under number 88751, represented by MDC Capital Partners II GP LLC, established and having its registered office at PO Box 45005 Al Mamoura Building A, Intersection of Muroor Road & 15th Street, Abu Dhabi, UAE, or represented by its body authorised to represent it legally, as represented by Mr Antoun GHANEM on the *Advisory Committee* of NOAL SCSp;

**16. Mr Antoun GHANEM,** occupation unknown, residing at 51 PO Box 45005 Al Mamoura Building A Intersection of Muroor Road & 15th street, Abu Dhabi, UAE, as he is appointed by and/or represents MDC CAPITAL PARTNERS H PARALLEL FUND (NON-US), LP, on the *Advisory Committee* of NOAL SCSp;

**17. MDC CAPITAL PARTNERS II PARALLEL FUND (US), LP,** Maples Corporate Services Limited, PO Box 309 Ugland House, South Church Street, George Town, Grand Cayman KY 1 -1104, Cayman Islands, registered with the Cayman Islands Trade and Companies Register under number 88753, represented by MDC Capital Partners II GP LLC, established and having its registered office at PO Box 45005 Al Mamoura Building A, Intersection of Muroor Road & 15th Street, Abu Dhabi, UAE, or represented by its body authorised to represent it legally, as represented by Mr Antoun GHANEM on the *Advisory Committee* of NOAL SCSp;

**18. Mr Antoun GHANEM,** occupation unknown, residing at PO Box 45005 Al Mamoura Building A Intersection of Muroor Road & 15th street, Abu Dhabi, UAE, as he is appointed by and/or represents MDC CAPITAL PARTNERS II PARALLEL FUND (US), LP, on the *Advisory Committee* of NOAL SCSp;

**19. BVK EUROPE OPPORTUNITIES FUND II, L.P.,** established and having its registered office at c/o Wilshire Associates 1299 Ocean Avenue, Suite 700, 90401 Santa Monica, California, USA, represented by its body authorised to represent it legally, as represented by Bjorn Waltmans on the *Advisory Committee* of NOAL SCSp;

**20. Mr Bjorn Waltmans,** occupation unknown, residing at WTC-Tower H 25th Floor, Zuidplein 204, 1077XV Amsterdam, The Netherlands, as he is appointed by and/or represents BVK EUROPE OPPORTUNITIES FUND II, L.P. on the *Advisory Committee* of NOAL SCSp;

**21. WILSHIRE BW EUROPE, L.P. – SERIES IV,** established and having its registered office at c/o Wilshire Associates 1299 Ocean Avenue, Suite 700, 90401 Santa Monica, California, USA, registered with the Delaware State Trade and Companies Register under number 200912700005, represented by its body authorised to represent it legally, as represented by Bjorn Waltmans on the *Advisory Committee* of NOAL SCSp;

**22. Mr Bjorn Waltmans,** occupation unknown, residing at WTC-Tower H 25th Floor, Zuidplein 204, 1077XV Amsterdam, The Netherlands, as he is appointed by and/or represents WILSHIRE BW EUROPE, L.P. – SERIES IV, on the *Advisory Committee* of NOAL SCSp;

**23. WILSHIRE MNCPPC EMPLOYEES' RETIREMENT SYSTEM GLOBAL, L.P. (SERIES II),** established and having its registered office at c/o Wilshire Associates 1299 Ocean Avenue, Suite 700, 90401 Santa Monica, California, USA, registered with the Trade and Companies Register of Delaware State, USA, under number 201326300012 represented by its body authorised to represent it legally, as it is represented by Bjorn Waltmans on the *Advisory Committee* of NOAL SCSp;

**24. Mr Bjorn Waltmans,** occupation unknown, residing at WTC-Tower H 25th Floor, Zuidplein 204, 1077XV Amsterdam, The Netherlands, as he is appointed by and/or represents WILSHIRE MNCPPC EMPLOYEES' RETIREMENT SYSTEM GLOBAL, L.P. (SERIES II), on the *Advisory Committee* of NOAL SCSp,

defendants for the purpose of the aforementioned ENGEL writ;

represented by the public limited company ELVINGER HOSS PRUSSEN SA, established and having its registered office at 2, place Winston Churchill, L-1340 LUXEMBOURG, registered on list V of the Luxembourg Bar Association Roll, registered with the Luxembourg Trade and Companies Register under number B 209469, represented in these proceedings by *Maître* Elisabeth OMES, avocat à la cour (court lawyer), residing at the same address;

**25.** The **State of Oregon (USA)**, acting through the Oregon Investment Council, on behalf of the Oregon Public Employees Retirement Fund, established and having its registered office at 16290 SW Upper Boones Ferry Road, 97224 Tigard, Oregon, United States of America, represented by its body authorised to represent it legally, as represented by Michael Langdon on the *Advisory Committee* of NOAL SCSp;

**26.** Mr Michael Langdon, occupation not known, residing at 16290 SW Upper Boones Ferry Road, 97224 Tigard, Oregon, United States of America, as he is appointed and/or represents the State of Oregon (USA), on the *Advisory Committee* of NOAL SCSp;

defendants for the purpose of the aforementioned ENGEL writ;

appearing through the public limited company ELVINGER HOSS PRUSSEN SA, established and having its registered office at 2, place Winston Churchill, L-1340 LUXEMBOURG, registered on list V of the Luxembourg Bar Association Roll, registered with the Luxembourg Trade and Companies Register under number B 209469, represented in these proceedings by *Maître* Pierre ELVINGER, avocat à la cour (court lawyer), residing at the same address;

**27. Alaska Permanent Fund Corporation,** established and having its registered office at 801 W 10th Suite 302, Juneau, AK 99801, United States of America, represented by its body authorised to represent it legally, as represented by Mr Steve MOSELEY, on the *Advisory Committee* of NOAL SCSp;

**28. Mr Steve MOSELEY,** occupation unknown, residing at 801 W 10th Suite 302, Juneau, AK 99801, United States of America, as he is appointed by and/or represents the Alaska Permanent Fund Corporation on the *Advisory Committee* of NOAL SCSp;

defendants for the purpose of the aforementioned ENGEL writ;

represented by the public limited company ELVINGER HOSS PRUSSEN SA, established and having its registered office at 2, place Winston Churchill, L-1340 LUXEMBOURG, registered on list V of the Luxembourg Bar Association Roll, registered with the Luxembourg Trade and Companies Register under number B 209469, represented in these proceedings by *Maître* Michel NICKELS, avocat à la cour (court lawyer), residing at the same address.

*Having regard to the summons served on 25 February 2022*
*Having regard to the writ of notice of garnishment with a summons for validation of 3 October 2022*
*Having regard to the order of joinder of 03 February 2023*

## I.    REGARDING THE ADMISSIBILITY OF THE APPLICATION IN DUE FORM

1.    The submitting parties refer to legal prudence as to the admissibility of the application procedurally.


## II.    REGARDING THE MERITS


### A)    *FACTS AND BACKGROUND INFORMATION*

2.    The submitting parties formally dispute the presentation of the facts as it appears in the summons of 25 February 2022. The facts put forward in support of the claims made by *Maître* Nicolas THIELTGEN's parties are inaccurate and incomplete.

3.    In addition, the dispute has seen, since the date on which the summons was drafted, numerous developments that should be mentioned.

4.    In order to be able to correctly understand the ins and outs of this dispute, it is therefore important to set out precisely and exhaustively the factual context of this case.


### 1.    The NOAL Group


#### 1.1.    *The Fund*

5.    NOAL SCSp, originally named Novalpina Capital Partners I SCSp (hereinafter the **"Fund"**), was incorporated in 2017 at the initiative of three founding members, namely Mr Stephen PEEL, Mr Stefan KOWSKI and Mr Bastian LUEKEN (hereinafter the **"Founders"**) under the terms of a *Limited Partnership Agreement* (hereinafter **"LPA"**) signed on 23 August 2017.

6.    This is a *private equity* (capital-investment) fund, whose principle consists in acquiring majority or minority interests in the capital of unlisted companies. The objective for investors is to enhance the

value of their investment in order to realise capital gains in the short or medium term through the resale of these holdings.

7. The *"Limited Partners"* of the Fund are institutional investors or private individuals (hereinafter the **"Investors"**) who have jointly made *"Undertakings"* in the Fund in the approximate amount of one billion euros. The Investors, some of which are parties to these proceedings, include state pension funds that have invested on behalf of employees, particularly in the United States.

8. Initial Investors in the Fund also included Novalpina Capital Partners I Group GP S.à r.l. (**"Group GP"**) and Novalpina Capital Partners I FP SCSp (**"Novalpina SCSp"**), two companies controlled by the Founders.

9. At the time of incorporation of the Fund, the general partner was Novalpina Capital Partners I GP S.à.r.l (hereinafter **"Novalpina GP"**), a subsidiary wholly-owned by Group GP. The Fund is currently managed by Treo NOAL GP S.à r.l., formerly BRG NOAL GP S.à r.l. (hereinafter **"Treo NOAL"**). The change of name occurred on 14 December 2022[1].

10. The Fund includes, pursuant to Article 12 of the LPA, an Investors' committee called *"Advisory Committee" or "LPAC"*, composed of representatives of the main Investors. Its mission includes providing advice to the general partner, the AIFM and the Fund's advisors. The LPAC must be informed or consulted by the General Partner on certain matters and may provide advice and recommendations.

11. The LPA has been amended four times since the formation of the Fund[2].

### 1.2.   Master Luxco and its shareholders

12. Master Luxco is the *soparfi* (holding company) set up by the Fund to control the vast majority of its subsidiaries[3].

13. Master Luxco comprises the following shareholders:

   −   Novalpina GP (holding approximately **0.85%** of the shares of Master Luxco);

   −   the Fund (directly holding approximately **0.77%** of the shares of Master Luxco);

   −   the Fund (indirectly holding approximately **98.38%,** through three entities owned by the Fund, namely NVP 101 S.à r.l. (holding approximately 51.36% of the shares of Master Luxco), NOAL LuxCo North S.à r.l. (holding approximately 6.37% of the shares of Master Luxco), and NVP 103 S.à r.l. (holding approximately 40.65% of the shares of Master Luxco).

14. The Fund therefore directly or indirectly holds 99.15% of the shares of Master Luxco.

15. The remaining 0.85% are held by Novalpina GP. Novalpina GP acquired this interest prior to its

---

[1]   MOLITOR Exhibit 131
[2]   MOLITOR Exhibit 40; the submitting parties submit the fourth amendment to the LPA
[3]   MOLITOR Exhibits 64 and 65

dismissal in the context of a transaction which, according to the understanding of the submitting parties, was designed in its exclusive interest to enable it to avoid the payment of all or part of the income tax collected under the LPA. Novalpina GP, as the submitting parties will demonstrate, subsequently attempted to exploit this minuscule interest to circumvent certain provisions of the LPA.

### 1.3.  The Portfolio Companies

16.    The Fund directly and indirectly holds a constellation of companies[4] (hereinafter the **"Portfolio Companies"[5]**) which themselves control operational companies in several countries:

- **In Romania and Malta:** OEGH Holdings S.à r.l. and Maximums Topco S.à r.l operate via the *"Maxbet"* companies in the casinos, slot machine rooms and online betting sector;

- **In Estonia, Latvia, Lithuania, Slovakia, Croatia, Malta and Italy:** The Fund controls, via Odyssey Europe Holdco S.à r.l., the OEG group (hereinafter **"OEG"**) which operates in these same sectors of activity (casinos, slot machine rooms and online betting);

17.    Master Luxco also indirectly held:

- via Hippocrate FI S.à r.l.: the French group LXO (hereinafter **"LXO"**) which produces, markets and distributes a wide range of pharmaceutical products subject to strict regulations; the LXO Group was sold to a third party in September 2022, regardless of the exact date;

- via the company incorporated under Israeli law Goatilev Ltd: the company incorporated under Israeli law Convexum Ltd which develops cutting-edge technologies in the field of civil-use security drones, including a system of defence drones which is mainly sold to major airports and infrastructure and transport projects; Convexum Ltd acquired in January 2023, regardless of the exact date, by a new subsidiary of the Fund, SAGITTA HOLDCO S.à r.l., as part of a restructuring plan approved by the Tel-Aviv Court;

- via several companies incorporated under Luxembourg law, including NorthPole HoldCo S.à r.l., Triangle Holdings S.A. and NorthPole Newco S.à r.l.: a group of companies essentially based in Israel and known under the name of "NSO Group" (hereinafter **"NSO"**) operating in the field of offensive cyber technology (e.g. spyware); on 17 February 2023, following NSO's failure to pay, the creditors of NSO enforced the pledge they held over the shares of NorthPole Newco S.à r.l. by having these shares appropriated by a third party; Master Luxco therefore no longer holds any stake in NSO since 17 February 2023, regardless of the exact date.

### 1.4.  Issues related to NSO

18.    NSO deserves particular attention because the dispute between the Novalpina group, and behind it the Founders, and the submitting parties, is partly linked to the situation of this group of companies.

---

[4]    MOLITOR Exhibits 64 and 65

[5]    It is important to note that the LPA gives a broader definition of the term *"Portfolio Company"*, which generally includes any company in which the Fund has invested, including therefore Master Luxco

19. In the early stages following its incorporation, the Fund kept to its commitment to invest in European companies, acquiring OEG in the gaming sector in Estonia, followed by the French pharmaceutical group LXO, in 2020. However, in 2019, the Fund acquired a majority stake in NSO, a group of Israeli companies founded in 2010.

20. NSO's flagship product is Pegasus software, described in New York Times as "*the world's most powerful cyberweapon*". This is spying technology capable of remotely monitoring smartphones without any action by the telephone user ("*zero-click surveillance*").

21. It allows the software user to take almost total control of a smartphone, including access to data stored on the device (such as messages), to monitor calls made on the device in real time and even exercise remote control over the camera and the microphone (which may potentially be activated to listen, in real time, to conversations held near the device).

22. Despite NSO's allegations that "*Pegasus*" was exclusively designed to be used by the authorities in the fight against crime, multiple pieces of evidence and allegations have accumulated since 2016 which appear to attest to a historical practice of offering the software to various governments and government agencies to be deployed in circumstances involving human rights violations.

23. The investment in the NSO group was clearly toxic and should never have been made, at the very least not without complete and adequate prior information about the real risks incurred given the extent of the investment (which represents approximately 40.7% of the value of the Fund's investments as at 30 September 2021). In view of the revelations that succeeded one another after the appointment of Treo NOAL, it became clear that the Fund would get nothing from realising its stake in NSO and that this investment was devoid of any value at the time of the dismissal of Novalpina GP (as will be explained below).

24. The failure of Novalpina GP and the Founders to put in place a solid governance structure is directly responsible for the total depreciation of the Fund's stake in NSO. As a prudent and diligent general partner, Treo NOAL has endeavoured, since its appointment, to actively manage the investment in order to prevent, at least to limit, additional damage to the Fund. The scope of the mismanagement committed by Novalpina GP continues to be investigated in the context of a series of legal proceedings, actions or regulatory investigations currently in progress[6]. By the present action and the other proceedings launched by them, the plaintiffs seek to destroy Treo NOAL's efforts to bring to light the circumstances that led Novalpina GP to make decisions in the context of the acquisition and management of NSO which have proved disastrous.

### 1.5. *The powers of the general partner of the Fund in relation to Master Luxco and the Portfolio Companies*

25. Among the powers conferred by the LPA to the Fund's general partner <u>to enable it to manage the assets</u> of the Fund, including Master Luxco and the Portfolio Companies, is the right for the general partner:

   - to operate and control the Investment Holding Vehicles (Article 10.3.1.) and;

---

[6]  See MOLITOR Exhibits 90, 96, 100 and 104

- to appoint *"Nominated Directors"* within each *"Portfolio Company"*, the definition of *"Portfolio Company"* comprising within the meaning of the LPA not only the Portfolio Companies, but Master Luxco itself (Article 10.3.9.);

26. Article 11.3 of the LPA specified that the Fund's general partner could appoint its own directors as directors of a *"Portfolio Company"* so that the latter exercise their powers in it in the best interests of the Fund (provided that these interests do not conflict with their duties with regard to the *"Portfolio Company"* concerned).

27. It follows from the foregoing that the power of Novalpina GP to appoint directors within the subsidiaries of the Fund obligatorily ceased with its dismissal by the Investors in accordance with the terms of the LPA.

28. This point is important for the proper understanding of the sequence of events.

**2.   The dispute between the Founders and its consequences on the operation of the Fund**

29. A letter sent by Mr PEEL on around 15 December 2020 to the LPAC[7] shows that a dispute arose between him and the other Founders at the end of 2020, regardless of the exact date.

30. The exact factual genesis of the dispute, largely echoed by the press[8], is not known (although it was suggested in the media that it was linked to the NSO Group, in which the Fund has invested massively), but it led to a highly detrimental situation for the Fund.

31. It had to deal with a certain paralysis and shortcomings on the part of the general partner at the time, Novalpina GP, in the management, control and supervision of the Portfolio Companies, as well as on the part of two *"Investment Advisors"* of the Fund, Novalpina Capital LLP and Novalpina Capital International Management LLP (the "**Investment Advisors**").

32. The dispute between Founders was brought several times before the Luxembourg courts from the beginning of 2021. In particular, it gave rise to interim decisions dated 4 August 2021, 27 August 2021 and 8 December 2021 which serve as a pretext for this action.

33. Hostilities began with a resolution adopted on 10 January 2021 by the management board of Novalpina Capital Group S.à r.l. ("**Novalpina Topco**"), the sole shareholder of Group GP, aiming to suspend the voting rights of Mr PEEL within this entity.

34. The circumstances of this meeting were the subject of enlightening minutes drawn up by two independent general partners at the time[9]. Everything suggests that Mr PEEL's removal was obtained fraudulently. This meeting is the starting point of a chain of events that led to other abuses and fraud committed to the detriment of the Fund, which is why a criminal complaint was filed in relation to the actions taken at the meeting[10].

---

[7]   See Minutes of the Investors' Meeting of 9 July 2021, p.10; MOLITOR Exhibit 18

[8]   MOLITOR Exhibit 1

[9]   MOLITOR Exhibit 99

[10]   MOLITOR Exhibits 108 and 113

35. The attempt to remove Mr PEEL resulted in a bitter struggle between the Founders for control of the Novalpina group.

36. This entire chain of events was unfolding before the eyes of Investors who gradually realised that the personal dispute between the Founders was leading to highly detrimental consequences on the Fund and its assets, on the valuation of the latter and consequently, on their commitments in the Fund.

37. It was in this context and in response to this situation that eight members of the LPAC engaged the English firm Proskauer Rose LLP (**"Proskauer"**) as counsel at the beginning of 2021 in order to get out of the impasse in which the Fund and Novalpina GP found themselves because of what appeared to be irreconcilable differences in points of view which were paralysing the proper management of the Fund.

38. With this in mind Proskauer attempted, in the name and on behalf of certain Investors, to conduct a conciliation between the Founders by asking them to submit solutions to it in order to get out of the deadlock situation in which the Fund found itself[11]. The proposals made by each camp were based on the withdrawal of the other camp from the management of the Fund. Consequently, the Founders failed to settle their dispute amicably.

39. As no solution to the dispute between Founders emerged, it appeared to the Investors that the only solution to restore serenity within the Fund and the Portfolio Companies was by the replacement of Novalpina GP as General Partner.

40. Indeed, one of the few protections offered to Investors in the LPA is the power to remove the General Partner (with or without cause). It was for Investors a right of critical importance.

41. Pursuant to Article 20.2 of the LPA, the General Partner could be dismissed "without Cause" after the second anniversary of the "First Closing Date " pursuant to a "Special Consent" (Article 20.2 of the LPA) taken by the Investors convened to a general meeting in accordance with Article 10.13 of the LPA.

42. After several unsuccessful attempts at conciliation, the Investors representing more than 25% of the *"Total Fund Undertakings"* thus asked Novalpina GP on 25 June 2021[12] to convene a meeting of the Investors of the Fund to examine and vote the removal of Novalpina GP without cause, in accordance with Article 20.2 of the LPA.

43. The fact that the Investors opted for a dismissal *"without cause"* does not mean that the management of Novalpina GP was irreproachable, far from it.

44. The dismissal *"without cause"* is explained by the fact that the Investors were not, *at the time*[13], aware of serious facts that could fall within the definition of *"cause"* as it appears in Article 1.2. of the LPA. *"Cause"* is defined in an extremely restrictive manner and covers only the most serious facts, such as fraud, which must be confirmed by the courts or by the competent regulatory authority.

---

[11]    MOLITOR Exhibit 8

[12]    MOLITOR Exhibit 9

[13]    For example, the amendment of the Articles of Association of Master Luxco having introduced the unanimity rule remained hidden until 23 July 2021; see MOLITOR Exhibit 17

45.     The priority of the Investors was, at the time, to obtain the rapid replacement of Novalpina GP in order to safeguard their interests and those of the Fund. A *"without cause"* removal appeared to them the best way to achieve this goal.

46.     On 28 June 2021, Novalpina GP convened the Investors' meeting for 9 July 2021.

### 3.     The removal of Novalpina GP

47.     Knowing that the days of Novalpina GP at the head of the Fund were now numbered, the Founders, in particular Messrs Stefan KOWSKI and Bastian LUEKEN, acted behind the scenes in order to create, through a series of manoeuvres, conditions to exit the Fund that were excessively favourable to the Novalpina group and extremely detrimental to the Fund and the Investors.

#### *3.1.    The fraudulent, unlawful and unfair practices of Novalpina GP on the eve of its dismissal*

48.     Indeed, anticipating its dismissal, Novalpina GP abused the powers it held as general partner of the Fund by taking several actions with the exclusive aim of favouring its personal interests and those of the Novalpina group to the detriment of the interests of the Fund and those of its Investors.

3.1.1.    The introduction of the principle of unanimous vote in the Articles of Association of Master Luxco for any decision of the general meeting of shareholders

49.     One of the first actions taken by Novalpina GP was to lock the management of Master Luxco, so as to enable it to retain control of most of the Portfolio Companies, even after its dismissal as general partner.

50.     After the suspension of Mr PEEL's voting rights within Topco, under the conditions described above, and after winning a first judicial battle under the terms of a judgment of 7 July 2021 of the Court of Appeal[14], Messrs KOWSKI and LUEKEN, were able to appoint new general partners fully supporting their own cause within Novalpina GP.

51.     On 7 July 2021, Messrs Stefan KOWSKI and Bastian LUEKEN thus notified the three independent general partners of Novalpina GP (namely Messrs Allen FOLEY, Gaëtan DUMONT and Philip ZARB MIZZI) that they were no longer general partners and that they had been replaced by Mr Stefano PILERI and Mr Michael ZINI (hereinafter the **"New General Partners"**)[15].

52.     After being appointed as general partners of Novalpina GP, the New General Partners immediately took advantage of this to appoint themselves as general partners of NVP 101 S.à r.l., NOAL Luxco North S.à r.l. and NVP 103 S.à r.l, wholly-owned subsidiaries of the Fund. The New General Partners then controlled all the shareholders of Master Luxco[16].

53.     They then locked in the management board of Master Luxco by removing Mr Stephen Peel as a class

---

[14]      MOLITOR Exhibit 11
[15]      MOLITOR Exhibit 12
[16]      MOLITOR Exhibits 14 to 16

A general partner and all class B general partners, in order to appoint themselves as class B general partners alongside Mr Luc REGENT[17].

54. In a third stage, they amended the Articles of Association of Master Luxco by notarial deed of 8 July 2021, again on the instructions of the Founders, Messrs KOWSKI and LUEKEN, in order to introduce a principle of unanimity for any decision to be taken by the shareholders of Master Luxco, including the removal of general partners[18]. In acting like this, the New General Partners attempted to make themselves unremoveable. Through the veto right they granted to Novalpina GP, the New General Partners sought to appropriate the power held by the Fund to select and appoint the directors of Portfolio Companies.

55. It should be noted that Novalpina GP acted in a particularly underhand manner.

56. Indeed:

- Novalpina GP did not take the trouble to inform the LPAC in accordance with Article 11.4.5. of the LPA when it was clearly in a situation of conflict of interest.

    Article 11.4.5 of the LPA stipulates in fact that:

    *" (...) All other actual or potential conflicts of interest relating to the Fund of which the General Partner becomes aware shall be referred to the Advisory Committee as soon as reasonably practicable after the General Partner becomes aware of that actual or potential conflict and any material actual or potential conflict of interest shall require the approval of the Advisory Committee prior to such action which gives rise to the material actual or potential conflict of interest is pursued. To the extent the Advisory Committee makes a determination in respect of any material actual or potential conflict of interest presented to it, the General Partner shall only pursue a course of action which is consistent with such determination to the extent legally permitted"*.

- The resolution was adopted on 8 July 2021, but it was only published on 23 July 2021[19].

- Messrs PILERI and ZINI did not adopt a resolution specifically modifying the

- majority rules at the general meeting, they proceeded with a so-called *"full revision of the Articles of association"* without highlighting the changes made, which made them difficult to detect. The lack of transparency was all the less admissible given that the nature of the change conflicts with the objective pursued by the Investors through the replacement of Novalpina GP.

57. This amendment of the Articles of Association is clearly the result of fraud, if not an abuse of rights on the part of Novalpina GP. The aim of Novalpina GP was to both lock in the management of Master Luxco while giving itself a blocking minority equivalent to a veto right in Master Luxco so as to be able to control, even after its removal, the management of the companies held by the Fund.

58. By acting in this way, Novalpina GP clearly sought to deprive its successor, Treo NOAL, of the power

---

[17]    MOLITOR Exhibit 13
[18]    MOLITOR Exhibit 17
[19]    MOLITOR Exhibit 17

to appoint directors within the subsidiaries of the Fund, including Master Luxco, in accordance with Article 10.3.9 of the LPA. Novalpina GP therefore abused the powers granted to it by Article 10.3 of the LPA in order to prevent its successor from exercising these same powers! Novalpina GP, by its fraudulent tactics, thus obtained a huge advantage compared to the derisory stake it held in the amount of 0.85% in the share capital of Master Luxco. Clearly, there was no legitimate reason, of a commercial or other nature, justifying the introduction of veto rights by the New General Partners. Effectively, the Fund and its direct subsidiaries abandoned, without the slightest consideration and without plausible or credible reason, the majority rule which provided them with control of Master Luxco and most of the Portfolio Companies.

59.     The counsel of the Fund has repeatedly written to the New General Partners and their counsel requesting clarification of the reasons for the amendment, but the latter refused to provide any explanation on futile grounds[20].

60.     Novalpina GP, having undoubtedly become aware of the untenable nature of its position, will claim after the fact and with staggering bad faith, in the context of one of the summary proceedings which will be mentioned below[21], that the adoption of the principle of unanimity was supposed to protect the Fund against the harmful consequences of the application of the *"change of control"* clauses included in the financing agreement of certain Portfolio Companies. These explanations, completely made up for the purposes of the case, are absurd[22], since the triggering of these clauses was essentially linked to the change of general partner at Fund level.

61.     It is clear that the New General Partners could only act in this way on the instructions of Messrs Stefan KOWSKI and Bastian LUEKEN.

62.     It is totally inconceivable that the New General Partners could have – within 24 hours of their appointment – acquired sufficient knowledge of the particularly complex situation[23] of the Fund, Master Luxco and Portfolio Companies, to take an impartial and informed decision with regard to the interests in play, have drawn up and executed an amendment to the Articles of Association before a notary. This is all the more so since Mr ZINI would later claim, at the general meeting of 9 July 2021[24], that the New General Partners did not have the time to obtain legal advice before the meeting[25].

63.     The New General Partners only executed the script drafted in advance by the Founders.

64.     Novalpina GP is currently trying to use the unanimity rule to call into question, through the action on

---

[20]     MOLITOR Exhibits 125 and 126

[21]     MOLITOR Exhibit 131

[22]     See the arguments submitted in MOLITOR's written submissions summarising counsel's address of 16 January 2023, Nos. 48 to 68, pages 10 to 14; see MOLITOR Exhibit 138

[23]     Mr Bastian LUEKEN would himself declare, at the Investors' Meeting of 9 July 2021, that a period of 10 days for the entry into office of a new general partner of the Fund was problematic in view of the complexity of the Fund and the underlying investments (see Minutes of the Investors' Meeting of 9 July 2021, p.6: MOLITOR Exhibit 18)

[24]     It is interesting to note that despite their efforts to try to save appearances at this general meeting, the New General Partners very clearly took their instructions from Mr Stefan KOWSKI, since they consulted with him during each of the numerous suspensions of the general meeting.

[25]     The minutes of the Investors' meeting of 9 July 2021, specify this with regard to Mr ZINI: *"As an introduction to this discussion, he stressed that the general partners are the newly appointed General Partner, and they did not receive proper counselling prior to the meeting (...)"* (See Minutes of the Investors' Meeting of 9 July 2021, p.16; MOLITOR Exhibit 18)

the merits[26] and the summary proceedings[27] it initiated at the same time, the entire governance of the NOAL group.

65.    The submitting parties will return below to these proceedings, but it is interesting to note at this stage that Novalpina GP's application for interim measures was rejected in the first instance, with the judge considering in his order of 28 October 2022, that the power that Novalpina GP had granted itself "[was not] *justified by any objective element and which is certainly not in the interest of the other shareholders of the company"* and that "[everything] *therefore suggested that the Amendment of the Articles of Association was made with a view to the dismissal of NOVALPINA GP as general partner of the Fund, in order to provide it with an advantage that it should not in principle have"*[28].

66.    Insofar as Novalpina GP and the New General Partners acted in their personal interest to the detriment of the Fund and its subsidiaries, their acts are subject to criminal penalties.

67.    A criminal complaint with a claim for damages was thus filed on 21 April 2022[29], by the Fund, Treo NOAL, Master Luxco, NVP 101 S.à r.l., NVP 103 S.à r.l. and NOAL LuxCo North S.à r.l., in particular against Novalpina GP, on the basis of Article 1500-11 of the amended law of 10 August 1915 on commercial companies (**"Law of 1915"**). Complaints or denunciations were also sent to the financial regulatory authorities in the United Kingdom, Cayman Islands and Luxembourg. The submitting parties will return to this point below.

68.    In addition, the Fund and its subsidiaries which hold an interest in Luxco initiated an action for nullity against the amendment to the Articles of Association of 9 July 2021[30].

3.1.2. Unlawful remediation of a failure on the part of Group GP

69.    The amendment of the Articles of association of Master Luxco did not constitute an isolated unlawful act. The New General Partners have taken further actions to promote the interests of the Novalpina group to the detriment of the interests of the Fund and the Investors.

70.    On 8 July 2021, on the same day of the fraudulent amendment of the Articles of Association, another action by the New General Partners, on the instructions of the two same Founders, was to allow Novalpina GP to remedy a payment default by Group GP[31].

71.    Group GP was in default of payment of several capital calls over a period running from March to June 2021. It should have remedied this default within 10 working days. Failing this, it should in principle have been excluded from the Fund by the General Partner in accordance with Article 4.9.2 of the LPA.

72.    However, Novalpina GP accepted Group GP regularising its situation outside the contractual period and waived its right to take advantage of this breach by a decision dated 8 July 2021.

---

[26]    MOLITOR Exhibit 81
[27]    MOLITOR Exhibit 88
[28]    MOLITOR Exhibit 127
[29]    MOLITOR Exhibits 95 and 110
[30]    MOLITOR Exhibit 121
[31]    MOLITOR Exhibit 28

73.   In addition, Novalpina GP made this decision to waive the right to take advantage of the non-payment by Group GP without the consent of the LPAC; however, pursuant to Article 11.4.5 of the LPA, the LPAC had to give its agreement whenever the general partner had to make a decision in a conflict-of-interest situation. The unlawful waiver of the right to take advantage of the non-payment did not benefit the Fund (which did not need the funds in an overriding manner, and which did not in fact receive them before 4 August 2021). On the contrary, it was designed to increase the commitments of the future purchaser of the *"Sponsor Commitment"* (the new general partner or a third party) to Group GP pursuant to Article 20 of the LPA in the event that Novalpina GP was removed from its duties as general partner at the investor meeting scheduled for 9 July 2021.

74.   Indeed, the removal of Novalpina GP triggered, as the submitting parties will detail below, the right of Group GP to have its *"Sponsor Commitment"* acquired. The waiver of the right to take advantage of the non-payment thus allowed Group GP to increase its *"Sponsor Commitment"* just before the dismissal of Novalpina GP. By increasing its *"Sponsor Commitment"*, Group GP hoped to be able to take greater advantage of the other fraudulent tactic that the Novalpina group, under the direction of Messrs KOWSKI and LUEKEN, was preparing to implement, namely obtaining a grossly overvalued report on the value of the Fund's assets, which will be discussed below. In short, Group GP was authorised to unlawfully remedy a payment default in order to be able to obtain a better benefit from another future unlawful act.

75.   It is clear that this decision to waive the payment default was only taken in the sole and exclusive interest of the plaintiffs and the Founders, to the detriment of the interest of the Fund and the Investors.

76.   This point was also raised with the New General Partners by the counsel of the Fund and Treo NOAL, without obtaining any response again.

### 3.2.   The deliberate acts of obstruction of Novalpina GP during and after the general meeting of 9 July 2021 convened for its dismissal

77.   Novalpina GP does not lack audacity when it states, in its summons of 25 February 2022, that it allegedly showed its *"clear good faith"* and *"attempted by all means to facilitate the transition"*[32].

78.   On the contrary, Novalpina GP did everything to disrupt the process to remove the general partner, as demonstrated by the extraordinary conditions under which the Investors' meeting of 9 July 2021 took place[33]. Not only did Novalpina GP make the voting process extremely restrictive for the Investors, but it refused, without valid reason, to publish the results of the Investors' meeting of 9 July 2021 and only made this publication once it was forced to do so by an order of the Presiding Judge of the Luxembourg District Court obtained by the members of the LPAC on 20 July 2021[34].

---

[32]   See the summons of 25 February 2022, title 1.3, page 12

[33]   See on this subject Mr Stephen PEEL's request of 3 August 2021, points 41 to 44, MOLITOR Exhibit 27; see also MOLITOR Exhibit 18.

[34]   MOLITOR Exhibit 20; the submitting parties specify in full transparency that this order was subsequently withdrawn.

79. It was only on 21 July 2021 that Novalpina GP provided the Fund's legal counsel with a bailiff's report detailing the result of the vote of the Investors' meeting, according to which the removal of Novalpina GP had been adopted by an overwhelming majority of 99.6%[35].

80. On 23 July 2021, two weeks after the vote, Novalpina GP finally announced to investors that the vote had been adopted[36].

81. Investors would understand later the reasons why Novalpina GP deliberately delayed the announcement of the results of the vote when they learnt of the existence of a report valuing the assets of the Fund prepared by Ernst & Young Luxembourg ("**EY**"). Had the results been announced immediately, it would have been more difficult for Novalpina GP to set up its scheme to obtain a report presenting a gross overvaluation of the assets of the Fund.

82. This will be discussed in more detail below.

83. Prior to that, it is important to revisit the legal consequences of the dismissal of Novalpina GP.

### 3.3.   *The legal consequences of the dismissal of Novalpina GP*

84. Pursuant to Article 20.3 of the LPA, the dismissal "*without Cause*" of Novalpina GP opened a certain number of rights to the plaintiffs:

   (i)   The dismissed general partner, Novalpina GP, was to receive, within 20 days[37] and in accordance with Article 20.3.1.1 of the LPA, a payment equivalent to the amount of the "*Priority Profit Share*" calculated for the previous year.

   (ii)  The "*Carried Interest Partner*" (i.e. Novalpina SCSp) was, where applicable, to receive an amount determined by an independent valuer in accordance with Articles 20.3.3 and 20.3.4 of the LPA (the "**Independent Valuer**"), corresponding to the amount it would have received had the Fund terminated (and the assets had been sold) at the time of the dismissal (hereinafter the "**Removal Entitlement**").

   (iii) The new general partner also had to acquire (or have acquired by a third party) the "*Sponsor Commitment*" of Novalpina SCSp, Group GP and Clarendon Trust (the "**Sponsor Entities**") (Article 20.3.5 of the LPA) if the latter so requested. The "*Sponsor commitment*" was also to be the subject of a valuation report by the Independent Valuer.

85. The dismissal of Novalpina GP also made essential the actual appointment of a new general partner within a specified period in order to avoid the liquidation of the Fund under Articles 20.2.2 and 19.3 of the LPA.

86. In its version applicable on 9 July 2021[38], Article 20.2.2 of the LPA stipulated this:

---

[35]   MOLITOR Exhibit 21

[36]   MOLITOR Exhibit 22

[37]   This period was extended to 35 days by the "*Third Amended and Restated Agreement Limited Partnership Agreement*"; Exhibit 4 of *Maître* Nicolas THIELTGEN

[38]   Exhibit 3 of *Maître* Nicolas THIELTGEN

*"The removal of the General Partner pursuant to clause 20.2.1 shall not be effective until the date on which a new general partner of the Partnership is appointed, the election of such a new general partner of the Partnership to require a Special Consent. If Investors do not approve the appointment of a new general partner pursuant to this clause 20.2.2, the Partnership shall automatically terminate and be wound up in accordance with the provisions of clause 19.4".*

87.    Article 19.3, in force at the same time, specified, for its part, that:

*"Following the insolvency, dissolution, liquidation, removal or withdrawal of the General Partner (except where voluntary for the purposes of restructuring or amalgamation), the Partnership and its activities may be continued if, within 20 Business Days of such event: (i) a Special Consent or, in respect of the removal of the General Partners pursuant to clause 20.1, an Ordinary Consent, approving the continuation of the Partnership and the election of a new General Partner; and (ii) such new General Partner is appointed as general partner of the Partnership".*

88.    Further to the points of the submitting parties, it is important to note that under the terms of the foregoing provisions, it was necessary not only for the Investors to proceed with the appointment ("election") of a new general partner, but that the latter actually is appointed within the time limit set to avoid a liquidation. This results in particular from the two cumulative conditions required by Article 19.3 to allow the continuation of the Fund.

### 3.4.    The obtaining by Novalpina GP of a biased and fundamentally vitiated valuation report in order to serve the interests of the Novalpina group

89.    The New General Partners took advantage of the respite they had arranged for themselves by delaying the announcement of the results of the Investors' vote at the general meeting in order to obtain, through the implementation of various schemes, a totally biased valuation report (the **"EY Report"**)[39].

90.    Apparently, the production of this report responded to a request from Sanne LIS S.A., the AIFM of the Fund (hereinafter **"LIS"**). In reality, the report was ordered by Messrs KOWSKI and LUEKEN who, after having suspended Mr PEEL's voting rights at Novalpina Topco level, wanted to apply valuation methods radically different from those applied historically by the Investment Advisors, claiming that the valuation was the responsibility of the general partner.

91.    The Founders, who controlled and still control Novalpina GP, used as a pretext LIS's request in order to have a completely biased valuation report hastily drawn up, based on false information and exclusively intended to support the exorbitant and unjustified financial claims of the Novalpina group in respect of the *"Sponsor Commitment"* and *"Removal Entitlement"*.

92.    Indeed, barely seven days after they took office as general partners of Novalpina GP, and while the Investors were still waiting for Novalpina GP's dismissal to be confirmed, the New General Partners signed EY's letter of engagement in order to obtain a valuation of the assets of the Fund.

93.    It is important to clarify here that Novalpina GP did not have the power to unilaterally appoint a valuer

---

[39]    Exhibit

for the purposes of determining the value of the *"Sponsor Commitment"* and the *"Removal Entitlement"*, since such appointment required the agreement of the LPAC. In addition, the valuation was to take place on the date respectively of the vote of the dismissal of the general partner *("Removal Entitlement")* and of his actual replacement (*"Sponsor Commitment"*), and not on another date, such as 30 June 2021 (date chosen with EY).

94.   The latter wanted to take advantage of the powers still available to Novalpina GP as general partner of the Fund in order to influence the outcome of the valuation. For this, they had to prevent the Investors from quickly appointing a successor. The way they found or was suggested to them by the Founders was to delay as much as possible the announcement of the results of the general meeting of 9 July 2021.

95.   Spurred on by Mr Stefan KOWSKI, who personally interfered in the management of Novalpina GP, and therefore the Fund, the New General Partners initially chose to appoint EY. Being unaware of the Fund's investments, EY was vulnerable to Novalpina GP's attempts at manipulation.

96.   In its summons of 25 February 2022, the plaintiffs suggest that it was LIS who allegedly recommended EY[40], but the exhibits submitted in proceedings demonstrate that it was indeed at the initiative of Mr KOWSKI, and despite the objections of Mr PEEL and the *Chief Financial Officer* of the Investment Advisors[41], that EY was appointed.

97.   EY deviated from the valuation methods provided for in the LPA and consistently applied since the inception of the Fund, which has led to irreconcilable differences between the previous valuations approved by the general partner and that contained in the EY Report. There was no objective reason justifying such a change in method. While EY deliberately ignored the valuation methods applied until then, it is certainly on the instructions of Novalpina GP (acting itself on the instructions of the Founders).

98.   EY has not had any contact with the management of the Portfolio Companies or with other independent third parties. EY relied, without being able to independently verify it, on the information provided by Mr Stefan KOWSKI and/or persons acting under his orders. In addition, the time limit imposed on EY was too short to allow it to conduct in-depth research and analysis.

99.   The conditions for preparing the EY Report would be strongly criticised by Proskauer in a subsequent letter of 25 August 2021[42] in these terms:

*"The Advisory Committee seeks to investigate whether there has been a breach of mandatory legal, fiduciary, or contractual duty by any of the Former IDs or the GP itself in relation to the Q2 Valuation, including by bad faith manipulation or failure to discharge properly each party's duty in relation to the Q2 Valuation.*

*(…)*

*"There has been no explanation why such a deficient process was adopted, in particular why: (i) input information was not provided by the portfolio companies to the Investment Advisor to pass on to EY as in the normal course of quarterly valuations; (ii) the Investment Advisor's Chief Financial Officer*

---

[40]   See summons of 25 February 2022, no. 21, page 13

[41]   MOLITOR Exhibit 19

[42]   MOLITOR Exhibit 36

*was circumvented; or (iii) why the GP decided it was appropriate for it itself, with only two independent managers, with no known experience in respect of valuations, and certainly no experience of the valuation process for the Partnership, apparently to take on the function of obtaining, collating and providing to EY all input data".*

100. Proskauer's letter would also recall that the New General Partners acted in disregard of the patent conflict of interest in which Novalpina GP found itself:

*" (...) the Former IDs[43] and the GP knew the LPs[44] had voted to remove the GP without Cause such that certain sums became due under the LPA to the GP and its affiliates in the context of such removal.*

*(...)*

*The GP's ultimate owners and affiliates therefore had and have a direct interest in the outcome of the Q2 Valuation process. The GP was therefore clearly conflicted when it unilaterally directed development of valuation inputs and the valuation process".*

101. Due to the blatant deficiencies in the valuation process, EY ended up, in its report, with a distorted, unreasonable and indefensible valuation of the Fund's assets in the second quarter of 2021. Taken at face value the EY Report would demonstrate that the Fund's assets had allegedly at least tripled in value in the space of 6 months, i.e. between 31 December 2020 (date on which the annual financial statements of the Fund for 2020 were approved) and 30 June 2021. This is obviously pure fiction as no significant event, likely to have positively impacted the value of the Fund's assets in such a massive way, occurred during this period. The EY Report is the culmination of the desperate tactics undertaken by the Novalpina group in order to artificially inflate the value of the *"Sponsor Commitment"* and *"Removal Entitlement"*, discussed below. The conclusions of the EY Report must be rejected from the outset and cannot have any impact on the determination of the alleged claims that the plaintiffs claim to hold against Treo NOAL and the Fund.

102. The submitting parties will return below to the EY Report, but they specify that this report was contested by the Investors as soon as they became aware of it. The latter immediately understood that the valuation was not based on reliable bases and gave an image of the value of the assets that was completely divorced from reality. The ousted Founder, Mr Stephen PEEL, himself acknowledged that this valuation was unreliable. The conduct of Messrs ZINI, PILERI, KOWSKI and LUEKEN was the subject of complaints to the Commission de Surveillance du Secteur Financier in Luxembourg[45] (all four) and before the *"Financial Conduct Authority"* in the United Kingdom[46] (for Messrs KOWSKI and LUEKEN).

## 4.    The "Sponsor Commitment" redemption request

103. By letter of 23 July 2021[47] sent on the same day as the announcement of the vote on its dismissal to

---

[43]    This expression refers to Messrs PILERI and ZINI

[44]    *"LPs"* refers to the Investors

[45]    MOLITOR Exhibit 117

[46]    MOLITOR Exhibit 114

[47]    MOLITOR Exhibit 22

the Investors, Novalpina GP invoked clause 20.3.5 of the LPA in order to demand that the new general partner of the Fund, who had not yet been appointed, acquire or have acquired the entire "*Sponsor Commitment*".

104. It is interesting to note that in this letter, Novalpina GP proposed to the Investors to appoint EY in order to proceed with the valuation of the *"Sponsor Commitment"*, when EY had already been hired since 16 July 2021.

## 5.    The appointment of Treo NOAL as new general partner of the Fund

105. After the dismissal of Novalpina GP, the appointment of the new General Partner of the Fund should, in accordance with clause 19.3 of the LPA, have taken place within 20 business days.

106. However, this period was extended to 35 business days by an amendment to the LPA made on 5 August 2021 with the agreement of Novalpina GP, represented by the New General Partners[48].

107. As follows from the letter sent by Novalpina GP to the Investors on 9 August 2021[49], Treo NOAL, called BRG NOAL GP at the time, was appointed as new general partner of the Fund in accordance with the "*consent forms*" which were communicated by the Investors to the management board of Novalpina GP on 6 August 2021.

108. BRG NOAL GP was a subsidiary of the US company BRG ASSET MANAGEMENT LLC, a company subject in the United States to the supervision of the Security Exchange Commission. BRG NOAL and its parent company had no connection with the Founders. It was chosen as an independent professional general partner in order to resume the management of the Fund in a context of dysfunction caused by the dispute between Founders.

109. It should be noted that the Investors approved by an overwhelming majority of **more than 96%** the following two resolutions:

    −    *"continuation of the Partnership pursuant to clause 19.3;*
    −    *election and appointment of BRG NOAL GP S.à r.l. as new general partner of the Partnership for an indefinite duration the appointment taking effect when the required Consent has been obtained on accordance with the LPA".*

110. The new general partner was thus elected by the Investors on 6 August 2021.

111. However, this appointment only became effective, as the submitting parties will detail below, on 27 August 2021 after Treo NOAL had formally accepted its appointment[50].

112. In the summons[51], the plaintiffs claim that the *"Special Consent"* required for the appointment of the new GP should have been adopted at a general meeting rather than by means of a circular resolution.

---

[48]    Exhibit 4 of *Maître* Nicolas THIELTGEN
[49]    MOLITOR Exhibit 32
[50]    MOLITOR Exhibits 42 and 43
[51]    See the summons of 25 February 2022, no. 10 (i), page 10

However, the LPA does not impose such a requirement. It simply states that a "*Special Consent*" presupposes: "*[...] the written consent*[52] *of Fund Investors whose aggregate Fund Commitments represent at least 75% of Total Fund Commitments at the time of the request for such consent (...)*".

### 6.    A new unforeseen development in the dispute between Founders: the presidential order of 4 August 2021

113.   Just before the appointment of Treo NOAL, Mr PEEL obtained, by presidential order of 4 August 2021, the suspension of the resolution appointing Messrs PILERI and ZINI as general partners of Novalpina GP and removing Messrs DUMONT, MIZZI and FOLEY.

114.   The latter were therefore reinstated as general partners of Novalpina GP.

### 7.    The taking up of office of Treo NOAL

115.   Although it was appointed by the Fund's Investors as new general partner of the Fund on 6 August 2021, Treo NOAL did not immediately take office.

116.   It is important to note here that as soon as Treo NOAL was approached to take over the duties of general partner of the Fund, negotiations were developed between the Investors, the Novalpina group, the Founders, with each party being assisted by its English and Luxembourg counsel, in order to facilitate the transition.

117.   There is an abundant exchange of correspondence covering the period from July to the end of August 2021, which demonstrates that most of the acts carried out, at the time or after Treo NOAL took up the appointment, were carried out in a concerted manner. It is important to note that the New General Partners, suspended under the aforementioned order of 4 August 2021, were kept informed of the negotiations[53].

118.   Treo NOAL finally accepted its term of office as general partner of the Fund on 27 August 2021. It was at that time that its appointment took effect. Indeed, as the plaintiffs themselves acknowledge, an appointment is not effective until it has been accepted[54].

119.   Treo NOAL therefore did not "*self-proclaim itself*"[55] general partner of the Fund, as the plaintiffs assert. It simply accepted the term of office that the Investors entrusted to it by their vote and made it known.

120.   This acceptance took place in the context of the negotiations aimed at structuring the transition process conducted by the Founders with the Investors (and their respective counsel). These negotiations ended with the express and unequivocal recognition of Treo NOAL as the new general partner of the Fund by each of the Founders, by Group GP and by Novalpina SCSp. Each of these parties signed a written document in which it acknowledged the effective appointment of Treo NOAL

---

[52]   Our emphasis

[53]   MOLITOR Exhibit 37

[54]   See the summons of 25 February 2022, no. 16, page 12

[55]   See the summons of 25 February 2022, no. 14, page 11

while undertaking not to challenge it, which they nevertheless are doing in the context of this action. This point will be further developed below.

121. The new general partner had to take up office on 27 August 2021 (i.e. 35 business days after the dismissal of Novalpina GP). Failing this, the Fund should have been liquidated in accordance with Article 20.2.2 of the LPA.

122. On 27 August 2021, immediately after taking office, Treo NOAL, in accordance with the LPA, changed the composition of the management board of Master Luxco by resolution of the shareholders of Master Luxco in order to be represented on it. All the shareholders of Master Luxco, including Novalpina GP, voted in favour of this amendment.

123. This was necessary in order to enable Treo NOAL to take up its role as general partner in accordance with the terms of the LPA, since the general partner was supposed, pursuant to Article 10.3.2., to "*operate*" and "*control*" the "*Investment Holding Vehicles*", which included Master Luxco and the Portfolio Companies.

**8.    The fulfilment of the obligations arising for the Fund and/or the new general partner from Article 20.3 of the LPA**

124. It was specified that the removal of Novalpina GP as general partner of the Fund gave rise to a number of obligations incumbent upon the Fund and/or the new general partner with respect to Novalpina GP and the Sponsor Entities, including Group GP and Novalpina SCSp, namely:

- the payment to Novalpina GP of compensation equal to the "*Priority Profit Share*" calculated for the previous year (Article 20.3.1.1 of the LPA);

- the payment, where applicable, of a "*Removal Entitlement*" to Novalpina SCSp (Articles 20.3.2 to 20.3.4 of the LPA) provided that the value of the Fund's investments has increased in significant proportions in relation to their acquisition value;

- the acquisition of the "*Sponsor Commitment*" held by "*Novalpina*" by the new general partner or a third party (Article 20.3.5 of the LPA) if the latter so requests.

125. The plaintiffs claim in their summons that the payment of the "*Priority Profit Share*" and the acquisition of the "*Sponsor Commitment*" were conditions precedent to the taking up of office of Treo NOAL.

126. These allegations are inaccurate and formally challenged by the submitting parties for the reasons that will be detailed in the "*in law*" part of these submissions.

*8.1.    The payment of the "Priority Profit Share"*

127. As the plaintiffs acknowledge[56], the payment *of the "Priority Profit Share"*, i.e. the amount of EUR 18,572,930, was paid to Novalpina GP on or around 25 August 2021.

---

[56]    See summons of 25 February 2022, no. 10, page 10

128.  The Fund therefore fulfilled its payment obligation under Article 20.3.1.1 of the LPA.

**8.2.    The possible right to payment of a "Removal Entitlement"**

129.  In accordance with Article 20.3.2 of the LPA, the *"Carried Interest Partner"*, namely Novalpina SCSp, has a *possible right* to the payment of a *"Removal Entitlement"*. However, the existence and amount of Novalpina SCSp's potential claim must be established and confirmed as part of a valuation.

130.  As of the date hereof, the "*Removal Entitlement*" has still not been valued by the Independent Valuer for the reasons that will be detailed below.

131.  It is absolutely not established that Novalpina SCSp may *ultimately* claim any payment under the *"Removal Entitlement"*. Regarding the elements of the case, everything suggests that it will not be entitled to anything.

**8.3.    The acquisition of the "Sponsor Commitment"**

132.  Pursuant to Article 20.3.5 of the LPA, "*Novalpina*" (as this term was defined in the LPA) was entitled to request at any time that the new General Partner acquire or <u>have acquired</u> its "*Sponsor Commitment*" at a price equal to the value of its stake on the date of its dismissal. Like the *"Removal Entitlement"*, the *"Sponsor Commitment"* must also be valued, but on a different date (Article 20.3.5).

133.  In view of the wording of Article 20.3.5 of the LPA, Treo NOAL was therefore under no obligation to itself acquire the *"Sponsor Commitment"*. It could be validly acquired by a third party, including the Fund itself.

134.  The *"Sponsor Commitment"* was validly acquired by the Fund on 27 August 2021, after Treo NOAL took office.

135.  The acquisition took place in two stages:

8.3.1. <u>Amendment of the LPA</u>

136.  Contrary to the plaintiffs' allegations[57], no provision of the second LPA or the third LPA formally prohibited the acquisition by the Fund of the *"Sponsor Commitments"*. The *"Investment Guidelines"* mentioned by the plaintiffs do not address the issue of the purchase of a *"Commitment"*. They only raise the context in which the Fund's investments are to be made. The purchase of *"Special Commitments"* clearly did not constitute an *"investment"* within the meaning of the "*Investment Guidelines"*. As for Article 10.4 of the LPA, it only settles the question of the Fund's borrowings.

137.  It is true, nevertheless, that the purchase of the "*Sponsor Commitment*" could not, given the size and the particular nature of the transaction, be carried out without the consent of the Investors.

---

[57]    See summons of 25 February 2022, no. 10 (iii), page 10

138. The *"Fourth Amended and Restated Limited Partnership Agreement"* (**"Fourth LPA"**) in fact establishes this agreement.

139. It expressly authorises and organises the financing of the acquisition of *"Sponsor Commitments"* by the Investors.

140. The Fourth LPA was pre-approved by the Investors by a majority of 95.6% and signed by Treo NOAL after taking office.

8.3.2. Expression of the Fund's desire to acquire the *"Sponsor Commitment"*

141. After the amendment of the LPA, Treo NOAL, in its capacity as new general partner, informed Novalpina GP by letter of 27 August 2021[58] that the Fund was purchasing, in accordance with the terms of the LPA, their *"Sponsor Commitment"* from the Sponsor Entities.

142. At the same time, the Fund informed Group GP and Novalpina SCSp that it was purchasing their *"Sponsor Commitment"* by sending them *"Notices of Acquisition"*[59].

143. The *"Notices of Acquisition"* clearly specify that the Fund purchases from each of the Sponsor Entities their *"Sponsor Commitment"* in accordance with Article 20.3.5 of the LPA (in force at the time of the exercise by Novalpina GP of the right to repurchase the *"Sponsor Commitments"*).

144. These *"Notices of Acquisition"* therefore constituted a pure and simple acceptance of the purchase request made by the Sponsor Entities dated 23 July 2021 pursuant to Article 20.3.5 of the LPA.

145. Subsequently, the Fund issued *"Promissory Notes"* (hereinafter the **"Notes"**) to the Sponsor Entities guaranteeing them, in accordance with the terms of the LPA, the right to full payment of the *"Sponsor Commitment"* once the value thereof has been determined in accordance with the LPA[60]. These Notes would be expressly accepted by the Sponsor Entities under the terms of the agreements referred to below.

146. It is important here to specify that, contrary to the plaintiffs' allegations, no provision of the LPA required the immediate payment of the *"Sponsor Commitment"* on the date of its acquisition.

147. Under the Notes, the Fund however undertook to repay to the Sponsor Entities the nominal amount of the sums already invested in the Fund as part of their *"Commitment"*, i.e. the total sum of EUR 43,290,532.63 (including EUR 10,354,530 to Group GP and Novalpina SCSp), as soon as Treo NOAL took over control of the Fund's bank accounts.

## 9. The conclusion of the agreements of (or around) 30 August 2021

148. After taking office on 27 August 2021, Treo NOAL, the Fund, the Sponsor Entities and the Founders

---

[58]    MOLITOR Exhibit 43

[59]    MOLITOR Exhibits 44 to 46

[60]    MOLITOR Exhibits 47 to 49

continued their negotiations started before it took office. These resulted in the conclusion of a series of agreements around 30 August 2021 (**"the Agreements"**).

149. The agreements had three objectives:

- recognition by Novalpina of the change of general partner of the Fund;
- the provision to the Sponsor Entities of a payment guarantee for the *"Sponsor* Commitment";
- the definition of the methods to value the *"Sponsor Commitment"* and the *"Removal Entitlement"*.

150. Firstly, Treo NOAL obtained from each of the Founders and each of the Sponsor Entities undertakings (**"Undertakings"**[61]) pursuant to which they acknowledged Treo NOAL as the new General Partner of the Fund with effect from 27 August 2021 and irrevocably and unconditionally undertook not to assert the contrary, nor to induce or provoke any statement to the contrary or to challenge or question the validity of its appointment, nor to induce or file any such dispute or challenge in any applicable forum.

151. The signatories of the Undertakings also agreed to cooperate with the new general partner in order to allow for a complete, orderly and timely transfer of the Fund and all of its assets. Among its key assets were Master Luxco, the Fund's main holding company through which it holds and controls the Portfolio Companies.

152. Even if Novalpina GP did not sign such an undertaking, it, by its behaviour and the acts it has taken in order to assist and allow Treo NOAL to take up its duties as new general partner of the Fund and take control of the subsidiaries of the fund, implicitly, but necessarily waived the right to challenge the changes made to the management of Master Luxco by Treo NOAL in order to be able to perform its term of office as general partner of the Fund. Moreover, it is inconceivable that Novalpina GP could not have acquiesced even implicitly in view of the fact that the Undertakings were approved by (i) the three Founders, who are the beneficial owners of Novalpina GP (ii) by one of its general partners, Mr Allen FOLEY, even if it was on behalf of Group GP, as well as by (ii) its Group GP, its parent company.

153. In return for the Undertakings signed by the Sponsor Entities, including Group GP and Novalpina SCSp, Treo NOAL agreed to issue to them a guarantee in the form of a pledge (hereinafter the **"Pledge"**) [62]covering the undertakings entered into under the Notes and in particular that of paying the entire *"Sponsor Commitment"*.

154. The Pledge was therefore not addressed to the Sponsor Entities at the same time as the Notes, as the plaintiffs contend, but after the Notes were issued following an agreement.

155. The acceptance of the Pledge by the Sponsor Entities necessarily entailed that of the Notes.

156. Finally, the parties agreed on the date on which the valuation of the *"Sponsor Commitment»* and *"Removal Entitlement"* was to be carried out, namely 1 August 2021, as well as on the principles to be applied to the hiring of the Independent Valuer. They have precisely defined the documents to be

---

[61]    MOLITOR Exhibits 52 to 57
[62]    MOLITOR Exhibit 51

transmitted and the instructions to be given to it so that it can carry out the valuation required under clauses 20.3.3 and 20.3.5 of the LPA (in force on that date) (hereinafter the **"Valuation principles"**)[63].

157. By committing to the terms of the Valuation principles, Novalpina GP and the Founders implicitly acknowledged that the EY Report could not be used as a valuation report for the purposes of Articles 20.3.3 (*"Removal Entitlement"*) and 20.3.5 (*"Sponsor Commitment"*).

**10. The attitude of the general partners reappointed by the order of 25 February 2022 in the context of the taking of office of Treo NOAL**

158. In their summons of 25 February 2022, the plaintiffs criticise the choices and decisions taken by the general partners " *temporarily reappointed* " (Messrs DUMONT, MIZZI and FOLEY) following the order of 4 August 2021, on the grounds that they " *never questioned the transfer of the term of office from the General Partner of the Fund to BRG NOAL GP* " and that allegedly they " *took advantage of their position to facilitate and orchestrate the effective takeover of BRG NOAL GP"*[64].

159. The plaintiffs seek, for reasons as fallacious as they are self-serving, to discredit Messrs DUMONT, MIZZI and FOLEY who found themselves involved despite themselves in the dispute between Founders.

160. However, it emerges from the exchanges of emails at the time that the general partners *"temporarily reappointed"* acted prudently and thoughtfully.

161. After the order of 4 August 2021, they resumed discussions with the Investors where the New General Partners had left them. They continued to be assisted by LOYENS & LOEFF, which advised Novalpina GP in the context of these discussions.

162. They scrupulously made sure not to take any action likely to attract the disapproval of the 3 Founders. They only signed the Agreements on behalf of the plaintiffs after ensuring that the Founders would do the same.

163. The plaintiffs cannot reasonably argue that Messrs DUMONT, MIZZI and FOLEY acted against their interests while their actions were approved by their economic beneficiaries. The latter would not have hesitated to act, despite their dispute, if they believed that the actions of the *"temporarily reinstated"* general partners were contrary to the interests of the Novalpina group.

**11. The implementation of Agreements**

*11.1. The Undertakings*

164. After the signing of the Undertakings, Novalpina GP and all the signatories of the Undertakings actively collaborated in order to enable Treo NOAL to take over the management of the Fund, Master Luxco and Portfolio Companies in accordance with the will clearly expressed in the Undertakings.

---

[63]     MOLITOR Exhibit 58

[64]     See summons of 25 February 2022, no. 31, page

165. Treo NOAL's takeover of all the companies held by the Fund was an integral part of the transition process after the dismissal of Novalpina GP, which Mr Stefan KOWSKI himself acknowledged in several emails sent to the advisors of the LPAC on 1 and 10 August 2021[65].

166. By email of 31 August 2021[66], MACFARLANES, which acted in particular for the Founders with the agreement of Novalpina GP, itself advised by LOYENS & LOEFF, circulated a list of the entities belonging to the Fund whose management had to be replaced. Among these entities was Master Luxco.

167. This was a response to a request made by one of the Fund's advisors, DLA Piper, on 30 August 2021 requesting confirmation of the resignation of the officers and employees of Novalpina from all boards of directors and management of the subsidiaries of the Fund. MACFARLANES therefore confirmed, without being contradicted by the recipients of its email, including the three Founders, that the composition of the management bodies of Master Luxco and of the Portfolio Companies would be modified in execution of the Undertakings.

168. On 6 September 2021[67], two of the Founders, namely Messrs LUEKEN and PEEL resigned from their mandates as general partners of Master Luxco, although such resignation was not legally required due to their dismissal voted on 27 August 2021.

169. On 27 October 2021, the Articles of Association of Master Luxco were amended as part of the transition process in order to comply with the terms of Article 20.3.6 of the LPA in its wording prior to 27 August 2021 which stipulated that:

   *"(...) the removed General Partner shall have the right, without the consent of any Investor, to cause the name of the Fund Vehicles to be changed so that it does not include the styling "Novalpina" or any variation thereof, and to make any filing related thereto".*

170. This was a clear signal sent to third parties in order to indicate to them that Master Luxco was no longer managed or controlled by the Novalpina group.

171. Novalpina GP has taken many other actions to enable the transfer of the management of the Fund, including the transfer of the Fund's bank accounts, which enabled Treo NOAL to honour one of the commitments made under the terms of the Notes.

172. The transition process between the former general partner and Treo NOAL was never called into question before 23 February 2022, the date on which the plaintiffs brought an interim action to temporarily restore Novalpina GP to its duties as general partner. The submitting parties will return to this point below.

### 11.2. Enforcement of the Notes guaranteed by the Pledge

173. In accordance with the commitments made in the Notes, Treo NOAL repaid to the Sponsor Entities

---

[65]    MOLITOR Exhibit 33

[66]    MOLITOR Exhibit 63

[67]    MOLITOR Exhibits 67 and 68

in respect of the *"Sponsor Commitment"* the nominal amount of the contributions they had made to the Fund, namely the sum of EUR 43,290,532.63. This pending the results of the independent valuation whose purpose was to confirm (or overturn) the existence of a balance to be paid.

174. In their summons, the plaintiffs assert in disregard of the most elementary good faith that the payment made by Treo NOAL in accordance with the Notes can *"only be qualified as an advance for another amount due for the dismissal, namely the Removal Entitlement"*[68].

175. These allegations are devoid of any basis and are, moreover, contradicted by the plaintiffs' own exhibits.

176. First of all, it should be noted that the transaction notices issued by Barclays bank and submitted in proceedings by the plaintiffs include the following communication: *"Remb/Sponsor Comm"*[69]. The purpose of the transfers was therefore the repayment of the *"Sponsor Commitment"*. But better still: in their inventory of exhibits, the plaintiffs themselves qualify these notices as *"Proof of partial payment of the Sponsor Commitment on 4/10/2021"*.

177. In this context, it is important to point out that to date there is nothing to assert that the payment of the sum of EUR 43,290,532.63 would only have constituted a "*partial payment*" of the *"Sponsor Commitment"*. The *"Sponsor Commitment"* " must still be valued. However, with regard to the information which the submitting parties have been able to become aware of since the date of payment concerning the situation of NSO, there is every reason to believe that the Independent Valuer will establish, at the end of his investigations, that the value of the *"Sponsor Commitment"* is less than the amount already paid to the plaintiffs. They therefore received more than what they were entitled to.

### 11.3. *The enforcement of the Valuation principles*

178. Pursuant to the Valuation principles, the parties undertook to make all reasonable efforts to hire, in accordance with the agreed terms, an Independent Valuer within 5 business days[70]. The obligation thus entered into by the parties was obviously a simple *obligation of means*, the implementation of which was not as simple as it appeared since the parties had to agree on the appointment of the Independent Valuer and on the content and scope of its letter of commitment which had to include and specify the Valuation principles.

179. The Valuation principles began to be enforced, as the parties succeeded in agreeing on the choice of the Independent Valuer, namely KPMG London.

180. However, it quickly became obvious to Treo NOA that it would not be possible to proceed immediately with the valuation in accordance with the Valuation Principles, for the reasons set out below.

### 12.    The dispute concerning Valuation

---

[68]    See summons of 25 February 2022, no. 44, page 17
[69]    Exhibit 40 of *Maître* Nicolas THIELTGEN
[70]    MOLITOR Exhibit 58

181. If the parties have been able to agree on the name of the Independent Valuer, the continuation of the valuation process has quickly encountered significant difficulties that have not yet been overcome.

182. The Valuation Principles defined the information to which the Independent Valuer should have access in order to be able to carry out its mission within the time limit set out in the Valuation Principles, i.e. 75 days after its formal commitment.

183. In this context, it has been agreed that certain underlying information (which would include forecasts and "Business Plans" for the assets of the Fund) would be prepared by the executive management teams of the Portfolio Companies in accordance with their usual processes and transmitted directly by them to the Independent Valuer. Unlike EY, the Independent Valuer should therefore have benefited from a direct channel of communication with the management of the Portfolio Companies.

184. However, the situation within the NSO group – a group that allegedly represented around 40.7% of the Fund's invested value – proved to be problematic, with Treo NOAL having had to deal with a series of revelations after the conclusion of the Agreements, namely:

- On 13 October 2021, NSO's management suddenly revealed to Treo NOAL that the company was facing an imminent lack of liquidity. The information on NSO's cash position and financial outlook had so far been carefully hidden from Treo NOAL as part of a deliberate strategy of obstruction and retention of information[71]. In the absence of an alternative source of financing, the Fund intervened at the end of October 2021 to ensure the payment of the salaries of NSO employees and avoid its immediate financial collapse. On this occasion, NSO's management promised to provide more detailed information on the group's financial situation.

- A few days after obtaining this emergency financing, on 3 November 2021[72], the NSO Group was placed by the "*Bureau of Industry and Security*" or "**BIS**" of the "*US Department of Commerce*" on its blacklist of entities accused of malicious cyber activity (hereinafter, the "**BIS Entity List**"). The BIS considered that the NSO group was an entity that "*has been involved, is involved or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States*"[73].

- The listing of NSO on the BIS Entity List prohibits the company from acquiring and selling any technology of U.S. origin and therefore has a severe impact on its operations that depend on software, hardware and services of U.S. origin.

- In the days following the listing of NSO on the BIS Entity List, NSO suffered another fatal blow, namely the departure of key management members. First, the newly appointed CEO of NSO resigned on 11 November 2021. This departure was followed by the resignation of its Chief Financial Officer, on 17 November, then that of the Chairman of the Board of Directors, on 19 November 2021[74].

---

[71] These revelations took place two weeks after the quarterly conference call held with NSO's lenders or their parent companies, at which NSO's management did not mention NSO's worrying financial situation and made all other allegations that proved to be false.

[72] MOLITOR Exhibit 76

[73] In English: "*the entity has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States*"

[74] MOLITOR Exhibit 79

- After the resignation of NSO's Chief Financial Officer *("CFO* "), NSO's financial department provided key information to Treo NOAL, which had not so far been revealed and which enabled it to obtain partial visibility of the group's sales activities. In light of this information obtained at the beginning of December 2021, regardless of the exact date, it appeared that NSO's ability to sell its main product, the *"Pegasus"* spyware, to new customers had been severely compromised well before the dismissal of Novalpina GP. After hiding these facts for months, NSO finally revealed to Treo NOAL that there had been no new orders for Pegasus software since the publication in July 2021 of the *"Pegasus Project"* consortium's report denouncing the malicious use of the *"Pegasus"* software by authoritarian regimes, the actions of which imply alleged violations of human rights.

- Shortly after these revelations, NSO admitted to Treo NOAL that it allegedly did not have sufficient liquidity to be able to honour the instalments of its loans at the end of the year and that it would soon be in default of payment under its financing agreements. NSO's legal advisors stated at the time that the group was insolvent. Uncomfortable with the fact that NSO's management continued to distort the reality of its financial situation vis-à-vis the group of lenders (particularly by refusing to grant their requests for information which would have forced it to admit the false nature of the information previously communicated), Treo NOAL took the decision to directly inform the lenders.

- In short, during its term of office, Treo NOAL encountered significant obstacles to communicating openly with NSO management. Cooperation from the remaining NSO management team, including on fundamental and necessary issues for any valuation process, was practically non-existent. Treo NOAL found that information was deliberately hidden from it, and therefore had no confidence in the reliability of the information that could be provided to the Independent Valuer to form the basis of a serious valuation. To date, the Fund is still not in possession of complete, sufficient and reliable information to understand and trace the history of the decisions taken by NSO (many of which were taken while Novalpina GP controlled the Fund and the Founders Messrs PEEL and KOWSKI were sitting on the board of directors of certain companies of the NSO group, with Mr KOWSKI also being a member of the *Governance Risk and Compliance Committee ("*GRCC*")* set up at the level of Triangle Holdings S.A., which led to its inclusion on the BIS Entity List.

- The legal actions initiated by the plaintiffs in order to call into question the governance of the Fund have only exacerbated the problem since the minority shareholders and directors of NSO have used the fallacious arguments developed by the Novalpina group as a pretext to refuse to shed light on the group's situation and to prevent Treo NOAL from obtaining accurate and exhaustive information on NSO's situation as it was before its appointment.

- Until recently, the NSO group has taken steps to prevent Treo NOAL from accessing information relating to the key business risks associated with NSO (including, but not limited to, understanding of the company's products, its customers, its corporate governance processes, the results of its own historical investigations and the status of ongoing investigations into the alleged misuse of its products) to enable it or to enable a third party valuer, to fully understand what was known or could be discovered about NSO's situation and prospects on the valuation date. However, on the basis of the limited information that Treo NOAL was able to benefit from regarding NSO's business, it became clear that the Fund's investment in NSO was seriously compromised at the very time of the appointment of Treo NOAL, with regard to: (i) its inability to sell new products after the disclosure of the *"Pegasus Project"* in July 2021; (ii) its inability to fulfil its financial obligations so soon after the dismissal

of Novalpina GP's from its duties as general partner and the active concealment of NSO's situation from Treo NOAL and the group of lenders; (iii) the listing prices of the NSO share; (iv) the fall in the price of NSO loans which fell to a fraction of their principal amount in response to the disclosure of an image that was closer to the reality of NSO's situation, indicating a valuation of NSO hundreds of millions of dollars less than the financial claims of the lenders against the group[75].

185. Treo NOAL thus had to realise that the Independent Valuer would simply not be able to receive the information necessary to carry out its valuation in accordance with the Valuation Principles.

186. Treo NOAL expressed its concerns to the counsel of Novalpina GP, LOYENS & LOEFF, on 9 November 2021[76]. It considered that the majority of the above issues, including those related to the apparent insolvency of NSO, were known, or should have been known, at least to Messrs PEEL and KOWSKI, taking into account their role as directors of NSO. Treo NOAL proposed to discuss any other alternative or proposal to move forward.

187. Indeed, there is no doubt that at the time when they negotiated the Valuation Principles, the Founders and Novalpina GP were aware of and could not reasonably be unaware of the disastrous financial situation in which NSO was[77], it being recalled that Mr KOWSKI was a member of the "*Governance Risk and Compliance Committee*" ("**GRCC**"), the NSO body in charge of governance and compliance oversight, the agreement of which was required to approve sales to high-risk customers. This lack of transparency on the state of affairs and the solvency of NSO constitutes a flagrant violation of the obligations of good faith and loyalty which were incumbent upon Novalpina GP.

188. MACFARLANES, acting for Novalpina Capital Partners I LLP (the Fund's portfolio management advisor) and the Founders, however merely responded that KPMG had to be appointed pursuant to the LPA[78].

189. Novalpina GP has failed to provide any alternative to Treo NOAL to allow for a fair valuation to be carried out, according to the Valuation Principles, or under the LPA. At the time, Treo NOAL had proposed to continue the valuation of all the Fund's other assets, with the exception of NSO. However, Novalpina GP ignored this proposal when it was a very reasonable alternative.

190. The dispute concerning the valuation of the *"Sponsor Commitment" and "Removal Entitlement"* is the trigger for the judicial offensive directed by the Novalpina group against Treo NOAL, the Fund and the Investors.

191. This offensive was constructed from a judgment handed down on 8 December 2021 by the Court of Appeal, sitting as in summary proceedings, in the dispute between Founders, that Messrs KOWSKI and LUEKEN are attempting to exploit opportunistically by denying all the commitments they made to the submitting parties.

---

[75]    MOLITOR Exhibit 91
[76]    MOLITOR Exhibit 77
[77]    The actions of Messrs KOWSKI and LUEKEN in relation to NSO were notably reported to the "Financial Conduct Authority" in the United Kingdom; see MOLITOR Exhibits 100 and 136
[78]    MOLITOR Exhibit 78

13. **The judgment handed down on 8 December 2021 in the dispute between Founders**

192. Pursuant to a judgment of 8 December 2021[79], Messrs KOWSKI and LUEKEN obtained the removal of the order of 4 August 2021. The New General Partners, Messrs PILERI and ZINI, were thus reinstated in particular as general partners of Novalpina GP.

193. On the basis of this judgment of 8 December 2021, Messrs KOWSKI, LUEKEN, PILERI and ZINI devised a plan in order to attempt to regain the management of the Fund and that of Master Luxco, and therefore to take back control of all the assets of the Fund, in order to obtain the satisfaction of the fanciful and fraudulent financial claims of Group GP and Novalpina SCSp in relation to the *"Sponsor Commitments"* and the *"Removal Entitlement"* and by putting the EY Report on the table.

194. By regaining control of the NOAL Group, the Founders also hope to be able to escape the investigations launched by Treo NOAL in relation in particular to the NOAL Group. Their interests converge on this point with the interests of NSO's directors who not only refused any investigation by Treo NOAL[80], but were still seeking to resume the sale of the sadly famous *"Pegasus"* software to high-risk customers, beyond any control. In addition, by taking control of NOAL, the Founders hope to avoid liability in the context of a series of regulatory actions in progress in Luxembourg, the United Kingdom and elsewhere.

195. It is therefore not surprising that collusion was established between the Novalpina group and NSO and that the latter are now acting jointly against the Fund and Treo NOAL.

14. **Actions (judicial or otherwise) aimed at calling into question the management of the NOAL group**

196. **On 4 February 2022**, the New General Partners initiated, without the knowledge of the submitting parties, legal actions against the three plaintiff companies, namely Novalpina GP, Group GP and Novalpina SCSp, of which they are the legal representatives, in order to request the annulment of all the acts and decisions taken by Messrs DUMONT, MIZZI and FOLEY between 4 August 2021 and 8 December 2021. The New General Partners consider that the judgment of 8 December 2021 had the effect of retroactively nullifying the acts carried out by Messrs DUMONT, MIZZI and FOLEY on behalf of Novalpina GP during this period.

197. Treo NOAL and the Fund only learned of the existence of these actions on 15 December 2022[81], when they received a copy of the two judgments that had just been handed down on 9 December 2022 in the context of these cases. These were deliberately concealed from them until that date, while numerous pleadings took place in the various proceedings detailed below. This concealment was clearly intended to prevent any intervention by the Fund in the proceedings until the judgment was handed down. The proceedings essentially constituted devices without adversarial debate. Thus, the *ad hoc* director supposed to represent Novalpina in the various proceedings was only a "*straw man*" who had the same legal adviser as the one chosen by Messrs PILERI and ZINI imposed on him for the future shares of Novalpina and who was quick to ask him to accept the requests of

---

[79]    Exhibit 37 of Maître Nicolas THIELTGEN

[80]    The fact that NSO obstructed Treo NOAL's investigations was recognised by the European Parliament's Inquiry Committee in its draft report on the misuse of the *"Pegasus"* software; see MOLITOR exhibit 139

[81]    MOLITOR Exhibits 132 and 133

Messrs PILERI and ZINI-

198. **On 15 February 2022,** arguing, again, the retroactive effects of the withdrawal decision of 8 December 2022, Novalpina GP filed a summons on the merits against the submitting parties, Master Luxco and a certain number of Portfolio Companies in order to obtain the nullity of the resolutions adopted by the shareholders of Master Luxco on 16 August 2021, 27 August 2021 and 20 October 2021[82].

199. Novalpina GP claims that it was not validly represented by Messrs DUMONT and FOLEY, who had signed the minutes of the resolutions at the general meetings having adopted these resolutions.

200. Then, on the basis of the unanimity rule that it and the New General Partners had fraudulently introduced into Master Luxco's Articles of Association on 8 July 2021, it asserts that the resolutions in question are allegedly null and void even though they allegedly had not been unanimously approved.

201. **On 15 and 16 February 2022,** at the same time as the summons of 15 February 2022, Novalpina GP sent letters[83] to the Portfolio company directors and to their creditors, with the clear aim of paralysing the operation of the Fund and the Portfolio Companies.

202. For example:

- Novalpina GP did not hesitate to write to the management of the Fund and the Portfolio Companies, in particular to NSO[84] in order to encourage their directors to consider as null and void both the appointment of certain directors and the acts carried out by the latter. This seriously hindered the work of the Class A directors of Triangle Holdings S.A., which is the key company through which numerous decisions are taken and by which the Fund holds the majority of the NSO group. These directors sought to investigate the governance, supervision and compliance by NSO with the international regulatory framework in which it was operating and the sales of the "*Pegasus*" spyware to high-risk customers, the suspension of which they requested[85].

  The Fund has very recently discovered that the NSO group had decided in February 2022, based probably on Novalpina GP's letter, to ignore the guidelines of Triangle Holding S.A. in particular with regard to the prohibition on the sale of the software to high-risk clients[86].

  Following the communications made by Novalpina GP, the "B" directors of Triangle Holdings S.A. – who are also the members of the remaining management team of NSO –, thus purely and simply refused to attend the meetings of the Board of Directors to which they were convened[87]. On the pretext of these legal proceedings, they initiated their own action in order to obtain the nullity of the resolutions having appointed representatives of Treo NOAL to the

---

[82]   MOLITOR Exhibit 81
[83]   MOLITOR Exhibits 82 to 85
[84]   MOLITOR Exhibit 85
[85]   See resolution of the board of directors of Triangle Holdings S.A. of 20 January 2022; MOLITOR Exhibit 80
[86]   MOLITOR Exhibit 139
[87]   MOLITOR Exhibit 89

Board of Directors of Triangle Holdings S.A[88].

- Novalpina GP, through Brucher, Thieltgen & Partners, also contacted the advisors (Kirkland & Ellis LLP) of the bondholders of the OEG group[89] with whom BRG NOAL had managed, not without difficulty, to enter into an agreement to restructure OEG's debt. The letter addressed to these bondholders was clearly intended to undermine the confidence of creditors in the new general partner, to hinder the proper conduct of the affairs of the Fund and to disorganise the ongoing transactions, it being specified that the letter was sent at the time the conditions of the restructuring of OEG's debt had been made public.

203.  **On 22 February 2022**, the plaintiffs filed a summons to appear in summary proceedings[90] against the submitting parties in order to obtain the suspension of the appointment of Treo NOAL as general partner of the Fund and the reinstatement of Novalpina GP to its former position as general partner. The plaintiffs also requested the suspension of the effects of all acts performed by Treo NOAL since its entry into office.

204.  **On 23 February 2022,** Novalpina GP filed an interim action[91] in order to obtain the suspension of the effects of the decisions taken by the shareholders of Master Luxco at the general meetings of 16 August 2021, 27 August 2021 and 20 October 2021. This case constitutes the counterpart, in summary proceedings, of the summons on the merits of 15 February 2022.

205.  Through the actions on the merits of 15 February 2022 and in summary proceedings of 23 February 2022, Novalpina GP attempts to take control of Master Luxco and hundreds of millions of euros of assets that it controls since the suspension and/or cancellation of the resolutions in question would have the effect of re-establishing Mr KOWSKI as class A general partner and Messrs PILERI and ZINI as class B general partners.

If its strategy is successful, Treo NOAL will be legally unable to manage and control most of the Fund's assets and this is precisely the interest of the action for Novalpina GP.

206.  **On 25 February 2022,** following their summons to appear in summary proceedings of 22 February 2022, the plaintiffs launched this action in particular in order to *"quash"* the taking of office of Treo NOAL which took place on 27 August 2021 and to claim the payment of the claims they claim to hold against the Fund under the *"Sponsor Commitment"* and *"Removal Entitlement"*.

207.  **On 1 April 2022**, the category B directors of Triangle Holdings S.A., Messrs HOLY and LAVIE, filed a summons for nullity[92] based on that of Novalpina GP in order to request the annulment of the decisions taken by the general meeting of Triangle Holdings S.A. in the context of the recomposition of the board of directors of Triangle Holdings S.A. made necessary following the change of general partner of the Fund.

208.  **On 27 April 2022**, Messrs HOLY and LAVIE summoned Triangle Holdings S.A. to obtain[93] the

---

[88]   MOLITOR Exhibit 93
[89]   MOLITOR Exhibit 84
[90]   MOLITOR Exhibit 87
[91]   MOLITOR Exhibit 88
[92]   MOLITOR Exhibit 93
[93]   MOLITOR Exhibit 105

suspension of the effects of these same decisions.

209. These two actions were obviously launched in concert with Novalpina GP since they are based on the same arguments drawn from the judgment of 8 December 2021. Their aim is to allow NSO to completely avoid Treo NOAL.

210. All the summary proceedings initiated by the plaintiffs and NSO representatives failed in the first instance.

211. Thus:

212. **By order of 17 June 2022** [94], the urgent applications judge declared admissible, but unfounded, the application of the plaintiffs to suspend the taking of office of Treo NOAL as general partner of the Fund and to reinstate Novalpina GP to these same duties. The urgent applications judge rightly considered that the existence of a manifestly unlawful disturbance within the meaning of Article 933 (1) of the New Code of Civil Procedure ("**NCPC**") was faced with serious challenges.

213. The judge concluded that *"(...) the lawfulness of the taking of office of BRG NOAL GP as Manager is the subject of a dispute between the parties which, in view of the objections and grounds issued on either side, falls within the exclusive jurisdiction of the judge ruling on the merits"*[95].

214. It is also important to note, because this is important for subsequent arguments of the submitting parties, that the urgent applications judge considered that:

*"The fact that, since the change of General Partner, certain assets have been sold or pledged is not, in itself, sufficient to demonstrate actions contrary to the interests of the Fund, its partners or the plaintiffs, knowing that the management of an investment fund naturally involves acquisitions and disposals of assets and that it is not disputed that following the replacement of the general partner which has occurred, BRG NOAL GP is required to carry out a certain restructuring of the Fund. Moreover, nothing obliges the latter to continue the same investment policy as that previously practised by NOVALPINA GP"*[96].

215. **By order of 28 October 2022**[97], the urgent applications judge dismissed Novalpina GP's application for suspension of the effects of the resolutions adopted by the shareholders of Master Luxco on 16 August, 27 August and 20 October 2021, on the grounds that the statutory provision of Master Luxco on which Novalpina GP relied to submit the nullity of the contested resolutions, namely the unanimity rule, was null and void.

216. In particular, the judge made the following observations:

*"(...) no perceptible reason or explanation provided by the plaintiff makes it possible to justify the introduction of unanimity in MASTER LUXCO's Articles of association, except the will of NOVALPINA GP, respectively general partners at the time, to seize a decision-making power in MASTER LUXCO.*

---

[94]   MOLITOR Exhibit 118

[95]   See order of 17 June 2022, point 4; MOLITOR Exhibit 118

[96]   See order of 17 June 2022, point 4; MOLITOR Exhibit 118

[97]   MOLITOR Exhibit 27

*(...)*

*It is only because of the Amendment of the Articles of Association, adopted by Michael ZINI the day after his appointment as general partner of NOVALPINA GP (Replacement of Managers), that it currently has power in MASTER LUXCO, power which is not justified by any objective element, and which is certainly not in the interest of the other shareholders of the company.*

*(...)*

*"Everything therefore suggests that the Amendment of the Articles of Association was made with a view to the removal of NOVALPINA GP as general partner of the Fund, in order to provide it with an advantage that it should not in principle have."*

217. The urgent applications judge logically deduced from this that the argument based on fraud, if not abuse of rights, was not devoid of any basis and required a more in-depth assessment of the factual and legal elements in question, an examination which was outside the jurisdiction of the urgent applications judge.

218. The plaintiffs appealed against the orders of 17 June and 28 October 2022.

219. **By order of 13 January 2023**[98], and for similar reasons, the urgent applications judge rejected the application of Messrs HOLY and LAVIE for the suspension of the resolutions adopted by the shareholders of Triangle Holdings S.A. It is important to note that the judge took this decision despite the terms of one of the aforementioned judgments of 9 December 2022 produced before him, which declared null and void all the decisions and acts taken by Messrs DUMONT, MIZZI and FOLEY on behalf of Novalpina GP between 4 August 2021 and 8 December 2021.

220. **By judgment of 15 February 2023**[99], the Court of Appeal upheld the order of 17 June 2022. The appeal against the order of 28 October 2022 is still pending.

### 15.    The English legal proceedings initiated by the submitting parties

221. The actions brought under the terms of the summonses of 15, 22, 23 and 25 February 2021 by the plaintiffs constitute flagrant breaches of the Undertakings made by not only the plaintiffs, but also by the Founders, in particular Messrs KOWSKI and LUEKEN.

222. Messrs KOWSKI and LUEKEN having remained in the United Kingdom, the submitting parties immediately referred the matter to the English courts in order to establish that the Founders had breached the terms of the Undertakings by inciting or allowing the plaintiffs to launch their actions in Luxembourg. It was indeed clear that the general partners of Novalpina GP, who are the same as those of Group GP and therefore Novalpina SCSp, could not have acted on their own initiative.

223. The English judge was of the same opinion since he considered that there was a serious question to be decided in relation to the breach of the Undertakings by Messrs KOWSKI and PEEL[100].

---

[98]    MOLITOR Exhibit 137
[99]    MOLITOR Exhibit 141
[100]    MOLITOR Exhibit 94: the English judge held in particular that:

224. However, the action of the submitting parties was rejected for reasons of territorial jurisdiction, with the English judge considering that the dispute should be settled by the Luxembourg courts.

225. The judgment of 11 April 2022 does not constitute a decision handed down on the merits. It has not in fact settled the question of the validity of the Undertakings.

226. This decision therefore has no legal consequences on the present case, contrary to what the plaintiffs will certainly try to have us believe.

## 16.   The management by BRG NOAL of the Fund's assets

227. In their summons, the plaintiffs attempt to call into question Treo NOAL's management by claiming in a totally gratuitous manner, on the basis of simple inaccurate and out of context press articles, that *"BRG NOAL GP has carried out and still carries out a multitude of acts whose purpose or objective is to remove assets from the Fund"* [101].

### 16.1.  The defence by Treo NOAL of the interests of the Fund and the Investors

228. Since its appointment, Treo NOAL has made considerable efforts to safeguard the interests of the Fund by attempting to correct the highly prejudicial investment decisions and errors committed by Novalpina GP and to mitigate the devastating effects that the dispute between the Founders has had on the Fund and the underlying investments.

229. For example, Treo NOAL successfully restructured the OEG group, which was spread over several months.

230. At the time of the summons of 25 February 2022, Treo NOAL had not, contrary to the plaintiffs' allegations, initiated any process for the sale of the assets of the fund and most certainly not *"below their actual value"*[102]. In addition, it has never been the intention of Treo NOAL to *"extract"* assets

---

*"118. Having considered the evidence carefully, I am satisfied that (although heavily reliant upon inference) there is a serious issue to be tried on this issue as against Mr Kowski. On the Claimants' view of events, as set out in Mr O'Connor's and Ms Murray's evidence, Mr Kowski initiated proceedings in the Luxembourg Court over Mr Peel's voting rights, removing those rights and thereafter installing the July Managers and directing their actions. Although the general partners of the claimant entities in the Luxembourg Proceedings could in theory have commenced those proceedings without his input – and might well have done so in the best interests of those entities – there is a rather striking lack of evidence from any of them (or indeed from the Liquidator of Topco) as to the circumstances in which they chose to embark upon the Luxembourg Proceedings.*

*119. The Claimants' evidence from Mr O'Connor is that various activities of Mr Kowski identified in his statement "are entirely consistent with him being the driving force behind the recent Luxembourg proceedings" (emphasis added), evidence which appears to be supported by assertions made by Mr Peel to the Luxembourg Court and set out in the evidence of Ms Murray (albeit there is a dispute between the parties as to the weight I should give to that evidence) (...).*

*(...)*

*123. Insofar as the Claimants' case depends upon Limb (b) of the Undertakings and asserts a failure on the part of the Defendants "to stop" the Luxembourg Proceedings, I consider there to be a serious issue to be tried in relation to both Mr Kowski and Mr Lueken (albeit I accept Mr Hubbard's submission that where there is no issue to be tried against Mr Lueken on Limb (a) the hypothesis on Limb (b) must be that it is wide enough to include an obligation to stop proceedings that Mr Lueken has not himself started or procured (...)*

[101]    See summons of 25 February 2022, no. 62, page 20
[102]    See summons of 25 February 2022, no. 66, page 20

from the Fund.

231. The Fund has, it is true, proceeded with the sale of the LXO group since the service of the summons of 25 February 2022. However, this sale took place in the best interests of the Investors. In addition, this sale does not in any way call into question the potential right of the plaintiffs to the payment of the *"Sponsor Commitment"* and *"Removal Entitlement"* provided that this right is confirmed at the end of a valuation.

### 16.2. The sale of LXO in a context of conflict

232. As indicated by the submitting parties above, the LXO group was sold in September 2022, regardless of the exact date, in the best interests of the Fund and the Investors.

233. Prior to that, Treo NOAL had to take legal action in the United Kingdom and Luxembourg[103] in order to prevent the appropriation of the LXO group by its creditors. The latter had indeed attempted, in breach of their contractual commitments, to enforce the pledge they held over the shares of Hippocrate Holdco S.à r.l.

234. The dispute was finally settled amicably thanks to the call for funds – called *"Bridging Investment"* in the LPA – launched by Treo NOAL in the amount of EUR 140,000,000[104] which allowed it to collect the sums necessary in order to pay off LXO's creditors.

235. After the sale of LXO, the Fund had to repay the "*Bridging Investment"* which by nature constitutes a temporary and short-term capital advance.

236. It is in this context that a communication entitled *"Distribution Notice no. 4"*[105] was sent to the Investors in order to announce to them a distribution in the amount of EUR 96,006,821[106] intended to clear the *"Bridging Investment"*.

237. However, it was specified to the Investors that the proceeds from the sale of LXO would not be distributed until the dispute with Novalpina was settled[107], which clearly demonstrates that this sale was absolutely not carried out to the detriment of the potential rights of the plaintiffs.

238. It is totally false to claim that Treo NOAL carried out distributions in disregard of Article 20.3.4 of the LPA which governs the way in which the *"Removal Entitlement"* should be paid[108]. This was not true at the time of the summons of 25 February 2022, and it was demonstrated that this was never the case.

### 17. The garnishment of 27 September 2022

---

[103]  MOLITOR Exhibits 110 and 112
[104]  MOLITOR Exhibit 109
[105]  MOLITOR Exhibit 122
[106]  Before that, investors had already been reimbursed the amounts of EUR 35,993,179 and EUR 8,000,000 collected as part of the "*Bridging Investment"*
[107]  MOLITOR Exhibit 120
[108]  See summons of 25 February 2022, no. 66 (vii), page 21

239. Using the pretext that the Fund was preparing to distribute the part of the LXO price not covering the *"Bridging Investment"* to Investors, Novalpina SCSp carried out, on the basis of a presidential order of 22 September 2022, a garnishment against the Fund on 27 September 2022[108] for an exorbitant amount of EUR 282,225,248.

240. The order of 22 September 2022 was obtained unfairly at the end of unilateral proceedings by means of a biased presentation of the facts concealing the respondent's challenges in relation in particular to the EY Report.

241. The claim alleged by Novalpina SCSp did not meet at all the criteria of certainty and payability making it possible to justify a garnishment.

242. The attachment was clearly carried out with an intention to harm.

243. It is sufficient, in order to be convinced, to find that Novalpina SCSp was quick to alert the press[110] in order to discredit the Fund by claiming, even though it was clearly and totally false, that all of its assets were attached, which did not fail to raise the concern of the Portfolio Companies and the Fund's business partners.

244. In addition, while Novalpina SCSp had obtained its garnishment authorisation as of 22 September 2022, it waited until 27 September 2022, i.e. the day before the "*closing*" of the sale of LXO, to have its attachment carried out in an attempt to scupper the sale.

245. After having filed on 30 September 2022 an application to shorten the time limits for appearance in accordance with Article 934 of the New Code of Civil Procedure, the Fund summoned on 4 October 2022 Novalpina SCSp in order to have the garnishment order of 22 September 2022 annulled if not withdrawn.

246. By order of 4 November 2022[111], the urgent applications judge granted the request for withdrawal on the grounds in particular that the certainty of the claim had not been sufficiently established by Novalpina SCSp, *"the court not having the technical knowledge necessary to judge the reliability and/or accuracy"* of the EY Report. The first judge also found that the *"Removal Entitlement"* was subject to a whole series of priority deductions, so that it was in no way established that Novalpina SCSp would *ultimately* be entitled to a payment.

247. Novalpina SCSp lodged an appeal against the order of 4 November 2022.

**18.    The appropriation of the shares of Northpole Newco S.à r.l. decided by the creditors of NSO**

248. Since the NSO group was unable to honour its commitments under the financing agreements since at least December 2021, and while Treo NOAL had increased its efforts to attempt to obtain

---

[108]    MOLITOR Exhibit 123
[110]    MOLITOR Exhibit 124
[111]    MOLITOR Exhibit 128

information on the situation of NSO, the lenders decided hastily to enforce the pledge they had over the shares of Northpole Newco S.à r.l. which controls all of the operating companies of the NSO group, by appropriating these shares on 17 February 2023[112] by a company named Dufresne Holding S.à r.l. the shareholder and sole general partner of which is Mr Omri LAVIE.

249.   The lenders therefore chose, in a kind of desperate headlong rush, to entrust the total control of the NSO group to one of the main architects of its failure.

250.   In the *"Notice of acceleration"* which they had served, the lenders state a claim of USD 523,866,262.58 against the NSO group.

251.   The non-payment and appropriation of the NSO group is just the culmination of a process of failure started well before the taking of office of Treo NOAL and probably even before its acquisition by the Fund, of which Treo NOAL only grasped fully from October 2021.

252.   It is this dramatic financial situation combined with the lack of cooperation of NSO's directors, itself affected by Novalpina's abusive procedures and unfair practices, which prevented any serious valuation process until today.

253.   Unfortunately, since the NSO group is no longer held by the Fund, it will now be impossible for any valuer likely to be appointed by the parties to the dispute or by the Court to have access to reliable information from NSO.

254.   The European Parliament, which is conducting an investigation into *"Pegasus"* and the implementation of similar technologies, has been informed about these new developments and its implications[113].

255.   The submitting parties will return to this point.


**19.   This action**

256.   This action, brought by summons of 25 February 2022, confirms that the summary proceedings brought against the submitting parties were solely intended to enable the Novalpina group to obtain, under constraint, the payment of exorbitant amounts, either by putting the Fund under judicial pressure such that it would have had no choice but to make concessions to Novalpina, or by taking over control of the Fund so as to be able to help itself directly to the assets of the Fund.


257.   Novalpina GP and the Founders having not won their gamble which, clearly, aimed to obtain a valuation of the assets of the Fund before the truth about the calamitous situation of NSO was exposed, changed its approach by opting for a strategy of judicial harassment.

---

[112]   MOLITOR Exhibits 142 and 43
[113]   MOLITOR Exhibit 144

258. The actions they have initiated prove that the plaintiffs are absolutely uninterested in obtaining a rigorous valuation report prepared in a transparent and honest manner, as they know that such a report will in all likelihood contradict the claims alleged in these proceedings.

259. If they were sure of their rightness, the plaintiffs should have tried to find a constructive solution to the difficulties reported in the letter of 9 November 2022 or should otherwise, in the event of disagreement, have requested a judicial expert valuation by way of summary proceedings.

260. In any event, it will be demonstrated in the context of the developments that will follow that the claims made by Novalpina GP, Group GP and Novalpina SCSp are inadmissible if not unfounded.

## B) IN LAW

### 1. Regarding the main claim based on the alleged breach of the provisions of the LPA

261. The plaintiffs' main claim is based on the premise that the terms of the LPA were allegedly not complied with and that Treo NOAL did not allegedly enter office validly due to the non-fulfilment of conditions precedent.

262. It will be demonstrated that these allegations do not hold and that the submitting parties scrupulously applied the provisions of the LPA.

### 1.1. Regarding the application for "quashing" or nullity of the acts carried out by Treo NOAL

263. The plaintiffs principally ask the Court to rule that Treo NOAL's term of office *"never became effective "* and that Novalpina remained general partner beyond 27 August 2021. The parties of Maître Nicolas THIELTGEN, consequently, the annulment of all the acts carried out by Treo NOAL since 27 August 2021.

264. These claims are clearly inadmissible if not unfounded.

#### 1.1.1. Mainly: the claims are inadmissible under the waiver exception

265. The claims of Maître Nicolas THIELTGEN's parties must be declared inadmissible whereas under the Undertakings, they expressly accepted Treo NOAL as the new general partner of the Fund and waived any action to call into question its appointment.

266. It should be recalled in this context that by letters dated 28 August 2021 and in exchange for the Pledge *("having been offered the pledge of today's date")*, Novalpina SCSp and Group GP, the parent companies of Novalpina GP, unconditionally and irrevocably committed to Treo NOAL and the Fund in these terms:

> " We, (…), hereby acknowledge that BRG NOAL Sari is the managing general partner (" **General**

*Partner* [114]*")* of NOAL SCSp with effect from 27 August 2021 and (having been offered the pledge of today's date) unconditionally and irrevocably undertake a) not to assert otherwise, or to induce or procure an assertion to the contrary or otherwise challenge or question de validity of its appointment or induce or produce such challenge or question, in any applicable forum and b) to cooperate with and assist the General Partner in completing a full, orderly and timely transfer of the control of the Partnership and all of its assets and any obligation to the General Partner ".

267. Novalpina SCSp and Group GP therefore *irremediably* accepted the appointment of Treo NOAL as new general partner while undertaking to refrain from any action likely to call this appointment into question.

268. In other words, Novalpina SCSp and Group GP definitively waived the right – insofar as this right may have existed – to challenge in any way the appointment of Treo NOAL as new general partner of the Fund, which obviously includes the waiver of the right to request the *"quashing"* of the taking of office of Treo NOAL and the annulment of the acts carried out by it.

269. According to doctrine:

*"The waiver is the fact that a litigant definitively abandons a right which it could claim or which it could enforce before the courts. (...).*

*In all circumstances, a litigant may abandon a right and consequently the right to claim the enforcement of this right in court. If, despite the waiver, it takes the initiative to continue the implementation of this right, its claim faces a plea of inadmissibility"* [115].

270. The application submitted by Novalpina SCSp and Group GP is therefore inadmissible.

271. The solution must be the same for Novalpina GP, even if it has not signed an Undertaking like Novalpina SCSp and Group GP.

272. Indeed, the waiver may be express or tacit [116]. While it is a principle that waivers are not presumed, they may nevertheless result from unequivocal acts demonstrating the desire to waive.

273. It follows from the elements of the case that Novalpina GP, through its actions, undoubtedly accepted Treo NOAL's taking of office.

274. Novalpina GP in fact actively collaborated in this taking of office:

   – by voting in favour of the appointment of new general partners on the management board of Master Luxco in order to enable Treo NOAL to exercise, in its capacity as new general partner of the Fund, its control over the Portfolio Companies in accordance with the provisions of the LPA; Novalpina GP also voted in favour of the change of name of Master Luxco at the general meeting of 27 October 2021;

   – by transferring the Fund's bank accounts to Treo NOAL;

---

[114] Bold in the text

[115] Thierry HOSCHEIT. " *Le droit judiciaire privé au Grand-Duché de Luxembourg* ", 2nd ed, Paul Bauler, 2019, n°1055, p.602

[116] See e.g. Lux. 21 July 2020, no. JUDOC 100087243

    &ndash;   by participating in the conclusion and implementation of the Agreements: the acceptance of the Pledge in the name and on behalf of the other defendants led to their adherence to the Notes; Novalpina GP also accepted the payment made by the Fund to Group GP and Novalpina SCSp under the "*Sponsor Commitment*".

275.  This is just a few examples.

### 1.1.2. Alternatively: the provisions of the LPA have been complied with

276.  The Plaintiffs claim that the LPA would have made the dismissal of the former general partner and the corresponding appointment of the new general partner subject to a series of "*cumulative conditions precedent*"[117].

277.  They assert firstly that the following conditions should have been met:

    &ndash;   the election of a new general partner by "*Special Consent*" in accordance with Article 20.2.2. of the LPA;

    &ndash;   the payment to Novalpina GP of the "*Priority Profit Share*" provided for in Article 20.3.1.1. of the LPA; and

    &ndash;   the commitment by the new General Partner, if the "*Novalpina*" parties defined in the LPA so request, to acquire or have acquired the "*Sponsor Commitment*" in accordance with Article 20.3.5.

278.  They then add that the appointment of an independent expert approved by the LPAC, whose mission is to value the "*Sponsor Commitment*"[118], was allegedly also part of the conditions precedent.

279.  The plaintiffs consider that the "*double condition*" relating to the acquisition of the "*Sponsor Commitment*" and the appointment of an independent expert was allegedly not fulfilled.

280.  Their claim is thus entirely based on the allegation that this double condition was allegedly not met.

281.  However, this analysis does not hold, for the following reasons:

*(i)     Principally: Article 20.3.5 of the LPA does not include a condition precedent*

282.  The submitting parties formally dispute the fact that Article 20.3 of the LPA contains a condition precedent.

283.  The alleged condition precedent only results from the personal interpretation of the plaintiffs, since the LPA absolutely does not specify that Article 20.3.5 would constitute a condition precedent within the meaning of Article 1181 of the Civil Code.

284.  The misleading term of "*condition*" is also used only in relation to the acquisition of the "*Sponsor*

---

*Commitment"*. It does not apply to the appointment of the valuer contrary to what the plaintiffs claim.

285.   Be that as it may, the terms of Article 20.3.5 of the LPA are ambiguous or even contradictory and do not make it possible to affirm that the parties to the LPA wanted to make the purchase of the "*Sponsor Commitment"* a condition precedent of the appointment of the new General Partner.

286.   It follows first of all from the paragraph introducing Article 20.3.5 that the right for *"Novalpina"* to request the purchase of the *"Sponsor Commitment"* could only arise on the date of the special approval taken under Article 20.2, and *provided* that the company continues pursuant to clause 20.2.2[119].

287.   However, it has been demonstrated above that the continuation of the company assumed, according to Articles 20.2.2 and 19.3 of the LPA, the *effective* appointment of a new general partner.

288.   This is also perfectly logical and consistent from a legal point of view. The new General Partner must first take up office in order to be bound by the LPA and be bound, by way of consequence, to the purchase of the *"Sponsor Commitment"* if *"Novalpina"* so requests. Moreover, how could *"Novalpina"* assert a contractual right against a third party to the contract?

289.   Article 20.3.5 then specifies that *"Novalpina"* could *"at any time"* request the new general partner to acquire or procure the acquisition of the *"Sponsor Commitment"*. The wording used here again assumes that the new general partner has been previously appointed for *"Novalpina"* to assert its right to purchase.

290.   So far, the provisions of the LPA remain consistent.

291.   However, the following passage sows doubt in that it stipulates that:

*"(…) as a condition of the appointment of the new General Partner, it must acquire or procure acquisition of the Sponsor Commitment pursuant to clause 20.3.5 on or before the date that it is appointed as new General Partner".*

292.   The literal application of the provisions of Article 20.3.5 leads to a legal impasse: **"*Novalpina*" may only request the purchase of the "*Sponsor Commitment*" if the new General Partner is actually appointed and the new General Partner may only be appointed provided that it acquires (or procures the acquisition by a third party) of the "*Sponsor Commitment*".** We go round in circles without being able to remove the ambiguity resulting from this incorrectly drafted clause.

293.   In the presence of an ambiguous contractual clause, the rules of interpretation of ordinary law should be applied and the common intention of the parties should be sought in accordance with Article 1156 of the Civil Code.

294.   According to doctrine:

*"This subjective approach can still be tied to Article 1157 of the Civil Code according to which, "When*

---

[119]   *"With effect from the date on which the Ordinary Consent (in the case of clause 20.1) or the Special Consent (in the case of clause 20.2) is passed and in the event that the Partnership is continued pursuant to clause 20.1.2. or 20.2.2 (as applicable): (...) Novalpina may elect that the new General Partner, (...) "*

a clause is likely to have two meanings, it must be understood in the one with which it may have some effect, than in the sense with which it would not produce any' – because, in principle, it must be assumed that, if the parties have inserted a clause in the contract, it is because they wanted the clause to have a meaning"[20].

295. In order to be able to give it a meaning consistent with the common intention of the parties, Article 20.3.5 of the LPA must therefore be understood as follows:

The appointment (with its consent) of the new general partner entails an obligation for it to acquire or have acquired by a third party the "Sponsor Commitment" if "Novalpina" so requests. The acquisition of the "Sponsor Commitment" does not therefore constitute **a condition precedent, but a contractual obligation for the new general partner arising from the acceptance of its term of office.** This is the consequence of the appointment and not its prerequisite.

296. The fact that the "Sponsor Commitment" could still be acquired on the day of the appointment of the new general partner ("on (...) the date that it is appointed as new General Partner") and therefore **after** this appointment, clearly demonstrates that it did not constitute a prerequisite for taking office.

297. Furthermore, if one were to follow the arguments of the plaintiffs and if it was accepted that Article 20.3.5 contained a condition precedent, it would necessarily be potestative and therefore null and void.

298. It is indeed accepted that:

"The directors are the agents of the shareholders, their term of office arising from the decision of the principal accepted by the agent"[21].

299. An appointment and acceptance of this appointment subject to the condition precedent of the performance by the agent, in this case the new general partner, of an event which it alone has the power to carry out, in this case the acquisition of the "Sponsor Commitment", would be null and void as a potestative condition pursuant to Article 1174 of the Civil Code.

300. This is certainly not what the parties to the LPA wanted.

301. The reasoning of the plaintiffs leads to absurd results.

302. If Treo NOAL has not validly taken office, this necessarily means that it could not have validly acquired the "Sponsor Commitment" on behalf of the Fund. But the fact that it has not become the general partner of the Fund also implies that it cannot be required to acquire or have acquired the "Sponsor Commitment".

303. The claim for payment of the "Sponsor Commitment" made by the plaintiffs would then be devoid of any contractual basis.

304. Not only would the plaintiffs not be able to demand the payment of the "Sponsor Commitment" (provided that they are still entitled to any amount, which remains to be established), but they would

---

[20]    Pascal ANCEL, "Contrats et obligations conventionnelles en droit luxembourgeois-Approche comparative", Larder, 2015, no. 497, p.584

[21]    Alain STEICHEN, "Précis de droit des sociétés", 6th ed., Saint-Paul, 2018, no. 342, p.268

be required to repay to the Fund the sum of EUR 43,290,532.63 that they received with Clarendon Trust under the *"Sponsor Commitment"*.

305.   However, and although they claim that all the acts carried out by Treo NOAL since 27 August 2021 are harmful, the plaintiffs have never offered to reimburse the amounts paid by Treo NOAL under the *"Sponsor Commitment"*.

*(ii)*    *Alternatively: the "condition" laid down by Article 20.3.5 of the LPA has been fulfilled*

306.   The submitting parties set out in detail the sequence of events that led to the taking of office of Treo NOAL and the actions taken by Treo NOAL in order to meet its obligation to acquire the *"Sponsor Commitment"*.

307.   It is very clear from their statement *"in fact"*, that the *"Sponsor Commitment"* was acquired on the same day by the Fund in accordance with the LPA, which specified in its Article 20.3.5 that this acquisition could be made before[122] or **on the day** of the appointment of the new general partner (" *(...) on or before the date that it is appointed as new General Partner")*.

308.   After the signature of the Fourth LPA, Treo NOAL sent the *"Notices of Acquisition"* by which the Fund acquired the *"Sponsor Commitments"* as well as the *"Promissory Notes"* which were the subject of the discussions of the parties throughout August 2021.

309.   By sending these documents to Novalpina GP, the Fund unequivocally expressed its willingness to proceed with the purchase of the *"Sponsor Commitments"* held by Novalpina SCSp and Group GP.

310.   It should be recalled in this context that by letter of 23 July 2021, Novalpina GP, in the name and on behalf of Novalpina SCSp and Group GP, informed the Investors that it was exercising the option provided for in Article 20.3.5 of the LPA.

311.   It therefore made an offer to sell the *"Sponsor Commitment"* for a price to be determined by an independent valuer to be appointed by the former general partner with the agreement of the LPAC.

312.   For a contract to be formed, it was therefore sufficient for this offer to be accepted. Indeed, any contract arises from the meeting of an offer and an acceptance[123].

313.   The Fund has expressed its unequivocal desire to accept the offer of the plaintiffs and to purchase the *"Sponsor Commitments"* in accordance with the terms of Article 20.3.5 of the LPA by issuing the *"Notices of Acquisition"* and the *"Promissory Notes"*.

314.   A contract was therefore formed, and the *"Sponsor Commitments"* were validly acquired.

315.   It is therefore false to state that the *"Notices of Acquisition"* and *"Promissory Notes"* would only have constituted a *"unilateral commitment"*[124].

---

[122]    But we have seen that it was legally impossible.

[123]    François TERRE, Philippe SIMLER, Yves LEQUETTE, *" Droit civil – Les Obligations",* 11th ed., DALLOZ, 2013, no. 105, p.130

[124]    See summons of 25 February 2022, no. 44, page 17

316.  It should also be noted that the acquisition of the *"Sponsor Commitment"* did not assume their actual payment, although the nominal value of the amounts invested by the plaintiffs in the Fund had already been reimbursed to them.

317.  Nothing in Article 20.3.5 of the LPA supports such an interpretation which is moreover contrary to the ordinary law of sale and Article 1583 of the Civil Code which provides that:

"[The sale] *is complete between the parties, and ownership is acquired by right by the buyer from the seller, as soon as the object and the price are agreed, even though the object has not yet been delivered or the price paid*[125]".

318.  It was also materially impossible to pay the price on the day of the appointment of the new general partner since the value of the *"Sponsor Commitment"* was still to be valued by an Independent Valuer on the day of the dismissal of the former general partner and the appointment of the new general partner.

319.  Indeed, and contrary to Article 20.3.3. of the LPA, which provides that the *"Removal Entitlement"* must be determined by reference to the date on which the *"Special Consent"* relating to the dismissal of the General Partner was passed, Article 20.3.5. refers only to the date of removal of the General Partner *("date of its removal")*.

320.  This difference in terminology necessarily makes sense.

321.  It necessarily means that the date of the dismissal of Novalpina GP according to Article 20.3.5 is the date on which it became effective, i.e. 27 August 2021, after the assumption of office of Treo NOAL. Indeed, in accordance with Article 20.2.2. of the LPA, the dismissal of Novalpina GP was supposed to become effective only with this assumption of office.

322.  The valuation could therefore only be carried out, at the earliest, on the day of the new general partner taking office after his appointment by the *"removed General Partner"* subject to the agreement of the LPAC.

*(iii)    In the further alternative: the plaintiffs waived the alleged condition precedent*

323.  If the Court were to conclude that Article 20.3.5 does indeed contain a condition precedent and this condition has not been satisfied in accordance with the terms of the LPA, which is formally disputed, it would then be necessary to consider that the plaintiffs waived the right to avail themselves of the non-fulfilment of the condition precedent.

324.  Indeed, it is in principle the party in whose favour the condition was stipulated that has the possibility of waiving it[126].

325.  In this case, the condition precedent, if there was any, has indisputably been stipulated in favour of Novalpina SCSp and Group GP.

326.  As the doctrine observes:

---

[125]  Our emphasis.

[126]  Olivier POELMANS, *"Droit des obligations au Luxembourg – Principes généraux et examen de jurisprudence"*, Larcier, 2013, no. 315, p.398

*"From a formal point of view, the waiver of the condition may be express. It may also be tacit and be deduced from the attitude adopted by the waiving party"*[127].

327. In this context, it must first be noted that Novalpina SCPs and Group GP expressly acknowledged Treo NOAL as new general partner and that they expressly committed not to undertake anything to call into question the appointment of the latter by virtue of the Undertakings. They therefore also waived the right to invoke an alleged condition precedent.

328. In addition, they executed the terms of the agreement of 30 August 2021 by accepting the Pledge as security for *"Promissory Notes"* and by accepting a first significant payment under these *"Promissory Notes"*.

329. Moreover, they did not take any action to challenge the validity of the appointment of Treo NOAL before February 2022 and they never suggested that it was up for discussion. Even if they now consider that they were unable to act before the decision in summary proceedings of 8 December 2021, the plaintiffs did not undertake anything during the first two months that followed.

*(iv)    In the further alternative: Treo NOAL holds the position of General Partner pursuant to a now-indisputable decision of the Investors' meeting*

330. As recalled above, Treo NOAL was appointed as new general partner of the Fund following a resolution adopted on 6 August 2021 by an overwhelming majority (more than 96% of the Investors).

331. The resolution adopted by the Investors was not subject to any conditions. It was simply specified that the appointment of Treo NOAL would take effect as soon as the *"Consent"* provided for in the LPA was obtained.

332. Even though Treo NOAL only accepted its appointment on 27 August 2021, it was in fact the resolution of 6 August 2021 which appointed Treo NOAL as general partner. If the plaintiffs were of the opinion that the decision of 6 August 2021 breached the provisions of the LPA since the resolution adopted by the Investors was not subject to any condition, they should have acted for nullity of the resolution adopted by the Investors' meeting.

333. For this purpose, they had a period of 6 months under Article 1400-6 of the 1915 Law which provides that: *"All actions for the nullity of acts and deliberations subsequent to the incorporation of the company from the date on which the decisions taken are enforceable against the person who invokes the nullity or are known to it or should have been, given the circumstances, are time-barred by six months."*

334. As no action has been initiated within the legal period, the resolution that appointed Treo NOAL can no longer be called into question by means of legal action. The action by which the plaintiffs intended to *"quash"* the *"taking of office"* of Treo NOAL is nothing more than an action for nullity of a decision of a nameless general meeting. The plaintiffs play in fact on the words by claiming that their action is directed against *"the taking of office"* of Treo NOAL; however, it is forgetting that this taking of office took place pursuant to a resolution of the Investors of 6 August 2021 appointing Treo NOAL **without**

---

127    Olivier POELMANS, op.cit., no. 315, p.399

**other conditions.**

335.    Taking office results from the acceptance by Treo NOAL of its term of office. Taking office is therefore not a legal act subject to challenge. This is the legal consequence of a resolution (which has become final) followed by an expression of will on the part of Treo NOAL, and we do not see the legal basis on which it could be challenged.

*(v)    In the further alternative: as regards the alleged nullity of the decisions taken by Treo NOAL in its capacity as general partner of the Fund as of 27 August 2021*

336.    As a preliminary point, it is important to recall that the Fund is not managed by collective management, but by a general partner who does not adopt resolutions but takes decisions on behalf of the Fund.

337.    It is therefore formally disputed that Article 100-22 of the 1915 Law may apply, including by way of analogy, to the decisions taken by Treo NOAL

338.    Then, even if Article 100-22 of the 1915 Law would be applicable by analogy, *quod non,* the actions carried out by Treo NOAL would have to have caused a grievance to Novalpina GP.

339.    Indeed, the plaintiff in the action for nullity must justify a grievance[128].

340.    According to the doctrine:

*"The grievance is distinguished from the interest, in that it provides a real material or non-material advantage, and not simply theoretical (...). It is not sufficient for an irregularity to be likely to harm the person concerned, but it must in addition actually cause him damage. There is no nullity without grievance"*[129].

341.    However, it is widely accepted in contractual matters that the nullity of a deed is not enforceable against third parties acting in good faith. This principle is accepted under French law both for administrative acts[130] and disposals[131]. However, the exercise of the voting right is understood as an administrative act[132].

342.    French doctrine confirms that *"neither the company nor the partners or shareholders may invoke nullity with regard to third parties in good faith"* in terms of irregular corporate decision[133].

343.    In Luxembourg, this principle is repeated in Article 100-22 (4) of the 1915 Law, which provides that:

*"Where the nullity is likely to affect the rights acquired in good faith by a third party with regard to the company on the basis of the decision of the meeting, the court may declare without effect the nullity with regard to these rights, subject to the claimant's right to damages if applicable"*.

---

[128]    Alain STEICHEN, *op.cit.,* no. 258, p.204

[129]    Alain STEICHEN, *op.cit.,* no. 258, p.204

[130]    Pascal ANCEL, *op.cit.,* no. 449, p.519; see also François TERRE, Philippe SIMLER, Yves LEQUETTE, *op.cit.,* no. 432 p. 477

[131]    See also François TERRE, Philippe SIMLER, Yves LEQUETTE, *op.cit.,* no. 432, p.478

[132]    Alain STEICHEN, *op.cit,* no. 287, p.226; see Court 15 February 2017, Pas.38, p.391

[133]    A. CHARVERIAT, *"De quelques difficultés relatives à la nullité d'une décision sociale irrégulière", Revue des sociétés,* 2010, no. 13, p. 212.

344. However, Treo NOAL has been managing the Fund for more than a year and a half and has entered into countless deeds and agreements with third parties. In particular, it has paid the operating costs of the Fund.

345. The annulment of the acts carried out by Treo NOAL would have incommensurable consequences and would even turn against the plaintiffs who would be obliged to return to the Fund the sums already received under the *"Sponsor Commitment"*.

346. It is for this reason moreover that *"cascade"* nullity is generally rejected by case law.

347. In France, the Court of Cassation, in a decision of 27 January 2009, approved a Court of Appeal which had refused to annul all the acts performed by the director of a company whose appointment had been annulled following an appeal lodged by the dismissed director, on the grounds that "*the validity of the acts performed by the irregularly appointed director could only be assessed in relation to each of them*"[134].

348. Luxembourg doctrine generally observes "(...) *a reluctance of the courts to annul or suspend the effects of a deliberation leading to a cascade of subsequent annulments*"[135]. According to another author, we must "(..) *balance the seriousness of the consequences of a cascade nullity and the seriousness of the irregularity, in order to limit the cascading nullities to those which are really necessary*[136]"[137].

349. The French authors confirm that *"the effects of an irregularity are (...) sometimes neutralised in order to result in a "channel for subsequent nullities"*[138]. This is particularly the case when the consequences of the nullity requested are far too significant with regard to the irregularity invoked, in which case the judge must use their discretion and apply their moderating power by rejecting the chain of nullities.

350. The Court will therefore reject Novalpina GP's application for nullity.

*(vi)    In the further alternative: as to the financial claims of Novalpina GP*

351. Novalpina GP intends not only to obtain its retroactive reinstatement to its duties as general partner with effect from 27 August 2021, but it also requests the payment of *"management fees"* that it allegedly should have received, as well as the return of the fees paid to Treo NOAL.

352. The submitting parties formally dispute Novalpina GP's claim both in principle and in its quantum.

353. First of all, Novalpina GP cannot claim payment of a *"management fee"* when it has not managed the Fund since 27 August 2021. Novalpina GP did not perform any services that would justify remuneration.

---

[134]    Cass. fr. com., 27 January 2009, RTDcom, p.391, notes Paul LE CANNU and Bruno DONDERO

[135]    Hélène ARVIS, *op.cit.*, p. 296

[136]    Our emphasis.

[137]    Alain STEICHEN, *op.cit.*, no. 265, p.208

[138]    A. CHARVERIAT, *op.cit.*, no. 14, p.217

354. Not only did Novalpina GP no longer manage the Fund, but all the acts carried out since the beginning of 2021 had only one purpose: to harm the interests of the Fund in order to make Group GP and Novalpina SCSp's financial claims successful. It would be paradoxical to say the least if Novalpina GP was remunerated for its sabotage.

355. Finally, Novalpina GP assumes that it would have continued to manage the Fund normally if Treo NOAL had not taken up its duties on 27 August 2021.

356. However, this would be forgetting the fact that the Fund should have been liquidated in accordance with Article 19.4 of the LPA in the absence of an actual appointment of a new general partner from that date.

357. Moreover, from its dismissal, the former general partner could no longer claim any other payment other than the compensation corresponding to the *"Priority Profit Share"* provided for in Article 20.3.1.1 of the LPA. It was not provided that the dismissed general partner could combine this compensation with *"management fees"* that it was no longer supposed to receive.

358. Regarding the claim for restitution based on the allegation that Treo NOAL allegedly *"illegitimately"* received *"management fees"*[139], the following observations should be made:

359. First of all, it should be noted that since Novalpina GP is not the general partner of the Fund, it does not have standing to make a claim for restitution in its name.

360. In the alternative, this claim is based, according to the understanding of the submitting parties, on the assumption that all acts performed by Treo NOAL in the context of its management would be considered null and void since its corporate mandate would never have taken effect.

361. The plaintiffs form their claim on the basis of Article 1143 of the Civil Code as well as on the theory of the payment of the undue payment (Articles 1376 to 1378 of the Civil Code).

362. These legal bases are clearly inapplicable in this case since Article 1143 of the Civil Code does not govern the consequences of the annulment of a contract, but those of its possible non-performance insofar as it establishes a form of compensation in kind.

363. Parts 1376 and 1378 of the Civil Code are also not applicable since the *"management fees"* constitute the consideration for the management work carried out by Treo NOAL. Their payment therefore has a cause.

364. Finally, since the management mandate entrusted to Treo NOAL is a contract for successive performance, its cancellation or non-existence could not be carried out retroactively, but as an early termination[140].

365. As the doctrine observes:

> *"(...) as there can be no question of requiring only restitution of what is returnable – the salary for the*

---

[139]    See summons of 25 February 2022, no. 84, page 24

[140]    François TERRE. Philippe SIMLER, Yves LEQUETTE, *op.cit.*, no. 424, no. 469

*worker, the rent for the lessor – by simply taking note of the impossibility of returning the reciprocal obligation, because such solution would provide unjustified enrichment to one to the detriment of the other, compensation is due to the person who provided the service that cannot be returned. Often it is equal to the consideration that the cancelled contract provided for. The nullity then effectively provides for the same non-retroactive effect as a termination (...)"[141].*

366. Through its requests, Novalpina GP seeks not only to be remunerated for work that it has not done, but also to deprive Treo NOAL of the remuneration due to it for the considerable work it has actually performed for the benefit of the Fund. Novalpina GP demonstrates, once again, its perfect bad faith. Treo NOAL took up its duties at a time when the management of the Fund had been rendered dysfunctional and practically non-existent by the dispute between the Founders. The disarray which preceded its arrival is confirmed by the massive support of the Investors of the resolutions aimed at dismissing Novalpina GP and appointing Treo NOAL in its place. As follows from these submissions, the management of Novalpina GP was not only dysfunctional, but in many ways fraudulent or even criminally reprehensible, since the former general partner engaged in a certain number of actions to harm the Fund and promote its own interests, despite its primary obligation to act in the best interests of the Fund.

367. The claims of Maître Nicolas THIELTGEN's parties must be rejected in full.

### 1.2.  *Regarding the claim for enforcement of the provisions of the LPA*

368. It is particularly inappropriate of the plaintiffs to reproach the submitting parties for a breach of the provisions of the LPA, while they have violated (and continue to do so) the LPA in order to serve their personal interests.

369. The action for nullity that Novalpina GP launched in order to obtain control of Master Luxco provides a devastating example of this since this action goes against the provisions of the LPA which grant the Fund general partner the right to have representatives appointed within the management bodies of the Portfolio Companies.

370. The claims made by the plaintiffs must be rejected for the following reasons.

### 1.2.1. The EY Report cannot be used as a substitute for the valuation provided for in the LPA

371. The reasoning of the plaintiffs according to which the *"Sponsor Commitment"* should, in the absence of having been able to be established in the context of a valuation in accordance with the LPA, be "[calculated] *on the basis of the independent valuation of the assets of the Fund carried out by Ernst & Young Luxembourg as at 30 June 2021* "[142] conflicts with serious objections and must therefore be rejected.

372. As a preliminary point, it should be recalled that the *"Sponsor Commitment"* should not be calculated on the date of the vote of the dismissal of Novalpina GP (as planned for the *"Removal Entitlement"*), but on the date of its actual replacement by Treo NOAL, i.e. 27 August 2021.

---

[141]  François TERRE, Philippe SIMLER, Yves LEQUETTE, *op.cit.,* no. 425, no. 470

[142]  See summons of 25 February 2022, no. 115, page 29

373. Furthermore, if the Court were to consider that Treo NOAL never took office, there would be absolutely no reason to have the *"Sponsor Commitment"* valued since Treo NOAL:

- would not have validly acquired the *"Sponsor Commitment"* on behalf of the Fund;

- would not be required to do so personally in the absence of a contractual or legal provision that is binding on it.

374. That being said, it is important to point out that under the Valuation Principles, it had been agreed that the *"Sponsor Commitment"* and the *"Removal Entitlement"* were to be valued on the same date, i.e. 1 August 2021.

375. A valuation report of the Fund's assets as at 30 June 2021 cannot therefore be used as a basis for calculating the *"Sponsor Commitment"*.

376. In addition, and as the submitting parties have already outlined in the *"in fact"* part of these submissions, the EY Report is unreliable and cannot be used as a basis for calculating the *"Sponsor Commitment"*.

377. Indeed, EY relied entirely on the incomplete and biased information provided to it by Novalpina GP as results from the report itself, which disqualifies it as an independent valuation report.

378. The following passages of the EY Report are particularly revealing:

- *"We have based our analysis on the business plans (...) provided by the Client*[143] *(...)*[144] "*;

- *" We were reliant on the accuracy and completeness of the underlying information supplied to us. We did not audit or otherwise verify this information*[145] *and therefore did not check the accuracy of the information or any explanation provided (...)*[146] "*;

- *"Most of the inputs and assumptions in the BP*[147] *are highly technical in nature and are based on the Management's judgment*[148] *(...)*[149]"*;

- *"We were not provided with the financial statements as of Valuation Date for all entities within the valuation perimeter, hence the cash and debt amounts are based on the Management's assumptions*[150] *(...) "*[151].

379. The terms *"Client"* and *"Management"* both refer to the general partners of Novalpina GP at the time (Messrs PILERI and ZINI) and not to the executives and management teams of the various Portfolio Companies. According to the persons interviewed by Treo NOAL, EY had no direct contact with any

---

[143]   Our emphasis
[144]   See page 3 of the EY Report; Exhibit 25 of Maître Nicolas THIELTGEN
[145]   Our emphasis
[146]   See page 4 of the EY Report; Exhibit 25 of Maître Nicolas THIELTGEN
[147]   "BP" probably refers to *"business plans"*
[148]   Our emphasis
[149]   See Page 4 of the EY Report; Exhibit 25 of Maître Nicolas THIELTGEN
[150]   Our emphasis
[151]   See Page 4 of the EY Report; Exhibit 25 of Maître Nicolas THIELTGEN

of the Portfolio Companies' management teams and did not have access to any other independent party to confirm the information provided to it. In fact, EY was entirely dependent on Novalpina GP to form its understanding of the Portfolio Companies and relied exclusively on Novalpina GP's statements to develop its basic assumptions which had a decisive impact on its valuation conclusions.

380.    The information provided by Novalpina GP included the *"business plans"* (i.e. company established projections) on which EY relied and the valuation of the risks associated with carrying out these *"business plans"* – two of the most important elements for a valuation process. EY acknowledges this very limitation of its commitment by specifically rejecting the responsibility to verify or confirm the accuracy and reliability of the *"business plans"*, then specifying in its report that its conclusions depended on the accuracy of all the information and statements provided by Novalpina GP.

381.    This is a capital element because Novalpina GP did not accurately and completely disclose the information necessary for EY to determine the fair value of the Fund's investments. For example, Novalpina GP did not communicate what the directors of NSO appointed by Novalpina knew. As evidence, the EY Report treated the publication of the *"Pegasus Project"* as a subsequent event, meaning that EY excluded it from its valuation analysis on the basis that such information was unknown at the date of the valuation. However, the directors appointed by Novalpina and NSO's management were not only aware of the pending reports on the *"Pegasus Project"* at the date of the valuation, but, more importantly, they were fully aware of the historical misuse of Pegasus software by NSO's customers, which was actively concealed at the date of the valuation. This information was not provided to EY and therefore could not be properly taken into account in the NSO valuation.

382.    In addition to being unreliable due to the errors introduced by the selective disclosure of Novalpina GP, the EY Report does not comply with the standard of *"fair value"* and the valuation standards contractually required to determine the value of the investments *("Value")* as defined in the LPA.

383.    First, EY's report contains reservations that are fundamentally inconsistent with the *"fair value"* standard on which the determination of the value *("Value")* of the Fund's assets should be based. For example, the EY Report states that "*This definition of value that we apply for this valuation does not integrate any Environmental, Social or Governance value considerations*" ("**ESG**"). Since the Portfolio Companies are all heavily affected by ESG considerations which are therefore of crucial importance for their valuation, this reservation disqualifies the EY Report as a valuation report for the purposes of determining the value *("Value")* of the assets of the Fund within the meaning of the LPA.

384.    Secondly, EY did not take into account the *"International Private Equity and Venture Capital Valuation Guidelines"* ("**IPEV**") which is a key element that should have been taken into consideration for the determination of value *("Value")* within the meaning of the LPA. This is particularly evident from the fact that EY completely ignored the cost of acquiring the Funds' investments as part of its analysis. According to the IPEV principles, consideration of the acquisition value is mandatory and is carried out by a *"calibration"* process. Indeed, acknowledging that this analysis is required by the LPA, Novalpina GP itself carried out this calibration process when determining the *"fair value"* of the Fund's investments, as indicated in the Fund's audited financial statements. The absence of calibration, as required by the LPA with reference to IPEV standards, explains most of the differences between Novalpina GP's historical valuations and the values of the EY Report and the fact that the EY Report deviates radically from previous valuations.

385. As the bases for the valuation were biased due to the lack of reliability of the information provided and the non-compliant valuation methods that were applied, EY arrived at an exorbitant valuation.

386. To be convinced of this, it is sufficient to compare the value of the assets as determined by Novalpina GP and confirmed by PWC in its capacity as auditor in the last quarter of 2020 with that resulting from EY's Report. To believe the EY Report, **the investments held at the end of 2020 allegedly tripled in value in the space of six months!** The absurd conclusions of the EY Report suggest that Maxbet, which had been acquired three months earlier for EUR 76 million, allegedly saw its value increase from its acquisition to reach EUR 422 million. NSO, valued by Novalpina GP in the Fund's audited financial statements as at 31 December 2020 at EUR 320 million, tripled, due to EY valuation errors and shortcomings, reaching EUR 998 million which was fundamentally inconsistent with NSO's operational and financial position.

387. The EY Report must therefore be rejected as the basis for determining the *"Sponsor Commitment"*.

388. There is no evidence at this stage that the Sponsor Entities will be entitled to other payments under the *"Sponsor Commitment"* than those already made, since this will depend on the outcome of the valuation to be carried out.

389. In this context, the valuation of the NSO group, which alone represents 40.7% of the amounts invested by the Fund, will be essential in order to be able to determine whether the plaintiffs can claim any amount.

390. However, everything suggests that NSO no longer had any or if not very little value on the date Treo NOAL took office.

391. The claim of the parties Group GP and Novalpina SCSp for the payment of the respective sums of EUR 33,972,928 (Group GP) and EUR 6,586,108 (Novalpina SCSp) on the basis of the EY report must therefore be rejected.

1.2.2. <u>In the alternative: with regard to the request for court-ordered appraisal for the determination of the value of the *"Sponsor Commitment"*</u>

392. In the alternative, the plaintiffs make a request for a court-ordered appraisal pursuant to Article 20.3.5 of the LPA and Articles 348 et seq. of the New Code of Civil Procedure[152] with the mission more fully detailed in its summons.

393. It immediately sticks out that the expert appraisal mission proposed by the plaintiffs to the Court is structured in such a way as to guide the conclusions of the court expert so that they are as close as possible to those of the EY Report with all the errors, shortcomings and inadequacies that this report contains.

394. The submitting parties formally object to the establishment of the expert appraisal requested by the plaintiffs when, contrary to what they claim, the proposed mission radically deviates from the LPA provisions.

---

[152]    See summons of 25 February 2022, no. 116, page 30

395. Furthermore, it is now accepted that it will be impossible to carry out a valuation in accordance with the Valuation Principles since the Fund no longer holds the NSO group and will never be able to access the information it was seeking to obtain since the appointment of Treo NOAL.

396. If the Court were to consider that an expert appraisal should be ordered, it would then be necessary for this expert appraisal to be structured around the following principles:

- the valuation of the *"Sponsor Commitment"* shall be carried out on 1 August 2021 adopted in the Valuation Principles, otherwise on 27 August 2021;

- the valuation must be carried out in accordance with the valuation standards provided for under the definition of the term *"Value"*; this definition refers, for non-marketable securities, to the IPEV standards and for marketable securities, to the provisions of Article 9.8.3 of the LPA;

- the expert shall be provided with all the audited accounts of the Fund prepared before the valuation date;

- the court expert must be able to carry out all verifications he deems useful and verify the reliability, relevance and plausibility of the projections and *"business plans "* provided to him by the management of the companies concerned;

- the expert may not take into account the conclusions of the EY Report due to its serious shortcomings.

**2.    Regarding the alternative claim drawn from the alleged failure to fulfil the so-called condition precedent**

397. The plaintiffs engage in laborious reasoning in order to attempt to demonstrate that the alleged condition precedent was allegedly not fulfilled due to the allegedly wrongful conduct of Treo NOAL and the LPAC.

398. The arguments of Maître Nicolas THIELTGEN's parties betray even more blatantly the weakness of the argument drawn from the existence of a condition precedent.

399. According to the plaintiffs' understanding, Treo NOAL would be accused of not having taken all the steps to enable the fulfilment of the condition precedent[153].

400. However, this reasoning has a major shortcoming: Treo NOAL was never bound to the plaintiffs by an agreement entered into subject to a condition precedent.

401. The appointment of Treo NOAL as new general partner dated 6 August 2021 was insufficient to contractually bind Treo NOAL to the Investors, including Group GP and Novalpina SCSp.

402. For Treo NOAL to be bound by the terms of the LPA, it was still necessary for it to accept its term of office as general partner.

---

[153]    See summons of 25 February 2022, no. 116, page 30

403. However, it has been demonstrated that this term of office could not be concluded under the condition precedent that the new general partner acquires or has acquired the *"Sponsor Commitment"*, such a condition being necessarily null and void due to its potestative nature within the meaning of Article 1170 of the Civil Code.

404. Article 1170 of the Civil Code in fact provides that:

*"The condition is potestative is that which makes the performance of the agreement dependent on an event that it is in the power of either of the contracting parties to make happen or prevent".*

405. According to Article 1174 of the Civil Code:

*"Any obligation is null and void when it has been entered into subject to a potestative condition on the part of the party which binds itself".*

406. It stands to reason that Treo NOAL could, after accepting its term of office, prevent the acquisition of the *"Sponsor Commitment"* by refusing to proceed with or have proceeded with its purchase.

407. Accepting the plaintiffs' argument would amount to considering that the Investors are unable to appoint a successor to Novalpina GP since the term of office of the new general partner would necessarily be null and void for being subject to a potestative condition.

408. In the alternative, it should be noted that the alleged condition precedent had to be fulfilled within 35 working days of the dismissal of Novalpina GP.

409. Treo NOAL accepted its term of office on the day of expiry of the period, i.e. 27 August 2021. However, it is permissible to wonder how it could have proceeded with the purchase of the *"Sponsor Commitment"* in accordance with the terms and conditions recommended by the plaintiffs, i.e. with the immediate payment of the value determined by the Independent Valuer, when such a valuation was lacking on the day of its taking office.

410. In other words, it was absolutely impossible for it to fulfil this alleged condition in the way the plaintiffs imagine it.

411. In any event, it emerges from the statement of facts that Treo NOAL made every effort to enable the purchase of the *"Sponsor Commitment"* in accordance with the LPA. Treo NOAL even went beyond that since it made a substantial payment in respect of the *"Sponsor Commitment"* when it was not contractually bound to do so.

412. The plaintiffs' alternative claim therefore does not hold up and must be rejected.

413. The submitting parties refer for the remainder to their arguments under section 1) above.

**3.    Regarding the further alternative claim drawn from an alleged contractual fault on the part of the submitting parties**

414. This claim made in the further alternative by the parties of Maître Nicolas THIELTGEN is no longer

based on the absurd assumption that Treo NOAL allegedly did not validly take up office on 27 August 2021 due to the non-fulfilment of conditions precedent. On the contrary, this claim argues that Treo NOAL became a party to the LPA by accepting its term of office and that it validly took up its duties as general partner of the Fund.

415. As Treo NOAL's assumption of office was effective as of 27 August 2021, this means, correlatively, that the duties of Novalpina GP ended on that date.

416. Novalpina GP therefore no longer had any right to a *"management fee"* as of 27 August 2021. The alleged non-acquisition and/or non-payment of the *"Sponsor Commitment"* to Group GP and Novalpina SCSp were therefore not likely to cause it personal harm.

417. At the time of taking office, Treo NOAL expressed its desire to acquire in the name and on behalf of the Fund, the *"Sponsor Commitment"* held by the Sponsor Entities.

418. The transfer was therefore validly carried out.

419. A substantial payment has already been made to the plaintiffs.

420. Only the question of the possible payment of a balance remains outstanding since it depends on a valuation of the assets of the Fund on the effective date of the dismissal of Novalpina GP.

421. The Fund is only the *potential* debtor of an obligation to pay a sum of money.

422. However, in accordance with Article 1153 of the Civil Code: *"In obligations which are limited to the payment of a certain sum, the damages resulting from the delay in performance never consist in anything other than the order to pay interest fixed by the law".*

The Fund could therefore only be ordered to pay interest for a delay as damages provided that the plaintiffs establish (i) that they are entitled to payment of a balance, (ii) the existence of a delay in its payment and (iii) the fact that this delay is attributable to the submitting parties.

423. However, it should first of all be noted that the LPA did not provide a time limit for carrying out the valuation of the value of the *"Sponsor Commitment"*. Only the Valuation Principles provide a time limit. However, it never started to run since the parties failed to reach an agreement on the terms of KPMG London's undertaking.

424. In the alternative, the submitting parties formally dispute that they are liable for any delay insofar as it is for reasons totally beyond their control that the valuation could not, to date, be carried out in accordance with the Valuation Principles.

425. If the plaintiffs felt that this valuation could perfectly well have been carried out as of October or November 2021, they could have referred to the urgent applications judge an application for a court-ordered appraisal rather than initiating vexatious actions, solely intended to put pressure on the Fund by disrupting its proper functioning.

426. In the absence of fault attributable to the submitting parties, the claim for damages made by the parties of Maître Nicolas THIELTGEN must be rejected.

4.    **Regarding the very alternative claim, drawn from the alleged tortious liability of the submitting parties**

427.    The claim based on tortious liability within the meaning of Articles 1382 and 1383 of the Civil Code must be declared inadmissible by virtue of the principle of non-cumulation between contractual and tortious liabilities.

428.    It is of course accepted that contractual and tortious liability may be invoked in an order of subsidiarity[154], but in this case the submitting parties do not dispute that Group GP and Novalpina SCSp are entitled, according to the terms of the LPA, but subject to the results of the valuation to be made, to the payment of the *"Sponsor Commitment "* and a *"Removal Entitlement"* due to the dismissal of Novalpina GP.

429.    Since the nature of the relationship between them is of a contractual nature, the claim based on the alleged tortious misconduct of the submitting parties must be declared inadmissible since it is in principle that: *"The victim of damage who may exercise the contractual action is not allowed to prefer the exercise of tortious action over that of the contractual action"*[155].

430.    Alternatively, assuming that Treo NOAL is not contractually bound by the terms of the LPA, Treo NOAL cannot be criticised for having, *"by* [its] *unfair conduct actively prevented the fulfilment of the condition precedent"*[156].

    In order for Treo NOAL to have been required to carry out due diligence in order to fulfil a condition precedent, it would have already had to have made a conditional commitment.

431.    Indeed, the case law cited by the plaintiffs in support of their argument presupposes the existence of a contract entered into subject to a condition precedent. It is when the debtor prevents the fulfilment of the condition and therefore, the formation of the contract, that its tortious liability could, where applicable, be sought.

432.    This scenario is absolutely not given in this case.

5.    **Regarding the *"Removal Entitlement"***

433.    The plaintiffs intend to hold the Fund contractually liable, if not the defendants liable in tort, due to the non-payment of the *"Removal Entitlement"*.

434.    Their argument is similar to that developed on the subject of the *"Sponsor Commitment"* and calls for the following observations:

*5.1.    Regarding the alleged contractual liability of the Fund*

---

[154]    Court of Cassation, 10 July 2018, Pas. 38. P.817
[155]    Lux. 11 July 1967, Pas. 20, p.392
[156]    See summons of 25 February 2022, no. 141, page 39

5.1.1. The potential right of Novalpina SCSp to the payment of a *"Removal Entitlement"*

435.  Novalpina SCSp claims that it allegedly has a certain, liquid and payable claim against the Fund in respect of the *"Removal Entitlement"*, and it is on this basis that it had, on 27 September 2022, a garnishee order enforced against the Fund for an amount of EUR 282,925,248.

436.  It is true, and it was never disputed, that following the dismissal of Novalpina GP, Articles 20.3.3 and 20.3.4 of the LPA gave the right to the *"Carried Interest Partner"* to receive, **where applicable**, a *"Removal Entitlement"*, the amount of which had to be determined by an independent expert on the date of the dismissal.

437.  In its summons, Novalpina SCSp claims that the *"Removal Entitlement"* represents the share of *profits*[157] that the Carried Interest Partner would have received (i.e. 20% of the total profits for investors) if all the investments had been sold at their value on the day the investors chose to dismiss the General Partner of the Fund, i.e. 9 July 2021"[158].

438.  This presentation is tendentious because it could suggest that it would suffice to compare the value of the assets of the Fund on the date of dismissal of the general partner with their acquisition price to determine whether the Fund made a capital gain and that, if so, Novalpina GP could seize 20% of the profits under the *"Removal Entitlement"*.

439.  The reality is much more complex.

440.  In order for the *"Carried Interest Partner"* to be able to claim a *"Removal Entitlement"*, first of all, the value of the Fund's assets needs to have increased compared to their acquisition value, which, as we will see, is not the case here.

441.  Even if this were the case, it would then be necessary that there remain an amount to be paid to the *"Carried Interest Partner"* following the application of the *"waterfall"* mechanism provided for in Article 9.1. of the LPA.

442.  More specifically, the *"Removal Entitlement"* is calculated on the basis of the *"Carried Interest"* which represents the right for the *"Carried Interest Partner"* to receive (provided that the independent valuation of the assets provided for in Article 20.3.3. of the LPA confirms the existence of profits) 20% of the profits of the Fund, but only in accordance with Article 9.1.4 of the LPA, i.e. (i) after the repayment to the Investors of all of their contributions *("Investors drawdown commitments")* in accordance with Article 9.1.2 of the LPA and (ii) the payment to these same Investors, in accordance with Article 9.1.3 of the LPA, of an amount corresponding to a return of 8% per year on the sums they invested.

443.  This essential principle is recalled in the Valuation Principles, according to which the parties to the LPA have adopted this:

*"The hypothetical proceeds of the sale of such are then run through the LPA's waterfall. (For the avoidance of the doubt, for this calculation, the assets/liabilities at the Fund level also need to be*

---

[157]  Our emphasis
[158]  See summons of 25 February 2022, no. 18, page 12

*factored in before running the assets values through the Fund waterfall, as well as the holding stack on the companies if not included in the valuer's figures. (...) It must further be confirmed that the valuation must include some measure of any accruals for any unpaid Fund level expenses incurred prior to the Valuation Date. Finally, this also assumes all management compensation, minority interest, and contingent consideration are dealt with at the Portfolio Company level)".*

444. It is only after all these corrections and deductions are made, in particular pursuant to Article 9.1. of the LPA which defines the *"waterfall"* principle, that there **may be** a *"profit"* distributable to the *"Carried Interest Partner"* under the *"Removal Entitlement"*.

445. It follows from the above that Novalpina SCSP only has a possible or virtual right to the payment of a *"Removal Entitlement"*.

446. The potential right is that *"not yet here, which exists in the state of simple expectation and which, uncertain in principle as a conditional right, differs from the latter in that it is not retroactive when the event occurs"*[159].

447. Contrary to what the plaintiffs argue, the existence and quantum of this potential claim cannot be determined using the EY Report.

5.1.2. The impossibility of invoking the EY Report as the basis for a request for enforcement

448. For the reasons previously set out in relation to the *"Sponsor Commitment"*, the EY Report must be excluded from the discussion as evidence.

449. The absurd nature of the valuation contained in the EY Report in relation to the *"Removal Entitlement"* can still be illustrated by the following demonstration:

450. On the basis of the documents produced by Novalpina GP itself[160], the submitting parties traced the evolution of the *"Carried Interest"*, which serves as the basis for the calculation of the *"Removal Entitlement"*, for the period from 31 December 2018 to 30 June 2021[161], the date of the disputed report.

451. The *"Carried Interest"* which amounted to EUR 21,584,718 according to Novalpina GP and according to the *audited* accounts as at 31 December 2020, first increased to EUR 23,274,901 as at 31 March 2021, before reaching, **3 months later** and while no major event likely to *positively* affect the value of the assets had occurred, the astronomical amount of EUR 282,925,248!, representing **a multiplication by 12!**

452. There is no objective element making it possible to justify such a dizzying increase in the *Carried Interest* in the space of 3 months. On the contrary, NSO's severely deteriorated financial situation, which Novalpina GP carefully concealed, should have led to a sharp downward revision of the amount of the *"Carried Interest"*.

---

[159] Gérard CORNU, *Vocabulaire juridique*, see *"Eventuel,elle"*, 10th ed., PUF, 2014, p.423

[160] MOLITOR Exhibit 5

[161] MOLITOR Exhibit 6

453. Indeed, the situation of NSO was already an issue in March 2021, since the Fund's Investment Advisors had not been able to provide a valuation as at 31 March 2021[162].

454. However, it should be recalled that the NSO group alone represents 40.7% of the amounts invested by the Fund.

455. Treo NOAL carried out calculations taking as a starting point the valuation of assets as it appears in the audited accounts as at 31 December 2020 and considering several scenarios[163].

456. It follows from these calculations that Novalpina SCSp could only hope for any payment under the *"Removal Entitlement"* if the value of NSO increased compared to its acquisition price (EUR 219 million as at 14 February 2019). **Otherwise, it will be entitled to nothing!**

457. In view of the foregoing, the Court shall therefore dismiss Novalpina SCSp's claim for payment of the sum of EUR 282,922,248 on the basis of the EY Report.

5.1.3. Regarding the alleged breach by Treo NOAL of the right to priority payment of the *"Removal Entitlement"*

458. The plaintiffs claim that *"several sales of investments have already been carried out without any amount having been paid to Novalpina Capital Partners IFP SCSp"*[164].

459. This allegation calls for the following observations:

460. First of all, it follows from the above points that nothing makes it possible to assert that Novalpina SCSp will *ultimately* be entitled to any amount under the *"Removal Entitlement"*.

461. However, Treo NOAL does not intend to make distributions to the Investors until the dispute with the Novalpina GP group has been settled, with the repayment of the *"Bridging Investment"* being a particular case since it does not fall within the scope of Article 9.1 (and therefore Article 20.3.4) but falls within the scope of Article 9.2 of the LPA.

462. To date, the only branch of operational business sold by Treo NAOL concerns the LXO group. The circumstances of this sale have been set out in the *"in fact"* part of these submissions.

463. The proceeds from the sale of LXO were not distributed to the Investors, as Treo NOAL had, from the outset, decided to refrain from any distribution pending the end of the dispute with the Novalpina group.

464. This is corroborated by two pieces of evidence prior to the attachment carried out by Novalpina SCSp.

465. It emerges from an email of 8 September 2022 that Treo NOAL sought at the time to invest the proceeds from the sale of LXO in due course[165].

---

[162]   MOLITOR Exhibits 4 and 19
[163]   MOLITOR Exhibit 140
[164]   See summons of 25 February 2022, no. 155, page 42
[165]   MOLITOR Exhibit 119

466. In a second email dated 19 September 2022, Treo NOAL sent the following response to an investor who asked it if there would be any other payments in relation to LXO apart from the repayment of the *"Bridging Investment"*:

*"The fund is distributing the remaining balance of the € 104M capital that was called in June for the refinancing of the investment. Further sale proceeds will be distributed in due course **once the dispute with the former GP has been resolved**[166 "167]*.

467. Treo NOAL followed the same logic when selling certain positions. It should be noted that the Fund buys and resells securities, particularly debt securities, depending on market developments or opportunities that come up, as Novalpina GP has itself done in the past[168]

468. The proceeds from these realisations were also not distributed.

469. In light of the foregoing developments, Novalpina SCSp cannot reasonably argue that its priority right in relation to the possible payment of a *"Removal Entitlement"* was allegedly violated by Treo NOAL.

470. It is its responsibility to prove its allegations.

471. In any event, the alleged violation of Novalpina SCSp's priority payment right has absolutely no consequence, insofar as the plaintiffs have formally admitted in one of the summary proceedings[169], the *"Fund has assets that are largely sufficient to reimburse investors their contributions*[170], and ensure them a profit once the Removal Entitlement and the Sponsor Commitment have been paid to the [plaintiffs]"*.

472. In disregard of any consistency Novalpina SCSp, nevertheless carried out a garnishment by suggesting that the Fund was frittering away its assets.

5.1.4. Regarding the request for court-ordered appraisal for the determination of the value of the *"Removal Entitlement"*

473. The submitting parties refer here to the points made on the subject of the *"Sponsor Commitment"* which can be transposed *mutatis mutandis* to the *"Removal Entitlement"*.

5.1.5. Regarding the request for disclosure of exhibits

474. Under the terms of the summons of 25 February 2022, Novalpina SCSp makes, in the alternative, a request for disclosure of exhibits on the basis of Articles 288 and 284 of the New Code of Civil Procedure.

---

[166]  Our emphasis

[167]  MOLITOR Exhibit 120

[168]  MOLITOR Exhibit 2; see Novalpina GP's report as at 31 December 2020

[169]  See written submissions summarising counsel's address of Maître Nicolas THIELTGEN of 15 November 2022, no. 19, page 8; MOLITOR Exhibit 129

[170]  Which however remains to be established.

475.   According to case law, an *"application for forced disclosure of an exhibit held by a party requires the plaintiff to designate the exhibit sufficiently precisely, demonstrate how its disclosure is relevant for the resolution of the dispute, that the existence of the exhibit is likely and not only hypothetical and that the possession of the exhibit by the defendant is likely"*[171].

476.   The submitting parties formally object to this request, which must be rejected whereas the legal conditions for the forced disclosure of exhibits are not met (i) and that legitimate grounds oppose this communication (ii).

*(i)     The claim is inadmissible because it does not meet the legal criteria*

477.   None of the conditions defined by case law to order the forced disclosure of exhibits is met in this case.

•   **The exhibits are not relevant to the resolution of the dispute**

478.   Novalpina SCSp justifies its claim by the fact that it was allegedly unable to determine *"the exact amount not distributed as a priority to Novalpina Capital Partners IFP SCSp, in breach of Article 20.3.4 of the LPA and still owed to the latter"*[172].

479.   First of all, it should be noted that this statement is totally false insofar as Novalpina SCSp is fully aware of the distributions made by the Fund. In particular, it demonstrated this in the context of summary applications for setting aside and restriction initiated by the Fund the day after the garnishment of 27 September 2022.

480.   Any distribution by the Fund to Investors is the subject of a *"distribution notice"* communicated to them prior to any payment.

481.   In the context of the aforementioned summary proceedings, Novalpina SCSp produced extracts from *"Distribution Notice no. 4"* dated 20 September 2022 which was sent by Treo NOAL to the Investors in order to announce to them the repayment of the *"Bridging Investment"*, even though it was a document of a confidential nature reserved for the Investors. The claimant therefore benefits from a source of information among the investors.

482.   It therefore knows very well that its allegations about a distribution made in violation of its rights are unfounded.

483.   Furthermore, the question of distribution is completely unrelated to its request for payment of the *"Removal Entitlement"*.

484.   Before concerning itself with the issue of payment of the *"Removal Entitlement"* it first needs to establish that it is actually entitled to it.

---

[171]   Lux. 3 May 2019, case list no. 161081

[172]   See summons of 25 February 2022, no. 163, page 44

- **The existence of the exhibit and its possession by the Fund are not demonstrated**

485. It has been decided that the person requesting the forced disclosure of an exhibit must not only establish the likelihood of its existence, but it must also *"provide proof of the physical possession of this exhibit by the opposing party. It cannot in fact be accepted that a person is forced to hand over a thing that is not in its physical possession, given that the contrary would amount to imposing on him an unenforceable obligation"*[173].

486. Novalpina SCSp obviously speculates about the existence of certain exhibits whose existence it in no way establishes.

487. This is the case for so-called communications concerning sales, disposals, etc.

- **The exhibits are not accurately identified**

488. The exhibits whose forced disclosure is requested are not identified with the required accuracy, notwithstanding the contrary assertions of Novalpina SCSp.

489. It merely lists different categories of documents, defined very broadly and covering periods of several months.

490. However, it is a principle that the exhibits whose disclosure is requested must be precisely identified in order to prevent a *"*"fishing expedition", by which a party will search in the archives of its opponent with the sole hope of possibly unearthing a document that may be useful to it"*[174].

491. As the doctrine tells us:

*"The procedure cannot be diverted by the plaintiff in proceedings to obtain unlimited access to all documentation"*[175].

492. Novalpina SCSp's approach indisputably falls within the scope of a *"fishing expedition"* when it requests any old how the communication of contracts, correspondence covering an extremely extended period, and financial statements described in a very vague manner, in the hope of finding a useful element to its application.

493. However, it should be recalled that the possibility for the judge to order the communication of an exhibit must be reconciled with Article 351 of the New Code of Civil Procedure which provides, in its 2nd paragraph, that: *"Under no circumstances may an investigative measure be ordered with a view to remedying the failure of the party in the administration of evidence"*[176].

*(ii)    Legitimate grounds conflict with the request for disclosure of exhibits*

494. Case law admits that the forced disclosure of exhibits may be refused for legitimate reasons on the

---

[173] Summary proceedings, 20 June 2010, no. 511/2010, cited *in* Marc KLEYR, *"La production forcée de pièces par voie de référé dans un contexte international: la pre-trial document discovery à la luxembourgeoise"*, JTL, no. 13, 2011, p.16

[174] Thierry HOSCHEIT, op.cit., no. 725, p.434

[175] Thierry HOSCHEIT, *op.cit.*, *loc.cit.*

[176] See in this sense Court, 19 April 2018, case list no. 43290

part of the party that is supposed to possess them. The request will thus be rejected in the event of a breach of privacy or professional secrecy[177].

495.  In the present case, Novalpina SCSp's application would have the consequence of violating the principle of secrecy of correspondence, business secrecy, the confidential nature of documents, as well as the rights of the defence of the submitting parties, all of which are protected by different standards.

### 5.1.6. Regarding the claim for damages

496.  The same observations as those made regarding the *"Sponsor Commitment"* should be made here.

497.  Insofar as the Fund has a potential debt of money to Novalpina SCSp, damages may at most only consist of interest for delay provided that the delay exists and is attributable to the Fund, which is not the case here.

### 5.2.  *Regarding the very alternative claim, drawn from the alleged tortious liability of the submitting parties*

498.  The submitting parties refer to their arguments under section 4 which are also applicable in this case.

### 6.  Regarding the application of Article 14 of the LPA

499.  The submitting parties formally dispute the existence of joint and several liability between them, whether on the basis of Article 1200 of the Civil Code, on the basis of Article 14 of the LPA or by virtue of the principle according to which joint and several liability is presumed in commercial matters.

500.  First of all, it should be recalled that if, as the plaintiffs claim, Treo NOAL never took office, it cannot have entered into joint and several contractual obligations under the LPA.

501.  Nevertheless, since Treo NOAL does not dispute its taking of office as general partner of the Fund as of 27 August 2021, the following observations should be made:

502.  Treo NOAL is not a general partner, but only the manager of a special limited partnership.

503.  In its capacity as manager, Treo NOAL does not enter into to any personal obligations when it acts for the Fund.

504.  Treo NOAL proceeded with purchase of the *"Sponsor Commitment"* in the name and on behalf of the Fund. Furthermore, it is indeed the Fund that is the potential debtor of the *"Removal Entitlement"*. Moreover, the garnishee order enforced on 27 September 2022 by Novalpina SCSp in respect of the *"Removal Entitlement"* was exclusively directed against the Fund.

---

[177]  Court of 5 November 2003, BU, 2004, p.8

505. In addition, pursuant to Article 320-3 of the 1915 Law: *"Managers who do not have the capacity of general partner are liable in accordance with Article 441-9"*. In other words, their liability is based on that of the directors of public limited companies.

506. However, it is unanimously accepted that a director of a public limited company incurs his personal liability with regard to third parties only in the event of a personal fault separable or detachable from his duties. The director must have committed faults of a gravity incompatible with the normal performance of corporate duties[178].

507. As Treo NOAL has not entered into any personal obligation and has not committed any fault (and *a fortiori* no fault detachable from its duties), it falls within the meaning that it cannot be jointly and severally bound to the Fund, whether pursuant to Article 1200 of the Civil Code or the principle of presumed joint and several liability in commercial matters.

508. Article 14 of the LPA is not of any assistance here since it only specifies the indemnifiable persons with respect to the assets of the Fund.

509. Moreover, Treo NOAL is itself a *"Indemnified Person"* within the meaning of the LPA. Any conviction handed down against it would *ultimately* be borne by the Fund.

## 7. Procedural indemnity

510. The parties of *Maître* Nicolas THIELTGEN still claim the award of a procedural indemnity for each of them in the amount of EUR 50,000 under Article 240 of the New Code of Civil Procedure.

511. This claim is formally contested and must be rejected when the plaintiffs have not justified their claim and do not establish how it would be unfair to leave the expenses not included in the costs to be borne solely by them.

512. Not only is there no need to award them a procedural indemnity, but on the contrary it is appropriate to order them jointly and severally, if not *in solidum,* each for its part, to pay a procedural indemnity of EUR 50,000 to the defendants on the basis of Article 240 of the New Code of Civil Procedure.

513. It follows from the points contained in these submissions that the plaintiffs initiated their action with the deliberate aim of harming the Fund when they should have accepted a constructive discussion in order to find a solution allowing an honest and reliable valuation of the assets of the Fund despite the problems caused by NSO.

514. In view of the circumstances, it would be manifestly unfair for the submitting parties to have to bear alone all the sums not included in the costs they had to incur to ensure their defence.

## 8. Provisional enforcement

515. Pursuant to Article 567 of the New Code of Civil Procedure, the district court dealing with commercial

---

[178]    See Georges RAVARANI, *"La responsabilité civile des personnes privées et publiques"*, 3rd ed, Pasicrisie, 2014, no. 632, p.650

matters may only order provisional enforcement notwithstanding appeal and without guarantee if there is an *"uncontested title"* or *"previous conviction which has not been appealed"*.

516.   The exemption from surety may only be ordered in the cases exhaustively listed in Article 567 of the New Code of Civil Procedure[179].

517.   However, none of these scenarios are given in this case.

518.   The submitting parties dispute in any event the bad faith attributed to them by the plaintiffs, it being further recalled that good faith is always presumed.

519.   It is up to the party claiming a breach of good faith to establish it[180].


## ON THESE GROUNDS

and all others to be deduced by pleading and to be added even ex officio and subject to the express and formal reservation of being able to change, increase or supplement these submissions during the proceedings and as appropriate, MOLITOR, for its parties, submits that it


## MAY IT PLEASE THE COURT

**to notify** the submitting parties that they refer to legal prudence as to the admissibility of claims procedurally;

on the merits,

**declare inadmissible** the claim of the plaintiffs for the *"quashing"* of the taking of office of Treo NOAL GP S.à r.l. and the annulment of all the acts executed by it since 27 August 2021, on the basis of the exception of waiver, when the plaintiffs acknowledged Treo NOAL GP S.à r.l. as new general partner of the Fund as of 27 August 2021 and undertook not to challenge this taking of office;

alternatively, **hold** that Article 20.3.5 of the *"Limited Partnership Agreement"* must be interpreted in the sense that the acquisition of the *"Sponsor Commitment"* does not constitute a condition precedent, but a contractual obligation on the part of the new general partner arising from the acceptance of its office;

therefore;

**dismiss** the plaintiffs' claims seeking to:

–   order the *"quashing"* of the taking of office of Treo NOAL GP S.à r.l. as general partner of the Fund;
–   hold that the term of office as general partner of Treo NOAL GP S.à r.l. never became effective;
–   hold that the term of office as general partner of Novalpina Capital Partners I GP S.à r.l. remained

---

[179]   Lux. 20 April 2018, case list no. TAL-2018-01786
[180]   François TERRE, Philippe SIMLER, Yves LEQUETTE, *op.cit.*, no. 439, p.487

effective on 27 August 2021;

**dismiss** Novalpina Capital Partners I GP S.à r.l.'s claim for the payment of *"management fees"* since 27 August 2021 for an amount of EUR 18,572,930 per year;

**dismiss** Novalpina Capital Partners I GP S.à r.l.'s claim that this order be accompanied by a penalty of EUR 50,000 per day of delay when under the terms of Article 2059 paragraph 2 of the Civil Code, *"the penalty cannot be pronounced in the event of an order to pay a sum of money"*;

**declare inadmissible,** regardless of the basis thereof, the plaintiffs' claim for restitution of the *"management fees"* received by Treo NOAL GP S.à r.l. since 27 August 2021, otherwise **dismiss** the plaintiffs' claim;

**dismiss** the plaintiffs' claim that this conviction be accompanied by a penalty of EUR 50,000 per day of delay when under the terms of Article 2059 paragraph 2 of the Civil Code, *"the penalty cannot be pronounced in the event of an order to pay a sum of money"*;

**declare inadmissible, if not reject,** the plaintiffs' claim for annulment of the decisions taken by Treo NOAL GP S.à r.l. since 27 August 2021;

**find** that NOAL SCSp validly acquired the *"Sponsor Commitment"* on 27 August 2021;

alternatively, in the event that these decisions of Treo NOAL, including that of acquiring the *"Sponsor Commitment"* in the name and on behalf of NOAL SCSp are annulled by the Court, **order** Novalpina Capital Partners I FP SCSp to reimburse to the Fund, the sum of EUR 8,673,147 received under its *"Sponsor Commitment"* and Novalpina Capital Partners I Group GP S.à r.l. to repay the sum of EUR 1,681,383 that it received under its *"Sponsor Commitment"*;

**reject** the plaintiffs' claim to have the amount of the *"Sponsor Commitment"* calculated on the basis of the Ernst & Young Luxembourg report of 6 August 2021;

**dismiss** the plaintiffs' claim for the establishment of a court-ordered appraisal in order to calculate the amount of the *"Sponsor* Commitment" when a court-ordered appraisal cannot be conducted at present due to the situation of NSO and the mission proposed by the plaintiffs violates the terms of the LPA;

in the alternative, and only in the event that the Court decides to order a court-ordered appraisal for the determination of the value of the *"Sponsor Commitment"*, **hold** that:

- the valuation of the *"Sponsor Commitment"* shall be carried out on 1 August 2021 adopted in the Valuation Principles, otherwise on 27 August 2021;

- the valuation must be carried out in accordance with the valuation standards provided for under the definition of the term *"Value"* of the LPA which provide for the application, for non-marketable securities, of the IPEV standards and which refer, for marketable securities, to the provisions of Article 9.8.3 of the LPA;

- the expert shall be provided with all the audited accounts of the Fund prepared before the valuation date;

- the court expert must be able to carry out all verifications he deems useful and verify the reliability, relevance and plausibility of the projections and *"business plans"* provided to him by the management

of the companies concerned;

- the expert may not take into account the conclusions of the EY Report due to its serious shortcomings;

**dismiss** the party Novalpina Capital Partners I Group GP S.à r.l.'s claim for payment of the sum of EUR 6,686,018 under the *"Sponsor Commitment"*, whether this claim was made in the context of a claim for enforcement of a contractual obligation or in the context of a claim for damages based on the contractual or tortious liability of the submitting parties;

**dismiss** the party Novalpina Capital Partners I FP SCSp's claim for payment of the sum of EUR 33,972,928 under the *"Sponsor Commitment"*, whether this claim was made in the context of a claim for enforcement of a contractual obligation or in the context of a claim for damages based on the contractual or tortious liability of the submitting parties;

**dismiss** the plaintiffs' claim that these convictions be accompanied by a penalty of EUR 50,000 per day of delay when under the terms of Article 2059 paragraph 2 of the Civil Code, *"the penalty cannot be pronounced in the event of an order to pay a sum of money"*;

**reject** the claim of the party Novalpina Capital Partners I FP SCSp to have the amount of the *"Removal Entitlement"* calculated on the basis of the Ernst & Young Luxembourg report of 6 August 2021;

**dismiss** the party Novalpina Capital Partners I FP SCSp's claim for the establishment of a court-ordered appraisal in order to calculate the amount of the *"Removal Entitlement"* when an expert valuation cannot be conducted at present due to the situation of NSO and the mission proposed by the plaintiff violates the terms of the LPA;

in the alternative, and only in the event that the Court decides to order a court-ordered appraisal for the determination of the value of the *"Sponsor Commitment"*, **hold** that:

- the valuation of the *"Removal Entitlement"* shall be carried out on the date of 1 August 2021 adopted in the Valuation Principles, otherwise on 9 July 2021;

- the valuation must be carried out in accordance with the valuation standards provided for under the definition of the term *"Value"* of the LPA which provide for the application, for non-marketable securities, of the IPEV standards and which refer, for the marketable securities, to the provisions of Article 9.8.3 of the LPA;

- the expert shall be provided with all the audited accounts of the Fund drawn up before the valuation date

- the court expert must be able to carry out all verifications he deems useful and verify the reliability, relevance and plausibility of the projections and *"business plans"* provided to him by the management of the companies concerned;

- the expert may not take into account the conclusions of the EY Report due to its serious shortcomings.

**dismiss** Novalpina Capital Partners I FP SCSp's claim for payment of the sum of EUR 282,925,127 under the *"Removal Entitlement"*, whether this claim was made in the context of a claim for enforcement of a

contractual obligation or in the context of a claim for damages based on the contractual or tortious liability of the submitting parties;

**dismiss** Novalpina Capital Partners I FP SCSp's application for validation of the garnishment of 27 September 2022 provided that this application still has a purpose with regard to the interim set-aside order of 4 November 2022;

**dismiss** Novalpina Capital Partners I FP SCSp's claim that these convictions be accompanied by a penalty of EUR 50,000 per day of delay when under the terms of Article 2059 paragraph 2 of the Civil Code, *"the penalty cannot be pronounced in the event of an order to pay a sum of money"*;

**reject** the request for forced disclosure of exhibits made by Novalpina Capital Partners I FP SCSp on the basis of Articles 288 and 284 of the New Code of Civil Procedure when the exhibits requested (i) are not relevant for the resolution of the dispute, (ii) do not exist and are not in the possession of the submitting parties, (iii) are not identified with the required accuracy and (iv) conflict with the principle of secrecy of correspondence, business secrecy, the confidential nature of documents and the rights of the defence of the submitting parties, all of which are protected by different standards;

in the event that this request is granted with a penalty, cap the amount of the penalty at a maximum total amount of EUR 10,000;

**dismiss** any other request of the plaintiffs for disclosure, subject to a penalty of information;

in the event that this request is granted with a penalty, cap the amount of the penalty at a maximum total amount of EUR 10,000;

**dismiss** the claim of the parties of *Maître* Nicolas THIELTGEN for the award of a procedural indemnity of EUR 50,000 on the basis of Article 240 of the New Code of Civil Procedure when they do not establish how it would be unfair to leave the expenses not included in the costs to be borne solely by them;

**hold** that there is no joint and several liability between Treo NOAL GP S.à r.l. and the Fund;

**order** the plaintiffs to pay, jointly and severally, if not *in solidum,* if not each for its part, to the defendants a procedural indemnity of **EUR 50,000 (fifty thousand euros)** under Article 240 of the New Code of Civil Procedure, for all the sums that the defendants must disburse, not included in the costs, such as legal fees and which it would be unfair to leave them to bear solely, given the attitude of the plaintiffs, which led to the dispute;

the plaintiffs **be ordered** jointly and severally, if not *in solidum* if not each for its part, to pay all the costs and expenses of the proceedings with deduction in favour of the submitting party avocat à la cour (court lawyer) who asserts that they advanced them;

**dismiss** the plaintiffs' request for provisional enforcement of the judgment to be handed down notwithstanding any appeal, without guarantee, immediately and before registration;

**acknowledge** to the submitting parties that they submit, in support of these submissions, the following exhibits;

1.  Press articles on the dispute between the Founders;

2.  Audited annual accounts of the Fund as at 31 December 2020;

3.  Articles of Association of Master Luxco as at 3 November 2020;

4.  Unaudited accounts of the Fund as at 31 March 2021;

5.  Tables prepared by Novalpina GP containing the "Accrued Capital Interest" by quarter;

6.  Evolution of the *"Carried Interest"* between 31 December 2018 and 30 June 2021 according to the tables of Novalpina GP;

7.  Email of 16 April 2021 from Messrs Stefan KOWSKI and Bastian LUEKEN to the LPAC;

8.  Letter of 14 May 2021 from Proskauer to the Founders;

9.  Letter from the Investors to Novalpina GP of 25 June 2021;

10. *"Convening Notice"* of 28 June 2018;

11. Judgment of 7 July 2021 handed down by the Court of Appeal in the context of the dispute between Founders;

12. Email of 8 July 2021 from Mr Gaëtan DUMONT to Proskauer;

13. Extract from the Electronic Records of Companies and Associations of 8 July 2021 on the changes of general partners within Master Luxco;

14. Extract from the Electronic Records of Companies and Associations of 8 July 2021 on the changes of general partners within Novalpina Capital Partners I LUXCO North SARL

15. Extract from the Electronic Records of Companies and Associations of 8 July 2021 on the changes of general partners within NVP 101 SARL;

16. Extract from the Electronic Records of Companies and Associations of 8 July 2021 on the changes of general partners within NVP 103 SARL;

17. Amendment of the Articles of Association of Master Luxco of 8 July 2021;

18. Minutes of the Investors' meeting of 9 July 2021;

19. Exchange of emails between LIS and the Founders of 15 and 16 July 2021;

20. Presidential order of 20 July 2021;

21. Certified report of the bailiff Guy ENGEL of 21 July 2021 on the results of the vote at the meeting of the Investors of the Fund of 9 July 2021;

22. Letters sent on 23 July 2021 by Novalpina GP to the Investors and the Fund;

23. Official letter of 28 July 2021 from Loyens & Loeff to Van Campen Liem;

24. Letter from Proskauer to MACFARLANES of 30 July 2021 with a draft amendment to the LPA (1st page only);

25. Email of 3 August 2021 from Proskauer to the Investors;

26. Second email of 3 August 2021 from Proskauer to the Investors;

27. Presidential order of 4 August 2021 issued in the context of the dispute between Founders;

28. Letter of 4 August 2021 from Novalpina GP to the LPAC;

29. Email of 6 August 2021 from Proskauer to Novalpina GP's counsel;

30. *"Consent forms"* inventories;

31. Example of *"consent form"*;

32. Letter of 9 August 2021 from Novalpina GP to the Investors confirming the resolutions adopted by the Investors on 6 August 2021;

33. Exchange of emails from 29 July 2021 to 11 August 2021 between Mr Stefan KOWSKI, Mr Stephen PEEL and Proskauer regarding the transition process between the former and the new General Partner;

34. Extract from the Electronic Records of Companies and Associations of 13 August 2021 relating to Novalpina GP;

35. Letter of 25 August 2021 from Proskauer to the Investors;

36. Letter of 25 August 2021 from Proskauer to Loyens & Loeff;

37. Email of 26 August 2021 from Mr Stefano PILERI;

38. Email of 26 August 2021 from DLA PIPER to Proskauer;

39. Emails exchanged between counsel between 18 and 28 August 2021 in the context of negotiations regarding the change of the LPA, the issue of *"Promissory Notes"*, the Pledge and the Valuation Principles;

40. *"Fourth Amended and Restated Limited Partnership Agreement"* of 27 August 2021;

41. Example of *"Additional consent 2"* which allowed the adoption of the Fourth LPA;

42. Letter of 27 August 2021 sent by Treo NOAL to the Investors confirming its taking of office and the fulfilment of the obligations arising from the replacement of Novalpina GP;

43. Letter of 27 August 2021 sent by Treo NOAL in particular to Novalpina GP confirming its taking of office and the fulfilment of the obligations arising from the replacement of Novalpina GP;

44. *"Notice of Acquisition"* sent by the Fund to Clarendon Trust on 27 August 2021;

45. *"Notice of Acquisition"* sent by the Fund to Novalpina SCSp on 27 August 2021;

46. *"Notice of Acquisition"* sent by the Fund to Group GP on 27 August 2021;

47. *"Promissory Note"* issued by the Fund to Clarendon Trust on 27 August 2021;

48. *"Promissory Note"* issued by the Fund to Novalpina SCSp on 27 August 2021;

49. *"Promissory Note"* issued by the Fund to Group GP on 27 August 2021;

50. Email exchanges between White & Case and Proskauer between 23 August and 28 August 2021;

51. "Pledge agreement" between the Fund, Treo NOAL and others of 28 August 2021;

52. Undertaking of Bastian LUEKEN of 28 August 2021;

53. Undertaking of Stephen PEEL of 28 August 2021;

54. Undertaking of Stefan KOWSKI of 28 August 2021;

55. Undertaking of Group GP of 28 August 2021;

56. Undertaking of Novalpina SCSp of 28 August 2021;

57. Undertaking of Clarendon Trust of 31 August 2021;

58. Email from White & Case to Proskauer of 30 August 2021;

59. Confirmation from Mr Stephen PEEL;

60. Confirmations from Mr Stefan KOWSKI and Mr Bastian LUEKEN;

61. Confirmations of Novalpina GP, Novalpina SCSp and Group GP;

62. Confirmation from BRG NOAL;

63. Email of 31 August 2021 from Macfarlanes to DLA Piper;

64. Organisation chart of the Fund prior to the change of general partner;

65. Organisation chart of the Fund after the change of general partner;

66. Letter of 3 September 2021 from Loyens & Loeff Luxembourg S.à r.l. to Proskauer;

67. Resignation of Mr Bastian LUEKEN from Master Luxco of 6 September 2021;

68. Resignation of Mr Stephen PEEL from Master Luxco of 6 September 2021;

69. Letter of 14 September 2021 from Proskauer to Messrs PILERI and ZINI;

70. Letter of 14 September 2021 from Proskauer to the Founders;

71. Email of 17 September 2021 from Mr LUEKEN to Proskauer;

72. Letter of 29 September 2021 from Mr PEEL to Proskauer;

73. Letter of 29 September 2021 from Mr PILERI and Mr ZINI to Proskauer;

74. Email of 1 October 2021 from BSP to Proskauer on behalf of Mr KOWSKI;

75. Exchange of emails between counsels of 28 September and 8 October 2021 concerning KPMG's undertaking;

76. Communication of 3 November 2021 concerning the placement of NSO on the blacklist of the Bureau of Industry and Security of the United States;

77. Letter of 9 November 2021 from Treo NOAL to Loyens & Loeff;

78. Letter of 10 November 2021 from Macfarlanes to Treo NOAL;

79. Press articles on the resignations within NSO;

80. Resolution of the Board of Directors of TRIANGLE HOLDINGS S.A. of 20 January 2022;

81. Summons on the merits of 15 February 2022 of Novalpina GP against in particular Master Luxco, Treo NOAL, the Fund and Portfolio Companies;

82. Letter of 15 February 2021 from Brucher, Thieltgen & Partners to Mr Finbarr O'CONNOR;

83. Letter of 15 February 2021 from Brucher, Thieltgen & Partners to Mrs Karine PINSON of the LXO group;

84. Letter of 16 February 2022 from Brücher, Thieltgen & Partners to the Ad Hoc Bondholder Group from ODYSSEY EUROPE HOLDCO SARL;

85. Letter of 16 February 2022 from Brücher, Thieltgen & Partners to NSO Group;

86. Letter of 16 February 2022 from Proskauer to Brucher, Thieltgen & Partners;

87. Summons of 22 February 2022 to appear in summary proceedings of Novalpina GP, Novalpina SCSp and Group GP against BRG NOAL and the Fund;

88. Summons of 23 February 2022 to appear in summary proceedings of Novalpina GP against in particular Master Luxco, Treo NOAL, the Fund and the Portfolio Companies;

89. Letter of 6 March 2022 from category B directors to category A directors of TRIANGLE HOLDINGS S.A.;

90. Press review on the situation of NSO;

91. Price of the NSO loan value;

92. Resolution of the Board of Directors of TRIANGLE HOLDINGS S.A. of 30 March 2022;

93. Summons on the merits of 1 April 2022 of Messrs HOLY and LAVIE against Triangle Holding S.A.;

94. English judgment of 11 April 2022;

95. Complaint with a claim for damages filed on 21 April 2022 against Messrs PILERI, ZINI and others on the basis of Article 1500-11 of the 1915 Law;

96. Press article concerning the launch by the European Parliament of an Inquiry Committee on NSO;

97. Letter of 21 April 2022 from MC DERMOTT, WILL & EMERY to the Inquiry committee of the European Parliament;

98. Letter of 21 April 2022 from OGIER to Messrs Gaëtan DUMONT and Allen FOLEY;

99. Response of 21 April 2022 from Messrs Gaëtan DUMONT and Allen FOLEY to OGIER;

100. Complaint filed by BRG NOAL on 22 April 2022 with the *"Financial Conduct Authority"* against Messrs KOWSKI, LUEKEN and PEEL and NOVALPINA CAPITAL LLP with its appendices;

101. Letter from BRG ASSET MANAGEMENT LLC of 24 April 2022;

102. Communication of 26 April 2021 on the restructuring of OEG's debt successfully conducted by Treo NOAL;

103. Press articles, legal requests and concerning the legal proceedings brought against NSO;

104. List of ongoing investigations about NSO

105. Summons to appear in summary proceedings of 27 April 2022 of Messrs HOLY and LAVIE against Triangle Holding S.A.;

106. Email of 4 May 2022 from MC DERMOTT, WILL & EMERY to the European Parliament Inquiry committee;

107. Email of 5 May 2022 from MC DERMOTT, WILL & EMERY to the European Parliament Inquiry committee;

108. Complaint with a claim for damages filed on 6 May 2022 against Messrs KOWSKI, LUEKEN and SCHMIDT and others on the basis of Article 1500-11 of the 1915 Law;

109. Capital Call of 10 May 2022 relating to the *"Bridging Investment"*;

110. Decision of the High Court of Justice of 10 May 2022;

111. Letter from the State Treasury of 11 May 2022 (deposit receipt) relating to the criminal complaint of 21 April 2022;

112. Presidential order of 16 May 2022 in the dispute between Hippocrate TopCo S.à r.l. and NOAL SCSp and Ares concerning LXO;

113. Letter from the State Treasury of 25 May 2022 (deposit receipt) relating to the criminal complaint of 6 May 2022;

114. Letter sent by Treo NOAL on 26 May 2022 to the *"Financial Conduct Authority"* concerning Messrs KOWSKI, LUEKEN and PEEL and NOVALPINA CAPITAL LLP;

115. Letter sent by Treo NOAL on 10 June 2022 to the *"Financial Conduct Authority"* concerning Messrs KOWSKI, LUEKEN and PEEL and NOVALPINA CAPITAL LLP;

116. Letter sent by Treo NOAL on 13 June to the *"Cayman Island Monetary Authority"* concerning Messrs KOWSKI and ZINI, in their capacity as director of NOVALPINA VISION GP LIMITED, the *general partner* of NOVALPINA VISION LP;

117. Registered letter with acknowledgement of receipt from BRG ASSET MANAGEMENT and Treo NOAL on 15 June 2022 to the Commission de Surveillance du Secteur Financier;

118. Interim order of 17 June 2022 handed down following the plaintiffs' summons to appear in summary proceedings of 22 February 2022;

119. Email of 8 September 2022 from Treo NOAL to the European Depositary Bank;

120. Email of 19 September 2022 from Treo NOAL to an Investor of the Fund;

121. Summons for nullity served on 22 September 2022 at the request of Treo NOAL GP; NOAL SCSp; NVP 101 SARL; NVP 103 SARL and NOAL LuxCo North SARL

122. *Distribution Notice no. 4* (anonymised) of 22 September 2022 announcing the repayment of the *"Bridging Investment"*;

123. Garnishee order of 27 September 2022 enforced by Novalpina SCSp against the Fund;

124. 9fin press article of 4 October 2022;

125. Official letter of 19 October 2022 from MOLITOR to *Maître* Thibault CHEVRIER;

126. Letter in response of 28 October 2022 from *Maître* Thibault CHEVRIER to MOLITOR;

127. Interim order of 28 October 2022 handed down further to Novalpina's summons to appear in summary proceedings to obtain the suspension of the decisions taken at the general meetings of Master Luxco of 16 August 2021, 27 August 2021 and 20 October 2021;

128. Interim order of 4 November 2022 withdrawing the presidential order of 22 September 2022 and ordering the release of the attachment of 27 September 2022;

129. Written submissions summarising counsel's address of 15 November 2022 of *Maître* Nicolas THIELTGEN in the context of the appeal against the order of 17 June 2022;

130. Notice of appeal of 17 November 2022 of Novalpina GP against the interim order of 28 October 2022;

131. Notarised deed of 14 December 2022 acknowledging the change of company name of BRG NOAL GP SARL which became Treo NOAL GP SARL published in the *Recueil électronique des Sociétés et Associations* on 11 January 2023;

132. Fax from *Maître* Joram MOYAL of 15 December 2022 (2:11p.m.) communicating the commercial judgment 2022TALCH02/01681 of 9 December 2022 in the context of nullity proceedings brought by Messrs Shalev HOLY and Mr Omri LAVIE against Triangle Holding S.A.;

133. Email from *Maître* Nicolas THIELTGEN of 15 December 2022 to the Court of Appeal with its appendices;

134. Letter sent by Treo NOAL on 15 December 2022 to the *"Financial Conduct Authority"*;

135. Letter from *Maître* Joram MOYAL dated 16 December 2022 sent to TRIANGLE HOLDINGS S.A. and its subsidiaries;

136. Letter sent by Treo NOAL on 29 December 2022 to the *"Financial Conduct Authority"*;

137. Interim order of 13 January 2023 handed down following the summons to appear in summary proceedings of 27 April 2022 of Messrs HOLY and LAVIE against Triangle Holding S.A.;

138. Written submissions summarising counsel's address of 16 January 2023 communicated by Treo NOAL and the Fund in the context of the appeal procedure against the order of 28 October 2022;

139. Email from MC DERMOTT, WILL & EMERY to the Inquiry committee of the European Parliament of

16 January 2023;

**140.** Simulations relating to the calculation of the "Removal Entitlement";

**141.** Judgment of 15 February 2023 handed down in the context of the appeal lodged against the order of 17 June 2022;

**142.** *"Notice of acceleration"* served on Northpole Newco S.à r.l. dated 17 February 2023;

**143.** *"Notice appropriation"* served on Diamond LIE S.à r.l. and Northpole Newco S.à r.l. dated 17 February 2023;

**144.** Letter from MC DERMOTT, WILL & EMERY of 16 March 2023 to the Inquiry committee of the European Parliament

**reserve** for the submitting parties the right to produce, in addition to the exhibits listed in the body of these submissions, all other exhibits in due time and place and as appropriate;

**reserve** for the submitting parties all other rights of actions and remedies;

The foregoing submissions are notified without prejudice as a copy by email to *Maître* Nicolas THIELTGEN, avocat à la cour (court lawyer) and ELVINGER HOSS PRUSSEN, represented according to the parties concerned by *Maître* Elisabeth OMES, *Maître* Pierre ELVINGER and *Maître* Michel NICKELS.

Original copy,

[*signature*]

MOLITOR Avocats a la Cour
signed: Paulo LOPES DA SILVA

Received on ...

signed: *Maître* Nicolas THIELTGEN

Received, on ...

For ELVINGER HOSS PRUSSEN
represented by *Maître* Elisabeth OMES

Received, on ...

For ELVINGER HOSS PRUSSEN
represented by *Maître* Pierre ELVINGER

Received, on ...

For ELVINGER HOSS PRUSSEN
represented by *Maître* Michel NICKELS

Received, on ...

| | |
|---|---|
| Case list no.: | TAL-2022-03617 |
| Chamber: | VI[th] Chamber |
| Notified on: | 17.03.2023 |
| In the case: | BRG NOAL GP SARL; NOAL SCSp./. NOVALPINA CAPITAL PARTNERS I GP SARL; NOVALPINA CAPITAL PARTNERS I FP SARL; NOVALPINA CAPITAL PARTNERS I GROUP GP SARL, ATRF (CB INTL); Mr Kevin McDOWELL; LION RIVER I NV; Mr Bruno SOLLAZZO; CARDIFF ASSURANCE VIE SA; Mr Eric BEQUET; CENTRA COMBINED COMMON INVESTMENT FUND LIMITED; Mr ROHIT KAPUR; CNP ASSURANCES SA and others |



Martine Weitzel
26, rue Antoine Meyer
L-2153 Luxembourg
*Certified true translation*
martine.weitzel@hotmail.com
P. +352 691 44 67 30
Sworn Translator

12/04/2023