**IN THE HIGH COURT OF JUSTICE**                    **Claim No. CL-2023-000851**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

**B E T W E E N :**


**(1) TREO NOAL GP S.à r.l**

**(2) NOAL SCSp (acting by its managing general partner TREO NOAL GP S.à r.l)**

**(3) NORTHPOLE HOLDCO S.à r.l**

**(4) NORTHPOLE BIDCO S.à r.l**

<u>**Claimants**</u>

**- and -**

**(1) MR STEFAN EMANUEL KOWSKI**

**(2) MR STEPHEN MARK PEEL**

**(3) MR BASTIAN FREDERIK LUEKEN**

<u>**Defendants**</u>

_____

**PARTICULARS OF CLAIM**
_____


## A.    EXECUTIVE SUMMARY

1.    In summary:

1.1.    The Claimants (including a private equity fund made up largely of institutional investors) allege that the Defendants (the founders of the fund) have conspired together to use unlawful means to cause harm or loss to the Claimants.

1.2.    The means included (i) fraudulent representations, (ii) bribery and (iii) breach of duty.

1.3.    The result was that the Claimants acquired a notorious manufacturer of spyware ("**NSO**").

EXHIBIT E

1.4.   As the Defendants well knew, that acquisition was ill-suited and inappropriate to the investment appetite of the Claimants, and, contrary to the representations made by or on behalf of the Defendants to some or all of the Claimants, had not been the subject of a proper level of due diligence.

1.5.   In due course, NSO financially collapsed under the weight of the widespread public concerns that its software, *Pegasus,* was being misused by its customers.

1.6.   As a result, the Claimants suffered loss by acquiring and/or being left holding an entity of little or no value.

2.   The claims and their location within this document are as follows.

2.1.   Unlawful Means Conspiracy: **Section D**

(1)   Combination/Understanding: **Section D**(1) ¶¶48-49.

(2)   Intention to harm: **Section D**(2) ¶¶50-53.

(3)   Unlawful Means: **Section D**(3) ¶54.

(a)   Breach of Limited Liability Partnership Duties: **Section E**, ¶¶59-62;

(b)   Deceit/Fraudulent Misrepresentation arising out of the 1 February 2019 Representations: **Section F**, ¶¶64-83;

(c)   Deceit/Fraudulent Misrepresentation arising out of the Notice of Acquisition Representations made on 14 February 2019: **Section G**, ¶¶89-112;

(d)   The Dahbash Payment of USD 5 million: **Section H**, ¶¶118-130;

(e)   Wrongful acts under Luxembourg Law: **Section I**, ¶¶133-151;

(4)   Loss: **Section D**(4) ¶¶55-58, together with **Section E**(3) ¶63, **Section F**(6) ¶¶84-87, **Section G**(6) ¶¶113-114 and **Section H**(3), ¶¶131-132.

2.2.   A claim in deceit for damages arising out of the 1 February 2019 Representations: **Section F(7)**, ¶88.

2.3.    A claim in deceit for damages arising out of the 14 February 2019 Representations: **Section G(7)**, ¶¶115-117.

3.    If, contrary to the Claimants' primary case, the claims arising out of the conduct of the Defendants are governed by Luxembourg law, the Claimants' claims under Luxembourg law are set out in **Section I**.

## B.    THE PARTIES

### B(1)    The Claimants

4.    On the 27 August 2021, the First Claimant ("**NOAL GP**") replaced Novalpina Capital Partners I GP S.à r.l. ("**Novalpina GP**") as, and it remains, the manager (*gérant*) and general partner (*associé commandité*) of the Second Claimant.

5.    The Second Claimant, **NOAL SCSp**, (the "**Fund**") is a Luxembourg special limited partnership (*société en commandité spéciale*) established pursuant to a limited partnership agreement dated 23 August 2017 (the "**LPA**").

6.    The LPA has been amended and restated on six occasions, most recently on 17 October 2023, and references to the LPA are to the version in force from time to time. The original parties to the LPA were Novalpina GP and Novalpina Capital Partners I Group GP S.à r.l ("**Group GP**"). Since 15 November 2017 (when the First Amended and Restated LPA was executed) the parties to the LPA have also included the Fund and its LPs.

7.    Until August 2021, the Second Claimant was named Novalpina Capital Partners I SCSp. The limited partners of the Second Claimant are referred to above and below as "**the LPs**".

8.    NOAL GP is entitled as a matter of Luxembourg law to bring claims for and on behalf of the Fund, which can act only through its manager, NOAL GP.

9.    The Third Claimant ("**NorthPole HoldCo**") and the Fourth Claimant ("**NorthPole BidCo**") are Luxembourg companies indirectly majority-owned by the Fund. See further ¶21 below.

**B(2)    The Defendants**

10.    The First Defendant ("**Mr Kowski**"), the Second Defendant ("**Mr Peel**") and the Third Defendant ("**Mr Lueken**") (together, the "**Founders**") are investment professionals who:

    10.1.    established (or caused to be established) the Fund and the Novalpina entities referred to in this pleading;

    10.2.    controlled the Fund's investment advisors, as described at ¶¶ 15 and 19 below; and

    10.3.    indirectly owned the shares of Novalpina GP, and exercised a degree of day-to-day practical control or influence over the managers of Novalpina GP, as described at ¶18 below.

11.    At all material times, each of the Defendants was domiciled and resident in England and Wales and operated out of, and typically exercised the control identified in sub-paragraphs 10.2 & 10.3 above from, offices in London.

**B(3)    The relationship between the Founders, the Novalpina IAs, the AIFM and Fund investments**

12.    The Fund is an Alternative Investment Fund ("**AIF**") as defined by the Commission de Surveillance du Secteur Financier ("**CSSF**") in Luxembourg. The relevant Luxembourg regulations required the Fund, as an AIF, to have an Alternative Investment Fund Manager ("**AIFM**"), which itself is subject to regulation by the CSSF.

13.    At all relevant times, the Fund's AIFM was Sanne LIS S.A. (formerly known as Luxembourg Investment Solutions S.A.) ("**Sanne**").

14.    In its capacity as AIFM and pursuant to an "**AIFM Agreement**" dated 2 October 2017 between Sanne and the Fund (acting through Novalpina GP), Sanne had authority and responsibility to carry out (among other services) portfolio management and risk management on behalf of the Fund.

DM_EU 19910821-2.117301.0010

15. At all relevant times, the following two limited liability partnerships (together, the "**Novalpina IAs**"), were appointed to act as investment advisers to Sanne (as the AIFM) and Novalpina GP with respect to the Fund:

15.1. Novalpina Capital LLP ("**Novalpina Capital**"), a limited liability partnership (OC414979) incorporated in England and Wales and currently in members' voluntary liquidation, and

15.2. Novalpina Capital Management International LLP ("**Novalpina International**"), a limited liability partnership (OC417109) incorporated in England and Wales and now dissolved.

15.3. The Novalpina IAs' appointment was governed (during the time material to this claim) by a Second Amended and Restated Investment Advisory and Distribution Agreement dated 14 November 2018, between the Novalpina IAs, Sanne and Novalpina GP ("**the Investment Advisory Agreement**"). The Investment Advisory Agreement was governed by Luxembourg law.

15.4. The Novalpina IAs operated out of their offices at The Caxton Building, 1 Brewers Green, London SW1H 0RH.

16. By the Investment Advisory Agreement, the Novalpina IAs undertook:

16.1. to provide "*the Investment Advisory Services*" (as defined) to Sanne and to Novalpina GP "*for the ultimate benefit of the* [Fund] *only*", by assisting Sanne and/or Novalpina GP as applicable in performing their functions as AIFM and GP respectively (clause 2.2). Accordingly, the substantive content of the duty under clause 2.2 was determined by the duty of Sanne and Novalpina GP to advance the interests of the Fund;

16.2. to discharge their duties "*in any manner which is consistent with the provisions of* [the Investment Advisory Agreement]*, the Partnership documents and Applicable Law*" (clause 9.1);

16.3. upon Sanne's reasonable request, to provide Sanne with "*such information and documents as is necessary in order to allow* [Sanne] *... to carry out its duties as required under Applicable Law*" (clause 9.4).

DM_EU 19910821-2.117301.0010

16.4.   to notify Sanne if (in broad summary) they paid any fee or commission to a third party without the existence, nature and amount of that fee being "*clearly disclosed to the investors in the* [Fund] *in a manner that is comprehensive, accurate and understandable, prior to the provision of the relevant service*" (clauses 12.1.6.2 and 12.2.1);

16.5.   when providing recommendations to Sanne, not to recommend, as far as they were reasonably aware, "*any transaction or financing that would be in breach of any Applicable Law, this agreement, the Partnership Documentation, (….) or any other obligation of the* [Fund], *the AIFM or the* [Novalpina IAs] *which has been disclosed to* [the Novalpina IAs]" (Schedule 1, ¶11.2); and

16.6.   to "*conduct high standard financial, legal and tax due diligence for each transaction recommended to* [Sanne] *and/or the General Partner as appliable, keep all such due diligence material and reports, and provide them proactively upon request to* [Sanne] *and/or the General Partner as applicable*" (Schedule 1, ¶12.2).

17.   Until 27 August 2021, the Defendants exercised day-to-day effective practical control or influence over Novalpina GP and, at all material times, exercised control over the Novalpina IAs, as further described at ¶¶ 18 and 19 below. In the circumstances, the Defendants were in ultimate control of the sources of advice and information to be provided to the Fund and those advising it.

18.   As to the Defendants' day-to-day effective practical control or influence over Novalpina GP:

18.1.   Novalpina GP was owned by Group GP. Group GP was owned by Novalpina Capital Group S.à r.l ("**Novalpina Topco**").

18.2.   Each of the Defendants held a one-third share of Novalpina Topco at all material times.

18.3.   Each of Novalpina GP, Group GP and Novalpina Topco is a "*société à responsabilité limitée*", i.e. a private limited liability company.

18.4.   Luxembourg private limited companies are administered by their managers. Each of the Defendants:

   (1)   was a manager of Novalpina Topco at all times before 28 December 2021.

   (2)   was a manager of Group GP at all times prior to 13 December 2021.

18.5.   Pursuant to Article 710-14 of the Companies' Law of Luxembourg, and Clause 7.1 of the articles of each of Group GP and Novalpina GP, the managers of each of Group GP and Novalpina GP could be appointed and removed at all material times by a resolution of the shareholders representing more than half of the relevant company's share capital. As a result, the Defendants were able to appoint and remove the managers of Novalpina GP at all material times.

18.6.   Pursuant to a shareholders' agreement or other similar governance arrangement or contract, the managers of Novalpina GP were obliged to seek the unanimous consent of the Defendants before making certain decisions regarding the Fund.

18.7.   At all material times, Novalpina GP had three managers (*gérants*), whose position is analogous to that of a director of an English-incorporated limited company. The managers of Novalpina GP were accustomed (whether obliged or otherwise) to seek approval or input for Novalpina GP's actions from the Defendants.

18.8.   As at 26 February 2022, the Luxembourg Register of Beneficial Owners described the three Defendants as the beneficial owners of each of (i) Novalpina GP, (ii) Group GP and (iii) Novalpina Topco.

19.   As to the Defendants' control of the Novalpina IAs:

19.1.   The three Defendants are the only "*active persons with significant control*" identified at Companies House. Each of the three Defendants is described as having "*[m]ore than 25% but not more than 50%*" of the voting rights for both of the Novalpina IAs.

19.2.   The Novalpina IAs each had a management committee which consisted of the three Defendants.

19.3. Investment advice was only given by the Novalpina IAs to the AIFM following a decision of the management committee to do so.

19.4. Any such decision of the management committee required unanimity among the Defendants.

19.5. In the premises:

(1) In order for the Novalpina IAs to give investment advice to the AIFM it was necessary for all three Defendants to be in agreement.

(2) All investment decisions of the Novalpina IAs were made unanimously.

20. As to the process by which Sanne on behalf of the Fund decided whether to acquire and/or continue to hold an investment:

20.1. The Novalpina IAs would advise Sanne and/or Novalpina GP of a potential investment.

20.2. Once an investment recommendation was received by Sanne and Novalpina GP from one or both of the Novalpina IAs, they would consider that recommendation and then determine whether or not to follow it in accordance with their independent duties. Typically, they would follow such a recommendation and rely on the contents of the recommendation being full, fair and truthful.

20.3. If, as would be expected and likely following a recommendation from the Novalpina IAs, Sanne, as the AIFM, decided to follow the recommendation and/or otherwise approve an investment, that decision would then be conveyed to the Fund (acting via Novalpina GP), and in turn to the relevant underlying companies intended to participate in the investment.

21. New investments and acquisitions would usually involve the creation of new subsidiary companies as vehicles for those investments. Indirect subsidiaries of the Fund of relevance to this claim include:

21.1. NOAL Luxco S.à r.l. ("**LuxCo**"), a Luxembourg-incorporated company with registration number B219319, known until 27 October 2021 as Novalpina Capital Partners 1 Luxco S.à r.l. LuxCo is and was used as the central holding company for most of the respective holding companies of the Fund's

8

individual portfolio investments. At all material times, the Fund, by itself and through three wholly-owned subsidiaries, owned approximately 99.15% of LuxCo's shares.

21.2.    NorthPole HoldCo (the Third Claimant) is directly wholly owned by LuxCo. It is a Luxembourg-incorporated company, incorporated in August 2018, with registration number B226434.

21.3.    NorthPole BidCo (the Fourth Claimant), a Luxembourg-incorporated company with registration number B228505, was incorporated in October 2018 to act as purchaser of the NSO group of companies in the sale and purchase transaction described below. The shares of NorthPole BidCo are and were at all material times owned (indirectly) (i) as to c. 70.33% by NorthPole HoldCo and (ii) as to c. 29.67% by the founders and managers of NSO.

22.    A structure chart of the Fund and its advisers, as it existed at all relevant times, is provided at **Annexure 1.**

## C.    THE FUND AND NSO PRIOR TO FEBRUARY 2019

### C(1)    The LPs' investment in the Fund

23.    It was a responsibility of Novalpina GP (or, in the EEA, of the AIFM using information supplied by Novalpina GP) to market and encourage investment into the Fund.

24.    By a Private Placement Memorandum ("**PPM**") dated 15 November 2017, the Defendants (through Novalpina GP) marketed the Fund to prospective investors (including the LPs) as a vehicle for investing in mid-market European investments.

25.    At §6.2.1 of the PPM, the Defendants/Novalpina GP purported to identify (non-exhaustively) those industries and markets of particular interest for potential investment by the Fund. Despite having undertaken assessments of potential investments in the cyber-security industry from 2017 if not earlier, the Defendants did not include the cyber-security industry (still less the offensive spyware sector of that industry) on the list at §6.2.1 of the PPM. Nor did the PPM identify any intention or interest in the Fund investing in the offensive spyware industry or areas that would potentially give rise to significant environmental, social and governance ("**ESG**") or reputational concerns.

DM_EU 19910821-2.117301.0010

26.    At §§6.3 and 7.2 of the PPM, the Defendants/Novalpina GP made claims as to the "Rigorous Underwriting Approach" and the "detailed due diligence" that would be undertaken with respect to potential investments.

27.    In reliance on the PPM, the LPs subscribed to the Fund during late 2017 and early 2018. The Fund raised a total of c. €1.03 billion in investment commitments from LPs.

28.    The majority of the LPs (by asset volume) were pension funds, other large institutional investors, and family offices; and, as a result, naturally sensitive to significant ESG and/or reputational concerns and adverse to investments which might raise such concerns.

29.    Pursuant to clause 12 of the LPA, an Advisory Committee was set up to include nominees of the LPs (the "**LPAC**"). According to clause 12.2 of the LPA, the functions of the LPAC include (i) providing guidance to the General Partner, Sanne and the Novalpina IA on the strategy and progress of the Fund; (ii) reviewing the financial performance of the Fund and the valuations of the Fund's investments; and (iii) to "*be consulted on, and give (or withhold) its consent to, matters relating to the Fund*".

30.    The LPs or a majority of them were (or would, if asked and properly consulted, have been) opposed to the Fund holding investments, such as the acquisition of NSO, which were potentially liable to give rise to major ESG and/or reputational concerns.

31.    In circumstances where such LPs formed the largest investors (by asset volume) in the Fund, both (i) the interests of the Fund and (ii) the question of what would amount to a suitable investment for the Fund were closely aligned with the interests of the majority of the Fund's LP investors.

32.    Thus, any investment potentially liable to give rise to major ESG and/or reputational concerns would be both:

32.1.    inappropriate and unsuitable for these LPs; and

32.2.    similarly inappropriate for, unsuitable for and not in the interests of the Fund into which these LPs had invested.

33.    It is to be inferred that the Defendants knew that the LPs or a majority of them would be opposed to the acquisition of a company like NSO, because it is obvious to any experienced financial professional that institutional investors and pension funds are

DM_EU 19910821-2.117301.0010

particularly sensitive to ESG and/or reputational concerns and so would be unlikely to countenance investments which create a high risk of significantly adverse publicity.

34.    The Court is invited to infer, from the matters pleaded at ¶¶24-33 above, that the Defendants made a deliberate decision to exclude the possibility of investing in an offensive spyware company such as NSO from the identification of areas of interest for potential investment in the PPM, notwithstanding their inquiries in that regard by that date, because they did not wish to alert the potential pension and institutional investors to the possibility of the Fund making such investments and thereby run the risk of losing such investment into the Fund.

**C(2)    NSO**

35.    "**NSO**" is and has at all times since 2014 been a group of companies directly or indirectly owned by OSY Technologies SARL, engaged in the development and sale of offensive spyware products. In particular:

35.1.    NSO Group Technologies Ltd ("**NSO Group**") is an Israeli company incorporated on 25 January 2010 (company number 514395409).

35.2.    Q Cyber Technologies Ltd ("**Q Cyber**") is an Israeli company incorporated on 2 December 2013, and known until 29 May 2016 as L.E.G.D. Company Ltd. Q Cyber was until 18 March 2019 the majority owner and only active director of NSO Group. (The only other shareholder in NSO Group was NSO Group itself.)

35.3.    OSY Technologies S.à r.l, ("**OSY**") is a Luxembourg limited liability company, incorporated on 3 February 2014, and was at all material times the sole shareholder and active director of Q Cyber.

35.4.    OSY directly or indirectly owned further companies (incorporated in Cyprus, Bulgaria, Luxembourg, the USA and Hong Kong).

36.    NSO's main product is and has at all material times been "*Pegasus*", an evolving piece or portfolio of software which enables its user to remotely and covertly collect data from (and access the software installed on) a target's mobile devices including a smart-phone.

**C(3)    Ownership of NSO prior to March 2019**

37.    Between 2014 and 18 March 2019, OSY was ultimately majority-owned by Francisco Partners III (Cayman) LP ("**Francisco Partners**"), a Cayman Islands private equity fund. As at 9 February 2019:

37.1.    Square 2 S.à r.l, (a Luxembourg company, now in liquidation) ("**Square 2**") held 100% of the share capital of OSY;

37.2.    Triangle Holdings S.A. (a Luxembourg company, now in liquidation) ("**Triangle**") held 100% of the share capital of Square 2;

37.3.    Francisco Partners indirectly held c.58% of the share capital in Triangle, via its wholly-owned subsidiary OSY Holdings Ltd (a BVI company);

37.4.    NSO founders / managers and other third parties held the remaining share capital in Triangle. These included Mr Shalev Hulio and Mr Omri Lavie, the co-founders and CEO / VP Business Development respectively of NSO Group.

**C(4)    Novalpina's Due Diligence on NSO**

38.    The Defendants and Novalpina International (i) were contemplating the possibility of investments in the cyber-security industry from no later than 2017; and (ii) by the first quarter of 2018 (if not earlier) were taking active steps to pursue a potential investment in NSO.

39.    A "Deal Team" was constituted within Novalpina International to further investigate the potential investment opportunity. The members of the Deal Team were Mr Peel, Mr Kowski, Mr Mickael Betito, Mr Chris Backes and Ms Juliette Sourisse.

40.    Novalpina International submitted a letter of interest to Francisco Partners (via its agent Francisco Partners L.P.) on 2 May 2018. This letter stated that Novalpina International had already "*spent considerable time evaluating the LI sector*" [i.e. lawful interception sector] with their "*industry advisors*". Pending disclosure, the Claimants are unable to determine if this was correct.

41.    In its 24 June 2018 non-binding offer letter, said to inform Francisco Partners of the "*steps…taken to address [their] concerns*", Novalpina International stated (falsely) that it had "*briefed our three largest LPs … about the possibility of acquiring Q Cyber Technologies S.a.r.l.*"; and that they had "*all expressed their strong support and co-*

*investment appetite to the extent required*". These representations were false because the Fund's three largest LPs (i) had not been briefed about the possibility of acquiring Q Cyber; and (ii) had not expressed support for such a purchase or co-investment.

42.     The Claimants will rely on the 24 June 2018 non-binding offer letter and the false representations as evidence: (i) that Francisco Partners, as sellers, were aware that there was likely to be opposition and concerns from the LPs in the Fund to the acquisition of their shares in NSO Group; (ii) that FP had communicated the same to the Defendants; (iii) that (by this means or otherwise) the Defendants (in particular Mr Kowski who signed it and Mr Peel whose name also appeared at the foot of the letter) well knew that the institutional LPs would not support the potential acquisition of NSO Group; (iv) that without support of the Fund's major LPs the sale may not have gone ahead and/or if it did the Fund would not have retained its investment in NSO; and (v) that the Defendants knew this. For the relevance of these allegations, see ¶¶76 and 106-112 below.

43.     On 23 July 2018, Novalpina International sent a letter to "*reconfirm*" their previous improved offer of 24 June 2018, sent following a visit to Israel to see "*a demonstration of some of [the] products*". No deal was concluded in the summer of 2018, from which the Claimants infer that Francisco Partners rejected Novalpina International's offers at this time.

44.     In January 2019, pursuant to an agreement between Novalpina International and NSO's CEO (Mr Shalev Hulio), a new offer was made to Francisco Partners to purchase NSO by way of a management buy-out supported by the Fund.

45.     Due diligence on NSO was carried out predominantly during January 2019.

## D.     CONSPIRACY TO USE UNLAWFUL MEANS

46.     On a date or dates presently unknown to the Claimants but on or about 15 November 2017 (the date of the PPM being signed), each of the Defendants, or a combination of them, combined (i) with intent to injure or harm the interests of the Claimants by the use of unlawful means and/or (ii) to direct their unlawful conduct at the Claimants (a) in circumstances and in a manner which they ought to have known was likely to cause injury to the Claimants and/or (b) in the absence of just cause or excuse, by advising, encouraging and ultimately assisting the Fund and its relevant subsidiaries to commit

to the acquisition of the NSO in circumstances where the Defendants well knew that such an investment and acquisition was not in the Fund's best, or any, interests.

47.    As at 15 November 2017, the Third and Fourth Claimants (NorthPole HoldCo and NorthPole BidCo) had not yet been incorporated or identified as the vehicles that would be used to hold the Fund's interest in NSO (if acquired). Nevertheless, the Defendants had the necessary intention to injure the Third and Fourth Claimants, because the Defendants knew that the Fund would be likely to make any investment using special purpose vehicles (¶17 above).

**D(1)    The Combination/Understanding and Steps Taken to Implement it**

48.    Pending disclosure, the Court is invited to infer the existence of the combination from the following, which also particularise the steps taken to implement that combination:

48.1.    The Defendants omitted any reference in the PPM to possible investment by the Fund into the offensive spyware industry, so as not to deter would-be pension fund holders and other state institutional investors from investing in the Fund (¶34 above).

48.2.    The Defendants agreed, unanimously, to approve and recommend, via the Novalpina IAs, the Fund's acquisition of NSO, despite being aware such an acquisition was not a suitable investment for the Fund taking into account the constituency of its larger investors (¶¶74-76 below).

48.3.    The Defendants put together, and controlled, the Deal Team responsible for negotiating with the NSO group of companies / Francisco Partners and carrying out due diligence. Mr Peel and Mr Kowski formed part of the Deal Team.

48.4.    On 1 February 2019, Novalpina International, one of the Novalpina IAs controlled by the Defendants, made a recommendation to Sanne in writing, and signed by Mr Kowski, to acquire NSO ("**the 1 February 2019 Recommendation**"). Without that recommendation, the acquisition would not have taken place. Novalpina International was controlled by the Defendants and any investment recommendation made by it to Sanne would have required the consent of each of the Defendants.

48.5.    The 1 February 2019 Recommendation also included the *Investment Compliance Checklist* referred to at ¶71 below. Given that this recommendation is from an entity controlled by the Defendants, it is to be inferred that each Defendant was aware of, and consented to, the checklist being included in the investment recommendation.

48.6.    The Claimants will rely upon the falsity of the representations contained within the 1 February recommendation (see **Section F** below) and maintain that each Defendant was aware of the relevant representations and further was aware that each representation was false or at the very least exhibited a reckless indifference to allowing them to be made.

48.7.    The Defendants had an interest (for the reasons set out at para 109 below) in being able to persuade the LPs and the Fund itself that there was no credible basis to the rumours and allegations raised against NSO (as to which see ¶77 and Schedule 1 below). This could only be achieved by the Defendants misrepresenting the true position to the LPs and the Fund. By Notice of Acquisition dated 14 February 2019, signed by each of the Defendants, the Defendants, acting collectively, made such representations, as set out in ¶¶ 90-91 below – thereby misrepresenting NSO's position in the manner and for the purpose pleaded at ¶48.6 above.

48.8.    At all material times, the Defendants controlled Novalpina International. On 10 May 2018, Novalpina International entered into a written Engagement Letter with Mr Dahbash, governed by English law, pursuant to which the Claimants allege (see **Section H** below) that the Defendants promised a bribe or corrupt payment to Mr Dahbash to ensure that the acquisition of the NSO group of companies was successful.

48.9.    The Defendants subsequently (on or around 18 March 2019) procured that such a payment was made to Mr Dahbash (see ¶¶ 124-125 below).

49.    Each of these steps, among others, evidence a combination by the Defendants to secure the acquisition of NSO by unlawful means.

DM_EU 19910821-2.117301.0010

**D(2)    Intention to Harm**

50.    Each of the Defendants well knew that NSO was within the offensive spyware industry and therefore a type of investment which (i) they had not previously indicated to the LPs would be within the scope of potential investments of the Fund; (ii) plainly gave rise to serious ESG and reputational risks to any entity acquiring NSO; (iii) was therefore not a suitable investment for the Fund; (iv) in respect of which proper due diligence had not been undertaken; and so (v) the Defendants were not, contrary to the position they adopted (see Sections E and F below), in a position to allay concerns about the numerous public complaints and criticisms about the business operation of NSO and in particular its *Pegasus* software, which if true would imperil the continued existence of NSO and/or its value.

51.    The Defendants' deliberate decision to mislead the Fund into acquiring NSO and thereby expose the Fund, and its LPs, to the serious ESG and reputational risks associated with that acquisition (together with the likely attendant negative financial impact that would ensue if the suspected abuses of the software were established) constitutes an intention on the part of the Defendants to engage in conduct contrary to the interests of the LPs and the Fund and thereby harm or injure the Fund and/or an intention to engage in conduct which recklessly ran the risk such harm or injury would ensue. This remains the position even if, which is not admitted, the Defendants or any of them undertook these steps through some ill-conceived aim or hope that any initial harm would be overcome by financial rewards in the long run by restructuring the NSO group of companies.

52.    Further or alternatively, the necessary intention to harm is established by virtue of the Defendants procuring Novalpina International to agree to pay a bribe or corrupt payment to Mr Dahbash to secure or facilitate the acquisition of NSO. As to this:

52.1.    Ultimately that payment or part thereof was accounted for in the books of the Fourth Claimant, NorthPole BidCo, and therefore represents an illegitimate extraction of funds from the Claimants.

52.2.    It also involves the Fund, and therefore the LPs invested in the Fund, in precisely the type of inappropriate conduct which gives rise not only to potential legal liability but considerable loss of reputation, both of which would have a financial impact.

DM_EU 19910821-2.117301.0010

53.  Further or alternatively, following *JSC BTA Bank v Ablyazov (No 14)* [2018] UKSC 19, the Defendants' intention to harm is established by virtue of the Defendants targeting their unlawful conduct (ie the unlawful means identified below) at those who were in a position to sanction, whether *de jure* or *de facto*, the Fund's acquisition of NSO in circumstances where the Defendants were aware that such conduct was likely to cause harm or loss to the Claimants or recklessly ran the risk that such conduct may cause such harm or loss.

**D(3)   The Unlawful Means**

54.  The unlawful means employed by the Defendants as part of the conspiracy were:

54.1.  Breach of each Defendant's own common law and equitable duties owed as a member of Novalpina Capital and Novalpina International ("**Breach of LLP Duties**"): see **Section E ¶¶** 59-63 below.

54.2.  Deceit/Fraudulent Misrepresentations by the Defendants to Novalpina International intending the same to be relied upon, in turn, by Sanne (and/or by the Defendants directly to Sanne), Novalpina GP and the Claimants ("**the 1 February 2019 Representations**"): see **Section F ¶¶** 64-87 below.

54.3.  Deceit/Fraudulent Misrepresentations by the Defendants to Novalpina Capital and, in addition, to the Limited Partners by Notice of Acquisition dated 14 February 2019 and signed by each of the Defendants. ("**the NoA Representations**"): see **Section G ¶¶** 89-114 below.

54.4.  Payment to Mr Dahbash, contrary to English and if relevant any applicable foreign law criminal law prohibitions against bribery: see **Section H ¶¶** 118-130 below.

54.5.  Carrying out wrongful acts which cause loss or harm to another under Article 1382 of the Luxembourg Civil Code ("**the Luxembourg Claims**"): see **Section I ¶¶** 133-151 below.

**D(4)   Loss**

55.  By virtue of the conspiracy set out above, the Claimants acquired NSO at a total cost (to the Fund) of €218.5 million (see ¶84.4 below), notwithstanding that, as pleaded at ¶86, the value of NSO was impaired to the extent that the Fund's interest in NSO was valueless from the outset. It was simply a matter of time as to when, not if, the full

17

abuses of the deployment of the *Pegasus* software became publicly known and/or the true impact of those abuses were properly reflected in a crash in the value attributed to the Fund's equity interests of NSO.

56.    Alternatively, as pleaded at ¶87 below, the Claimants' interest in NSO was subsequently rendered valueless, by reason of events which are the natural consequence of the reputational and human rights considerations described above; and this is a loss to the Claimants caused by the alleged conspiracy.

57.    In addition, the Claimants have incurred significant expenses resulting from their ownership of Triangle shares, and not reimbursed by Triangle, OSY or any other NSO group company. (The Claimants do not include within this heading the legal expenses of these proceedings which they intend to claim as costs.) The Claimants will provide further particulars of these further heads of loss by way of schedules and witness evidence in due course.

<u>PARTICULARS OF CONSEQUENTIAL LOSS</u>

57.1.    Costs incurred by Second Claimant (as incoming GP) and charged to the Fund in investigating the circumstances of NSO's acquisition.

57.2.    Costs of dealing / negotiating with NSO's lenders.

57.3.    Loss of the profit that would likely have been made on an alternative investment, as per ¶58 below.

58.    If the Claimants had not invested in NSO (or had initially invested in NSO but subsequently sold that investment), the Fund would instead have made one or more different investments of approximately the same value (€218.5 million) ("**the Counterfactual Investment**"). The Counterfactual Investment is likely to have achieved a return to the Fund of no less than 8% per annum, compounded annually, over the period between 2019 and the date of judgment.

## E.    BREACH OF LLP DUTIES

### E(1)    Duties

59.    Each of the Defendants, as members of Novalpina Capital and Novalpina International, and/or as each having "*more than 25% but not more than 50% of the voting rights*" of

each of the Novalpina IAs, owed fiduciary obligations under English law to each of those IAs including:

59.1.    The Defendant must at all times, when acting on behalf of the LLP or carrying out his role or responsibilities as a member, act in what he believes to be the best interests of the LLP and for a proper purpose.

59.2.    The Defendant must make full and fair disclosure to the LLP of all information which he obtained which is material to the business of the LLP.

60.    As each of the Defendants well knew, the primary obligation of Novalpina Capital and Novalpina International was to provide investment advice to Sanne and/or Novalpina GP as to appropriate investments to be made by the Fund.

**E(2)    Breach**

61.    Notwithstanding that primary obligation, in breach of their obligation to act in the best interests of the LLP and/or to make full and fair disclosure of all material information relating to proposed investments:

61.1.    the Defendants procured Novalpina International to advise Sanne to recommend the unsuitable acquisition of NSO and did so (it is to be inferred) without properly informing others within either of the Novalpina IAs of material facts including (i) the absence of proper due diligence; and (ii) the full extent of the potential risk and exposure of the Fund arising out of any acquisition of NSO given the numerous allegations of misuse of the *Pegasus* software known at that point; and

61.2.    the Defendants procured Novalpina International to enter into the Engagement Letter with Mr Dahbash (see ¶ 119 below) pursuant to which it was agreed to pay Mr Dahbash USD 5 million by way of a corrupt payment.

62.    The Defendants so conducted themselves knowing that:

62.1.    the advice given by Novalpina International would, in practice, be accepted by Sanne and acted upon by Sanne, in turn, recommending to the Fund and/or Novalpina GP, that the acquisition of NSO should proceed; and/or

62.2.    the USD 5 million would ensure that the Claimants acquired NSO despite it not being a suitable investment for the Fund.

DM_EU 19910821-2.117301.0010

**E(3)**    **Loss**

63.    In this way, as intended, the Defendants ensured that the Claimants agreed to and did acquire, via the NSO group of companies, an investment known by the Defendants to be unsuitable for the Fund/the Claimants given its ESG and reputational risk and one inherently damaged by the manner in which it had been allowed to operate over the years. The loss thereby suffered by the Claimants is that claimed by the unlawful means conspiracy claim: see **Section D(4)** ¶¶ 55-58 above.

## F.    THE 1 FEBRUARY 2019 REPRESENTATIONS

64.    It is the Claimants' case, for the reasons pleaded in this section, that the Defendants fraudulently misrepresented NSO to Novalpina International, intending the same to be relied upon, in turn, by Sanne, by Novalpina GP and by the Claimants.

**F(1)**    **The Representations**

65.    The Defendants represented to Novalpina International (and, as intended by the Defendants, Novalpina International represented to Sanne) that NSO was suitable for an acquisition by the Claimants and had been subject to full and proper due diligence to identify material risks. (Particulars are given at ¶¶ 68-71 below.)

66.    The Defendants further caused it to be represented to Novalpina International and Sanne that NSO's Business Ethics Committee ("**BEC**") would only approve sales of the Pegasus product to customers where its members had unanimously approved doing so ("**the BEC Unanimity Representation**"). (Particulars are given at ¶72 below. The falsity of the BEC Unanimity Representation is pleaded below at ¶97.)

**F(2)**    **Intention to be relied upon by Novalpina International and, in turn, by Sanne**

67.    The Defendants knew and intended that:

67.1.    Novalpina International would rely upon the said representations in repeating the same to Sanne as part of its recommendation that the Claimants should acquire NSO.

67.2.    Sanne and the directors/managers of (i) Novalpina GP, (ii) NorthPole BidCo and (iii) NorthPole HoldCo would in turn rely on the recommendation by Novalpina International in advising Novalpina GP and the Fund to enter into the investment.

DM_EU 19910821-2.117301.0010

**F(3)    Reliance**

68.    On the 1 February 2019, by way of an Investment Recommendation Letter exhibiting (i) a Checklist (¶71 below), signed by Mr Kowski and sent on behalf of Novalpina International and (ii) a Final Investment Memorandum (¶72 below), Novalpina International did rely upon the said representations and plainly considered the same to be material, as it repeated the same to the Investment Committee of Sanne as part of its advice that NSO should be acquired.

69.    As further intended by the Defendants, Sanne, in turn, relied upon the same, by recommending the acquisition of NSO to the Claimants with the consequence that NSO was acquired.

70.    Further, and as intended by the Defendants in making the said representations, the Fund and the directors/managers of (i) Novalpina GP, (ii) NorthPole BidCo and (iii) NorthPole HoldCo each, in turn, relied upon the said representations in deciding to enter into the purchase of Triangle.

71.    The Investment Recommendation Letter warranted the accuracy of an "*Investment Compliance Checklist*" appended thereto as Exhibit B. The Investment Compliance Checklist included, and the Defendants and Novalpina International thereby made to Sanne, the following representations:

71.1.    that the proposed transaction was "*suitable for the Fund*" ("**the Suitability Representation**"). By these words, Novalpina International (and the Defendants) intended Sanne to understand, and Sanne (in particular M. Michael Lhuillier) did so understand, that the proposed investment was consistent with the type of industry investment identified in the PPM and/or was not one which might arguably give rise to very significant ESG and reputational concerns and/or which might involve the Fund in an international offensive spyware scandal; and

71.2.    that, in making the said recommendation, Novalpina International had "*conducted a thorough review of the relevant information to identify material risks...*" ("**the Risk Review Representation**"). (As to the meaning conveyed thereby, see ¶80 below.

72.    The Final Investment Memorandum submitted (i) to the Investment Committee of Novalpina International and (ii) to Sanne as an exhibit to the Investment Recommendation Letter (¶68 above), included, at slide 36, statements that BEC "*[a]pprovals will only be given where there is <u>unanimous</u> agreement from all the members present*" (emphasis in original) and that "*The BEC reviews and approves unanimously (i.e. every member has a veto right).*"

73.    The Investment Recommendation Letter also expressly or impliedly warranted Novalpina International's continuing compliance with the representations and warranties referred to at ¶16 above.

**F(4)    Falsity of the Suitability Representation**

74.    The Suitability Representation was false, because NSO was not a suitable investment for the Fund, given (i) the misuse allegations made in respect of NSO and Pegasus (¶77 below); (ii) the fact that Novalpina International and the Defendants had no reasonable basis for concluding that the misuse allegations were unjustified (¶¶ 78-82 below); and (iii) the risk and reputational profile of the LPs (¶¶ 28-30 above).

75.    The Defendants knew, when they made (or caused to be made) the Suitability Representation to Sanne that that representation was false (because NSO was not a suitable investment) and/or were reckless as to the same. Paragraphs 48 and 50 above are relied on.

76.    In further support of the plea that the Defendants knew that NSO was not a suitable investment for the Fund/the Claimants, the Claimants rely on (i) the false representations made by the Defendants to the LPs as set out at **Section G** below and (ii) the falsity of the BEC Unanimity Representation (¶97 below), in addition to (iii) the 24 June 2018 offer letter as pleaded above (¶¶ 41-42 above). The Defendants would not have considered it necessary to lie if they had believed that NSO was a suitable investment.

**F(5)    Falsity of the Risk Review Representation**

77.    By early 2019, NSO had been the subject of sustained public criticism, arising out of concerns that its Pegasus product had been used and was continuing to be used to surveil political opponents, human rights activists, lawyers, journalists and other civil society actors. A non-exhaustive list of the main reports and articles appears at **Schedule 1** to these Particulars of Claim.

78.　Mr Peel and Mr Kowski as members of the Deal Team, and all three Defendants as Founders and as members of the Investment Committee of Novalpina International, will have been aware of the nature, extent and significant detail of the public criticism referred to at ¶77 above.

79.　It was obvious, and known to the Defendants, that the question of whether these human rights and reputational concerns were well-founded was critical (i) to the suitability of NSO as a Fund investment; (ii) to NSO's long-term success and/or survival; and (iii) to the willingness or otherwise of institutional investors to invest in NSO.

80.　In these circumstances (and *a fortiori* given the Defendant's awareness – as pleaded above ¶¶ 75-76 – that the NSO investment was not, in principle, the type of investment suitable for the Fund), normal and reasonable due diligence by and on behalf of a prospective buyer of NSO (in and around January 2019) (and, *a fortiori*, "*a thorough review of the relevant information to identify material risks…*" [¶71.2 above] and/or a "*high standard* [of] *… legal … due diligence*" [¶16.6 above]) would have required:

80.1.　collating and summarising those allegations;

80.2.　assessing the strength and credibility of the allegations, with the benefit of (i) advice from credible external experts able to speak to that issue; (ii) engagement with key NGOs such as Citizen Lab and Amnesty International; (iii) relevant, comprehensive and specific questioning of NSO's management and members of its BEC; and (iv) obtaining security clearance if and insofar as security clearance was required in order to receive relevant due diligence information; and

80.3.　(as required by Clause 9.4 of the Investment Advisory Agreement: ¶16.3 above) presenting the results of those enquiries transparently, fully and neutrally, so as to enable Sanne, Novalpina GP and others (in particular the boards of NorthPole BidCo and any other Fund SPV asked to enter into or permit or approve entry) to take properly informed decisions, with a proper appreciation of the risks of past and potential ongoing customer misuse.

81.　Novalpina International's due diligence with respect to the misuse allegations referred to at ¶77 above fell below the standard or standards referred to at ¶80 above.

## PARTICULARS OF INADEQUATE DUE DILIGENCE

81.1.    The due diligence with respect to misuse allegations carried out by or on behalf of Novalpina International and its advisers was limited (i) to reviewing NSO's risk and compliance policy documents and (ii) to holding a small number of interviews with NSO managers (who it is to be inferred were unlikely to be impartial or reliable).

81.2.    Novalpina International and its advisers had not reviewed the implementation of NSO's compliance and risk management procedures.

81.3.    Novalpina International and its advisers had not reviewed end-user agreements between NSO and its customers or copies of issued export licences.

81.4.    Novalpina International did not know the identity of NSO's customers and was therefore unable properly or at all to assess reputational and/or other concerns which might derive from involvement with unidentified customers.

81.5.    Novalpina International had not reviewed the BEC's deliberations.

81.6.    The BEC Unanimity Representation was false, as pleaded at ¶97 above.

82.    In the premises of ¶81 above, Novalpina International and the Defendants did not have reasonable grounds for concluding that the misuse allegations were unjustified; and no honest and reasonable individual would have so represented.

83.    It is inferred, from their status as experienced investment professionals, and given their roles as pleaded above at ¶10 above, that the Defendants were aware (i) what due diligence should have been carried out as part of investigating the potential acquisition of the NSO in the circumstances, (ii) what due diligence had in fact been carried out, and (iii) the difference between the two. Accordingly, the Defendants well knew that proper and adequate due diligence had not been carried out, let alone due diligence to a high standard and/or to the standard required for an investment in the offensive spyware industry, and so it was not true that a thorough review of the relevant information had been undertaken so as to be able to assess the material risks.

**F(6)    Resulting Loss to the Claimants**

84.    As the direct result of the Suitability Representation and the Risk Review Representation (and, by way of contributing cause, as a result of the BEC Unanimity Representation):

    84.1.    Sanne directed Novalpina GP to take all necessary steps to enable NorthPole BidCo to acquire Triangle;

    84.2.    Novalpina GP complied with that direction;

    84.3.    Northpole BidCo resolved to and did (on 10 February 2019) enter into a written Share Purchase and Sale Agreement (the "**SPA**") to purchase c.70% of the share capital of Triangle (see further ¶85 below) for a total price to be determined pursuant to clause 2.2 of the SPA (in the event c.USD 850 million);

    84.4.    the Fund contributed €218.5 million towards the acquisition of NSO, of which:

        (1)    €200 million derived from LPs' "*Commitments*" (as defined by the LPA, i.e. equity investments); and

        (2)    €18.5 million was originally advanced as a bridging loan (intended to be redeemed during the second quarter of 2020 via a return of capital from NSO), but was not repaid and was converted into an equity investment in or around June/July 2020;

    84.5.    Northpole BidCo entered into a Credit Agreement dated 3 March 2019 (subsequently amended on 7 March 2019, 20 May 2019, 20 November 2020, 28 February 2022 and 17 May 2022), by which it borrowed USD 510 million of syndicated debt, in order to fund the balance of its share of the purchase price under the SPA;

    84.6.    Northpole BidCo acquired 70.33% of the share capital of Triangle, upon completion of the SPA on 18 March 2019; and

    84.7.    Northpole BidCo's interest in NSO was pledged in favour of the collateral agent acting for the lenders under the Credit Agreement.

85.    As to the SPA referred to at ¶84.3 above, the Claimants will refer to and rely on the full agreement at trial, but in summary:

85.1.    NorthPole BidCo contracted to purchase c.70% (and as it turned out 70.33%) of the share capital of Triangle;

85.2.    Francisco Partners contracted to sell the entirety of its c.58% indirect shareholding in Triangle; and

85.3.    Mr Hulio, Mr Lavie and certain other NSO managers with vested or contingent interests in Triangle retained their stakes in Triangle, as a result of which they were left holding (between them) 29.67% of the share capital of Triangle.

86.    The said Suitability Representation and Risk Review Representation disguised and concealed from the Claimants the full impact as at February-March 2019 of the business sales and practices of the NSO on its true enterprise value with the consequence that the price paid by the Claimants to acquire its shareholding in NSO did not reflect the true market value of NSO or anything like it. Put another way, the true market value was the value of NSO once the market had become fully aware of the reputational and human rights considerations described at ¶77 above and their impact on NSO's business prospects as described at ¶79 above. Its value was impaired to the extent that the Claimants' interest in NSO was valueless from the outset.

87.    Alternatively, the Claimants' interest in NSO was subsequently rendered valueless by reason of events which are the natural consequence of the reputational and human rights considerations described above (and of the risks and unsuitability which rendered the Suitability Representation and Risk Review Representation false). Thus, there is a direct causal link between the Defendants' wrongful act(s) and the Claimants' loss.

PARTICULARS

87.1.    In July 2021, media reports adverse to NSO were published under the name "*Pegasus Project*" that detailed allegations of the systemic misuse of the company's technology by authoritarian governments around the world.

87.2.    As a result, NSO did not collect any cash from sales of its Pegasus product to new customers between July 2021 and at least 1 December 2021.

87.3.    That in turn caused a liquidity crisis for NSO. In October 2021, NSO management requested that the Claimants provide an immediate capital injection of USD 10-25 million in order to meet month-end payroll and critical vendor payments.

87.4.   On 3 November 2021, NSO Group was placed on the Entity List by the Bureau of Industry and Security, an agency of the US Department of Commerce (the "**Entity Listing**"). The Entity Listing prohibits NSO Group from procuring and selling any US-sourced technology. The Final Rule issued by the Bureau of Industry and Security (15 CFR Part 744: Docket No.21101900210) expressly justifies the inclusion of NSO Group on the List under §744.11 ("*Licence requirements that apply to entities acting contrary to the national security or foreign policy interests of the United States*") because NSO Group has "*developed and supplied spyware to foreign governments that used this tool to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers.*"

87.5.   The events in ¶¶ 87.1 and 87.4 above arose as the natural and probable consequence of the existence and/or discovery of the business practices of NSO which (i) rendered NSO an unsuitable investment for the Claimants and (ii) would and should have been discovered if proper due diligence had been undertaken.

87.6.   After (i) the First Claimant took over the role of General Partner of the Fund and (ii) the Entity Listing, the First Claimant concluded that the Fund's equity interest in NSO was valueless and had been since well before July 2021.

87.7.   On 17 February 2023, Wilmington Trust (London) Ltd, acting as collateral agent on behalf of the Credit Agreement lenders referred to at ¶¶ 84.5 and 84.7 above, exercised rights of enforcement under clause 9 of the Share Pledge Agreement, thereby appropriating (or causing to be appropriated) the Fund's equity interest in NSO.

87.8.   The Fund has therefore lost the entirety of its original €218.5 million equity investment in NSO.

**F(7)    Deceit claim (1 February 2019 representations)**

88.     In addition to its conspiracy claim, the Fund claims damages in deceit based on the facts and matters pleaded in this **Section F**. Thus:

88.1.    The Defendants made false representations (viz. the Suitability Representation and the Risk Review Representation) knowing and intending that they would be conveyed to and relied on by the Claimants: ¶¶ 64-70 above.

88.2.    The Defendants did so in the knowledge that these representations were false or alternatively were reckless as to their truth (¶¶ 74-83 above).

88.3.    The Claimants relied on the Suitability Representation and the Risk Review Representation, in deciding to enter into the purchase of Triangle (¶¶ 70 and 84 above).

88.4.    The Claimants have suffered direct and consequential loss as a result, as pleaded above at ¶¶ 55-58 and 84-87.

## G.    THE 14 FEBRUARY 2019 REPRESENTATIONS

**G(1)    Representations to Limited Partners in the Notice of Acquisition**

89.     The Fund's investment in NSO was announced to the LPs by a "**Notice of Acquisition**" dated 14 February 2019 (i.e. immediately following NorthPole BidCo's entry into the SPA), signed by each of the three Defendants, on paper headed "*Novalpina Capital*".

90.     The Notice of Acquisition included the following statements:

> "*A particular focus of our extensive due diligence has been the quality of the company's processes for vetting the suitability of customers, especially in the light of past reports from an NGO alleging certain governments illegally used its technology to target political dissidents. Our work has found that the specific claims about the misuse of the technology by its customers in these reports are substantially incorrect. The company's business ethics committee (…) only approves a customer after receiving unanimous consent from all its members, which include four highly qualified independent directors… We consider the firm's business ethics practices, put in place by Francisco Partners, to be best-in-class. Further, the firm re-evaluates each customer on an annual basis and investigates all reports alleging misuse of its technology, exercising its right to audit the use of the system. After such investigation, if it still suspects any actual misuse, it terminates the customer's use of the technology.*"

DM_EU 19910821-2.117301.0010

91.     The Defendants (and each of them) thereby represented to the LPs:

91.1.    that Novalpina (i.e. Novalpina International, overseen by the Defendants) had carried out an "*extensive due diligence*" exercise, with a particular focus on misuse allegations;

91.2.    that Novalpina had scrutinised the claims of misuse made by Amnesty International, Citizen Lab, the New York Times and others and been provided with evidence justifying a conclusion that the reports of misuse were "*substantially incorrect*";

91.3.    that NSO's "*business ethics practices*" were "*best-in-class*";

91.4.    (impliedly) that Novalpina had undertaken a study of business ethics practices of similarly situated purveyors of spyware sold to governments, and that the results of that study justified the conclusion that NSO's business ethics practices were superior (in their stringency) to all others in the relevant class;

91.5.    that the BEC would only approve a customer after receiving unanimous consent from all its members;

91.6.    that it was NSO's practice (i) to investigate "*all reports alleging misuse of its technology*" and (ii) to do so by way of an "*audit*" of its customer's use of the system;

91.7.    (impliedly) that NSO could, by such investigation and audit, verify whether or not its technology had been (mis)used by its customer against a political dissident or other inappropriate target; and

91.8.    that it was NSO's practice to terminate any contract with a customer if, following such audit, there was any residual suspicion of misuse.

**G(2)    Materiality of the NoA Representations**

92.    These representations ("**the NoA Representations**") were, individually and collectively, material to the LPs' consideration of whether the acquisition of NSO was a suitable investment for the Fund, in that they were liable to lead, and were intended by the Defendants to lead, to the recipient concluding that (i) the allegations of misuse against NSO were ill-founded; (ii) there was unlikely to be any continuing misuse; (iii) NSO had robust processes for preventing or if necessary responding to customer

DM_EU 19910821-2.117301.0010

misuse; and (iv) there should in consequence be only *de minimis* reputational and/or regulatory risk (and ensuing commercial risk) associated with misuse of NSO products.

93. On any view, these representations were made deliberately and expressly to assuage any concerns the LPs might have as to ESG and/or reputational concerns about an investment in a highly controversial software portfolio such as *Pegasus*.

**G(3)    Falsity of the NoA Representations**

94. Individually and collectively, the NoA Representations were false, in the respects pleaded at ¶¶ 95-99 below.

95. As to the representations at ¶¶ 91.1 and 91.2 above concerning the extent of, and conclusions to be drawn from, Novalpina's due diligence in response to misuse allegations as at 14 February 2019, Novalpina had not carried out "*extensive*" (or adequate) due diligence: ¶¶ 80-83 above are relied on.

96. As to the representations at ¶¶ 91.3 and 91.4 above (that NSO's business ethics practices were "*best in class*" and that Novalpina had reasonable justification for drawing that conclusion):

96.1.    NSO had carried out no such comparative exercise of the business ethics practices of comparable companies or at least no such exercise which would enable Novalpina to reach the conclusions it did;

96.2.    It is to be inferred from the criticism of NSO during 2019 and thereafter that NSO's business ethics practices were inferior (and not superior) to those of comparable companies.

97. As to the representation at ¶91.5 above, that the BEC would only approve a customer after receiving unanimous consent from all its members, the charter of the BEC was amended in or before January 2019 so as to permit approval of a customer by a majority rather than unanimity of the external members of the BEC.

98. As to the representations at ¶¶ 91.6 and 91.7 above concerning the claim that NSO investigated all misuse allegations including by exercising a right of audit:

98.1.    NSO did not investigate all allegations of misuse, and instead as at 14 February 2019 had, at best, investigated only a small fraction of the allegations of misuse that had been made publicly by NGOs and journalists.

DM_EU 19910821-2.117301.0010

98.2. By NSO's own admission in its June 2021 "Transparency and Responsibility Report", NSO had no "*knowledge of the individuals whom states might be investigating*".

98.3. It is to be inferred that NSO's "*audit*" process identified nothing other than what a customer might choose to tell it (aside, perhaps, from the telephone number of the individual targeted).

98.4. NSO's audit process therefore did not permit scrutiny of the relevant question, viz. whether the individual in question was someone credibly alleged to be a terrorist or serious criminal (as opposed to an opposition politician, journalist, human rights activist or other civil society actor).

99. As to the representation at ¶91.8 above, NSO did not terminate its contracts with Mexico, Saudi Arabia, Panama or the United Arab Emirates, notwithstanding that any reasonable person must have had (and, it is inferred, NSO and Novalpina did have) continuing suspicions of misuse.

100. The Defendants must have known, and it is inferred did know, that the NoA Representations were false in each of the respects alleged above. In particular:

100.1. The Defendants knew what due diligence Novalpina and its advisers had and had not carried out; and must have known how their due diligence carried out with respect to customer misuse allegations fell below the standard of due diligence that would normally be expected of a private equity investment advisor (and/or general partner) in the circumstances.

100.2. The Defendants knew that information had been withheld from Novalpina on grounds of confidentiality / security (including the identity of customers, the decision-making of the BEC, and the process and outcomes of NSO's process for investigating and responding to allegations of misuse).

100.3. The Defendants knew of the misuse allegations. In January 2019, Novalpina was told by Morgan Stanley that by January 2019, Citizen Lab had reported c.175 misuse allegations.

100.4. The Defendants knew that there had been no independent verification of what Novalpina had been told by NSO management.

100.5.   The Defendants knew that they did not have answers to the specific and detailed questions that investors in NSO would want to know, because:

(1)   they had during January 2019 been asked such questions by potential debt financiers / underwriters including Morgan Stanley, Barclays and Jefferies;

(2)   the answers they provided either failed to answer the banks' questions or depended on unverified assertions by NSO management or both; and

(3)   most of the banks declined to advance funding (on reputational grounds), and the few willing to do so were only prepared to do so at a high rate of interest.

100.6.   The Defendants knew that the BEC did not (by January 2019) require unanimous voting to approve customers, because:

(1)   the Novalpina International "Deal Team" (Ms Sourisse, Mr Betito and Mr Backes) were so informed; and

(2)   it is to be inferred that this information was communicated promptly to the Defendants.

**G(4)    Continuing Representations**

101.   By not correcting the NoA Representations, the Defendants continued impliedly to make the NoA Representations at all times up until the summer / autumn of 2021.

102.   During the period between 14 February 2019 and 17 June 2019, the following events (amongst others) occurred which must have brought to the Defendants' attention the fact that the NoA Representations they had made on 14 February 2019 (and specifically those pleaded at ¶¶ 91.5 and 91.8 above) were untrue:

102.1.   At a meeting on 12 April 2019, the BEC declined to take a decision as to whether the sale / licensing of *Pegasus* to Saudi Arabia should be permitted.

102.2.   In or around May or June 2019, the Board of Square 2 resolved to renew the sale / licensing of *Pegasus* to Saudi Arabia. The board members of Square 2 who would have been voting on appointments to the BEC at this time were Mr Peel, Mr Kowski, Mr Dahbash, Mr Hulio, Mr Betito, Mr Schmidt (the co-managing partner of Weil, Gotshal & Manges's German office, who oversaw

the legal due diligence for the acquisition of NSO) and Mr Schmid (the co-founder of KERBEROS Compliance Managementsysteme GmbH, who acted as an advisor in relation to the corporate due diligence for the acquisition of NSO).

102.3.  One of the four independent members of the BEC, Mr Jeremy Bash, resigned his position on the BEC as a result of the decision to renew the sale / licensing of *Pegasus* to Saudi Arabia. It is to be inferred that Mr Bash had suspicions that Saudi Arabia had misused and would continue to misuse the product.

**G(5)   Reliance by the LPs**

103.  As was intended by the Defendants, the LPs were induced by the NoA Representations to believe that the rumours and criticisms of NSO were baseless and unjustified and that proper due diligence had taken place to ensure that all material matters had been fully and properly investigated so as to be confident that the acquisition of NSO was a suitable investment for the Fund.

104.  The only way in which the Defendants could have avoided either expressly or impliedly making the NoA Representations (as particularised at ¶91 above) or representations to like effect, in the circumstances described at ¶105 below, is if they had given in the Notice of Acquisition, a fair account by the Defendants of the subject matter of the representations set out in ¶91 above. Thus, the relevant counterfactual ("**the Counterfactual**") by which the existence and extent of loss and damage is to be assessed is a scenario in which such a true and fair account had been given.

105.  The following circumstances are relied on in support of the Counterfactual plea:

105.1.  statements made in the PPM (in particular at §6.3 & §6.4, under the headings "*Rigorous Underwriting Approach*" and "*Focus on Downside Protection*", and more generally at §§6-7);

105.2.  the size (in absolute terms and relative to the overall level of LLPs' Commitments) of the investment in NSO; and

105.3.  industry norms for a private equity fund conducting due diligence before acquiring an investment (as to which see ¶80 above).

106. In the Counterfactual, the LPs would have been told of (i) the very limited due diligence exercise that had been undertaken and (ii) the fact that, as a result, the Novalpina vehicles and Sanne had no sensible or verifiable insight into NSO's business practices and the allegations in the public domain, and therefore had no reasonable basis for assessing the material investment risks.

107. In the Counterfactual (or even, if relevant, in an alternative counterfactual situation where the LPs had been given no explanation at all of steps taken by Novalpina vehicles or Sanne to scrutinise NSO's business practices or the allegations in the public domain), the LPs or a significant portion of the LPs, would have taken such action as they were able to (or there is a significant possibility that they would have done so) resulting in either (a) NSO not being acquired or (b) the Fund divesting itself of its interest in NSO at the earliest possible opportunity.

108. The action referred to in ¶107 above would likely have taken one or more of the following forms:

108.1. Seeking further, more specific and verified assurances from Novalpina GP, the Novalpina IAs and/or the Defendants about the human rights and reputational concerns associated with NSO (which Novalpina GP, the Novalpina IAs and/or the Defendants could not honestly have given, thereby leading to the LPs taking further action as pleaded in this ¶).

108.2. Exercising (or threatening to exercise) their right to withdraw from the Fund under Section 22.14.1 of the LPA (see further ¶109 below) or their right to be excused from the particular investment under Section 4.10.1 of the LPA (see further ¶110 below) in the absence of truthful representations assuaging their concerns (which could not be given).

108.3. Requesting Novalpina GP (a) to investigate and if reasonably available then pursue opportunities not to complete the purchase, alternatively (b) to re-sell the Fund's interest in NSO following the 18 March 2019 acquisition.

108.4. Threatening to remove Novalpina GP (and, if necessary, carrying out that threat) if it did not comply with the requests at sub-paragraph 108.3 above. The LPs were entitled to remove the GP either 'for cause' under Clause 20.1 of the

LPA or (from the second anniversary of the 'First Closing Date', i.e. c. November 2019) 'without cause' under Clause 20.2 of the LPA.

108.5.    Deciding and/or announcing a decision not to participate in any successor funds set up by the Founders. The Fund was the first fund of the Founders and they intended to set up successor funds.

109.    As to the LPs' exercise of their right to withdraw from the Fund under Section 22.14.1 of the LPA (¶108.2 above):

109.1.    Section 1 of the LPA defines the term "**Regulated Partner**" as an ERISA Investor or a State Retirement System.

109.2.    A "**State Retirement System**" is itself defined as meaning an "Investor that is a retirement system or plan established for the benefit of the employees of any state or local government body or entity located in the US". The Side Letter of the Oregon Public Employees Retirement Fund ("**OPERF**"), the LP with the largest holding in the Fund, states that OPERF "*warrants to the General Partner that it is a State Retirement System and accordingly, a Regulated Partner*".

109.3.    Section 22.14.1 of the LPA permits a Regulated Partner to withdraw from the Fund if it obtains an opinion from legal counsel "*to the effect that, as a result of: (i) the manner in which the activities of the Partnership are conducted or the terms upon which any Investment or Investments of the Partnership are made or continued; (ii) the relative Contributions of all Investors; or (iii) ERISA, the ERISA Plan Assets Regulation, or any other applicable statues, rules or regulations or case law or interpretation thereof or actions taken by any governmental authority or applicable state law (...) there is a reasonable likelihood that the continuation of the Regulated Partner as an Investor will result in a violation or* [sic: "of"] *ERISA or other applicable law or applicable state law, rules or regulations*".

109.4.    In circumstances where LPs knew about the misuse allegations that had been made about NSO and instead the Counterfactual was applicable, relevant LPs (i.e. those who either (i) were Regulated Partners or (ii) as a result of side letters with Novalpina GP were entitled to be treated as such) would have

35

obtained, alternatively lost the opportunity to obtain, opinions from legal counsel to the effect that as a result of the Fund acquiring a controlling investment in NSO there was a reasonable likelihood that the relevant LP's continuation as an LP in the Fund would result in a violation of applicable law or applicable state law, rules or regulations.

109.5.   "*applicable law or applicable state law, rules or regulations*" for these purposes would (with respect to OPERF) have included Oregon Revised Statutes ("**O.R.S**") § 293.726, which requires a trustee:

(1)   to invest and manage assets "*as a prudent investor would do, under the circumstances then prevailing and in light of the purposes, terms, distribution requirements and laws governing each investment fund*"; and

(2)   to exercise "*reasonable care, skill and caution*" in satisfying that standard, "*which should incorporate risk and return objectives reasonably suitable to the particular investment fund*".

110.   As to the LP's right to be excused from a particular investment under Section 4.10.1 of the LPA:

110.1.   Section 4.10.1 states:

"*An Investor shall not be required to advance (in whole or in part) any amount(s) on account of its Commitment with respect to a particular Investment if, within five Business Days of service of the relevant Drawdown Notice, the Investor notifies the General Partner in writing that its participation in that Investment (in whole or in part) would cause:*

*4.10.1.1   a violation of an Agreed Policy that, as at the date of service of the Drawdown Notice, continues to apply to the Investor; or*

*4.10.1.2   a violation of any law, regulation, permit or licence to which the Investor is subject,*

*and the written notification from the Investor is accompanied by a supporting opinion given by the Investor's legal counsel to that effect*".

DM_EU 19910821-2.117301.0010

110.2.   In relation to Section 4.10.1.2, a violation of any law, regulation, permit or licence would:

(1)   (with respect to OPERF) have included O.R.S § 293.726 as detailed above;

(2)   (with respect to the Alaska Permanent Fund, another large investor) have included Alaska Statute ("**AS**"), and in particular the Alaska Uniform Prudent Investor Act at AS §§ 13.36.225-13.36.290, which stipulates at § 13.36.225 and AS § 13.36.230 that "*a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule*", which in turn requires a trustee:

(a)   to "*invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the trust*"; and

(b)   to "*exercise reasonable care, skill and caution*" in satisfying that standard;

(3)   (with respect to the LPs domiciled in the UK) have included duties of skill, care and diligence under the Financial Services and Markets Act 2000 ("**FSMA**"); and

(4)   (with respect to any LPs domiciled in jurisdictions other than the UK or the US) have included comparable duties of skill, care and diligence which (absent proof to the contrary) will be presumed to be the same as duties under FSMA.

111.   In the circumstances, in the Counterfactual, whether because of the exercise of commercial actions or legal rights by some or all of the LPs, either the Fund would not have acquired NSO at all or, if it had, the Fund would have shortly thereafter sought to sell NSO.

112.   If the Fund had sought to sell NSO then it would have done so or there is a chance, which the Fund has lost (and the loss of which sounds in damages on a loss-of-a chance basis), that the Fund would have done so.

**G(6)    Loss to the Fund arising from the False Representations to LPs**

113.    If the NoA Representations had not been made then, as a consequence of any action taken by the LPs as pleaded at ¶108 above:

113.1.    the Fund would not have acquired NSO; alternatively

113.2.    the Fund would have acquired NSO but would have subsequently re-sold its investment at a time when it still may have had value, whether:

(1)    because, contrary to the Fund's primary case pleaded at ¶86 above, the Fund's investment in NSO had some value; or

(2)    because, to an investor less concerned with loss of reputation, and more interested in gaining access to the use of the *Pegasus* software, the NSO remained valuable; or

(3)    because a purchaser would have paid for the Fund's investment in NSO notwithstanding that that investment was objectively valueless as pleaded at ¶86 above.

113.3.    Alternatively, the NoA Representations deprived the Fund of the chance that the LPs would have taken action resulting in the consequences pleaded at ¶113.1 or ¶113.2 above.

114.    The value of the Fund's loss will have to be assessed at trial in light of all of the evidence (including evidence as to counterfactuals and expert evidence). Meanwhile the Fund provisionally estimates its direct loss at €218.5 million, and claims damages accordingly, in addition to claiming consequential loss as pleaded above at ¶¶ 57-58. (Alternatively, as per ¶113.3 above, the Fund claims damages on a loss of a chance basis.)

**G(7)    Deceit claim (14 February 2019 representations)**

115.    In addition to its conspiracy claim, the Fund claims damages in deceit based on the facts and matters pleaded in this **Section G**.

116.    In that connection:

116.1.    The Fund is the (or a) proper claimant in respect of a claim in deceit brought on behalf of the LPs generally, given that the Fund is the legal embodiment of the LPs' collective action and identity *qua* LPs.

116.2. Further or alternatively, the NoA Representations were (by definition) made to the Fund, having been made to all of the LPs constituting the Fund.

116.3. Further or alternatively, the Defendants made the NoA Representations to the LPs with the intention and effect that the LPs should pass it on to the Fund, and the LPs impliedly did so in the circumstances pleaded at ¶¶ 106, 108 & 113 above.

117. As to the other constitutive elements of the tort of deceit:

117.1. The NoA Representations were false: ¶¶ 94-99 above.

117.2. The Defendants made the NoA Representations knowing that they were false: ¶100 above.

117.3. The Defendants intended the Fund (as well as the LPs, if and insofar as a distinction can meaningfully be drawn between the two) to rely on the NoA Representations: ¶¶ 92, 93, 103 & 106 above.

117.4. The Fund relied on the NoA Representations, by completing the acquisition of NSO and not thereafter divesting itself of its investment in NSO: ¶113.2 above.

117.5. The Fund has suffered loss as a result: ¶¶ 113-114 above.

## H. PAYMENT OF A BRIBE OR SECRET COMMISSION TO MR DAHBASH

**H(1)    The Payment and what was said about it**

118. Zamir Dahbash is an Israeli PR consultant, who acted as a spokesperson for NSO between 2014 and 2019. In that capacity, it is to be inferred that Mr Dahbash became privy to internal confidential information and the strategic thinking of those operating NSO.

119. On 10 May 2018, the Defendants caused Novalpina International (acting in its own name and for and on behalf of its affiliates, defined as "*the Novalpina Group*") to enter into a written Engagement Letter with Mr Dahbash, governed by English law. Pursuant to that agreement, Novalpina International promised to pay, and Mr Dahbash agreed to receive, a fee of USD 5 million for the purported services identified more fully hereinbelow. The Claimants rely on the full terms of the Engagement Letter.

120. By Clause 2 of the Engagement Letter, Mr Dahbash promised during the Term of the Engagement to provide the following "*Services*":

> "*2.1.1 To use best efforts: (i) to identify and source an opportunity for Novalpina to engage in a suitable Transaction, in particular by introducing Novalpina to Mr. Shalev Hulio and/or his partners and/or other members of the Target and/or the Seller; and (ii) to establish a commercial relationship with the Seller; and (iii) to contribute value added and strategic insights pertaining to the Transaction;*"

> "*2.1.2 To facilitate, co-ordinate and orchestrate the discussions and negotiations between the parties to any potential Transaction;*"

> "*2.1.3 To organize and attend meetings relating to the Transaction as advised by Dahbash and requested by Novalpina from time to time*"; and

> "*2.1.4 To provide other assistance in the successful consummation of the Transaction as may be reasonably requested by Novalpina, in particular to advise Novalpina in relation to the PR strategy and aspects of the Transaction.*"

121. Clause 2.2 of the Engagement Letter provided that Mr Dahbash and his affiliates could not provide services or advice relating to the Transaction to Francisco Partners or to any other bidder, but could continue to provide services to NSO and to Mr Hulio "*with a view to finding commercial consensus between the parties to the Transaction and to assisting in the promotion of the discussions and negotiations with regard to the Transaction*".

122. The Engagement Letter was headed "*STRICTLY CONFIDENTIAL*". By Clause 5, Mr Dahbash promised not to tell anyone about (*inter alia*) the Engagement Letter.

123. The Engagement Letter was subsequently novated (by written contracts dated 10 May 2018 and 17 March 2019, both also governed by English law) so as to replace the original contracting parties with NorthPole BidCo S.à r.l, and Zamir Dahbash Assets and Investments Ltd ("**Dahbash Assets**") (an Israeli company), owned and controlled by Mr Dahbash. This does not alter the fact that the original bargain was struck as between Novalpina International (as promisor to pay) and Mr Dahbash (as would-be recipient of the payment).

124. On 20 March 2019, NorthPole BidCo paid USD 5 million to Dahbash Assets (the "**Dahbash Payment**"), in response to an invoice from Dahbash Assets requesting

payment for "*Consultancy Service and Transaction Initiative for NorthPole BidCo Sarl*", as per Clause 3 of the Engagement Letter.

125.   It is to be inferred (from the fact that Novalpina International was originally party to the Engagement Letter, and from their control generally over the Fund and its subsidiaries as pleaded above) that the Defendants procured the making by NorthPole BidCo of the Dahbash Payment.

126.   The Dahbash Payment was not a regular commercial consultancy or "*finder's*" payment, but was instead a bribe made in order to induce Mr Dahbash to breach his duties to NSO and/or its shareholders, and/or unlawfully to facilitate the proposed acquisition of shares in NSO.

127.   On the present state of the information available to the Claimants (to be supplemented in due course by disclosure and evidence), it is inferred that the Dahbash Payment was made in order to induce Mr Dahbash:

127.1.   to pass, or facilitate the passing, to Novalpina information of a confidential and/or business sensitive nature regarding (i) what Francisco Partners would require in order to agree or consider agreeing a sale and (ii) when a bid should be made in order to maximise the prospects of success; and/or

127.2.   to persuade Mr Hulio and other NSO managers to oppose the contemplated acquisition of NSO by Verint, in or around May – July 2018.

128.   The Claimants invite the Court to infer that the Dahbash Payment was a bribe or secret commission on the basis of the following matters (to be supplemented in due course by evidence at trial):

128.1.   Comparison between the size of the payment (USD 5 million) and the limited nature of any non-corrupt services provided by Mr Dahbash in return (viz., as per ¶120 above, introducing Novalpina to Mr Hulio, arranging discussions and meetings, and advising Novalpina in relation to PR aspects of the proposed transaction).

128.2.   Comparison between the size of the payment and industry norms as to the level of finder's fee that might be expected if Mr Dahbash did arrange and

coordinate the introduction between Novalpina and Mr Hulio / NSO and manage and coordinate subsequent deal negotiations.

128.3.   The vagueness of the definition of the "*Services*" provided or to be provided by Mr Dahbash.

128.4.   The substantive content (such as it is) of the Services specified, including "*contribut[ing] value added and strategic insights*".

128.5.   Mr Dahbash's duties (and his knowledge of Mr Hulio's duties), including duties of confidence, owed to NSO group companies (in particular OSY and NSO Group) and to Francisco Partners, which would have prohibited Mr Dahbash from disclosing "*strategic insights*" to a proposed purchaser such as Novalpina without the informed consent of those companies' shareholders.

128.6.   Clause 2.2 of the Engagement Letter, which permitted Mr Dahbash to continue in his existing role on behalf of NSO providing that he did so with a view to promoting the conclusion of a sale of NSO to Novalpina – at a time when Francisco Partners was negotiating a sale of NSO to a third party (Verint).

128.7.   The secrecy attending the Engagement Letter (¶122 above), and its non-disclosure (i) to Francisco Partners, (ii) to the NSO group of companies; (iii) the LPs, (iv) to Sanne to whom Novalpina was contractually obliged to make disclosure (¶16.4 above, quoting Clauses 12.1.6.2 and 12.2.1 of the Investment Advisory Agreement), and/or (v) in due course, to the First Claimant when it replaced Novalpina GP in August 2021.

128.8.   As to point (iii) in ¶128.7 above, the Dahbash Payment was partially disclosed to the LP Advisory Committee only after the acquisition in October 2019, and then only as a line item in a spreadsheet where it was described simply as a "*Success Fee*" (or, in an accompanying footnote, as "*Finders/Originators fees*"). The Claimants will maintain that such limited disclosure was inadequate for the purpose of alleging that the LP Advisory Committee was fully aware of, and thereby consented to, the Dahbash Payment.

128.9.   In the premises of ¶¶ of 121 and 122 above, by the terms of the confidential Engagement Letter, the parties thereto agreed to impose restrictions and conditions on the manner in which Mr Dahbash was to carry out his duties to

DM_EU 19910821-2.117301.0010

NSO group companies without the boards of such companies or the ultimate controlling shareholder of NSO (Francisco Partners) being made aware of such restrictions or conditions. NSO group companies (and, indirectly, Francisco Partners) were thereby denied their right to the disinterested loyalty of Mr Dahbash.

128.10. The lack of any sound basis for the first of the stated purposes of the Engagement Letter (viz. that Mr Dahbash should "*identify and source an opportunity for Novalpina to engage in a suitable Transaction*", per Clause 2.1.1(i) of the Engagement Letter), in circumstances where Novalpina must have known about NSO well before 2018.

<u>PARTICULARS OF KNOWLEDGE</u>

(1)  The individuals who (subsequently) made up Novalpina's Deal Team (or some of them) had been assessing the offensive spyware industry (and/or the cybersecurity industry more generally) for several years and contemplated several transactions within that industry during the years before 2019.

(2)  A failed attempt to conclude a deal between Blackstone and Francisco Partners in 2017 had been widely publicised. It was in the public domain that Francisco Partners was looking to sell NSO.

(3)  NSO occupied a prominent place within the offensive spyware industry, and must have been known about by any professional investor with an interest in that industry (and/or in the cybersecurity industry more generally).

**H(2)**   **Loss**

129.  The agreement to make the payment to Mr Dahbash set out in the Engagement Letter played an instrumental role in and/or materially assisted in ensuring that the Claimants were able to and did acquire NSO, in furtherance of the conspiracy pleaded at **Section C** ¶¶ 46 & 47 above. Further, and in any event, it is presumed that such an agreement was causative of the acquisition.

130.   The Claimants rely upon the Dahbash Payment as an example of the unlawful means used by the Defendants to carry out the conspiracy. Any resulting loss is claimed by way of damages under the unlawful means conspiracy.

**H(3)    Claim for Loss of the Value of the Dahbash Payment**

131.   NorthPole BidCo and/or the Fund has suffered further loss (equal to the value of the Dahbash Payment, i.e. USD 5 million) on the basis that if funds in that amount had not been paid to Mr Dahbash's company, such funds would instead have remained as an asset of NorthPole BidCo.

132.   Alternatively, as pleaded above at ¶52, the Dahbash Payment was accounted for in the books of NorthPole BidCo and therefore represents an illegitimate extraction of funds from the Claimants.

# I.    ARTICLE 1382 OF THE LUXEMBOURG CIVIL CODE.

**I(1)    Luxembourg Law**

133.   Article 1382 of the Luxembourg Civil Code (the "**LCC**") provides (in translation) that:

> *"Any person who commits a wrongful act which causes loss or harm* ("dommage"*) to another person is under obligation to repair such loss or harm."*

134.   Article 1383 of the LCC provides that:

> *"Anyone is liable not only for the loss or harm* ("dommage"*) that they have caused, but also for their negligence or reckless behaviour."*

135.   Pursuant to Articles 1382-1383 of the LCC, as clarified in Luxembourg case law and doctrine, a claimant has a claim against a defendant where it can show that (i) the defendant has committed a wrongful act; (ii) the claimant has suffered loss or harm, whether that loss or harm is of a financial, moral or reputational nature, and (iii) there is a direct causal link between the wrongful act and the claimant's loss or harm.

136.   For these purposes:

136.1.   The expression "*wrongful act*" encompasses (but is not limited to) any breach of a pre-existing duty, where 'duty' ("*obligation*") is not restricted to contractual or legal duties but also refers to the general duty to act diligently and prudently.

136.2.    Abstention, silence and inaction can qualify as "*acts*".

137.    Without prejudice to the generality of ¶136 above, the following legal events or states of affairs would qualify as a "*wrongful act*" (unless there is a specific justificatory defence for so acting):

137.1.    violation of a criminal obligation, including complicity in the violation of a criminal obligation by another (as to which see ¶139 below);

137.2.    violation of a civil obligation;

137.3.    violation of a contractual obligation;

137.4.    causing, procuring, directing or assisting the violation of a criminal, civil or contractual obligation by another person; and

137.5.    making a conscious false representation in the knowledge that the (direct or indirect) recipient is likely to rely on the same to their detriment.

138.    Articles 310 and 310-1 of the Luxembourg Criminal Code enact criminal liability for receiving, agreeing to receive or paying a bribe or other corrupt payment, as follows:

138.1.    It is an offence under Article 310 for a person who is a director or manager of a legal person, or agent of a legal or natural person, to agree to receive a benefit of any kind for himself or a third party, or to accept an offer or promise of such a benefit, to do or abstain from doing any act stemming from or facilitated by his position, without the knowledge and authorisation of his principal or employer.

138.2.    Under Article 310-1, it is an offence for a person to give such a benefit, or to make an offer or promise of such a benefit.

139.    Articles 66 and 67 of the Luxembourg Criminal Code make it a criminal offence to instigate, instruct, assist or facilitate the commission of a criminal offence by another.

140.    As to the requirement of a "*direct causal link between the wrongful act and the claimant's loss or harm*", this criterion:

140.1.    will be satisfied where the event would, in the ordinary course of events, normally cause such a loss;

140.2.    may be satisfied even though there is a chain of events between the wrongful act and the claimant's loss or harm; but

140.3.    will not be satisfied if one of the events in the chain between the wrongful act and the claimant's loss or harm is entirely free and voluntary conduct of the claimant.

141.    Under Luxembourg law, simple interest is awarded on non-contractual damages as follows:

141.1.    compensation interest, in the discretion of the court, to compensate the victim for prejudice caused to the victim as a result of the delay between the loss and the judgment, typically at the "*legal interest rate[s]*" applicable over the relevant period;

141.2.    penalty interest for the period between the ruling and the effective payment, likewise typically at the applicable "*legal interest rate*"; and

141.3.    increased penalty interest (at a rate 3% above the legal interest rate) if payment is not made within three months of judgment.

142.    For these purposes, the "*legal interest rate*" was 2% pa during 2019-2022, and rose to 2.25% in 2023.

**I(2)    Breach of LLP Duties**

143.    **Section E**, ¶¶ 59-63 above are repeated. The Defendants' breaches of duty to Novalpina International amounted to a wrongful act which has caused loss to the Claimants.

**I(3)    False Representations to Sanne and up the line to the Fund/Novalpina GP**

144.    **Section F**, ¶¶ 64-87 above are repeated.

145.    The Suitability Representation, the Risk Review Representation and the BEC Unanimity Representation were or entailed a "*wrongful act*" or "*wrongful acts*" by the Defendants (and each of them) as a matter of Luxembourg law, whether:

145.1.    (in Mr Kowski's case) because he signed the Investment Recommendation Letter and the Investment Compliance Checklist; or

145.2.   (in the case of each of the Defendants) because, as Designated Members of Novalpina International and members of its investment committee, they caused or authorised Novalpina International to make the representations.

146.   In support of the previous paragraph, the Claimants rely on:

146.1.   the conscious falsity of the Defendants in respect of the Suitability Representation, the Risk Review Representation and the BEC Unanimity Representation (¶¶ 74-76, 77-83 and 97 above);

146.2.   breach by Novalpina International of its contractual duties to Sanne, and the Defendants' responsibility for causing that breach (¶¶ 16, 48, 61-62, 68-72 and 84 above);

146.3.   the Defendants' failure to act diligently and prudently (¶¶ 136.1 and 74-84 above).

## I(4)   False Representations to the LPs

147.   **Section G**, ¶¶ 89-117 above are repeated.

148.   The making by the Defendants and/or by Novalpina International of the NoA Representations to the LPs was or entailed a "*wrongful act*" or "*wrongful acts*" by the Defendants (and each of them) as a matter of Luxembourg law.

## I(5)   Agreement to Pay under the Engagement Letter

149.   The Engagement Letter and the Dahbash Payment were wrongful by virtue of being (i) contrary to bribery offences in Luxembourg, Israel and the UK; (ii) made in order to procure breach of contractual, statutory or other duties (¶¶ 126-127 above); (iii) falsely represented to constitute an ordinary and legitimate "*success fee*" / "*finder's fee*" as opposed to a payment made to induce breaches of duty (¶128 above); (iv) in breach of Novalpina International's contractual duty to Sanne (¶16.4 above); and (v) in all the circumstances contrary to the general Luxembourg law duty to act diligently and prudently.

150.   Mr Kowski committed wrongful acts by signing the Engagement Letter on behalf of Novalpina International and (thereby and more generally) procuring (i) that Novalpina International enter into the Engagement Letter and (ii) that the Fund's resources would be used to ensure that NorthPole BidCo pays the Dahbash Payment.

151.    The Claimants infer that Mr Peel and Mr Lueken were aware of the Engagement Letter and Dahbash Payment, and that they gave their consent to both (or at any rate did not disapprove). Mr Peel and Mr Lueken thereby likewise committed wrongful acts, by their complicity in the making of the Engagement Letter and Dahbash Payment (in accordance with the principles of Luxembourg law pleaded at ¶¶ 137.4 and 139 above).

**I(6)    Luxembourg Law Claims**

152.    If (contrary to the Claimants' primary case) the claims against the Defendants are governed by Luxembourg law, then the Claimants claim damages against the Defendants under Articles 1382 & 1383 of the LCC, on the basis of:

152.1.    the allegations of Luxembourg law "*wrongful act*" articulated at Sections I(2)-I(5) above; and

152.2.    the corresponding allegations of resulting loss and damage pleaded above:

(1)    paragraphs 55-58 and 63 (breach of LLP duties);

(2)    paragraphs 84-88 (1 February 2019 representations); and

(3)    paragraphs 113-114 (14 February 2019 representations).

## J.    INTEREST

153.    The Claimants are entitled to and claim interest under Section 35A of the Senior Courts Act 1981.

154.    Alternatively, the Claimants are entitled to, and claim, pre-judgment interest on such amounts as are found due to them, from the date of loss until the date of judgment, in accordance with the principles and practices of Luxembourg law pleaded at ¶¶ 141-142 above.

**AND THE CLAIMANTS CLAIM**

(1)    Damages.

(2)    Interest, under Section 35A of the Senior Courts Act 1981, alternatively in accordance with principles of Luxembourg law.

(3)    Costs.

**PAUL MCGRATH KC**
**JOHN ROBB**
**13 September 2024**

DM_EU 19910821-2.117301.0010

## STATEMENT OF TRUTH

The First and Second Claimants believe that the facts stated in this Particulars of Claim are true. The First and Second Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to make this statement on behalf of the First and Second Claimants.

Signed:

Print name:    GAVIN FARRELL

Position held:  Manager of First Claimant

Date:            13 September 2024


## STATEMENT OF TRUTH

The Third and Fourth Claimants believe that the facts stated in this Particulars of Claim are true. The Third and Fourth Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to make this statement on behalf of the Third and Fourth Claimants.

Signed:

Print name:    TAMARA MAKARENKO

Position held:  Manager of Third and Fourth Claimants

Date:            13 September 2024

# SCHEDULE 1

As per paragraph 77 of the Particulars of Claim, what follows is a non-exhaustive list of the main reports and articles published before 10 February 2019 expressing criticism of and concern about NSO and use by NSO's customers of the Pegasus product to surveil political opponents, human rights activists, lawyers, journalists and other civil society actors:

i.   "Governments Turn to Commercial Spyware to Intimidate Dissidents", The New York Times, 29 May 2016

ii.  "The Million Dollar Dissident: NSO Group's iPhone Zero-Days used against a UAE Human Rights Defender", The Citizen Lab, 24 August 2016

iii. "Startup Manipulated iPhone to Allow Government Spying, Report Says", Wall Street Journal, 25 August 2016

iv.  "How governments in the Middle East snoop on human-rights activists", The Economist, 18 May 2017

v.   "Mexico's Sloppy Hacking Attempts Expose Customers of a $1 Billion Spyware Company", Vice, 19 June 2017

vi.  "Using Texts as Lures, Government Spyware Targets Mexican Journalists and Their Families", The New York Times, 19 June 2017

vii. "Mexico spyware scandal: Opposition politicians 'targeted'" BBC News, 29 June 2017

viii. "Mexican spy scandal escalates as study shows software targeted opposition", The Guardian, 30 June 2017

ix.  "Spyware That Governments Can't Resist", New York Times, 11 July 2017

x.   "Mexico students: Pegasus spyware 'used on foreign investigators'", BBC News, 11 July 2017

xi.  "Blackstone ends talks for NSO Group stake that prompted protest: sources", Reuters, 15 August 2017

xii. "Blackstone won't invest in the NSO Group's "toxic" spyware", Access Now, 15 August 2017

DM_EU 19910821-2.117301.0010

xiii.   "Buyer beware: The Israeli company helping governments spy on their own citizens",
Middle East Eye, 22 August 2017

xiv.   "The Dark Side of Israeli Technology: Six Takes on the Sale of Cyberattack Firm
NSO", Haaretz, 30 May 2018

xv.   "Israel charges former employee of NSO Group with cyber crimes", Reuters, 5 July
2018

xvi.   "How Israeli Tech Firms Act as Global Agents of Repression", The Nation, 27 July
2018

xvii.   "Powerful Smartphone Malware Used to Target Amnesty International Researcher"
Vice, 1 August 2018

xviii.   "Amnesty International Among Targets of NSO-powered Campaign", Amnesty
International, 1 August 2018

xix.   "Meet NSO Group: a go-to company for human rights abusers", Amnesty International,
6 August 2018

xx.   "Hacking a Prince, an Emir and a Journalist to Impress a Client", The New York Times,
31 August 2018

xxi.   "UAE used Israeli spyware 'to target Qatari emir, Saudi prince'", Al Jazeera, 1
September 2018

xxii.   "HIDE AND SEEK: Tracking NSO Group's Pegasus Spyware to Operations in 45
Countries", The Citizen Lab, 18 September 2018

xxiii.   "Revealed: Israel's Cyber-spy Industry Helps World Dictators Hunt Dissidents and
Gays", Haaretz, 19 October 2018

xxiv.   "Snowden: Israeli Firm's Spyware Was Used to Track Khashoggi", Haaretz, 7
November 2018

xxv.   "Israel: 'Rogue' NSO Group must have licence revoked over controversial surveillance
software", Amnesty International, 28 November 2018

xxvi.   "Israeli Software Helped Saudis Spy on Khashoggi, Lawsuit Says" New York Times,
2 December 2018

DM_EU 19910821-2.117301.0010

xxvii.    "Khashoggi Friend Accuses Cyber Security Firm Of Helping Saudis Spy On Their Messages", NPR, 3 December 2018

xxviii.    "Khashoggi friend sues Israeli firm over hacking he says contributed to the journalist's murder", Washington Post, 4 December 2018

xxix.    "Jamal Khashoggi: private WhatsApp messages may offer new clues to his murder", CNN, 4 December 2018

xxx.    "NSO Group's Pegasus spyware linked to Saudi journalist death", TechTarget, 6 December 2018

xxxi.    "How a chilling Saudi cyberwar ensnared Jamal Khashoggi", Washington Post, 7 December 2018

xxxii.    "The Case of the Bumbling Spy: A Watchdog Group Gets Him on Camera", 28 January 2019, New York Times.

DM_EU 19910821-2.117301.0010

**Annex 1**

Structure Chart of Novalpina Capital Partners I SCSp as at 1 February 2021
Confidential and Trade Secret

Management Committee Members:
Stefan Kowski, Bastian Lueken, Stephen Peel

Novalpina Capital LLP
(England, OC414979)

Novalpina Capital Management International LLP
(England, OC417109)

Luxembourg Investment Solutions
(Alternative Investment Fund Manager)

AIFM Agreement

Investment Advisory Agreements

Novalpina Capital Partners I GP S.à r.l.
(Luxembourg, B217341)

Team members

Novalpina Capital Partners I FP SCSp
(Luxembourg, B217330)

LPs

LP <0.30%

GP <1%

Novalpina Capital Partners I SCSp
(Luxembourg, B217345)

LP >98.17%

Limited Partners

100%

Co-Investor (current Fund LP)

100%

Gallica III S.à r.l. SICAV-RAIF
(Luxembourg, B234617)

Loan Notes (€9.8m)

SPV Project 1907 S.R.L. Law 130 vehicle (Italy)

18%* Claim (>€57.6m)

Gruppo Grandi Lavori Fincosit S.p.A.

>0.85%

100%

NVP 101 S.à r.l.
(Luxembourg, B248060)

<0.77%

100%

Novalpina Capital Partners I LuxCo North S.à r.l.
(Luxembourg, B233835)

100%

NVP 103 S.à r.l.
(Luxembourg, B244933)

NVP I Co-Invest SCSp
(Luxembourg, B249867)

<51.36%

<6.37%

>40.65%

0%

Novalpina Capital Partners I LuxCo S.à r.l.
(Luxembourg, B219319)

100%

Hippocrate FI S.à r.l.
(Luxembourg, B244936)

Management

>86.90%

Hippocrate MI 1 S.à r.l.
(Luxembourg, B247312)

<13.10%

Management

>91.01%

Hippocrate MI 2 S.à r.l.
(Luxembourg, B247315)

LP >64.45%

Management

LP <15.55%

100%

Odyssey Europe GP S.à r.l.
(Luxembourg, B226341)

GP <1%

Currently >90%

Currently >96.10%

Ringo HoldCo S.à r.l.
(Luxembourg, B247764)

100%

OÜ Nordic Gaming
(Estonia, 10024734)

100%

NorthPole HoldCo S.à r.l.
(Luxembourg, B226434)

>70.33%

<29.67%

>64.29%

>8.99%

<9.65%

<15.96%

Odyssey Europe Investment SCSp
(Luxembourg, B229393)

Odyssey Europe Topco S.à r.l.
(Luxembourg, B222191)

100%

OEGH Holdings S.à r.l.
(Luxembourg, B247706)

100%

Triangle Holding SA
(Luxembourg, B192115)

Hippocrate TopCo S.à r.l.
(Luxembourg, B239543)

>10.10%

SC Transition (G. Leduc)

100%

Olybet Lux Holding S.à r.l.
(Luxembourg, B239555)

100%

Odyssey Europe Holdco S.à r.l.
(Luxembourg, B222194)

100%

Maximus TopCo S.à r.l.
(Luxembourg, B247906)

100%

Square 2 S.à r.l.
(Luxembourg, B192125)

Quiet (0%)

100%

Hippocrate HoldCo S.à r.l.
(Luxembourg, B240200)

100%

OB Holding 1 OÜ
(Estonia, 14975047)

100%

Olympic Entertainment Group AS
(Estonia, 14437516)

100%

Maximus HoldCo I S.à r.l.
(Luxembourg, B247970)

100%

Maximus HoldCo II S.à r.l.
(Luxembourg, B247868)

100%

NorthPole Bidco S.à r.l.
(Luxembourg, B228505)

100%

Hippocrate Pharma SAS
(France, 885 164 731 RCS Paris)

100%

Maximus BidCo I S.à r.l.
(Luxembourg, B248015)

100%

Maximus BidCo II S.à r.l.
(Luxembourg, B247911)

Future MEP allocation

Emerald LIE S.à r.l.
(Luxembourg, B242289)

100%

Hippocrate IP SAS
(France, 887 537 066 RCS Paris)

100%

Laboratoire X.O SAS
(France, 813 935 863 RCS Nanterre)

100%

Diamond LIE S.à r.l.
(Luxembourg, B242326)

100%

NorthPole Newco S.à r.l.
(Luxembourg, B230411)

100%

Oxy Technologies S.à r.l.
(Luxembourg, B184226)

"LP" = Limited Partner
"GP" = General Partner

- - - ▶ Agreement
——▶ Equity ownership

**IN THE HIGH COURT OF JUSTICE**                    Claim No. CL-2023-000851
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

**B E T W E E N :**


**(1) TREO NOAL GP S.à r.l**

**(2) NOAL SCSp (acting by its managing general partner TREO NOAL GP S.à r.l)**

**(3) NORTHPOLE HOLDCO S.à r.l**

**(4) NORTHPOLE BIDCO S.à r.l**


**Claimants**

**- and -**

**(1) MR STEFAN EMANUEL KOWSKI**

**(2) MR STEPHEN MARK PEEL**

**(3) MR BASTIAN FREDERIK LUEKEN**

**Defendants**

_____

**GLOSSARY OF DEFINED TERMS**
**IN THE PARTICULARS OF CLAIM**

_____

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
| 1 February 2019 Recommendation | | 48.4 | Recommendation made by Novalpina International to Sanne in writing to acquire NSO |
| 1 February 2019 Representations | | 54.2 | Representations allegedly made by Defendants to Novalpina International intending the same to be relied upon, in turn, by Sanne (and/or by the Defendants |

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
|  |  |  | directly to Sanne), Novalpina GP and the Claimants |
| AIF | Alternative Investment Fund | 12 |  |
| AIFM | Alternative Investment Fund Manager | 12 |  |
| AIFM Agreement | Alternative Investment Fund Management Agreement dated 2 October 2017 | 14 | Contract between Sanne and the Fund (acting through Novalpina GP) |
| BEC | NSO's Business Ethics Committee | 66 |  |
| BEC Unanimity Representation |  | 66, (72) | Alleged representation by the Defendants to Novalpina International and Sanne that the BEC would only approve sales of the Pegasus product to customers where its members had unanimously approved doing so |
| Breach of LLP Duties |  | 54.1 | Alleged breach by the Ds of their common law and equitable duties owed as a member of Novalpina Capital and Novalpina International |
| Counterfactual |  | 105, 107 | A hypothetical scenario in which the LPs would have been told certain additional matters which they were not told by the 14 February 2019 Notice of Acquisition |
| Counterfactual Investment |  | 58 | Investment that the Claimants allege the Fund would have made had it not invested in NSO |
| CSSF | Commission de Surveillance du Secteur Financier | 12 | Luxembourg financial regulator |
| Dahbash Assets | Zamir Dahbash Assets and Investments Ltd | 124 | Israeli company, owned and controlled by Mr Zamir Dahbash |

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
| Dahbash Payment | | 124 | Payment of USD 5 million by NorthPole BidCo to Dahbash Assets made on 20 March 2019. |
| Entity Listing | | 87.4 | Measure taken by the US Department of Commerce on 3 November 2021, prohibiting NSO Group from procuring or selling any US-sourced technology |
| ESG | environmental, social and governance | 25 | |
| Founders | Mr Kowski, Mr Peel and Mr Lueken. | 10 | Defendants |
| Francisco Partners | Francisco Partners III (Cayman) LP | 37 | Cayman Islands private equity fund |
| FSMA | Financial Services and Markets Act 2000 | 111(3) | |
| Group GP | Novalpina Capital Partners I Group GP S.à r.l | 6, (18.1) | Parent company of Novalpina GP |
| Investment Advisory Agreement | Second Amended and Restated Investment Advisory and Distribution Agreement dated 23 October 2018 | 15.3 | Contract between the Novalpina IAs, Sanne and Novalpina GP |
| LCC | Luxembourg Civil Code | 54.5, 134 | |
| LPA | Limited Partnership Agreement dated 23 August 2017, as subsequently amended from time to time | 5, 6 | |
| LPAC | Limited Partners' Advisory Committee | 29 | Committee established pursuant to clause 12 of the LPA |
| LPs | Limited Partners of the Second Claimant. | 7 | |

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
| LuxCo | NOAL Luxco S.à r.l. (known until 27 October 2021 as Novalpina Capital Partners 1 Luxco S.à r.l.) | 21.1 | Central holding company for most of the respective holding companies of the Fund's individual portfolio investments |
| Luxembourg Claims | | 54.5 | Claimants' claim that the Defendants carried out wrongful acts which caused loss or harm to another under Article 1832 of the LCC. |
| NOAL GP | Treo NOAL GP S.à r.l | 4 | First Claimant |
| NorthPole BidCo | NorthPole BidCo S.à r.l | 9, (21) | Fourth Claimant |
| NorthPole HoldCo | NorthPole HoldCo S.à r.l | 9, (21) | Third Claimant |
| Notice of Acquisition | | 89 | Written notice, signed by each of the Defendants, by which the Fund's investment in NSO was announced to the LPs |
| NoA Representations | | 54.3, 92 | Alleged representations made by the Defendants to the Limited Partners by Notice of Acquisition dated 14 February 2019 |
| Novalpina Capital | Novalpina Capital LLP | 15.1 | a limited liability partnership (OC414979) incorporated in England and Wales and currently in members' voluntary liquidation |
| Novalpina GP | Novalpina Capital Partners I GP S.à r.l. | 4 | General Partner of the Fund until 27 August 2021 |
| Novalpina IAs | Sanne's two investment advisers, Novalpina Capital and Novalpina International | 15 | |
| Novalpina International | Novalpina Capital Management International LLP | 15.2 | a limited liability partnership (OC417109) incorporated in England and Wales and now dissolved |

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
| Novalpina Topco | Novalpina Capital Group S.à r.l | 18.1 | Parent company of Novalpina Group GP |
| NSO | Corporate group directly or indirectly owned by OSY. | 35, (36) | Producer of *inter alia* Pegasus |
| NSO Group | NSO Group Technologies Ltd | 35.1 | Israeli company |
| OPERF | Oregon Public Employees Retirement Fund | 110.2 | LP with the largest holding in the Fund |
| O.R.S. | Oregon Revised Statutes | 110.5 | |
| OSY | OSY Technologies S.à r.l, | 35.3 | Luxembourg company; sole shareholder and active director of Q Cyber |
| PPM | Private Placement Memorandum dated 15 November 2017 | 24 | |
| Q Cyber | Q Cyber Technologies Ltd (known until 29 May 2016 as L.E.G.D. Company Ltd). | 35.2 | Israeli company; majority owner and only active director of NSO Group |
| Regulated Partner | Reference to an "*ERISA Investor*" or a "*State Retirement System*". | 110.1 | A defined term in the LPA |
| Risk Review Representation | | 71.2 | Alleged representation to Sanne by the Defendants and by Novalpina International that in recommending the acquisition of NSO Novalpina had "*conducted a thorough review of the relevant information to identify material risks*" |
| Sanne | Sanne LIS S.A. (formerly known as Luxembourg Investment Solutions S.A.) | 13 | |
| SPA | Share Purchase and Sale Agreement dated 10 February 2019. | 84.3 | Agreement by which Northpole BidCo contracted to purchase c.70% of the share capital of Triangle |

| Defined Term | Full Name / Term | POC ¶ | Brief Description |
|---|---|---|---|
| Square 2 | Square 2 S.à r.l, | 37.1 | Luxembourg company, now in liquidation; 100% owner of OSY |
| State Retirement System | Reference to an "*Investor that is a retirement system or plan established for the benefit of the employees of any state or local government body or entity located in the US*" | 110.2 | A defined term in the LPA |
| Suitability Representation | | 71 | Alleged representation to Sanne by the Defendants and by Novalpina International that the proposed acquisition of NSO was "*suitable for the Fund*" |
| Triangle | Triangle Holdings S.A. | 37.2 | Luxembourg company, now in liquidation; 100% owner of Square 2 |