**CALVO & *ASSOCIÉS***
**HUISSIERS DE JUSTICE**
LUXEMBOURG

Huissiers de Justice
Carlos CALVO | Martine LISÉ | Laura GEIGER
*Huissier de Justice Suppléant*
Kelly FERREIRA SIMOES

L-1461 LUXEMBOURG • 65, rue d'Eich   (Adr. Postale : B.P. 2625 • L-1026 LUXEMBOURG)

307289 / SaPa / **A77965**

**ASSIGNATION**
**Devant le Tribunal d'arrondissement de et à Luxembourg**
**siégeant en matière civile**

L'an deux mille vingt-quatre, le  — 13 —   juillet

A la requête de :

1.  **la société à responsabilité limitée OEGH Holdings S.à r.l.,** établie et ayant son siège social à L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, inscrite au Registre de commerce et des sociétés de Luxembourg sous le numéro B 247706, représentée par son ou ses gérants actuellement en fonctions ;

2.  **la société à responsabilité limitée NOAL Luxco S.à r.l.** (anciennement Novalpina Capital Partners I Luxco S.à r.l.), établie et ayant son siège social à L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, inscrite au Registre de commerce et des sociétés de Luxembourg sous le numéro B.219.319, représentée par ses gérants actuellement en fonctions ;

3.  **la société en commandite spéciale NOAL SCSp,** anciennement NOVALPINA CAPITAL PARTNERS I SCSp, établie et ayant son siège social au L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, immatriculée au Registre de commerce et des sociétés de Luxembourg sous le numéro B 217345, représentée par son gérant, la société à responsabilité limitée Treo NOAL GP S.à r.l., anciennement BRG NOAL GP S.à r.l., établie et ayant son siège social au L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, immatriculée au Registre de commerce et des sociétés, Luxembourg sous le numéro B 258060, représentée par son conseil de gérance actuellement en fonction, sinon par tout autre organe autorisé à la représenter légalement ;



(les parties demanderesses sont ci-après
collectivement désignées par *« les Demanderesses »*)

élisant domicile en l'étude **MOLITOR Avocats à la Cour SARL**, société à responsabilité limitée, établie et ayant son siège social à L-2763 Luxembourg, 8, rue Sainte-Zithe, inscrite sur la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, immatriculée auprès du Registre de Commerce et des Sociétés de Luxembourg sous le numéro B211810, qui est constituée et occupera par les Demanderesses et qui est représentée pour les besoins de la procédure par **Maître Paulo LOPES DA SILVA**, avocat à la Cour, demeurant professionnellement à la même adresse,

Je soussigné* ~~Carlos CALVO / Martine LISÉ~~ / Laura GEIGER, Huissier de Justice, demeurant à L-1461 LUXEMBOURG, 65, rue d'Eich, immatriculé près le tribunal d'arrondissement de et à Luxembourg

{* ☐ Christine KOVELTER, huissier de justice  ☐ Kelly FERREIRA SIMOES, huissier de justice suppléant, en remplacement de} *(cet alinéa est réputé non écrit s'il n'est pas coché)*

EXHIBIT G

ai donné assignation :

1.  **au** *limited liability partnership* **de droit anglais, NOVALPINA CAPITAL MANAGEMENT INTERNATIONAL LLP**, établi et ayant son siège social au Royaume-Uni, London, SW1H 0RH, Westminster, 1 Brewers Green, 4th Floor The Caxton Building, immatriculé sous le numéro OC417109, représenté par ses représentants statutaires sinon légaux actuellement en fonction;

2.  **au** *limited liability partnership* **de droit anglais, NOVALPINA CAPITAL LLP** (*in liquidation*), établi et ayant son siège social au Royaume-Uni, London, E14 4HD, Canary Wharf, 15 Westferry Circus, immatriculé sous le numéro OC414979, représenté par ses liquidateurs actuellement en fonction (« *joint liquidators* »), Monsieur Stephen GODERSKI et Monsieur Peter HART, demeurant tous deux professionnellement à la même adresse ;

3.  **à Monsieur Stefan KOWSKI**, administrateur de sociétés, demeurant au Royaume-Uni, London SW1P 2AJ, 24 Monck Street, Sherbrooke House, Apartment 516, sinon à Monaco, 98000 Monaco, 15, Boulevard des Moulins, 6e étage, appartement 62/63 ;

(les parties défenderesses étant ci-après désignées par, les « ***Défendeurs*** »)

---

à comparaitre par ministère d'avocat à la Cour dans le délai de la loi qui est de 40 (quarante) jours compte tenu du délai de distance dont bénéficient les Défendeurs en vertu de l'article 167 du Nouveau Code de Procédure Civile, devant le Tribunal d'arrondissement de et à Luxembourg, 1ère Chambre, siégeant en matière civile, Cité judiciaire, Plateau du Saint-Esprit, Bâtiment du Tribunal d'arrondissement, TL, 0.11,

---

avec la déclaration, conformément aux articles 79 et 80 du Nouveau Code de procédure civile, que si la signification est faite à personne et que les Défendeurs ne comparaissent pas, le jugement à intervenir sera réputé contradictoire et ne sera pas susceptible d'opposition, pour :

---

## I.    EN FAIT

### A)    LE FONDS ET SES FILIALES

1.  La société en commandite spéciale NOAL SCSp, anciennement NOVALPINA CAPITAL PARTNERS I SCSp (ci-après le « **Fonds** »), la partie demanderesse sub 3), a été constituée en 2017 à l'initiative de trois membres fondateurs, à savoir Monsieur Stephen PEEL, Monsieur Stefan KOWSKI, l'assigné sub 3), et Monsieur Bastian LUEKEN, (ci-après les « **Fondateurs** ») aux termes d'un *Limited Partnership Agreement* » ou « **LPA** » signé en date du 23 août 2017 et modifié à quatre reprises par la suite.

2.  NOAL SCSp est un fonds de *private equity* (capital-investissement) dont l'objet est d'acquérir des participations majoritaires ou minoritaires dans le capital de sociétés non cotées en bourse. L'objectif

pour les investisseurs (les « *limited partners* ») est de valoriser leur placement afin de réaliser des plus-values à terme grâce à la revente de ces participations.

3.   Les associés commanditaires (« *Limited Partners* ») actuels du Fonds sont des investisseurs institutionnels ou des personnes privées (ci-après les « **Investisseurs** ») qui ont souscrit ensemble des engagements (« *Commitments* ») dans le Fonds à hauteur d'un montant total d'environ un milliard d'euros. Parmi les Investisseurs, figurent des fonds de pension étatiques qui ont investi pour le compte de salariés, notamment aux Etats-Unis (par exemple, l'« *Oregon Public Employees Retirement Fund* » ) et au Royaume-Uni (par exemple, le « *South Yorkshire Pensions Authority* »).

4.   Le Fonds était géré jusqu'au 27 août 2021 par la société NOVALPINA CAPITAL PARTNERS GP S.à r.l. (« **Novalpina GP**») en tant qu'associé commandité gérant. Depuis le 27 août 2021, c'est la société Treo NOAL GP S.à r.l., anciennement BRG NOAL GP S.à r.l., (ci-après « **Treo NOAL** »), qui assume les fonctions de gérant du Fonds.

5.   Le Fonds a confié la gestion de ses actifs à un gestionnaire de fonds d'investissements alternatifs, la société LIS SANNE S.A., anciennement Luxembourg INVESTMENT SOLUTIONS S.A. (ci-après l'« **AIFM** »).

6.   Tel qu'indiqué ci-avant, le principal objectif d'un fonds de *private equity* est d'investir dans des sociétés non cotées afin d'en prendre le contrôle et d'en augmenter la valeur en vue de leur revente.

7.   Dans ce contexte, le Fonds a constitué plusieurs filiales par l'intermédiaire desquelles il a réalisé des investissements dans différents secteurs d'activité.

8.   Au sommet de sa structure de détention se trouve une société à responsabilité limitée dénommée NOAL Luxco S.à r.l. (ci-après « **Master Luxco** »), la demanderesse sub 2). Il s'agit de la *soparfi* par laquelle le Fonds contrôle la vaste majorité des filiales du groupe.



9.   Master Luxco détient actuellement indirectement une constellation de sociétés (les « **Sociétés Portfolio** ») qui exercent des activités opérationnelles dans plusieurs pays.

10.  Parmi les Sociétés Portfolio figurent la société à responsabilité limitée Maximus Bidco I S.à r.l.(ci-après « **Bidco 1** ») et la société à responsabilité limitée Maximus Bidco II S.à r.l. (ci-après « **Bidco 2 »**).

11.  Les investissements du Fonds comprennent le secteur des jeux et des paris. Certaines des Sociétés Portfolio opérant dans ce secteur sont détenues par la sous-holding OEGH HOLDINGS S.à r.l. (ci-après « **OEGH** »), la demanderesse sub 1)[1].

12.  OEGH détient, entre autres, 100% des actions de Maximus Topco S.a.r,l (« **Topco** »). Topco détient 100% de Maximus Holdco I S.à r.l. qui détient elle-même 100% des actions de Bidco 1. OEGH détient en outre 100% des actions de Maximus Holdco II S.à r.l. qui détient l'intégralité du capital social de Bidco 2.

13.  Par acte sous seing privé signé le 27 juin 2024, Bidco 1 et Bidco 2 ont cédé au Fonds les droits et actions qu'elles détiennent contre les Défendeurs en relation avec les faits qui seront exposés ci-après. Ces droits et actions incluent leurs créances respectives de dommages et intérêts contre les Défendeurs telles qu'elles seront détaillées dans la présente assignation. Le Fonds entend par conséquent faire valoir ces créances dans le cadre de la présente assignation en sa qualité de cessionnaire. Il est précisé que la cession ne comporte pas de contrepartie financière pour les

---

[1]   Pièce n°1 de MOLITOR

sociétés Bidco 1 et Bidco 2 car elle s'insère dans le cadre d'une transaction plus large qui profite aux deux sociétés.

14. La signification de la présente assignation aux Défendeurs vaut, conformément à la jurisprudence, notification de la cession au sens de l'article 1690 du Code civil.

15. L'expression *« les Demanderesses »* employée ci-après, vise non seulement les parties demanderesses sub 1) à 3) *stricto sensu*, mais également les sociétés Bidco 1 et Bidco 2 en tant que titulaires initiaux des créances de dommages et intérêts cédées au Fonds.

**B)** **LA CONVENTION DE CONSEIL EN INVESTISSEMENTS**

16. Le 15 novembre 2017, Novalpina GP et l'AIFM ont conclu une convention de conseil en investissements régi par le droit luxembourgeois avec la société NOVALPINA CAPITAL MANAGEMENT INTERNATIONAL LLP (ci-après **« Novalpina International »**), la partie défenderesse sub 1), NOVALPINA CAPITAL LLP (ci-après **« Novalpina UK »** et ensemble avec Novalpina International, les **« Investment Advisors »**), la partie défenderesse sub 2). La dernière version de la convention date du 23 octobre 2018 (ci-après la **« Convention »**)[2].

17. Aux termes de cette convention, les *« Investment Advisors »* se sont engagés à fournir à Novalpina GP, en sa qualité d'associé commandité gérant du Fonds, et à l'AIFM un certain nombre de services, parmi les lesquels figurent l'identification, l'évaluation et la recommandation d'investissements potentiels ou d'opportunités d'investissements pour le Fonds ainsi que la négociation et la préparation de la documentation relative aux investissements recommandés.

18. Les Fondateurs étaient à la fois les associés et les membres du comité de gestion des *« Investment Advisors »*. Chaque Fondateur avait un droit de véto lui permettant de s'opposer à toute décision des *« Investment Advisors »*. Même si les trois Fondateurs avaient en principe les mêmes prérogatives au sein des *« Investment Advisors »,* dans les faits, c'est Monsieur Stefan KOWSKI qui a joué le rôle moteur dans l'acquisition de certains actifs du Fonds, dont *« Maxbet »*.

**C)** **L'ACQUISITION DE MAXBET**

19. En exécution de la Convention, les *« Investment Advisors »* ont, au courant de l'année 2019, sans préjudice quant à la date exacte, identifié une opportunité d'investissement dans le secteur des jeux en Roumanie et à Malte.

20. L'investissement potentiel portait sur l'acquisition d'une entreprise de jeux d'argent opérant par le biais de points de jeu terrestres (Roumanie) ou offrant ses services en ligne (Malte) sous le nom commercial « Maxbet ». La branche d'activité *« terrestre »* a été présentée comme étant détenue par les sociétés chypriotes Maxbet Entertainment Group Ltd (" **MBEG**") et Toptunes Ltd dont Monsieur Vladimir SADOVSKII (**« SADOVSKII »**) aurait été le bénéficiaire effectif. L'activité de jeux et paris en ligne a, quant à elle, était présentée comme étant directement détenue et contrôlée par Monsieur SADOVSKII.

---

[2]     Pièce n°2 de MOLITOR

21.    Il importe de noter que le secteur des jeux d'argent est une activité sensible du point de vue de la lutte contre le blanchiment d'argent et le financement du terrorisme[3].

22.    Les entreprises opérant dans le secteur des jeux d'argent étant soumises à une réglementation stricte, ce type d'actif doit être soigneusement examiné dans le cadre de tout processus de « due diligence » car il est exposé à divers risques commerciaux, réglementaires et réputationnels liés à la possibilité qu'il puisse être associé ou autrement compromis par des activités criminelles, y compris le blanchiment d'argent.

23.    Seuls les opérateurs titulaires d'une licence délivrée par les autorités compétentes sont autorisés à exercer des activités de jeu d'argent. Toute incertitude par rapport à l'identité de l'UBO communiquée aux autorités chargées de l'octroi des licences, conduirait à un risque considérable de perte de ces licences d'exploitation qui, à son tour, pourrait entraîner une perte totale pour les investisseurs.

24.    En conséquence et au regard du caractère peu liquide de l'investissement proposé[4], il était essentiel pour les « Investment Advisors » de procéder, avant toute proposition d'investissement, à une *due diligence* appropriée, rigoureuse et approfondie. Ils devaient également s'assurer que des informations complètes, fiables et appropriées soient fournies tant à l'AIFM qu'aux gérants et conseils de gérance des sociétés acquéreuses (et à toute autre entité du groupe NOAL impliquée dans la vente, ce qui englobait *in fine* le Fonds et Master Luxco).

25.    Du côté de l'acquéreur, ce sont les « Investment Advisors » qui, sous la conduite de Monsieur Stefan KOWSKI, se sont chargés de la négociation, de la « due diligence » et de la préparation de la documentation transactionnelle.

26.    Les « Investment Advisors » se sont tous deux impliqués dans le processus d'acquisition comme le démontre la documentation établie dans le cadre de la transaction. C'est Monsieur Stefan KOWSKI qui a personnellement pris la direction et la responsabilité du processus de négociation et du processus ayant conduit à ce que des recommandations favorables soient soumises, avec les documents justificatifs, à l'AIFM et aux organes de direction des parties acquéreuses, c'est-à-dire Bidco 1 et Bidco 2, à travers toute leur chaîne de détention.

27.    Du côté du vendeur, la vente a été négociée par Monsieur Maxim PASIK, un consultant de MBEG (et, selon la compréhension des Demanderesses, une relation d'affaires de SADOVSKII).

28.    Le 27 février 2020, un protocole d'accord (« Memorandum of Understanding » ou « MoU ») a été conclu entre MBEG et Novalpina International[5]. Le 1er septembre 2020[6], un deuxième MoU a été conclu entre MBEG et Novalpina International. Monsieur KOWSKI a signé les deux MoUs en sa qualité de « Member of the Management Committee ».

29.    Finalement, après avoir préparé et négocié la transaction, Novalpina UK a adressé en date du 16 octobre 2020[7] un courrier à l'AIFM recommandant au Fonds l'acquisition de « Maxbet » et confirmant

---

[3]    Au Luxembourg, les prestataires de services de jeu d'argent et de hasard sont soumis à la loi modifiée du 12 novembre 2008 relative à la lutte contre le blanchiment et contre le financement du terrorisme

[4]    L'article 12.2 de l'annexe 1 (« Schedule 1 ») de la Convention stipule que lorsque le Fonds investit dans des actifs avec une liquidité limitée, les "Investment Advisors" s'obligent à conduire des « high standard financial, legal and tax due diligence for each transaction recommended to the Client and/or the General Partner as applicable, keep all due diligence material and reports, and provide them proactively or upon request to the Client and/or the General Partner as applicable ».

[5]    Pièce n°3 de MOLITOR

[6]    Pièce n°4 de MOLITOR

[7]    Pièce n°6 de MOLITOR

que la documentation comprenant notamment les rapports de « due diligence » était en ordre. Le courrier de Novalpina UK était signé de la main de Stefan KOWSKI.

30.   Deux jours auparavant, le 14 octobre 2020, l'acquisition avait été préapprouvée par les gérants respectifs de Topco, OEGH, Bidco et Bidco 2[8] en présence de Novalpina UK sur base d'informations trompeuses et incomplètes. Ce point sera plus amplement développé ci-après.

31.   Un « Share Purchase Agreement » (« **SPA** »)[9] régi par le droit anglais a été conclu dès le lendemain, c'est-à-dire le 17 octobre 2020 entre Bidco 1 et Bidco 2 en tant qu'acheteurs et MBEG, Toptunes Ltd et SADOVKII en tant que vendeurs.

32.   Le prix d'achat nominal total pour l'activité terrestre et l'activité en ligne était de 273 millions d'euros. Le montant nominal de EUR 147 millions (« Deferred LB Purchase Price Claim ») devait faire l'objet d'un paiement différé par le biais d'un prêt vendeur. Un paiement différé supplémentaire a par la suite été prévu pour le montant nominal de EUR 25 millions (« Additional Deferred LB Purchase Price Claim »).

Le « Deferred LB Purchase Price Claim » et le « Additional Deferred LB Purchase Price Claim » ont été garantis par OEGH, par l'octroi d'un gage à MBEG en date du 4 août 2021 sur ses actions dans Topco (« **le Gage** »).

33.   Le reste de l'acquisition a été financé au moyen d'un emprunt souscrit auprès d'un tiers pour un montant de EUR 50 millions et d'une injection en capital d'un montant de EUR 75 millions par le Fonds à la suite d'un appel de fonds lancé auprès de ses Investisseurs.

34.   Le « closing » de l'acquisition a eu lieu le 1er avril 2021.


**D)    LA TROMPERIE PAR LA DISSIMULATION DELIBEREE DE DOCUMENTS CLE**


35.   A titre introductif, il importe de souligner que l'article 10.1.4. du SPA stipulait que :

« (…) the Online Business Seller [10] is the Ultimate Beneficial Owner of the Target Group Entities[11]and he does not hold his (direct and indirect) ownership in any of the Target Group Entities as trustee for any Person or otherwise on behalf of and/or for the account for any Person».

36.   Cette clause était d'une importance cruciale pour les Demanderesses qui pouvaient légitimement partir du principe (mais uniquement en raison de la rétention délibérée et coupable d'informations de la part des Défendeurs dont il sera question ci-après) qu'il n'existait pas d'informations sérieuses susceptibles de suggérer ou laissant à penser qu'il pouvait y avoir un doute quant à l'identité du bénéficiaire effectif de « Maxbet » (ci-après l'« **UBO** »).

37.   Après son entrée en fonctions en tant que nouveau gérant du Fonds, Treo NOAL s'est efforcée de remettre de l'ordre dans les nombreux dossiers relatifs aux investissements du Fonds et a lancé des

---

[8]    Pièces n°6 à 9 de MOLITOR
[9]    Pièce n°10 de MOLITOR
[10]   Défini dans le SPA comme étant SADOVSKII
[11]   Il s'agit des sociétés vendues

investigations au sujet des affaires des différentes Sociétés Portfolio et du comportement des Fondateurs, en particulier Monsieur Stefan KOWSKI et Monsieur Bastian LUEKEN.

38. Dans le cadre de ses investigations, Treo NOAL a découvert que certains documents importants (ci-après « **les Documents Clé** ») avaient été obtenus par les Défendeurs ou mis à leur disposition dans le cadre de leur processus de « *due diligence* » et KYC. Les Documents Clé, ou au moins un résumé de leur contenu, auraient dû être communiqués aux Demanderesses.

39. Les Documents Clé indiquaient qu'il existait une possibilité réelle et sérieuse que l'UBO de « *Maxbet* » ne soit pas Monsieur SADOVSKII en se concentrant sur un certain Mikhael MIRILASHVILI (ci-après «**MIRILASHVILI** »), un homme d'affaires israélo-géorgien.

40. La révélation (indépendamment de la véracité des faits sous-jacents) du fait qu'il existait une possibilité réelle et sérieuse que Monsieur SADOVSKII ne soit pas le véritable UBO, aurait nécessairement dû être considérée comme un facteur de risque très élevé pour l'investissement. Les Défendeurs ont dû réaliser que pour assurer la conclusion et le « *closing* » de l'opération d'acquisition, il était essentiel que les Documents Clé (et les informations qu'ils contenaient) soient cachés aux Demandeurs ainsi qu'aux autres parties intéressées (banques, organismes prêteurs, régulateurs etc). A défaut, ils n'auraient pas accepté (et les Défendeurs le savaient) la recommandation de procéder à l'acquisition ou ils auraient été dans l'incapacité de le faire. Il aurait par exemple été impossible d'obtenir un financement tiers puisque tout doute sur l'identité de l'UBO aurait constitué un obstacle dirimant à l'octroi de crédits nécessaires pour financer l'acquisition.

41. Les Documents Clé comprennent deux rapports commandés par les « *Investment Advisors* » et Monsieur Stefan KOWSKI, à savoir, une première version d'un rapport daté du 16 mars 2020 établi par CONTROL RISK[12] (« **le Rapport Original CONTROL RISK** ») et un rapport émis par RÖDL & PARTNER le 4 septembre 2020[13] (« **le Premier Rapport RÖDL** »).



42. Ces rapports, séparément et collectivement, ont révélé des liens étroits entre Monsieur MIRILASHVILI et « *Maxbet* » et soulevé la possibilité réelle et sérieuse que Monsieur SADOVSKII n'en soit pas le véritable UBO

43. Le rapport daté du 16 mars 2020 établi par CONTROL RISK, évoquait des liens entre Monsieur MIRILASHVILI et Monsieur Boris SPEKTOR, identifié comme étant l'un des actionnaires des sociétés venderesses[14].

44. Treo NOAL a toutefois découvert qu'il existait une version antérieure[15] du rapport CONTROL RISK comportant une trentaine de références à Monsieur MIRILASHVILI. Son nom était en effet associé non seulement à Monsieur SPEKTOR mais à d'autres actionnaires de « *Maxbet* ». La version finale du rapport a été modifiée afin de retirer toutes les références à Monsieur MIRILASHVILI à l'exception d'une seule. Le Rapport Original CONTROL RISK n'a pas été divulgué aux Demanderesses et aucune référence n'a jamais été faite à une partie quelconque de son contenu. Il s'agissait manifestement d'une non-divulgation volontaire, voire d'une dissimulation délibérée, dans le but d'assurer la conclusion de la transaction. Il importe peu que le contenu supprimé ait été exact ou pas. Toutes les informations figurant dans le Rapport Original CONTROL RISK auraient dû être communiquées.

---

12  Pièce n°14 de MOLITOR
13  Pièce n°15 de MOLITOR
14  Pièce n°13 de MOLITOR
15  Pièce n°14 de MOLITOR

45.  Le nom de Monsieur MIRILASHVILI apparaissait encore dans un autre rapport, à savoir le Premier Rapport RÖDL.

46.  Le Premier Rapport RÖDL remettait directement en cause la qualité d'UBO de Monsieur SADOVSKII. L'auteur du rapport qualifiait Monsieur SADOVSKII « *d'homme de paille* » dans les termes suivants :

*"In the opinion of the analysts actually the shareholding in the company is owned not by V.G. Sadovskiy, but by M.M. Mirilashvili (based on an arrangement between the two), Sadovskiy himself is neither a director nor a shareholder in any of the Russian companies. Moreover Mr. Sadovskiy didn´t travel outside of Russia last 12 months"[16].*

47.  Le Premier Rapport RÖDL précisait encore que :

*"Mikhail Mikhailovich Mirilashvili could be a UBO of the Group of Companies. He is a Russian businessman, owned St. Petersburg´s biggest network of casinos ("Conti") as well as the hotels "St. Petersburg", "Olgino", "Oktyabrskaya" and "Pribaltiyskaya", is involved into the local business of "LUKoil", "Rosgosstrakh" and "Media-Most", head of "Russkoye Video", president of ZAO "Gruppa Conti", member of the executive committee of the Russian Jewish Congress".*

48.  Indépendamment de la question de l'exactitude de son contenu, le Premier Rapport RÖDL aurait dû être pris extrêmement au sérieux par les « *Investment Advisors* ». Il aurait été crucial pour eux de le divulguer entièrement à l'AIFM et aux Demanderesses afin qu'elles puissent l'examiner, ou au moins d'attirer leur attention sur son contenu, que ce soit sous forme de résumé ou autre. Cela n'a pas été fait. Comme pour le Rapport Original CONTROL RISK, il s'agissait manifestement d'actes délibérés de dissimulation et de non-divulgation. En effet, les « *Investment Advisors* », sous la direction de Stefan KOWSKI, ont choisi de ne pas divulguer le Premier Rapport RÖDL (et les informations saillantes qu'il contenait) afin de ne pas compromettre la transaction.

49.  De plus, au lieu de demander à RÖDL & PARTNER d'approfondir ses recherches, ils ont au contraire considérablement limité le champ de ses investigations en lui donnant instruction de s'intéresser uniquement aux relations entre Monsieur Boris SPEKTOR et Monsieur Yevgeny PRIGOZHIN.

50.  RÖDL & PARTNER a donc rendu un second rapport sur cette question en date du 5 octobre 2020[17]. Quant au premier rapport, il a, tel que cela a été indiqué, été délibérément caché par les Défendeurs.

51.  Cette attitude est d'autant plus impardonnable que les Demanderesses ont appris, et cela leur a été confirmé par écrit par les conseils de MBEG, le cabinet anglais FIELDFISHER, en date du 21 mai 2024[18], que MBEG avait expressément indiqué à Monsieur Stefan KOWSKI et à Monsieur Kristjan PIILMANN, qui travaillait pour les « *investment Advisors* », lors d'échanges de messages WhatsApp les 8, 9 et 10 octobre 2020, que Monsieur MIRILASHVILI avait indirectement détenu la majorité du capital social de MBEG avant Monsieur SADOVSKII.

52.  Le courrier FIELDFISHER indique ceci :

*"(…) Maxim Pasik, acting at all times on the instructions of Maxbet and as its agent, disclosed to both Mr Kowski and Kristjan Piilmann, who led the commercial negotiations on behalf of the buyer group*

---

[16]  Pièce n°14 de MOLITOR
[17]  Pièce n°15 de MOLITOR
[18]  Pièce n°17 de MOLITOR

*and through their questioning appeared to be responsible for the diligence into the prior ownership of Maxbet, that Mikhael Mirilashvili was the indirect owner of the majority of the shares of Maxbet prior to Mr Sadovskii".*

53. Les Défendeurs savaient que les Demanderesses se fieraient exclusivement aux informations qu'ils leur fourniraient et qu'elles partiraient raisonnablement du principe que celles-ci étaient complètes sur tous les points importants – ceci d'autant plus que les Demanderesses ignoraient totalement que l'identité réelle de l'UBO de « Maxbet » suscitait des interrogations. Les Défendeurs savaient également que si l'un ou l'autre des Documents Clé (ou toute référence aux informations qu'ils contenaient) avait été fourni aux Demanderesses (comme cela aurait dû être le cas), l'acquisition n'aurait pas eu lieu. Ils ont donc délibérément, sciemment et malhonnêtement dissimulé les Documents Clé et les informations qu'ils contenaient afin de ne pas compromettre l'opération.

54. Les Demanderesses (qui ont toutes joué un rôle critique dans l'acquisition) ont donc été trompées (en raison de la dissimilation). Elles ont été amenées à croire qu'il n'y avait aucun doute sur la propriété de « Maxbet », et encore moins qu'il y avait une possibilité réelle ou sérieuse que l'UBO de « Maxbet » ne soit pas Monsieur SADOVSKII.

55. La question qui se pose en l'espèce, n'est pas celle de savoir si Monsieur MIRILASHVILI était ou non le véritable UBO de « Maxbet » et les Demanderesses ne demandent d'ailleurs pas au Tribunal de se prononcer sur le ce point. Ce qu'il faut retenir c'est que les Documents Clés ont fait apparaître un doute sérieux au sujet de l'UBO qui au lieu d'être porté à la connaissance des Demanderesses afin qu'elles intègrent cette information dans leur processus de prise de décision, leur a été dissimulé.



56. Monsieur SADOVSKII a été présenté de manière affirmative comme étant l'UBO de « Maxbet » à l'égard des autorités de régulation. Le fait qu'un doute ait pu être soulevé à cet égard, signifie que les autorités de régulation ont potentiellement reçu de fausses informations.

57. Tel que les Demanderesses l'ont indiqué ci-avant, « Maxbet » opère dans un secteur très règlementé. Seuls les opérateurs disposant d'agréments délivrés par les autorités compétentes sont autorisés à exploiter des jeux d'argent. Si des incertitudes venaient à surgir au sujet de l'identité de l'UBO d'un opérateur de jeux d'argents, cela lui ferait courir un risque considérable de perte de ses licences d'exploitation.

58. Si les Demanderesses avaient reçu le Rapport Original CONTROL RISK ou le Premier Rapport RÖDL, ou si elles avaient été informées (que ce soit sous forme de résumé ou autrement) du contenu de ces rapports :

    (i)     ni le Fonds ni Master Luxco n'auraient jamais approuvé la vente ;

    (ii)    OEGH n'aurait pas non plus approuvé la vente ni accordé le Gage et

    (iii)   Bidco 1 ou Bidco 2 n'auraient pas accepté de procéder à l'acquisition des activités de « Maxbet ».

59. Bidco 1 et Bidco 2 ont donc subi une perte dont le montant pourrait potentiellement s'élever au prix stipulé dans le SPA (qui d'après les Demanderesses était nettement supérieur à la valeur de l'entreprise Maxbet). Le montant exact de cette perte, qui est d'ores et déjà avérée, reste à déterminer.

60.    A cela s'ajoutent les frais et coûts de transaction, tels que les différents rapports d'audit et de « due diligence » et d'investigation pris directement et indirectement en charge par le Fonds pour un montant évalué sous toutes réserves à la somme de EUR 10 millions.

61.    Par ailleurs, OEGH a subi un préjudice matériel provisoirement évalué à EUR 4.000.000 résultant des frais, dont les frais d'avocat, qu'elle a dû exposer afin de tenir en échec une tentative d'exécution du Gage.

62.    Enfin, les Demanderesses ont subi chacune un préjudice d'ordre moral évalué sous toutes réserves à la somme de EUR 100.000 résultant d'une atteinte à leur réputation en raison des révélations contenues dans les Documents Clé. Aux yeux des tiers, parmi lesquels figurent les relations d'affaires des Demanderesses dont des banques, qui ont eu connaissance ou qui auront à connaître du caractère gravement défaillant du processus de « due diligence » et KYC qui a conduit à l'acquisition de « Maxbet », l'image des Demanderesses a été et sera sévèrement écornée. Les Demanderesses ne seront plus perçues à l'égard de certains acteurs comme des partenaires rigoureux et fiables.

63.    Les Demanderesses entendent, par la présente action, engager la responsabilité civile délictuelle des Défendeurs afin d'obtenir réparation pour le dommage que leurs actes de dissimulation leur ont causé.


## II.    EN DROIT

64.    La présente action est fondée sur la responsabilité délictuelle des Défendeurs (C).

65.    Les juridictions luxembourgeoises sont territorialement compétentes pour connaître de cette demande (A) qui doit incontestablement être régie par le droit luxembourgeois (B).


### A)    *QUANT A LA COMPETENCE TERRITORIALE*

66.    Le Royaume-Uni n'étant plus membre de l'Union européenne, la compétence internationale des juridictions luxembourgeoises pour connaître de litiges impliquant de défendeurs établis au Royaume-Uni se détermine désormais en vertu des règles de droit commun du droit international privé luxembourgeois.

67.    L'article 14 du Code civil dispose que :

*« L'étranger même non résident dans le Luxembourg, pourra être cité devant les tribunaux luxembourgeois, pour l'exécution des obligations par lui contractées dans le Luxembourg avec un Luxembourgeois ; il pourra être traduit devant les tribunaux luxembourgeoise, pour les obligations par lui contractées en pays étranger envers des Luxembourgeois ».*

68.    Cette disposition profite également aux sociétés luxembourgeoises[19].

---

[19]    Cour 29 mai 1925, Pas. 11, p.352

69. D'après la jurisprudence, le privilège de juridiction institué par l'article 14 du Code civil s'étend à toutes les obligations quelle qu'en soit l'origine, couvrant partant outre les obligations contractuelles, celles quasi-délictuelles, patrimoniales, extra-patrimoniales[20] et délictuelles[21].

70. La compétence des tribunaux luxembourgeois est donc établie en application de l'article 14 du Code civil.

71. Subsidiairement, leur compétence est acquise au regard du fait que les faits dommageables qui constituent la cause de la présente demande en justice, se sont produits au Luxembourg.

72. La présente demande en justice est en effet fondée, telle que cela sera développé plus amplement ci-après, sur la responsabilité délictuelle des Défendeurs au sens des articles 1382 et 1383 du Code civil.

73. En effet, en l'absence de conventions internationales applicables, il est de *« principe que sur le plan international, la juridiction compétente se détermine, en général, conformément aux mêmes règles que celles qui définissent la compétence territoriale en droit interne »*[22].

74. Aux termes de l'article 42 du Nouveau Code de Procédure Civile, *« en matière de réparation du dommage causé par un délit ou un quasi-délit »,* tel le cas en l'espèce, *« la demande pourra être portée, au choix du demandeur, soit devant la juridiction du lieu du domicile du défendeur, soit devant celle du lieu où le fait dommageable s'est produit ».*

75. En l'espèce, le fait dommageable s'est réalisé au siège des Demanderesses puisque c'est là qu'elles ont été trompées par les Défendeurs et que, étant privées d'informations remettant en question l'identité de l'UBO de *« Maxbet »,* elles ont pris la décision de procéder à l'acquisition de *« Maxbet ».*

76. Les Tribunaux luxembourgeois sont donc compétents en tout état de cause pour statuer sur la présente demande.

## B)     LOI APPLICABLE

77. Il est de jurisprudence que c'est la loi du lieu où le fait illicite dommageable s'est produit qui régit les conditions de la responsabilité civile ainsi que le mode et l'étendue de la réparation à laquelle la victime peut prétendre[23].

## C)     QUANT AU BIEN-FONDE DE LA DEMANDE

78. Il est un fait que les Demanderesses n'entretenaient pas de relations contractuelles avec les Défendeurs au moment des faits, puisqu'elles n'ont pas signé la Convention avec les *« Investments Advisors ».*

---

20     Cour 21 novembre 2000, Pas. 31, p.480
21     Cour 5 février 1897, Pas. 4, p.330
22     Cour 21 novembre 2000, Pas. 31, p.480
23     Lux., 6 avril 1965, Pas. 19, p.549

79. La responsabilité délictuelle *in solidum* (3) des Défendeurs est néanmoins clairement engagée dans la mesure où ils ont commis une faute (1) qui causé un préjudice individuel à chacune des Demanderesses (2).

## 1.     La faute délictuelle

80. Aux termes de l'article 1382 du Code civil :

« *Tout fait quelconque de l'homme, qui cause à autrui un dommage, oblige celui par la faute duquel il est arrivé, à le réparer* ».

81. Il est unanimement admis que la mise en œuvre de l'article 1382 du Code civil exige la preuve d'une faute.

82. Tant les « *Investment Advisors* » (1.1.) que Monsieur Stefan KOWSKI personnellement (1.2.) ont commis des fautes qui engagent leur responsabilité délictuelle, *in solidum*, à l'égard de chacune des Demanderesses.

### 1.1.    *La faute commise par les « Investment Advisors »*

83. Tel que cela résulte de l'exposé des faits, les « *Investment Advisors* » ont chacun travaillé sur la transaction dans le cadre de la Convention. Si la décision de recommander l'investissement à l'AIFM et par voie de conséquence aux Demanderesses a été signée par Monsieur Stefan KOWSKI au nom de Novalpina UK[24], Novalpina International est elle-aussi activement intervenue dans la préparation de la transaction en signant notamment les MoUs qui ont précédé l'acquisition.

84. Monsieur KOWSKI a également signé une note KYC au nom de Novalpina International le 8 octobre 2020[25], aux termes de laquelle il a certifié n'avoir découvert aucun problème significatif en relation avec l'UBO (« *no material issues have been raised concerning the UBO* »). Cette note fait uniquement référence à la version édulcorée du rapport CONTROL RISK et au second rapport de RÖDL & PARTNER. Monsieur KOWSKI se garde bien de préciser, dans sa note, qu'il existait une première version du rapport CONTROL RISK et que RÖDL & PARTNER avait été chargé d'une première mission bien plus étendue que la seconde qui avait donné lieu à des signaux d'alerte (« *red flags* »).

85. Aux termes de la Convention, les « *Investment Advisors* » étaient contractuellement tenus à l'égard de Novalpina GP et de l'AIFM d'effectuer un audit de manière prudente et diligente par rapport à la structure de détention de « *Maxbet* » et à l'identité de son UBO et de faire leurs recommandations sur une base complète et honnête, après avoir divulgué aux Demanderesses toutes les informations susceptibles d'avoir un impact matériel sur leur décision d'investir (que cette information soit en fait exacte ou non).

---

[24]     Pièce n°10 de MOLITOR
[25]     Pièce n°5 de MOLITOR

86.   Cette obligation découle également de l'article 1134 alinéa 3 du Code civil selon lequel les conventions doivent être exécutées de bonne foi. Il est de jurisprudence constante que le devoir d'exécution de bonne foi des conventions implique un devoir de loyauté entre les parties[26].

87.   En vertu de leur devoir de loyauté, les *« Investment Advisors »* auraient dû transmettre à leurs cocontractants toutes les informations dont ils avaient connaissance et qui pouvaient avoir un impact majeur sur la décision de l'AIFM et des Demanderesses d'investir (ou pas) dans *« Maxbet. »*

88.   L'attitude des *« Investment Advisors »* va bien au-delà de la simple négligence. Elle relève clairement du dol.

89.   Selon la doctrine :

*« Le dol est une inexécution consciente, sans que le débiteur ait nécessairement eu l'intention de nuire, ni la conscience du dommage qui résulte de son attitude. Peu importe que le dommage n'ait été recherché ; il suffit que, de manière délibérée, le débiteur essaye de se soustraire à ses obligations, ou prenne le risque des conséquences dommageables que son action ou son inaction peut causer à son contractant. Il se montre ainsi de mauvaise foi, malhonnête, mais sans avoir été nécessairement malveillant ; le dol est en quelque sorte l'envers la bonne foi devant régner entre contractants »[27].*

90.   En l'espèce, les *« « Investment Advisors »* n'ont pas simplement commis une faute par omission, ils ont délibérément fait en sorte que le Rapport Original CONTROL RISK et que Premier Rapport RÖDL soient tenus secrets à l'égard de l'AIFM et des Demanderesses.

91.   Même si les Demanderesses ne sont pas parties à la Convention, la jurisprudence luxembourgeoise la plus récente admet que des tiers peuvent se prévaloir sur le plan délictuel, d'un manquement contractuel.

92.   Selon un jugement du Tribunal d'arrondissement de Luxembourg du 22 février 2019[28]:

*« Il est actuellement acquis qu'« un tiers à un contrat peut invoquer, sur le fondement de la responsabilité délictuelle, un manquement contractuel dès lors que ce manquement lui a causé un dommage » (Cass. ass. plén., 6 octobre 2006, n° jurisdata 2006-035298 ; Cass.1re civ., 15 mai 2007, n° jurisdata 2007-038866 ; Cass. 2e civ.,10 mai 2007, n° jurisdata 2007-038801; Cass. com., 6 mars 2007, n° jurisdata 2007-037930 ; Cass. com., 21 octobre 2008, n° jurisdata 2008-045511).*

*Cette jurisprudence, qui a été reprise par la jurisprudence luxembourgeoise, a consacré l'uniformité des fautes contractuelle et délictuelle (Cour d'appel, 9 octobre 2008, n° 32596 et 32680 du rôle ; Cour d'appel, 25 octobre 2017, n° 40026 du rôle) ».*

93.   La jurisprudence luxembourgeoise admet encore plus facilement la possibilité pour un tiers de se prévaloir de l'inexécution d'un contrat auquel il n'était pas partie, lorsque l'obligation inexécuté intéressait directement ce tiers[29].



---

[26]   Cf. notamment Cour 2 juillet 2020, Pas. 40, p.59 ; Lux. 12 juillet 2021, Pas.40, p.562

[27]   Georges RAVARANI, *« La responsabilité civile des personnes privées et publiques »*, Pasicrisie luxembourgeoise, 3e éd., 2014, n°723, p.746

[28]   Lux. 22 février 2019, nos 131 499 et 187 540 du rôle ; cf. dans le même sens et plus récemment : Cour 31 mai 2022, Pas. 41, p.175

[29]   Cf. Cour, 24 mai 2006, nos 30212 et 30446 du rôle : il s'agissait en l'espèce de la violation d'une obligation de s'informer sur la présente de câbles souterrains ; cette obligation intéressait selon la Cour au *« premier chef »* les tiers *« puisqu'elle avait pour objet la sécurité de tous »*

94.     Or, il ne saurait être contesté que l'exécution des obligations à charge des « *Investment Advisors* » aux termes de la Convention intéressait directement le Fonds et ses filiales, dont Master Luxco, OEGH, Bidco 1 et Bidco 2, puisque la Convention portait précisément sur les investissements à réaliser par le Fonds via son gérant et son AIFM. La Convention a incontestablement été conclue dans leur intérêt.

95.     Il est d'ailleurs intéressant de relever que des représentants de Novalpina UK ont participé aux réunions aux cours desquelles les organes de gestion d'OEGH, Topco, Bidco 1 et Bidco 2 ont adopté les résolutions approuvant l'acquisition[30]. Il résulte des résolutions écrites du gérant unique d'OEGH et des minutes des réunions des conseils de gérance de Topco, Bidco 1 et Bidco 2 du 14 octobre 2020, que Kristjan PIILMANN, qui faisait partie de l'« *Advisory Commitee* » des « *Investment Advisors* », est intervenu pour fournir des informations aux gérants des sociétés appelés à se prononcer sur l'acquisition.

96.     Il y a donc lieu de retenir que la violation de la Convention constitue une faute délictuelle qui engage la responsabilité délictuelle des « *Investment Advisors* » de chacune des Demanderesses.

97.     A supposer que la violation délibérée de la Convention ne suffise pas à caractériser une faute délictuelle à l'égard des Demanderesses, il aurait alors lieu de retenir que les « *Investment Advisors* » ont commis une faute en n'agissant pas en bon père de famille.

98.     D'après la doctrine :

     « *La notion de faute dépasse de loin celle d'illicéité. Il existe en effet, à côté des obligations de comportements déterminés dans des situations définies au préalable par la loi, un devoir général de prudence et de diligence imposant à toute personne, en toutes circonstances, de se comporter de manière à ne pas causer à autrui un dommage. Ce qui est essentiel dans l'appréciation de tout comportement c'est le respect des intérêts légitime d'autrui* »[31].

99.     La faute s'apprécie « *in abstracto, objectivement, c'est-à-dire par rapport à un modèle de référence abstrait, à savoir l'homme normalement diligent, prudent et avisé, le bon père de famille* »[32].

100.    Selon le même auteur:

     « *Pour apprécier le respect du devoir général de prudence et de diligence, les juges observent les pratiques habituelles des hommes, recherchent dans chaque activité quels sont les usages en en vigueur. Il semble que dans ce contexte, un rôle normatif revienne à l'usage, à l'équité et même à la morale. On se référera à la conduite habituelle de ceux qui se trouvent dans une situation semblable à celle de l'agent* »[33].

101.    Dans ce contexte, la jurisprudence tend à considérer qu'il existe, dans certaines situations et en dehors même de tout contrat, un devoir général de bonne foi qui met des obligations d'informations à charge de certaines parties[34].

---

[30]    Pièces n°6 à 9 de MOLITOR

[31]    Georges RAVARANI, *op.cit.*, n°62, p.67

[32]    Georges RAVARANI, *op.cit.*, *loc.cit.*

[33]    Georges RAVARANI, *op.cit.*, n°63, p.67

[34]    Pascal ANCEL, « *Contrats et obligations conventionnelles en droit luxembourgeois- Approche comparative* », Larcier, 2015, n°474, p.554

102. En l'espèce, les « *Investment Advisors* » étaient incontestablement tenus d'un devoir de bonne foi envers les Demanderesses qui les obligeaient à leur communiquer toute information pouvant matériellement affecter leur prise de décision par rapport à l'acquisition.

103. Les « *Investment Advisors* » ne se sont pas comportés comme l'aurait fait une personne normalement prudente et diligente placée dans les mêmes circonstances. Les Défendeurs ont délibérément caché les signaux d'alerte contenus dans les Documents Clé dont ils avaient connaissance au sujet du fait que Monsieur MIRILASHVILI pouvait éventuellement être le véritable UBO de « *Maxbet* ». Leur attitude ne relève donc pas de la simple négligence, mais d'un acte délibéré et d'une véritable tromperie.

104. Ici encore, les « *Investments Advisors* » ont eu un comportement dolosif en dissimulant le contenu des Documents Clé.

105. Plus subsidiairement, il est admis que la faute délictuelle peut également résulter de la violation d'une norme de droit positif telle qu'une loi ou un règlement.

106. D'après un auteur :

> « La preuve d'une faute est aisée à établir lorsqu'elle se manifeste dans l'inobservation d'une norme spécifique imposant aux individus un comportement défini dans les situations qu'elle prévoit. On peut alors parler d'un comportement « illicite » »[35].

107. En l'espèce, Novalpina UK et Novalpina International étaient non seulement obligées en vertu de la Convention de recueillir des renseignements complets et fiables sur l'UBO de « *Maxbet* » afin de les communiquer à l'AIFM et aux Demanderesses sans chercher à cacher des informations gênantes, mais elles étaient également tenues de le faire au regard de obligation légale pesant sur tous les professionnels au sens de la loi modifiée du 12 novembre 2008 relative à la lutte contre le blanchiment et contre le financement du terrorisme (« **Loi AML** »), y compris les professionnels de droit étranger, intervenant dans la transaction.

108. La Loi AML oblige en effet tous les professionnels qui y sont soumis à procéder à une évaluation des risques en relation avec la transaction dans laquelle ils interviennent. Dans le cadre d'une vente cela implique non seulement de recueillir des informations sur la partie venderesse, mais également des documents probants sur son bénéficiaire effectif.

109. Alors même que les Documents Clé soulevaient des interrogations au sujet de l'identité de l'UBO de « *Maxbet* », les « *Investment Advisors* », au lieu de se livrer à des investigations plus approfondies conformément aux dispositions impératives de la Loi AML, ont délibérément choisi d'ignorer ces signaux d'alerte et de cacher à l'AIFM et aux Demanderesses les informations contenues dans ces documents.

110. Les Défendeurs savaient pertinemment que la documentation et les rapports qu'ils avaient établis, fait établir ou contribué à établir dans le cadre de l'acquisition (en ce compris les Documents Clé) devaient être soumis sinon en entier, du moins sous forme de résumé aux organes décisionnels du Fonds et aux gérants de Master Luxco, OEGH, Bidco 1 et Bidco 2 afin de leur permettre de décider de procéder ou non à l'acquisition de « *Maxbet* ».

---

[35] Georges RAVARANI, *op.cit.*, n°62, p.67

111.  Par voie de conséquence, aucun des Défendeurs ne pouvait ignorer le fait que si le Premier Rapport RÖDL ou le Rapport Original CONTROL RISK avaient été divulgués, ou si leur contenu avait été référencé ou résumé, la transaction aurait été compromise et n'aurait pas eu lieu.

112.  Tel qu'indiqué ci-dessus, l'acquisition procède formellement d'une recommandation de Novalpina UK adressée l'AIFM, mais il résulte de la documentation transactionnelle que Novalpina International a été étroitement impliquée dans la transaction puisqu'elle a signé un certain nombre de documents, dont les MoU. Les Défendeurs, qui voulaient à tout prix conclure la vente, ont sciemment caché des informations en leur possession, dont principalement les Documents Clé, afin de faire aboutir l'opération. Les deux *Investment Advisors* ont travaillé la main dans la main pour mener à bien cette transaction et portent la même responsabilité dans le préjudice causé aux Demanderesses.

113.  Le fruit de ce travail effectué collectivement par les Défendeurs a été soumis à Novalpina GP qui a pris la décision d'investir EUR 75 millions au nom du Fonds et aux gérants de Master Luxco, OEGH, Bidco 1 et Bidco 2 qui ont pris la décision d'acquérir *Maxbet* ou de garantir l'opération (OEGH).

114.  En violant leurs obligations légales, les *Investments Advisors* ont commis une faute engageant, *in solidum*, leur responsabilité délictuelle à l'égard des Demanderesses.

### 1.2.  *La faute commise par Stefan KOWSKI*

115.  Tel que les Demanderesses l'ont indiqué ci-avant, Monsieur KOWSKI a joué un rôle clé dans la transaction puisqu'il est personnellement intervenu tant au nom de Novalpina UK que de Novalpina International qu'il a dirigées et représentées tout au long de l'opération. Il a notamment signé les deux MoUs avec MBEG ainsi que la lettre recommandant à l'AIFM de réaliser l'investissement dans *Maxbet*.

116.  Il a également personnellement signé, au nom de Novalpina International, mais sur du papier à entête de Novalpina UK, une note KYC en date du 8 octobre 2020[36].

117.  Dans cette lettre il a sciemment occulté l'existence du Premier Rapport RÖDL. Seul le second rapport établi par RÖDL & PARTNER y est mentionné. Cette lettre a été clairement établie pour tromper la vigilance des Demanderesses alors que Monsieur Stefan KOWSKI connaissait les Documents Clés et que c'est à son initiative qu'ils ont été modifiés et/ou cachés.

118.  L'ensemble des fautes et actes de dissimulation commis par Novalpina UK et Novalpina International décrits ci-avant l'ont été par son intermédiaire.

119.  Ces actes sont donc personnellement imputables à Monsieur Stefan KOWSKI qui ne saurait ne soustraire à sa responsabilité personnelle sur le fondement des articles 1382 et 1383 du Code civil en prétendant qu'il n'a fait qu'agir au nom et pour le compte des *Investment Advisors*.

120.  D'une part, la jurisprudence continue d'admettre que les organes d'une société peuvent être tenus pour responsables dans les termes de l'article 1382 du Code civil au même titre que la société qu'ils représentent.

---

[36]   Pièce n°5 de MOLITOR

121. Il a ainsi été décidé que :

> « La faute qui peut leur être reprochée dans ce contexte consiste dans un manquement à un comportement qui s'impose à tous, à savoir un manquement aux devoirs de loyauté, de prudence, de diligence et de compétence (…). Cette action existe à côté de l'action dont peut disposer les tiers à l'encontre de la société elle-même, le principe étant que celui de la coexistence des responsabilités de la société et de l'organe en cas de faute délictuelle »[37].

122. D'autre part, même si les tribunaux se montrent parfois réticents à engager la responsabilité délictuelle des dirigeants de société lorsqu'ils ont agi dans le cadre de leurs fonctions, ils admettent néanmoins que cette responsabilité peut être engagée en cas de «manquement à une obligation générale de prudence d'une certaine gravité ou à tout le moins volontaire et consciente et un dommage distinct de celui résultant de la mauvaise exécution de cette obligation » (L.BIHAIN, Responsabilité des dirigeants de sociétés à l'égard des tiers, J.T. belge, 2006, p.421 s.). Il en est ainsi « lorsque le dirigeant commet intentionnellement une faute d'une particulière gravité incompatible avec l'exercice normal des fonctions sociales »[38].

123. En l'espèce, il ne peut pas être sérieusement contesté que Monsieur Stefan KOWSKI a commis une faute grave consistant dans la dissimulation délibérée d'informations qui auraient pu avoir un impact sur une transaction majeure.

124. De plus, il a également enfreint la Loi AML qui s'applique également aux employés et représentants des professionnels qui y sont soumis.

**2.    Le dommage**

125. D'après la jurisprudence, la « victime d'un dommage a le droit d'exiger que le responsable la replace dans l'état où elle se serait trouvée si ce dommage n'était pas intervenu »[39].

126. Par ailleurs, « le préjudice résultant d'une faute, quelle qu'elle soit, doit être réparé par l'auteur de la faute et cette réparation doit être totale »[40].

**2.1.    Le dommage subi par Bidco 1 et Bidco 2 et réclamé par le Fonds en sa qualité de cessionnaire de leurs créances de dommages et intérêts**

127. Les sociétés Bidco 1 et Bidco 2 ont subi un préjudice matériel car elles ont effectué un investissement à haut risque dans une entreprise de jeu d'argent.

---

[37]    Lux.25 février 2025, pas. 37, p.627
[38]    Cour 31 janvier 2018, n° 43056 du rôle
[39]    Lux. 21 mars 1956, Pas.16, p.540
[40]    Cour 4 janvier 2012, Pas. 35, p.848

128. Bidco 1 et Bidco 2 n'auraient jamais investi dans « *Maxbet* » si les Documents Clé (ou les informations qu'ils contiennent) leur avaient été divulgués (en d'autres termes, s'ils n'avaient pas été trompés quant au fait qu'il y avait une possibilité réelle et sérieuse que l'UBO ne soit pas Monsieur SADOVSKII).

129. La perte subie par Bidco 1 et Bidco 2 est aujourd'hui certaine dans son principe puisque « *Maxbet* » a engagé des frais en pure perte dans l'acquisition, tels que les coûts liés Premier Rapport RÖDL, et il apparaît aujourd'hui qu'elle ne pourra pas récupérer tout ou partie du prix nominal stipulé dans le SPA.

130. Le montant définitif de la perte de Bidco 1 et Bidco 2 ne pourra toutefois être établi qu'au moment de la revente, si revente il y a, de l'investissement (qui n'a pas vocation à rester dans le portefeuille du Fonds qui, il convient de le rappeler, est un fonds de *private equity* »).

131. Cette perte pourrait potentiellement atteindre la valeur **nominale** de leur investissement, soit la somme de EUR 265 millions pour Bidco 1 et de EUR 8 millions pour Bidco 2.

132. Le préjudice de Bidco 1 et de Bidco 2, dont le Fonds réclame réparation en sa qualité de cessionnaire, est donc provisoirement évalué, sous toutes réserves et sans reconnaissance préjudiciable aucune, aux montants respectifs de EUR 265 millions et de EUR 8 millions.

133. Le Fonds se réserve le droit d'établir ces préjudices par tous moyens et notamment par la voie d'expertise conformément aux articles 461 et suivants du Nouveau Code de Procédure Civile. Elles se réservent également le droit de majorer leur demande en cours d'instance.

134. Enfin, les sociétés Bidco 1 et Bidco 2 ont subi un préjudice moral résultant de l'atteinte à l'image. Leur préjudice de ce chef est évalué à EUR 100.000 pour chacune des deux sociétés.

135. Le Fonds se réserve le droit de majorer ces demandes en cours d'instance.

### 2.2. Le dommage subi par OEGH

136. OEGH a elle aussi subi un préjudice d'ordre matériel et un préjudice réputationnel.

137. OEGH a été trompée au même titre que les autres Demanderesses.

138. Il convient de rappeler que Novalpina UK était représentée lors de la réunion du 14 octobre 2020 à l'occasion de laquelle le gérant unique de OEGH a préapprouvé l'acquisition et a fourni des conseils à ce dernier[41].

139. De plus, OEGH a accordé le Gage qui faisait partie intégrante du financement de l'acquisition. Il est évident que si l'acquisition n'avait pas eu lieu, le Gage n'aurait pas été consenti.

140. Le Gage a été accordé au moment du « *closing* » (le 1er avril 2021), soit quatre mois après la conclusion du SPA. OEGH n'aurait jamais pris cette décision si les Documents Clé (ou les informations qu'ils contiennent) lui avaient été divulgués (en d'autres termes, si elle n'avait pas été trompée quant au fait qu'il y avait une possibilité réelle et sérieuse que Monsieur SADOVSKII ne soit

---

41    Pièce n°6 de MOLITOR

pas l'UBO de « *Maxbet* »). La tromperie s'est dont inscrite dans la durée puisque qu'elle s'est prolongée au-delà de la conclusion du SPA.

141.  OEGH a subi un préjudice matériel direct en raison des frais exposés par elle afin de s'opposer judiciairement à l'exécution du Gage par la partie venderesse à la suite d'un différend portant sur l'exécution du SPA. Ce préjudice est provisoirement évalué à la somme de EUR 4.000.000.

142.  OEGH a aussi une atteinte à son image évaluée à la somme de EUR 100.000.

143.  OEGH se réserve le droit d'augmenter ses demandes en cours d'instance.

### 2.3.   Le dommage subi par Master Luxco

144.  En raison des manœuvres déloyales et dolosives des Défendeurs, Master Luxco a également subi un préjudice moral résultant d'une atteinte à son image évaluée à la somme de EUR 100.000.

145.  Master Luxco se réserve le droit d'augmenter ses demandes en cours d'instance.

### 2.4.   Le dommage personnel subi par le Fonds

146.  Les fautes des Défendeurs ont également occasionné un dommage personnel au Fonds.

147.  Le Fonds par l'intermédiaire de son gérant et de son AIFM a donné son accord à l'investissement sur la base de la recommandation qu'elle a reçu de Novalpina UK et Novalpina International. S'il avait été informé du contenu des Documents Clé, il aurait refusé l'acquisition.

148.  Le Fonds a dû exposer directement et indirectement des frais et coûts dans le cadre de l'acquisition de « *Maxbet* » et, plus tard, dans le cadre de ses investigations pour un montant évalué sous toutes réserves à la somme de EUR 10 millions.

149.  Le Fonds a également subi une atteinte à son image évaluée à la somme de EUR 100.000.

150.  Le Fonds se réserve le droit d'augmenter ses demandes en cours d'instance.

### 3.   La responsabilité *in solidum*

151.  La responsabilité des Défendeurs est engagée *in solidum* puisque leurs fautes respectives ont concouru au même dommage.

152.  Il est en effet admis que :

> « *Si les différents faits générateurs du dommage sont indissociables ou s'ils ont produit un dommage unique et indivisible, les différents auteurs de ce dommage sont responsables in solidum, à l'égard de la victime : chacun a l'obligation de réparer l'intégralité du dommage (…)* »[42].

---

[42]    Cf. Georges RAVARANI, *op.cit.*, n°1017, p.1003

**A CES CAUSES**

voir **déclarer** la présente demande recevable en la forme ;

donner acte à la société NOAL SCSp que par acte sous seing privé signé le 27 juin 2024 elle a acquis les droits et actions détenues par les sociétés Maximus Bidco I S.à r.l. et Maximus Bidco II S.à r.l. contre les parties défenderesses ;

constater que la présente assignation vaut notification de la cession aux défendeurs conformément à l'article 1690 du Code civil ;

au fond **dire** la demande justifiée ;

Partant,

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à la société NOAL SCSp, en sa qualité de cessionnaire des droits et actions de la société Maximus Bidco I S.à r.l. contre les défendeurs, la somme de **EUR 265.000.000.- (deux cent soixante-cinq millions d'euros)** ou toute autre somme, même supérieure à déterminer à dires d'expert ou à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour préjudice matériel, avec les intérêts légaux à compter du jour de la cession, le 17 octobre 2020, sinon de la présente demande en justice jusqu'à solde ;

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à la société NOAL SCSp, en sa qualité de cessionnaire des droits et actions de la société Maximus Bidco II S.à r.l. contre les défendeurs, la somme de **EUR 8.000.000.- (huit millions d'euros)** ou toute autre somme, même supérieure à déterminer à dires d'expert ou à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour préjudice matériel, avec les intérêts légaux à compter du jour de la cession, le 17 octobre 2020, sinon de la présente demande en justice jusqu'à solde ;

**Donner acte** à NOALSCSp que ces demandes sont basées sur une évaluation provisoire du préjudice qui est effectuée sous toutes réserves et sans reconnaissance préjudiciable aucune ;

**Donner acte** à NOAL SCSp qu'elle se réserve formellement le droit d'augmenter ou de diminuer sa demande en cours d'instance ;

**Donner acte** à NOAL SCSp qu'elle offre, au besoin, d'établir le montant du préjudice accru aux sociétés Maximus Bidco I S.à r.l. et Maximus Bidco II S.à r.l., par voie d'expertise conformément aux articles 461 et suivants du Nouveau Code de Procédure Civile ;

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à la société NOAL SCSp, en sa qualité de cessionnaire des droits et actions des droits et actions des sociétés Maximus Bidco I S.à r.l. et Maximus Bidco II S.à r.l. contre les défendeurs, la somme de **EUR 200.000,00.- (deux cent mille euros)** ou toute autre somme, même supérieure à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour atteinte à l'image et à la réputation des sociétés Maximus Bidco I S.à r.l. et Maximus Bidco II S.à r.l.;

**Donner acte** à NOAL SCSp que les demandes qui précèdent sont basées sur les articles 1382 et suivants du Code civil ;

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer la société OEGH Holdings S.à r.l., la somme de EUR 4.000.000 (quatre millions d'euros) ou toute autre somme, même supérieure à déterminer à dires d'expert ou à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour son préjudice matériel, avec les intérêts légaux à compter de la présente demande en justice jusqu'à solde ;

**Donner acte** à OEGH Holdings S.à r.l. que sa demande est basée sur une évaluation provisoire de son préjudice qui est effectuée sous toutes réserves et sans reconnaissance préjudiciable aucune ;

**Donner acte** à OEGH Holdings S.à r.l. qu'elle se réserve formellement le droit d'augmenter ou de diminuer leur demande en cours d'instance ;

**Donner acte** à OEGH Holdings S.à r.l. qu'elle offre, au besoin, d'établir le montant de son préjudice matériel par voie d'expertise conformément aux articles 461 et suivants du Nouveau Code de Procédure Civile ;

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à chacune des sociétés NOAL Luxco S.à r.l. et OEGH Holdings S.à r.l. la somme de EUR 100.000,00.- (cent mille euros) ou toute autre somme, même supérieure à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour atteinte à leur image et à leur réputation;

**Donner acte** à NOAL Luxco S.à r.l. et à OEGH Holdings S.à r.l. que leurs demandes sont basées sur les articles 1382 et suivants du Code civil ;

**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à la société NOAL SCSp la somme de EUR 10.000.000 (dix millions d'euros) ou toute autre somme, même supérieure à arbitrer *ex aequo et bono* par le Tribunal au titre de son préjudice matériel avec les intérêts légaux à compter de la présente demande en justice jusqu'à solde ;

**Donner acte** à NOAL SCSp qu'elle se réserve formellement le droit d'augmenter ou de diminuer sa demande en cours d'instance ;

**Donner acte** à NOAL SCSp qu'elle offre, au besoin, d'établir le montant de son préjudice par voie d'expertise conformément aux articles 461 et suivants du Nouveau Code de Procédure Civile ;



**Condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer à la société NOAL SCSp la somme de EUR 100.000 (cent mille euros) ou toute autre somme, même supérieure à arbitrer *ex aequo et bono* par le Tribunal à titre de dommages et intérêts pour atteinte à son image et à sa réputation ;

**Donner acte** à NOAL SCSP que ses demandes sont basées sur les articles 1382 et suivants du Code civil ;

**Voir encore condamner** les parties assignées *in solidum*, sinon chacune pour sa part à payer aux parties demanderesses la somme de EUR 50.000 (cinquante mille euros), au titre de l'article 240 du Nouveau Code de procédure civile, pour toutes les sommes que les parties demanderesses doivent débourser, non compris dans les dépens, tels les frais d'avocat et qu'il serait inéquitable de laisser à leur seule charge, compte tenu de l'attitude des parties assignées, ayant conduit au litige ;

**Condamner** les parties assignées aux frais et dépens de l'instance avec distractions au profit de l'avocat à la Cour concluant qui la demande, affirmant en avoir fait l'avance sur base des articles 238 et 239 du Nouveau Code de procédure civile ;

Voir **réserver** aux Demanderesses le droit de produire, outre les pièces énumérées dans le corps de la présente assignation, toutes autres pièces en temps et lieu utiles et suivant qu'il appartiendra ;

Voir **réserver** aux Demanderesses tous autres droits, dus, moyens et actions.

**A L'APPUI DE LA PRESENTE DEMANDE, SONT INVOQUEES LES PIECES SUIVANTES :**

1.    Organigramme avec la structure de détention du groupe OEG/Maxbet ;

2.    « *Second Amended and Restated Investment Advisory and Distribution Agreement*" du 23 octobre 2018;

3.    « *Memorandum of Understanding* » du 27 février 2020 ;

4.    « *Memorandum of Understanding* » du 1er septembre 2020 ;

5.    Note KYC du 8 octobre 2020 signée par Monsieur Stefan KOWSKI;

6.    Résolution du gérant unique d'OEGH Holdings S.à r.l. du 14 ocobre 2020;

7.    Résolution du conseil de gérance de Maximus Topco S.à r.l. du 14 octobre 2020;

8.    Résolution du conseil de gérance de Maximus BidCo 1 S.à r.l. du 14 octobre 2020;

9.    Résolution du conseil de gérance de Maximus BidCo 2 S.à r.l. du 14 octobre 2020;

10.   Lettre de Novalpina Capital LLP du 16 octobre 2020 recommandant l'acquisition de « *Maxbet* » à l'AIFM;

11.   Lettre de l'AIFM du 16 octobre 2020 informant le Fonds de sa décision d'investir dans « *Maxbet* »;

12.   « Share *Purchase Agreement* » du 17 octobre 2020;

13.   Rapport définitif CONTROL RISK  du 16 mars 2020 ;

14.   Rapport original de CONTROL RISK ;

15.   1er Rapport RÖDL & PARTNERS remis le 4 septembre 2020 ;

16.   2e Rapport RÖDL & PARTNERS du 5 octobre 2020 ;

17.   Courrier du 21 mai 2024 du cabinet anglais FIELDFISHER, agissant pour Maxbet Entertainment Group Ltd, au cabinet anglais MCDERMOTT, WILL & EMERY UK

Dont acte et attendu que les parties assignées demeurent au Royaume-Uni, j'ai adressé, deux copies de l'acte avec traduction en langue anglaise, par lettre recommandée avec avis de réception, à l'autorité centrale territorialement compétente :

> *For the attention of the Foreign Process Section*
> *Room E16*
> *Royal Courts of Justice*
> *Strand*
> *LONDON WC2A 2LL*

afin que cet acte soit signifié ou notifié conformément à la Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965, et pour autant que de besoin, j'ai adressé une copie de l'acte avec traduction en langue anglaise, par lettre recommandée avec avis de réception, à ces destinataires.

Et attendu que la partie assignée sub 3) a également une adresse à Monaco, j'ai adressé, deux copies de l'acte par lettre recommandée avec avis de réception, à l'autorité centrale territorialement compétente :

> **Maître Claire NOTARI**
> **Palais Heraclès**
> **17, Boulevard Albert 1er**
> **98000 MONACO**

afin que cet acte soit signifié ou notifié conformément à la Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965, et pour autant que de besoin, j'ai adressé une copie de l'acte, par lettre recommandée avec avis de réception, à ce destinataire.

```
COUT DE L'ACTE
Droit:432,00
Dest.:108,00
Voy. : 10,00
Adres: 28,80
Timb.:216,00
Enreg: 12,00
TVA : 98,40
       ------
TOTAL:905,20

Copie:198,00
TVA  : 33,66
Port :140,00
       ------
TOTAL:1 276,86
```



Huissiers de Justice
Carlos CALVO | Martine LISÉ | Laura GEIGER
Huissier de Justice *Suppléant*
Kelly FERREIRA SIMOES

**CALVO & *ASSOCIÉS***
**HUISSIERS DE JUSTICE**
LUXEMBOURG

L-1461 LUXEMBOURG • 65, rue d'Eich   (Adr. Postale : B.P. 2625 • L-1026 LUXEMBOURG)

307289 / SaPa / **A77965**

## SUMMONS

## Before the District Court of and in Luxembourg
### sitting in civil matters

The year two thousand and twenty-four, on July 1̶9̶

At the request of :

1.  **the limited liability company OEGH Holdings S.à r.l.,** established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered with the Luxembourg Trade and Companies Register under number B 247706, represented by its manager(s) currently in office;

2.  **the limited liability company NOAL Luxco S.à r.l.** (formerly Novalpina Capital Partners I Luxco S.à r.l.), established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered with the Luxembourg Trade and Companies Register under number B.219.319, represented by its managers currently in office;

3.  **Société en commandite spéciale NOAL SCSp,** formerly NOVALPINA CAPITAL PARTNERS I SCSp, established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered in the Luxembourg Trade and Companies Register under number B 217345, represented by its manager, Société à responsabilité limitée Treo NOAL GP S.à r.l., formerly BRG NOAL GP S.à r.l., established and having its registered office at L-2411 LUXEMBOURG, 15, Boulevard F.W. Raiffeisen, registered in the Luxembourg Trade and Companies Register under number B 258060, represented by its Management Board currently in office, or by any other body legally authorised to represent it;

(the Claimants are hereinafter
collectively referred to as ***"the Claimants"***)

with an address for service at **MOLITOR Avocats à la Cour SARL**, a limited liability company, established and having its registered office at L-2763 Luxembourg, 8, rue Sainte-Zithe, registered on list V of the Roll of the Luxembourg Bar, registered with the Registre de Commerce et des Sociétés de Luxembourg under number B211810, which is incorporated and occupied by the Claimants and which is represented for the purposes of the proceedings by **Mr Paulo LOPES DA SILVA**, avocat à la Cour, residing professionally at the same address,

I, the undersigned* ~~Carlos CALVO / Martine LISÉ~~ / **Laura GEIGER**, Court Bailiff, residing at L-1461 LUXEMBOURG, 65, rue d'Eich, registered with the District Court of and in Luxembourg

{* ☐  Christine KOVELTER, bailiff ☐   Kelly FERREIRA SIMOES, substitute bailiff, in place of} *(this paragraph is deemed to be unwritten if it is not ticked)*

gave summons to :

1.  the *limited liability partnership* under English law, **NOVALPINA CAPITAL MANAGEMENT INTERNATIONAL LLP**, established and having its registered office in the United Kingdom, London, SW1H 0RH, Westminster, 1 Brewers Green, 4th Floor The Caxton Building, registered under number OC417109, represented by its statutory or legal representatives currently in office;

2.  the *limited liability partnership* under English law, **NOVALPINA CAPITAL LLP** (*in liquidation*), established and having its registered office in the United Kingdom, London, E14 4HD, Canary Wharf, 15 Westferry Circus, registered under number OC414979, represented by its liquidators currently in office ("*joint liquidators*"), Mr Stephen GODERSKI and Mr Peter HART, both residing professionally at the same address;

3.  to **Mr Stefan KOWSKI**, company director, residing in the United Kingdom, London SW1P 2AJ, 24 Monck Street, Sherbrooke House, Apartment 516, or in Monaco, 98000 Monaco, 15, Boulevard des Moulins, 6e floor, flat 62/63;

(the defendants hereinafter referred to as, the "***Defendants***")

to appear before the District Court of and in Luxembourg, 1ère Chamber, sitting in civil matters, Cité judiciaire, Plateau du Saint-Esprit, Bâtiment du Tribunal d'arrondissement, TL, 0.11, within the statutory time limit of 40 (forty) days, taking into account the time limit for distance granted to the Defendants pursuant to Article 167 of the New Code of Civil Procedure,

with the declaration, in accordance with Articles 79 and 80 of the New Code of Civil Procedure, that if service is made in person and the Defendants do not appear, the judgment to be rendered will be deemed to be contradictory and will not be subject to opposition, for :

## I.    IN FACT

### A)    THE FUND AND ITS SUBSIDIARIES

1.  The special limited partnership NOAL SCSp, formerly NOVALPINA CAPITAL PARTNERS I SCSp (hereinafter the "**Fund**"), the claimant sub 3), was formed in 2017 on the initiative of three founding members, namely Mr Stephen PEEL, Mr Stefan KOWSKI, the respondent sub 3), and Mr Bastian LUEKEN, (hereinafter the "**Founders**") under the terms of a *Limited Partnership Agreement* or "**LPA**" signed on 23 August 2017 and amended four times thereafter.

2.  NOAL SCSp is a *private equity* fund whose purpose is to acquire majority or minority stakes in the capital of unlisted companies. The objective of the investors (the "*limited partners*") is to increase the value of their investment in order to realise capital gains over time through the resale of these holdings.

3.  The current *Limited* Partners of the Fund are institutional investors or private individuals (hereinafter the **"Investors"**) who have together made *commitments* in the Fund totalling approximately one billion euros. The Investors include state pension funds that have invested on behalf of employees, notably in the United States (for example, the *Oregon Public Employees Retirement Fund*) and in the United Kingdom (for example, the *South Yorkshire Pensions Authority*).

4.  Until 27 August 2021, the Fund was managed by NOVALPINA CAPITAL PARTNERS GP S.à r.l. (**"Novalpina GP"**) as managing general partner. Since 27 August 2021, Treo NOAL GP S.à r.l., formerly BRG NOAL GP S.à r.l. (hereinafter **"Treo NOAL"**), has assumed the role of Fund Manager.

5.  The Fund has entrusted the management of its assets to an alternative investment fund manager, LIS SANNE S.A., formerly Luxembourg INVESTMENT SOLUTIONS S.A. (hereinafter the **"AIFM"**).

6.  As mentioned above, the main objective of a *private equity* fund is to invest in unlisted companies in order to take control of them and increase their value with a view to resale.

7.  In this context, the Fund has set up a number of subsidiaries through which it has made investments in various sectors of activity.

8.  At the top of its holding structure is a limited liability company called NOAL Luxco S.à r.l. (hereinafter **"Master Luxco"**), the claimant sub 2). This is the *soparfi* through which the Fund controls the vast majority of the group's subsidiaries.

9.  Master Luxco currently indirectly owns a constellation of companies (the **"Portfolio Companies"**) which operate in several countries.

10. The Portfolio Companies include Maximus Bidco I S.à r.l. (hereinafter **"Bidco 1"**) and Maximus Bidco II S.à r.l. (hereinafter **"Bidco 2"**).

11. The Fund's investments include the gaming and betting sector. Some of the Portfolio Companies operating in this sector are owned by the sub-holding company OEGH HOLDINGS S.à r.l. (hereinafter **"OEGH"**), the claimant under 1)[1] .

12. OEGH holds, among others, 100% of the shares of Maximus Topco S.a.r,l (**"Topco"**). Topco owns 100% of Maximus Holdco I S.à r.l., which in turn owns 100% of Bidco 1. OEGH also holds 100% of the shares of Maximus Holdco II S.à.r.l., which holds the entire share capital of Bidco 2.

13. By private deed signed on June 27, 2024, Bidco 1 and Bidco 2 assigned to the Fund the rights and actions they hold against the Defendants in connection with the facts to be set out below. These rights and actions include their respective claims for damages against the Defendants as detailed in this assignment. The Fund therefore intends to assert these claims in this writ in its capacity as assignee. It should be noted that the assignment does not involve any financial consideration for Bidco 1 and Bidco 2 as it forms part of a broader transaction that benefits both companies.

14. Service of this summons on the Defendants shall, in accordance with case law, constitute notification of the assignment within the meaning of Article 1690 of the Civil Code.

---

[1]    Exhibit n°1 from MOLITOR

15.    The expression *"the Claimants"* used below refers not only to the Claimants sub 1) to 3) *stricto sensu*, but also to Bidco 1 and Bidco 2 as the initial holders of the claims for damages assigned to the Fund.

## B)    INVESTMENT ADVISORY AGREEMENT

16.    On 15 November 2017, Novalpina GP and the AIFM entered into an investment advisory agreement governed by Luxembourg law with NOVALPINA CAPITAL MANAGEMENT INTERNATIONAL LLP (hereinafter **"Novalpina International"**), the defendant sub 1), NOVALPINA CAPITAL LLP (hereinafter **"Novalpina UK"** and together with Novalpina International, the **"Investment Advisors"**), the defendant sub 2). The latest version of the Agreement is dated 23 October 2018 (hereinafter the **"Agreement"**)[2] .

17.    Under the terms of this agreement, the *Investment Advisors* have undertaken to provide Novalpina GP, in its capacity as managing general partner of the Fund, and the AIFM with a number of services, including the identification, evaluation and recommendation of potential investments or investment opportunities for the Fund and the negotiation and preparation of documentation relating to the recommended investments.

18.    The Founders were both partners and members of the *Investment Advisors'* management committee. Each Founder had the right to veto any decision taken by the *Investment Advisors.* Although in principle the three Founders had the same prerogatives within the *Investment Advisors,* in practice it was Mr Stefan KOWSKI who was the driving force behind the acquisition of certain Fund assets, including *Maxbet*.

## C)    THE ACQUISITION OF MAXBET

19.    Pursuant to the Agreement, the *Investment Advisors* have, in the course of 2019, without prejudice as to the exact date, identified an investment opportunity in the gaming sector in Romania and Malta.

20.    The potential investment involved the acquisition of a gambling business operating through land-based gaming outlets (Romania) or offering its services online (Malta) under the trade name *"Maxbet"*. The *land-based business* was presented as being owned by the Cypriot companies Maxbet Entertainment Group Ltd (**"MBEG"**) and Toptunes Ltd of which Mr Vladimir SADOVSKII (**"SADOVSKII"**) was the beneficial owner. The online gaming and betting business was presented as being directly owned and controlled by Mr SADOVSKII.

21.    It is important to note that the gambling sector is a sensitive activity from the point of view of the fight against money laundering and terrorist financing[3] .

22.    As businesses operating in the gambling sector are subject to strict regulation, this type of asset must be carefully considered as part of any *due diligence* process as it is exposed to a variety of commercial, regulatory and reputational risks relating to the possibility that it may be associated with or otherwise compromised by criminal activity, including money laundering.

---

[2]    Exhibit n°2 from MOLITOR

[3]    In Luxembourg, providers of gambling services are subject to the amended law of 12 November 2008 on the fight against money laundering and terrorist financing.

23. Only operators holding a licence issued by the competent authorities are allowed to carry out gambling activities. Any uncertainty as to the identity of the UBO communicated to the licensing authorities would lead to a considerable risk of loss of these operating licences which, in turn, could result in a total loss for investors.

24. As a result, and given the illiquid nature of the proposed investment[4] , it was essential for the *Investment Advisors* to carry out appropriate, rigorous and thorough *due diligence* prior to any investment proposal. They also had to ensure that complete, reliable and appropriate information was provided both to the AIFM and to the managers and management boards of the acquiring companies (and to any other NOAL group entity involved in the sale, which *ultimately* included the Fund and Master Luxco).

25. On the buyer's side, the *Investment Advisors*, led by Stefan KOWSKI, were responsible for the negotiation, *due diligence* and preparation of the transaction documentation.

26. The *Investment Advisors were* both involved in the acquisition process, as demonstrated by the transaction documentation. It was Mr Stefan KOWSKI who personally took the lead and responsibility for the negotiation process and for the process that led to favourable recommendations being submitted, with supporting documentation, to the AIFM and to the management bodies of the acquiring parties, i.e. Bidco 1 and Bidco 2, through their entire holding chain.

27. On the seller's side, the sale was negotiated by Mr Maxim PASIK, a consultant to MBEG (and, as the Claimants understand it, a business associate of SADOVSKII).

28. On 27 February 2020, a *Memorandum of Understanding* ("**MoU**") was signed between MBEG and Novalpina International[5] . On 1 September 2020[6] , a second MoU was signed between MBEG and Novalpina International. Mr KOWSKI signed both MoUs in his capacity as *"Member of the Management Committee"*.

29. Finally, after preparing and negotiating the transaction, Novalpina UK sent a letter to the AIFM on 16 October 2020[7] recommending that the Fund acquire *Maxbet* and confirming that the documentation, including the *due diligence* reports, was in order. The letter from Novalpina UK was signed by Stefan KOWSKI.

30. Two days earlier, on 14 October 2020, the acquisition had been pre-approved by the respective managers of Topco, OEGH, Bidco and Bidco 2[8] in the presence of Novalpina UK on the basis of misleading and incomplete information. This point will be developed in greater detail below.

31. A *Share Purchase Agreement* ("**SPA**")[9] governed by English law was entered into on the following day, 17 October 2020, between Bidco 1 and Bidco 2 as purchasers and MBEG, Toptunes Ltd and SADOVKII as sellers.

---

[4]     Article 12.2 of *Schedule* 1 of the Agreement stipulates that when the Fund invests in assets with limited liquidity, the *Investment Advisors undertake to* conduct *"high standard financial, legal and tax due diligence for each transaction recommended to the Client and/or the General Partner as applicable, keep all due diligence material and reports, and provide them proactively or upon request to the Client and/or the General Partner as applicable".*

[5]     Exhibit n°3 from MOLITOR

[6]     Exhibit n°4 from MOLITOR

[7]     Exhibit n°6 from MOLITOR

[8]     Exhibits n°6 to 9 from MOLITOR

[9]     Exhibit n°10 from MOLITOR

32.  The total nominal purchase price for the terrestrial and online businesses was EUR 273 million. The nominal amount of EUR 147 million *("Deferred LB Purchase Price Claim")* was to be the subject of a deferred payment by way of a vendor loan. An additional deferred payment was subsequently agreed for the nominal amount of EUR 25 million (*"Additional Deferred LB Purchase Price Claim"*).

     The *Deferred LB Purchase Price Claim* and *the Additional Deferred LB Purchase Price Claim* have been guaranteed by OEGH, through the grant of a pledge to MBEG dated 4 August 2021 over its shares in Topco (**the "Pledge"**).

33.  The remainder of the acquisition was financed by a third-party loan of EUR 50 million and a capital injection of EUR 75 million by the Fund following a call for funds from its Investors.

34.  The acquisition *closed on* 1$^{er}$ April 2021.


D)  **DECEPTION THROUGH THE DELIBERATE CONCEALMENT OF KEY DOCUMENTS**


35.  By way of introduction, it should be noted that article 10.1.4. of the SPA stipulated that :

     *"(...) the Online Business Seller*[10] *is the Ultimate Beneficial Owner of the Target Group Entities*[11] *and he does not hold his (direct and indirect) ownership in any of the Target Group Entities as trustee for any Person or otherwise on behalf of and/or for the account for any Person".*

36.  This clause was of crucial importance to the Claimants who could legitimately assume (but only because of the Defendants' deliberate and culpable withholding of information discussed below) that there was no serious information to suggest or suggest that there could be any doubt as to the identity of the beneficial owner of *"Maxbet"* (hereinafter the **"UBO"**).

37.  After taking up her duties as the Fund's new manager, Treo NOAL endeavoured to bring order to the numerous files relating to the Fund's investments and launched investigations into the affairs of the various Portfolio Companies and the behaviour of the Founders, in particular Mr Stefan KOWSKI and Mr Bastian LUEKEN.

38.  In the course of its investigations, Treo NOAL discovered that certain important documents (**the "Key Documents"**) had been obtained by or made available to the Defendants as part of their *due diligence* and KYC process. The Key Documents, or at least a summary of their contents, should have been disclosed to the Claimants.

39.  The Key Documents indicated that there was a real and serious possibility that the UBO of *"Maxbet"* was not Mr SADOVSKII by focusing on a certain Mikhael MIRILASHVILI (hereinafter **"MIRILASHVILI"**), an Israeli-Georgian businessman.

---

[10]  Defined in the SPA as SADOVSKII
[11]  These are the companies sold

40. The revelation (irrespective of the truth of the underlying facts) that there was a real and serious possibility that Mr SADOVSKII was not the true UBO should necessarily have been considered a very high risk factor for the investment. The Defendants must have realised that in order to ensure the successful completion and *closing of* the acquisition, it was essential that the Key Documents (and the information they contained) were kept from the Claimants as well as from other interested parties (banks, lenders, regulators etc). Otherwise, they would not have accepted (and the Defendants knew) the recommendation to proceed with the acquisition or they would have been unable to do so. For example, it would have been impossible to obtain third party financing since any doubt as to the identity of UBO would have constituted a major impediment to the granting of the credit necessary to finance the acquisition.

41. The Key Documents comprise two reports commissioned by the *Investment Advisors* and Mr Stefan KOWSKI, namely a first version of a report dated 16 March 2020 issued by CONTROL RISK[12] ("**the Original CONTROL RISK Report**") and a report issued by RÖDL & PARTNER on 4 September 2020[13] ("**the First RÖDL Report**").

42. These reports, individually and collectively, revealed close links between Mr Mirilashvili and *Maxbet* and raised the real and serious possibility that Mr Sadovskii was not the real UBO.

43. The report dated 16 March 2020 drawn up by CONTROL RISK referred to links between Mr Mirilashvili and Mr Boris Spektor, who was identified as one of the shareholders of the seller companies[14] .

44. However, Treo NOAL discovered that there was an earlier version[15] of the CONTROL RISK report containing some thirty references to Mr MIRILASHVILI. His name was associated not only with Mr SPEKTOR but also with other *Maxbet* shareholders. The final version of the report has been amended to remove all but one reference to Mr Mirilashvili. The Original CONTROL RISK Report was not disclosed to the Claimants and no reference was ever made to any part of its contents. This was clearly a deliberate non-disclosure, if not a deliberate concealment, in order to secure the completion of the transaction. It does not matter whether the deleted content was accurate or not. All the information in the Original CONTROL RISK Report should have been disclosed.

45. Mr Mirilashvili's name also appeared in another report, the First RÖDL Report.

46. The First RÖDL Report directly challenged Mr SADOVSKII's status as a UBO. The author of the report described Mr SADOVSKII as a *"straw man" in the* following terms:

*"In the opinion of the analysts actually the shareholding in the company is owned not by V.G. Sadovskiy, but by M.M. Mirilashvili (based on an arrangement between the two), Sadovskiy himself is neither a director nor a shareholder in any of the Russian companies. Moreover Mr. Sadovskiy didn't travel outside of Russia last 12 months"[16] .*

47. The First RÖDL Report also stated that :

---

[12]  Exhibit n°14 from MOLITOR
[13]  Exhibit n°15 from MOLITOR
[14]  Exhibit n°13 from MOLITOR
[15]  Exhibit n°14 from MOLITOR
[16]  Exhibit n°14 from MOLITOR

*"Mikhail Mikhailovich Mirilashvili could be a UBO of the Group of Companies. He is a Russian businessman, owned St. Petersburg's biggest network of casinos ("Conti") as well as the hotels "St. Petersburg", "Olgino", "Oktyabrskaya" and "Pribaltiyskaya", is involved into the local business of "LUKoil", "Rosgosstrakh" and "Media-Most", head of "Russkoye Video", president of ZAO "Gruppa Conti", member of the executive committee of the Russian Jewish Congress".*

48.     Irrespective of the question of the accuracy of its contents, the First RÖDL Report should have been taken extremely seriously by the *Investment Advisors*. It would have been crucial for them to disclose it in full to the IAMF and the Claimants so that they could have examined it, or at least to draw their attention to its contents, whether in summary form or otherwise. This was not done. As with the Original CONTROL RISK Report, this was clearly a deliberate act of concealment and non-disclosure. Indeed, the *Investment Advisors*, led by Stefan KOWSKI, chose not to disclose the First RÖDL Report (and the salient information it contained) in order not to jeopardise the transaction.

49.     Moreover, instead of asking RÖDL & PARTNER to carry out more in-depth research, they considerably limited the scope of its investigations by instructing it to focus solely on the relationship between Mr Boris SPEKTOR and Mr Yevgeny PRIGOZHIN.

50.     RÖDL & PARTNER therefore issued a second report on this matter dated 5 October 2020[17] . As for the first report, it was, as indicated, deliberately concealed by the Defendants.

51.     This attitude is all the more unforgivable given that the Claimants have learned, and this was confirmed to them in writing by MBEG's advisors, the English law firm FIELDFISHER, dated 21 May 2024[18] , that MBEG had expressly indicated to Mr Stefan KOWSKI and Mr Kristjan PIILMANN, who worked for the *Investment Advisors*, in WhatsApp messages exchanged on 8, 9 and 10 October 2020, that Mr MIRILASHVILI had indirectly held the majority of MBEG's share capital before Mr SADOVSKII.

52.     The FIELDFISHER letter states:

*"(...) Maxim Pasik, acting at all times on the instructions of Maxbet and as its agent, disclosed to both Mr Kowski and Kristjan Piilmann, who led the commercial negotiations on behalf of the buyer group and through their questioning appeared to be responsible for the diligence into the prior ownership of Maxbet, that Mikhael Mirilashvili was the indirect owner of the majority of the shares of Maxbet prior to Mr Sadovskii".*

53.     The Defendants knew that the Claimants would rely exclusively on the information provided to them by the Defendants and that the Defendants would reasonably assume that the information provided to them was complete in all material respects - particularly as the Claimants were completely unaware that there was any question as to the true identity of the UBO of *"Maxbet"*. The Defendants also knew that if any of the Key Documents (or any reference to the information contained therein) had been provided to the Claimants (as should have been the case), the acquisition would not have taken place. They therefore deliberately, knowingly and dishonestly concealed the Key Documents and the information contained therein so as not to jeopardise the transaction.

---

[17]     Exhibit n°15 from MOLITOR
[18]     Exhibit n°17 from MOLITOR

54. The Claimants (all of whom played a critical role in the acquisition) were therefore deceived (as a result of the concealment). They were led to believe that there was no doubt about the ownership of *"Maxbet", let alone that there was* any real or serious possibility that the UBO of *"Maxbet"* was not Mr SADOVSKII.

55. The issue in this case is not whether or not Mr Mirilashvili was the true UBO of *Maxbet*, and the Claimants are not asking the Court to rule on this point. What must be remembered is that the Key Documents revealed a serious doubt about the UBO which, instead of being brought to the attention of the Claimants so that they could incorporate this information into their decision-making process, was concealed from them.

56. Mr SADOVSKII was presented in an affirmative manner as being the UBO of *"Maxbet"* to the regulatory authorities. The fact that a doubt may have been raised in this respect means that the regulatory authorities may have received false information.

57. As the Claimants have indicated above, *"Maxbet"* operates in a highly regulated sector. Only operators with licences issued by the competent authorities are allowed to operate gambling activities. If uncertainties were to arise as to the identity of the UBO of a gambling operator, it would run a considerable risk of losing its operating licences.

58. If the Claimants had received the Original CONTROL RISK Report or the First RÖDL Report, or if they had been informed (whether in summary form or otherwise) of the contents of these reports :

    (i)    neither the Fund nor Master Luxco would ever have approved the sale;

    (ii)   OEGH would also not have approved the sale or granted the Pledge and

    (iii)  Bidco 1 or Bidco 2 would not have agreed to acquire the *Maxbet* business.

59. Bidco 1 and Bidco 2 have therefore suffered a loss, the amount of which could potentially amount to the price stipulated in the SPA (which, according to the Claimants, was significantly higher than the value of the Maxbet business). The exact amount of this loss, which has already been established, remains to be determined.

60. To this must be added transaction costs, such as the various audit, *due diligence* and investigation reports paid directly and indirectly by the Fund, estimated at EUR 10 million.

61. In addition, OEGH has suffered material damage provisionally assessed at EUR 4,000,000 resulting from the costs, including lawyers' fees, that it has had to incur in order to thwart an attempt to enforce the Pledge.

62. Finally, the Claimants have each suffered moral prejudice assessed without prejudice at the sum of EUR 100,000 resulting from damage to their reputation due to the revelations contained in the Key Documents. In the eyes of third parties, including the business relations of the Claimants, including banks, who were or will be aware of the seriously flawed nature of the *due diligence* and KYC process that led to the acquisition of *Maxbet*, the image of the Claimants has been and will be severely damaged. The Claimants will no longer be perceived by certain players as rigorous and reliable partners.

63. In this action, the Claimants seek to hold the Defendants liable in tort for the damage caused to them by their acts of concealment.

## II.    IN LAW

64.    This action is based on the tort liability of the Defendants (C).

65.    The Luxembourg courts have territorial jurisdiction to hear this claim (A), which must unquestionably be governed by Luxembourg law (B).

### A)    TERRITORIAL JURISDICTION

66.    As the United Kingdom is no longer a member of the European Union, the international jurisdiction of the Luxembourg courts to hear disputes involving defendants established in the United Kingdom is now determined by virtue of the ordinary rules of Luxembourg private international law.

67.    Article 14 of the Civil Code states that :

*"A foreigner, even one not resident in Luxembourg, may be summoned before the Luxembourg courts for the performance of obligations contracted by him in Luxembourg with a Luxembourg national; he may be brought before the Luxembourg courts for obligations contracted by him in a foreign country with Luxembourg nationals".*

68.    This provision also benefits Luxembourg companies[19] .

69.    According to the case law, the privilege of jurisdiction instituted by article 14 of the Civil Code extends to all obligations, whatever their origin, thus covering not only contractual obligations, but also quasi-delictual, patrimonial, extra-patrimonial[20] and tortious[21] obligations.

70.    The jurisdiction of the Luxembourg courts is therefore established pursuant to Article 14 of the Civil Code.

71.    In the alternative, their jurisdiction is acquired by virtue of the fact that the harmful events which constitute the cause of the present action occurred in Luxembourg.

72.    As will be explained in greater detail below, this claim is based on the Defendants' liability in tort within the meaning of Articles 1382 and 1383 of the Civil Code.

73.    In the absence of applicable international conventions, the *"principle is that, at international level, the competent court is generally determined in accordance with the same rules as those defining territorial jurisdiction in domestic law"[22]* .

---

[19]    Court 29 May 1925, Pas. 11, p.352
[20]    Court 21 November 2000, Pas. 31, p.480
[21]    Court 5 February 1897, Pas. 4, p.330
[22]    Court 21 November 2000, Pas. 31, p.480

74. Under article 42 of the New Code of Civil Procedure, *"in matters of compensation for damage caused by a tort, delict or quasi-delict"*, as in this case, *"the claim may be brought, at the option of the plaintiff, either before the court of the place where the defendant is domiciled, or before the court of the place where the harmful event occurred"*.

75. In the present case, the harmful event occurred at the Claimants' head office since it was there that they were deceived by the Defendants and that, being deprived of information calling into question the identity of the UBO of *"Maxbet"*, they took the decision to proceed with the acquisition of *"Maxbet"*.

76. The Luxembourg Courts therefore have jurisdiction in any event to rule on this claim.

## B) APPLICABLE LAW

77. It is settled case law that it is the law of the place where the unlawful act causing damage occurred that governs the conditions of civil liability and the method and extent of the compensation to which the victim is entitled[23] .

## C) AS TO THE MERITS OF THE REQUEST

78. It is a fact that the Claimants did not have a contractual relationship with the Defendants at the material time, as they did not sign the Agreement with the *Investment Advisors*.

79. However, the Defendants are clearly liable *in* tort *in solidum* (3) insofar as they have committed a fault (1) which caused individual damage to each of the Claimants (2).

## 1. Tort and delict

80. Under the terms of Article 1382 of the Civil Code :

*"Any act whatsoever by man which causes damage to another person obliges the person through whose fault it occurred to make reparation for it"*.

81. It is universally accepted that the application of article 1382 of the Civil Code requires proof of fault.

82. Both the *Investment Advisors* (1.1.) and Mr Stefan KOWSKI personally (1.2.) have committed faults for which they are *jointly and severally* liable to each of the Claimants.

### 1.1. *The investment advisors' misconduct*

---

[23]    Lux, 6 April 1965, Pas. 19, p.549

83.    As can be seen from the facts, the *Investment Advisors* each worked on the transaction within the framework of the Agreement. Although the decision to recommend the investment to the AIFM and consequently to the Claimants was signed by Mr Stefan KOWSKI on behalf of Novalpina UK[24] , Novalpina International was also actively involved in the preparation of the transaction, in particular by signing the MoUs that preceded the acquisition.

84.    Mr KOWSKI also signed a KYC note on behalf of Novalpina International on 8 October 2020[25] , in which he certified that *"no material issues have been raised concerning the* UBO". This note refers only to the watered-down version of the CONTROL RISK report and the second report by RÖDL & PARTNER. Mr KOWSKI is careful not to point out in his note that there was a first version of the CONTROL RISK report and that RÖDL & PARTNER had been entrusted with an initial assignment that was much more extensive than the second, which had given rise to *"red flags"*.

85.    Under the terms of the Agreement, *the Investment Advisors* were contractually obliged to Novalpina GP and the AIFM to carry out a prudent and diligent audit in relation to the ownership structure of *Maxbet* and the identity of its UBO and to make their recommendations on a full and fair basis, having disclosed to the Claimants all information likely to have a material impact on their decision to invest (whether or not that information was in fact accurate).

86.    This obligation also derives from article 1134 paragraph 3 of the Civil Code, which states that agreements must be performed in good faith. It is settled case law that the duty to perform agreements in good faith implies a duty of loyalty between the parties[26] .

87.    By virtue of their duty of loyalty, the *Investment Advisors* should have passed on to their co-contractors all the information of which they were aware and which could have had a major impact on the decision of the AIFM and the Claimants to invest (or not) in *Maxbet.*

88.    The attitude of the *Investment Advisors* goes far beyond simple negligence. It clearly amounts to fraud.

89.    According to the doctrine :

*"Fraud is a conscious failure to perform, without the debtor necessarily having intended to do harm or being aware of the damage resulting from his attitude. It does not matter that the damage was not intended; it is sufficient that, deliberately, the debtor tries to avoid his obligations, or takes the risk of the harmful consequences that his action or inaction may cause to his contracting party. In this way, he shows himself to be acting in bad faith, dishonestly, but without necessarily having been malicious; fraud is, as it were, the reverse side of the good faith that should prevail between contracting parties"[27] .*

90.    In this case, the *Investment Advisors did* not simply commit a fault of omission, they deliberately ensured that the Original CONTROL RISK Report and the First RÖDL Report were kept secret from the AIFM and the Claimants.

91.    Even though the Claimants are not parties to the Convention, the most recent Luxembourg case law accepts that third parties may rely on a breach of contract in tort.

---

[24]    Exhibit n°10 from MOLITOR
[25]    Exhibit n°5 from MOLITOR
[26]    See in particular Court 2 July 2020, Pas. 40, p.59; Lux. 12 July 2021, Pas.40, p.562
[27]    Georges RAVARANI, *"La responsabilité civile des personnes privées et publiques"*, Pasicrisie luxembourgeoise, 3ᵉ ed., 2014, n°723, p.746

92. According to a judgment of the Tribunal d'arrondissement de Luxembourg of 22 February 2019[28] :

*"It is now accepted that "a third party to a contract may invoke a breach of contract on the basis of delictual liability if that breach has caused him damage" (Cass. ass. plén, 6 October 2006, no. jurisdata 2006-035298; Cass. 1st civ. 15 May 2007, no. jurisdata 2007-038866; Cass. 2nd civ. 10 May 2007, no. jurisdata 2007-038801; Cass. com. 6 March 2007, no. jurisdata 2007-037930; Cass. com. 21 October 2008, no. jurisdata 2008-045511).*

*This case law, which was taken up by Luxembourg case law, established the uniformity of contractual and tortious faults (Court of Appeal, 9 October 2008, no. 32596 and 32680 of the roll; Court of Appeal, 25 October 2017, no. 40026 of the roll)".*

93. Luxembourg case law is even more open to the possibility of a third party relying on the non-performance of a contract to which he was not a party, where the unperformed obligation was of direct interest to that third party[29] .

94. It cannot be disputed that the performance of the *Investment Advisors*' obligations under the Agreement was of direct interest to the Fund and its subsidiaries, including Master Luxco, OEGH, Bidco 1 and Bidco 2, since the Agreement related precisely to the investments to be made by the Fund via its manager and its AIFM. The Agreement was unquestionably entered into in their interests.

95. It is also interesting to note that representatives of Novalpina UK attended the meetings at which the management bodies of OEGH, Topco, Bidco 1 and Bidco 2 adopted the resolutions approving the acquisition[30] . It is clear from the written resolutions of the sole manager of OEGH and the minutes of the meetings of the management boards of Topco, Bidco 1 and Bidco 2 on 14 October 2020 that Kristjan PIILMANN, who was a member of the *Advisory Committee* of the *Investment Advisors*, intervened to provide information to the managers of the companies called upon to vote on the acquisition.

96. It must therefore be held that the breach of the Convention constitutes a tort or delict for which the *Investment Advisors* of each of the Claimants are liable.

97. Assuming that the deliberate breach of the Convention is not sufficient to constitute a tort against the Claimants, it would then be appropriate to hold that the *Investment Advisors* committed a tort by not acting as a prudent person.

98. According to the doctrine :

*"The concept of fault goes far beyond that of illegality. In addition to obligations to behave in a certain way in situations defined in advance by law, there is a general duty of prudence and diligence requiring all persons, in all circumstances, to behave in such a way as not to cause damage to others. What is essential in assessing any conduct is respect for the legitimate interests of others"[31] .*

---

[28] Lux. 22 February 2019, nos. 131 499 and 187 540 of the roll; cf. in the same sense and more recently: Court 31 May 2022, Pas. 41, p.175

[29] Cf. Court of Justice, 24 May 2006, nos. 30212 and 30446 of the roll: this case concerned the breach of an obligation to obtain information about the presence of underground cables; according to the Court, this obligation was of *"primary"* interest to third parties *"since its object was the safety of all"*.

[30] Exhibits n°6 to 9 from MOLITOR

[31] Georges Ravarani, *op.cit.* n°62, p.67

99.  Fault is assessed *"in abstracto, objectively, that is to say in relation to an abstract reference model, namely the normally diligent, prudent and well-informed man, the good father of the family"[32]* .

100.  According to the same author:

*"To assess compliance with the general duty of prudence and diligence, judges observe the usual practices of men, looking for the customs in force in each activity. In this context, custom, equity and even morality seem to have a normative role to play. We will refer to the usual conduct of those who find themselves in a situation similar to that of the agent"[33]* .

101.  In this context, case law tends to consider that there exists, in certain situations and even outside any contract, a general duty of good faith which imposes information obligations on certain parties[34].

102.  In this case, the *Investment Advisors* undoubtedly owed a duty of good faith to the Claimants, which required them to disclose to them any information that could materially affect their decision in relation to the acquisition.

103.  The *Investment Advisors did* not behave as an ordinarily prudent and diligent person in the same circumstances would have done. The Defendants deliberately concealed the warning signs contained in the Key Documents of which they were aware concerning the fact that Mr MIRILASHVILI could possibly be the true UBO of *"Maxbet"*. Their attitude was therefore not one of simple negligence, but of deliberate deception.

104.  Here again, the *Investment Advisors behaved* fraudulently by concealing the contents of the Key Documents.

105.  In the alternative, it is accepted that a tort or delict may also result from a breach of a rule of positive law such as a statute or regulation.

106.  From an author :

*"Proof of fault is easy to establish when it manifests itself in the non-observance of a specific norm imposing on individuals a defined behaviour in the situations for which it provides. One can then speak of "illicit" behaviour"[35]* .

107.  In the present case, Novalpina UK and Novalpina International were not only obliged under the Agreement to collect complete and reliable information on the UBO of *"Maxbet" in* order to communicate it to the AIFM and the Claimants without seeking to conceal any embarrassing information, but they were also obliged to do so in view of the legal obligation on all professionals within the meaning of the amended law of 12 November 2008 on the fight against money laundering and terrorist financing ("AML **Law**"), including foreign professionals, involved in the transaction.

108.  The AML requires all professionals subject to it to carry out a risk assessment in relation to the transaction in which they are involved. In the case of a sale, this involves not only gathering information about the seller, but also documentary evidence about the beneficial owner.

---

[32]  Georges Ravarani, *op.cit, loc.cit.*
[33]  Georges Ravarani, *op.cit.* n°63, p.67
[34]  Pascal ANCEL, *"Contrats et obligations conventionnelles en droit luxembourgeois- Approche comparative",* Larcier, 2015, n°474, p.554
[35]  Georges Ravarani, *op.cit.* n°62, p.67

109. Even though the Key Documents raised questions about the identity of *Maxbet*'s UBO, the *Investment Advisors*, instead of carrying out more in-depth investigations in accordance with the mandatory provisions of the AML Law, deliberately chose to ignore these red flags and to conceal the information contained in these documents from the AIFM and the Claimants.

110. The Defendants were well aware that the documentation and reports that they had prepared, caused to be prepared or contributed to prepare in connection with the acquisition (including the Key Documents) had to be submitted, if not in full, at least in summary form, to the decision-making bodies of the Fund and to the managers of Master Luxco, OEGH, Bidco 1 and Bidco 2 in order to enable them to decide whether or not to proceed with the acquisition of *"Maxbet"*.

111. Consequently, none of the Defendants could have been unaware that if the First RÖDL Report or the Original CONTROL RISK Report had been disclosed, or if their contents had been referenced or summarised, the transaction would have been compromised and would not have taken place.

112. As noted above, the acquisition was formally pursuant to a recommendation by Novalpina UK to the AIFM, but it appears from the transaction documentation that Novalpina International was closely involved in the transaction as it signed a number of documents, including the MoUs. The Defendants, who were desperate to complete the sale, knowingly concealed information in their possession, principally the Key Documents, in order to complete the transaction. The two *Investment Advisors* worked hand in hand to complete this transaction and bear equal responsibility for the harm caused to the Claimants.

113. The result of this work carried out collectively by the Defendants was submitted to Novalpina GP who took the decision to invest EUR 75 million on behalf of the Fund and to the managers of Master Luxco, OEGH, Bidco 1 and Bidco 2 who took the decision to acquire *"Maxbet"* or to guarantee the transaction (OEGH).

114. By breaching their legal obligations, the *Investment Advisors* committed a fault which rendered them *jointly and severally* liable to the Claimants in tort.

## 1.2.   Stefan KOWSKI's misconduct

115. As the Claimants have indicated above, Mr KOWSKI played a key role in the transaction as he personally acted on behalf of both Novalpina UK and Novalpina International, which he managed and represented throughout the transaction. In particular, he signed the two MoUs with MBEG and the letter recommending the investment in *Maxbet* to the AIFM.

116. He also personally signed, on behalf of Novalpina International, but on Novalpina UK letterhead, a KYC note dated 8 October 2020[36] .

117. In this letter he deliberately concealed the existence of the First RÖDL Report. Only the second report drawn up by RÖDL & PARTNER is mentioned. This letter was clearly drawn up in order to deceive the Claimants' vigilance, whereas Mr Stefan KOWSKI was aware of the Key Documents and it was on his initiative that they were modified and/or concealed.

118. All of the misconduct and acts of concealment committed by Novalpina UK and Novalpina International described above were committed through its intermediary.

---

[36]   Part n°5 de MOLITOR

119. These acts are therefore personally attributable to Mr Stefan KOWSKI, who cannot avoid personal liability on the basis of articles 1382 and 1383 of the Civil Code by claiming that he only acted in the name and on behalf of the *Investment Advisors*.

120. On the one hand, case law continues to accept that the organs of a company can be held liable under the terms of article 1382 of the Civil Code in the same way as the company they represent.

121. It has therefore been decided that :

*"The fault that may be attributed to them in this context consists of a failure to comply with behaviour that is binding on everyone, namely a failure to comply with the duties of loyalty, prudence, diligence and competence (...). This action exists alongside the action that third parties may have against the company itself, the principle being that the liability of the company and that of the corporate body coexist in the event of a tort"*[37] .

122. On the other hand, even if the courts are sometimes reluctant to hold company directors liable in tort when they have acted within the scope of their duties, they nevertheless admit that such liability may be incurred in the event of *"a breach of a general duty of care of a certain seriousness or at least wilfully and consciously and damage distinct from that resulting from the improper performance of that duty"* (L.BIHAIN, *Responsabilité des dirigeants de sociétés à l'égard des tiers, J.T. belge, 2006, p.421 f.*). This is the case *"when the director intentionally commits a particularly serious fault that is incompatible with the normal exercise of the company's functions"*[38] .

123. In this case, it cannot be seriously contested that Mr Stefan KOWSKI committed a serious error consisting in the deliberate concealment of information that could have had an impact on a major transaction.

124. He also breached the AML Act, which also applies to employees and representatives of professionals who are subject to it.

## 2.     The damage

125. According to case law, *"the victim of damage has the right to demand that the person responsible restore the victim to the state in which he or she would have been had the damage not occurred"*[39] .

126. Moreover, *"the damage resulting from a fault, whatever it may be, must be made good by the author of the fault and this reparation must be total"*[40] .

### 2.1.     *The damage suffered by Bidco 1 and Bidco 2 and claimed by the Fund in its capacity as assignee of their claims for damages*

127. Bidco 1 and Bidco 2 suffered material loss because they made a high-risk investment in a gambling business.

---

[37]     Lux.25 February 2025, pas. 37, p.627
[38]     Court no. 43056 of 31 January 2018
[39]     Lux. 21 March 1956, Pas.16, p.540
[40]     Court 4 January 2012, Pas. 35, p.848

128. Bidco 1 and Bidco 2 would never have invested in *"Maxbet"* if the Key Documents (or the information contained therein) had been disclosed to them (in other words, if they had not been misled as to the fact that there was a real and serious possibility that UBO was not Mr SADOVSKII).

129. The loss suffered by Bidco 1 and Bidco 2 is now certain in principle, since *Maxbet* has incurred pure losses in the acquisition, such as the costs associated with the First RÖDL Report, and it now appears that it will not be able to recover all or part of the nominal price stipulated in the SPA.

130. However, the definitive amount of Bidco 1 and Bidco 2's loss can only be determined at the time of resale, if any, of the investment (which is not intended to remain in the Fund's portfolio, which, it should be remembered, is a *private equity* fund).

131. This loss could potentially reach the **nominal** value of their investment, i.e. the sum of EUR 265 million for Bidco 1 and EUR 8 million for Bidco 2.

132. The loss suffered by Bidco 1 and Bidco 2, for which the Fund is claiming compensation in its capacity as assignee, is therefore provisionally assessed, without prejudice and without any prejudicial recognition whatsoever, at EUR 265 million and EUR 8 million respectively.

133. The Fund reserves the right to establish these losses by any means and in particular by expert appraisal in accordance with articles 461 et seq. of the New Code of Civil Procedure. They also reserve the right to increase their claim in the course of the proceedings.

134. Finally, Bidco 1 and Bidco 2 suffered non-material damage resulting from the damage to their image. Their loss in this respect is assessed at EUR 100,000 for each of the two companies.

135. The Fund reserves the right to increase these claims during the proceedings.

## 2.2. *The damage suffered by OEGH*

136. OEGH also suffered material and reputational damage.

137. OEGH was deceived in the same way as the other Claimants.

138. It should be recalled that Novalpina UK was represented at the meeting on 14 October 2020 at which the sole manager of OEGH pre-approved the acquisition and provided advice to OEGH[41].

139. In addition, OEGH granted the Pledge which was an integral part of the financing of the acquisition. Clearly, if the acquisition had not taken place, the pledge would not have been granted.

140. The Pledge was granted at the time of *closing* (on 1er April 2021), i.e. four months after the SPA was entered into. OEGH would never have taken this decision if the Key Documents (or the information contained therein) had been disclosed to it (in other words, if it had not been deceived as to the fact that there was a real and serious possibility that Mr SADOVSKII was not the UBO of *"Maxbet"*). The deception was therefore long term, extending beyond the conclusion of the SPA.

---

41      Exhibit n°6 from MOLITOR

141. OEGH has suffered direct material loss as a result of the costs incurred by it in order to judicially oppose the execution of the Pledge by the seller following a dispute relating to the execution of the SPA. This loss is provisionally assessed at EUR 4,000,000.

142. OEGH has also suffered damage to its image valued at EUR 100,000.

143. OEGH reserves the right to increase its claims during the course of the proceedings.

### 2.3. The damage suffered by Master Luxco

144. As a result of the Defendants' unfair and fraudulent manoeuvres, Master Luxco also suffered non-material damage resulting from damage to its image valued at EUR 100,000.

145. Master Luxco reserves the right to increase its claims during the course of the proceedings.

### 2.4. Personal loss suffered by the Fund

146. The Defendants' misconduct also caused personal injury to the Fund.

147. The Fund, through its manager and its AIFM, agreed to the investment on the basis of the recommendation it received from Novalpina UK and Novalpina International. Had it been informed of the contents of the Key Documents, it would have refused the acquisition.

148. The Fund had to incur direct and indirect expenses and costs in connection with the acquisition of *Maxbet* and, later, in connection with its investigations for an amount estimated, without qualification, at EUR 10 million.

149. The Fund also suffered damage to its image valued at EUR 100,000.

150. The Fund reserves the right to increase its claims during the course of the proceedings.

### 3. Joint and several liability

151. The Defendants are liable *in solidum* because their respective faults contributed to the same damage.

152. It is accepted that :

*"If the various events giving rise to the loss or damage are inseparable or if they have produced a single and indivisible loss or damage, the various parties responsible for that loss or damage are jointly and severally liable to the victim: each has an obligation to compensate for the loss or damage in full (...)"[42] .*

---

[42]     See Georges Ravarani, *op. cit.* n° 1017, p. 1003.

**TO THESE CAUSES**

**declare** the present application admissible in form ;

give notice to NOAL SCSp that by private deed signed on 27 June 2024 it has acquired the rights and shares held by Maximus Bidco I S.à r.l. and Maximus Bidco II S.à r.l. against the defendants;

declare that this writ of summons constitutes notification of the assignment to the defendants in accordance with Article 1690 of the Civil Code;

on the merits, **declare** the application justified;

I'm off,

**Order** the parties summoned *jointly and severally*, or each for its part, to pay NOAL SCSp, in its capacity as assignee of the rights and shares of Maximus Bidco I S.à r.l. against the defendants, the sum of **EUR 265,000,000.- (two hundred and sixty-five million euros)** or any other sum, even greater, to be determined by expert opinion or to be arbitrated *ex aequo et bono* by the Court, by way of damages for material loss, with statutory interest from the date of the assignment, 17 October 2020, or from the date of this claim until the balance is paid;

**Order** the parties summoned *jointly and severally*, or each for its part, to pay NOAL SCSp, in its capacity as assignee of the rights and shares of Maximus Bidco II S.à r.l. against the defendants, the sum of **EUR 8,000,000.- (eight million euros)** or any other sum, even greater, to be determined by expert opinion or to be arbitrated *ex aequo et bono* by the Court, by way of damages for material loss, with statutory interest from the date of the transfer, 17 October 2020, or from the date of this claim until the balance is paid;

**To acknowledge** to NOALSCSp that these requests are based on a provisional evaluation of the damage which is carried out under all reserves and without any prejudicial recognition;

**Acknowledge** that NOAL SCSp formally reserves the right to increase or decrease its claim in the course of the proceedings;

**To give notice to** NOAL SCSp that it offers, if necessary, to establish the amount of the prejudice accrued to Maximus Bidco I S.à r.l. and Maximus Bidco II S.à r.l., by means of expert appraisal in accordance with articles 461 et seq. of the New Code of Civil Procedure;

**Order** the parties summoned *jointly and severally*, or each for its part, to pay NOAL SCSp, in its capacity as assignee of the rights and shares of Maximus Bidco I S.à r.l. and Maximus Bidco II S.à r.l. against the defendants, the sum of **EUR 200.000.00 (two hundred thousand euros)** or any other sum, even greater, to be arbitrated *ex aequo et bono* by the Court by way of damages for injury to the image and reputation of the companies Maximus Bidco I S.à r.l. and Maximus Bidco II S.à r.l.;

**Give notice** to NOAL SCSp that the foregoing claims are based on articles 1382 et seq. of the Civil Code;

**Order** the parties summoned *jointly and severally*, or each for its part, to pay OEGH Holdings S.à r.l. the sum of **EUR 4,000,000 (four million euros)** or any other sum, even greater, to be determined by an expert or to be arbitrated *ex aequo et bono* by the Court, by way of damages for its material loss, with statutory interest from the date of the present action until the balance is paid;

Acknowledge that OEGH Holdings S.à r.l.'s claim is based on a provisional assessment of its loss, which is made without prejudice or prejudicial recognition;

**Acknowledge that** OEGH Holdings S.à r.l. formally reserves the right to increase or decrease their claim during the course of the proceedings;

**Give notice to** OEGH Holdings S.à r.l. that it offers, if necessary, to establish the amount of its material loss by expert appraisal in accordance with articles 461 et seq. of the New Code of Civil Procedure;

**Order** the parties summoned *jointly and severally,* or each for its part, to pay to each of NOAL Luxco S.à r.l. and OEGH Holdings S.à r.l. the sum of **EUR 100,000.00 (one hundred thousand euros)** or any other sum, even greater, to be arbitrated *ex aequo et bono* by the Court by way of damages for injury to their image and reputation;

**Acknowledge** to NOAL Luxco S.à r.l. and OEGH Holdings S.à r.l. that their claims are based on articles 1382 et seq. of the Civil Code;

**Order** the parties summoned *jointly and severally,* or each for its part, to pay NOAL SCSp the sum of **EUR 10,000,000 (ten million euros**) or any other sum, even greater, to be arbitrated *ex aequo et bono* by the Court in respect of its material loss, with statutory interest from the date of the present action until the balance is paid;

**Acknowledge that** NOAL SCSp formally reserves the right to increase or decrease its claim in the course of the proceedings;

**To give notice to** NOAL SCSp that it offers, if necessary, to establish the amount of its loss by expert appraisal in accordance with articles 461 et seq. of the New Code of Civil Procedure;

**Order** the parties summoned *jointly and severally,* or each for its part, to pay NOAL SCSp the sum of **EUR 100,000 (one hundred thousand euros**) or any other sum, even greater, to be arbitrated *ex aequo et bono* by the Court by way of damages for injury to its image and reputation;

**Acknowledge** that NOAL SCSP's claims are based on articles 1382 et seq. of the Civil Code;

Further **order** the parties summoned *in solidum,* if not each for its part, to pay to the Claimants the sum of **EUR 50,000 (fifty thousand euros)**, pursuant to Article 240 of the New Code of Civil Procedure, for all the sums that the Claimants must disburse, not included in the costs, such as lawyers' fees, and which it would be unfair to leave to their sole charge, given the attitude of the parties summoned, which led to the dispute;

**Order** the parties summoned to pay the costs of the proceedings, with deductions for the benefit of the lawyer at the Court making the application, claiming to have advanced them on the basis of Articles 238 and 239 of the New Code of Civil Procedure;

To **reserve to** the Claimants the right to produce, in addition to the documents listed in the body of this summons, any other documents at the appropriate time and place and as may be required;

To **reserve** to the Claimants all other rights, dues, means and actions.

**THE FOLLOWING EXHIBITS ARE SUBMITTED IN SUPPORT OF THIS CLAIM:**

1.    Organisation chart showing the OEG/Maxbet group's ownership structure ;

2.    *"Second Amended and Restated Investment Advisory and Distribution Agreement"* of 23 October 2018;

3.    *"Memorandum of* Understanding of 27 February 2020;

4.    *"Memorandum of* Understanding of 1 September 2020;

5.    KYC note dated 8 October 2020 signed by Mr Stefan KOWSKI;

6.    Resolution of the sole manager of OEGH Holdings S.à r.l. of 14 October 2020;

7.    Resolution of the Management Board of Maximus Topco S.à r.l. of 14 October 2020;

8.    Resolution of the Management Board of Maximus BidCo 1 S.à r.l. of 14 October 2020;

9.    Resolution of the Management Board of Maximus BidCo 2 S.à r.l. of 14 October 2020;

10.   Letter from Novalpina Capital LLP dated 16 October 2020 recommending the acquisition of *"Maxbet"* to the AIFM;

11.   Letter from the AIFM dated 16 October 2020 informing the Fund of its decision to invest in *"Maxbet"*;

12.   "Share *Purchase Agreement* dated 17 October 2020*;*

13.   Final CONTROL RISK report of 16 March 2020;

14.   Original CONTROL RISK report ;

15.   1er RÖDL & PARTNERS report submitted on 4 September 2020;

16.   2e RÖDL & PARTNERS report of 5 October 2020;

17.   Letter dated 21 May 2024 from the English law firm FIELDFISHER, acting for Maxbet Entertainment Group Ltd, to the English law firm MCDERMOTT, WILL & EMERY UK

Noting this, and whereas the parties summoned remain in the United Kingdom, I have sent two copies of the document with a translation into English, by registered letter with acknowledgement of receipt, to the central authority having territorial jurisdiction:

> ***For the attention of the Foreign Process Section***
> ***Room E16***
> ***Royal Courts of Justice***
> ***Strand***
> ***LONDON WC2A 2LL***

in order for this document to be served in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague on 15 November 1965, and insofar as necessary, I have sent a copy of the document with an English translation, by registered letter with acknowledgement of receipt, to these addressees.

And whereas the party summoned under 3) also has an address in Monaco, I have sent two copies of the document by registered letter with acknowledgement of receipt to the central authority with territorial jurisdiction:

**Claire NOTARI**
**Palais Heraclès**
**17, Boulevard Albert 1** **er**
**98000 MONACO**

in order for this document to be served in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague on 15 November 1965, and insofar as necessary, I have sent a copy of the document, by registered letter with acknowledgement of receipt, to this addressee.

COST OF THE ACT

```
duty:432.00
Destination:108.00
Price: €10.00
Adres: 28.80
Stamp:€216.00
Enreg: 12.00
VAT: 98.40
       ------
TOTAL:905.20

Copy:198.00
VAT: 33.66
Postage: €140.00
       ------
TOTAL:1,276.86
```