<u>**IN THE HIGH COURT OF JUSTICE**</u>                    **Claim No: CL-2023-000851**

<u>**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**</u>

<u>**COMMERCIAL COURT (KBD)**</u>

**B E T W E E N:**

**(1) TREO NOAL GP S.à r.l**

**(2) NOAL SCSp**

**(acting by its general managing partner TREO NOAL GP S.à r.l)**

**(3) NORTHPOLE HOLDCO S.à r.l**

**(4) NORTHPOLE BIDCO S.à r.l**

<u>**Claimants**</u>

**-and-**

**(1) STEFAN EMMANUEL KOWSKI**

**(2) STEPHEN MARK PEEL**

**(3) BASTIAN FREDERIK LUEKEN**

<u>**Defendants**</u>

_____

**DEFENCE OF THE FIRST DEFENDANT**

_____

<u>**Introduction and summary**</u>

1. In this Defence:

   1.1.   All references to paragraphs are to the corresponding paragraphs in the Particulars of Claim ("**PoC**") except where otherwise stated.

   1.2.   Where any headings or abbreviations used in the PoC are adopted, this is for convenience only and no admissions are made thereby.

   1.3.   All documents referred to will be relied on a trial for their full terms and legal effect.

EXHIBIT I

1.4. Save where expressly admitted or not admitted in this Defence, all allegations in the PoC are denied.

2. The Claim is the latest in a series of inappropriate actions that have been taken by the First Claimant, NOAL GP, and the individuals behind it, in order to seek to exert pressure on Mr Kowski and Mr Lueken in particular, in a misguided attempt to obtain benefits for the Claimants in ongoing litigation in Luxembourg. Specifically:

2.1. As pleaded to further below, on 27 August 2021, NOAL GP registered itself as the new general partner of the Fund, thereby purporting to replace Novalpina GP. In February 2022, various Novalpina entities brought proceedings in Luxembourg seeking relief on the basis that NOAL GP had not been validly appointed and seeking the reinstatement of Novalpina GP as general partner pending payment of substantial unpaid amounts contractually due on a removal of Novalpina GP without cause (the **"Luxembourg Proceedings"**). The Luxembourg Proceedings are ongoing.

2.2. As a first step, NOAL GP and the Fund brought proceedings in this jurisdiction against Mr Kowski and Mr Lueken seeking injunctive relief in relation to the Luxembourg Proceedings. Those proceedings were stayed on *forum non conveniens* grounds by the order of Joanna Smith J dated 11 April 2022 (permission to appeal Joanna Smith J's order has now been refused).

2.3. Following that decision of Joanna Smith J, the Claimants (and/or entities or individuals connected with them) have instigated a campaign designed to exert pressure on Mr Kowski and Mr Lueken, and to cause them significant wasted time and expense. That campaign has involved:

2.3.1. Making groundless complaints to regulatory authorities, namely to (a) the Luxembourg authorities on 21 April and 6 May 2022; (b) the Financial Conduct Authority ("**FCA**") on 22 April, 19 May, 26 May, 10 June, 15 December, and 29 December 2022; and (c) the Cayman Islands Monetary Authority on 13 June 2022. Upon discovering these groundless complaints, in 2022, Mr Kowski wrote to each of these authorities and offered his assistance. Mr. Kowski has not had any response from any of these authorities.

2.3.2. Submitting such regulatory complaints to the Luxembourg court in the Luxembourg Proceedings (notwithstanding the fact that Mr Kowski was not a party to those proceedings and had no opportunity to respond).

2.3.3.    Soliciting the European Parliament to investigate Mr Kowski and Mr Lueken. In 2022, Mr. Kowski wrote to the European Parliamentarians who had been approached by the Claimants (and/or entities or individuals connected with them) and offered his assistance. Mr. Kowski has not heard back from them.

2.3.4.    Causing or procuring the provision of one or more of the reports to the FCA to the press, and specifically The Sunday Times.

2.3.5.    Issuing, or causing to be issued, a press release that falsely claimed that Mr Kowski and Mr Lueken were under investigations by regulatory authorities.

2.3.6.    Threatening Mr Kowski with spurious defamation proceedings by way of a purported letter of claim dated 30 November 2022.

3.  The present Claim is part and parcel of a tactic of pursuing spurious litigation claims against Mr Kowski and Mr Lueken in England, similarly, in order to exert pressure on them and to cause them wasted time and expense. Such conduct includes NOAL GP and the Fund bringing ongoing Commercial Court proceedings under claim number 2022-000664 (the "**Hippocrate Claim**"). The Hippocrate Claim is not merely spurious; in fact, NOAL GP and the Fund bring claims for losses on a basis that must be knowingly false. As set out in Humphries Kerstetter's letter of 20 February 2024 to McDermott Will & Emery LLP, NOAL GP and the Fund brought a case on causation and loss premised on allegations as to the reasons for the sale of the Fund's investments in Laboratoire XO SAS, and as to the timing of the sale process, which contradicted facts known to NOAL GP's representatives and documents of which NOAL GP's representatives must have been aware. Mr Kowski avers that NOAL GP and the Fund, and those who have given the relevant instructions for the case on loss, have claimed relief on a dishonest basis, consistently with their intention to cause oppression to Mr Kowski and Mr Lueken.

4.  So far as the first three Claimants are concerned, the Claim is also invalidly brought. In the case of NOAL GP and the Fund, as pleaded further at paragraph 10 below, NOAL GP had not been validly appointed as the manager and general partner of the Fund. In the case of Northpole Holdco, as pleaded further at paragraph 15 below, the persons purporting to act as managers of the company, at present and at the time the Claim was brought, were not validly appointed to their offices.

5.  Consistently with the fact that the Claim is spurious, and brought by the Claimants with the predominant intention of acting as a means of pressure on Mr Kowski and Mr Lueken, the Claim has a number of immediate and fundamental flaws.

5.1.   The central theme of the PoC is that the Defendants wished to invest in NSO from sometime in late 2017 but knew that the key LPs of the Fund would oppose any such investment, and so deliberately kept hidden this intention. Both assertions are manifestly false. In the first place, Mr Kowski was not considering investing in NSO until around spring 2018. In the second, the Defendants were open about the possible investment once it became a possibility. Far from hiding it from the LPs, in summer 2018, the Novalpina IAs consulted the three largest investors in the Fund at the time (i.e. OPERF, CNP, and Yana Peel). All of them were enthusiastic about the investment. Far from opposing such an investment, OPERF, the largest LP, was in fact *already* invested in NSO through its investment in the fund operated by Francisco Partners that held a majority stake in NSO prior to March 2019, such that, far from being concerned about the offensive spyware industry, it was already an enthusiastic participant in it.

5.2.   The premise of the Claimants' claims is that the Defendants intended to cause injury to them through the investment being made. Yet the Defendants and their associates invested more than *€75m of their own money* in the Fund, and a large eight-figure sum in the specific investment in NSO. Their interests were directly aligned with those of the Fund. They would not have acted in a manner that was intended to injure the Fund, because that would have had the effecting of injuring their own, significant, investment. For all of the length of the PoC, no answer is provided to this fundamental flaw in the Claim.

5.3.   The Claim is premised on the assertion that NSO was a worthless investment from the outset. Yet in May 2021, more than two years after the acquisition, the Fund signed a term sheet with an investor to sell a 35% equity stake in NSO on the basis of a valuation of NSO at 2.4x the valuation at the time of the Fund's purchase of its interest. In August 2021, the putative investor then offered to acquire the Fund's entire stake in NSO. Meanwhile, as at 30 June 2021, the Fund's interest was independently valued by EY Luxembourg ("**EY**") at €998.3 million (around 4.6x the valuation at the time of the Fund's acquisition). The only reason that a significant profit was not realised was because of actions taken inappropriately by the Claimants, which actions constitute a failure to mitigate and/or would be the real cause of any loss (which loss is denied).

6.   In summary, the true position in respect of the issues raised in the PoC is as follows.

6.1.   The Fund was set up to pursue a contrarian investment philosophy with few ethical restrictions on the scope of its investments. It was also set up such that the general

partner via its regulated investment manager (Sanne), not the underlying investors (the LPs), made all investment decisions. The LPs' rights to influence the general partner's decision-making were highly constrained. The LPs subscribed to the Fund on the above basis. None of them sought to limit their participation in reputationally risky or ESG-sensitive investments – and as explained above, the largest LP, OPERF, was *already* invested in NSO.

6.2.    In or around early 2018, the Defendants and the Fund's corporate investment advisers became aware of the possibility of acquiring NSO together with NSO's co-founders and management. In June 2018 representatives of the three LPs with the largest investments in the Fund were consulted, and they expressed enthusiasm about the proposed deal. In early 2019 extensive and rigorous due diligence of NSO was commissioned; the conclusion of this due diligence, which was reached by the experienced due diligence providers and relied on by the Defendants, was that there were no material red flags and that, in particular, NSO had robust ethical and compliance policies which it had taken various effective steps to implement. While NSO's offensive targeted surveillance technology entailed that the acquisition (the "**Transaction**") inevitably carried reputational risks, these were obvious to, and known about, by all relevant entities at the time.

6.3.    On 1 February 2019 one of the corporate investment advisers, Novalpina International, provided a non-binding recommendation of the Transaction to Sanne on the basis of the third-party, professional due diligence, which it provided along with its non-binding recommendation. Sanne subsequently made its own decision to pursue the Transaction. Northpole BidCo, set up as the vehicle for the Transaction, entered into a binding share purchase agreement on 10 February 2019. On 14 February 2019, after the parties had committed themselves, the Transaction was announced to the media and the LPs.

6.4.    One of the steps taken in pursuing the Transaction was the engagement, in May 2018, of an Israeli public relations and M&A professional, Zamir Dahbash, to facilitate an introduction to NSO's CEO, Shalev Hulio, and to support negotiations towards a deal. While Mr Dahbash's media services company may also have been retained by NSO in Israel, Mr Kowski is not aware that he owed any fiduciary duties to NSO; nor is he aware of Mr Dahbash owing any duties to the substantive vendor in the Transaction, NSO's ultimate majority-owner Francisco Partners—which nevertheless knew about and raised no objection to Mr Dahbash's work for the Fund. Given that the Transaction was effected, Mr Dahbash received a Success Fee of US$5 million for his services

(which fee was in-keeping with the sorts of fees payable on a transaction of this sort). Approximately 30% of the Success Fee was ultimately paid by NSO's co-founders and management who were equity investors in NSO alongside the Fund.

6.5.    After the Transaction completed on 18 March 2019, the Fund's investment continued to be valuable and indeed substantially increased in value. As aforesaid, and as set out in detail in paragraphs 93 to 94 below, the Fund had the opportunity to realise at least part of its investment at a very substantial profit, and would very likely have done so had Novalpina GP not been removed as general partner. If the Fund's ongoing investment in NSO declined in value after Novalpina GP's removal, it did so because, as pleaded in paragraph 95 below, NOAL GP mishandled the investment, in particular by failing to maintain good relations with NSO's management. In any event, to this day the Fund (to the best of Mr Kowski's knowledge) continues to hold an interest of substantial value derived from its original investment in NSO.

7.    There is no cause for complaint against the Defendants. On the contrary, the Claim amounts to little more than a complaint that a particular private equity investment proved unprofitable (albeit, as explained above and below, it would, in fact, have proved very profitable but for the actions, including those of NOAL GP, referred to in paragraphs 94 and 95 below). Specifically:

7.1.    The Claimants allege that the Defendants conspired to use unlawful means against them by procuring the Fund's acquisition of NSO. Leaving aside the alleged unlawful means themselves (which are addressed below), there was no conspiracy and no intention to harm the Claimants. The Defendants and their associates had between them invested more than €75 million in Fund and accordingly had a large stake in the success of its investments. Far from the Defendants' profit being the opposite side of the coin of the Claimants' loss, the interests of the Defendants and the Claimants were fully aligned.

7.2.    The Claimants allege that on 1 February 2019 the Defendants made fraudulent misrepresentations to Novalpina International, intending these to be relayed to Sanne and from there to the Claimants, that the investment was suitable for the Fund and that a thorough review had been conducted to identify material risks. It is denied that actionable representations were made as alleged. In any case, even if they were made, these representations were correct in light of the Fund's investment guidelines and the due diligence.

7.3.    Further in any event, the chain of representations alleged by the Claimants did not exist. All that happened was that Novalpina International made a representation and a non-

binding investment recommendation to Sanne (which is not a party). Sanne then made its own decision to invest and directed Novalpina GP and Northpole BidCo to take steps accordingly. In the premises, the 1 February 2019 Representations support neither the conspiracy claim nor the free-standing claim in deceit.

7.4.    The Claimants allege that on 14 February 2019 the Defendants made fraudulent misrepresentations to the LPs, on which the LPs relied in refraining from taking steps to stop the Transaction. Any claim in this regard could not, on any view, be brought by the Claimants, which did not receive the representations. In any regard, it is denied that actionable representations were made as alleged. In any case, any representations were made only to the LPs, not the Claimants. They were not intended to be relayed to the Claimants and nor did this happen (and any damage suffered would be too remote). Further:

7.4.1.    The actual statements made were not misrepresentations, let alone were they fraudulent.

7.4.2.    There was no intention for them to be relied upon in the way alleged, there was no such reliance, and they did they not cause any loss. By 14 February 2019 Northpole BidCo had committed itself to the Transaction: it was too late to back out.

7.4.3.    The LPs (or a sufficient proportion of them) actively supported the Transaction quite apart from the statements made on 14 February 2019 and would not, on any view, have wished to stop the Transaction even if possible. In any case, the LPs lacked the formal or practical power to prevent the Transaction from proceeding.

7.4.4.    The Claimants' alternative case that the LPs would have forced the sale of the interest in NSO at an earlier time, contrary to the wishes of Novalpina GP as general partner, is unsustainable for the same reasons: the LPs would not have wished to abandon an investment they actively supported, and lacked the power to compel the Fund to sell an investment just as much as they lacked the power to stop an investment in the first place. In any event, as pleaded above and below, the interest in NSO could have been realised at a high value in 2021, and this would very likely have happened had Novalpina GP not been removed as general partner.

7.5.    The Claimants allege as part and parcel of their claims for unlawful means conspiracy that the payment to Mr Dahbash was a bribe. That allegation is false. The payment was made for the services Mr Dahbash provided. The Claimants have failed to provide particulars or evidence of any contractual and/or fiduciary relationship between Mr Dahbash and the counterparty in the Transaction. In any event, if (which is not admitted) there was any such relationship, Mr Kowski was unaware of its existence at the time (and remains unaware). In any event Francisco Partners was fully aware of engagement of Mr Dahbash by the Fourth Claimant by no later than 4 May 2018.

7.6.    The Claimants allege that the Defendants breached their duties as members of the LLP corporate advisors. This allegation is parasitic on the meritless allegations of deceit and bribery and is also denied.

7.7.    The Claimants allege that the interest in NSO which the Fund acquired by the Transaction was worthless at the outset, or became worthless well before July 2021 in a way foreseeable as of February 2019. As aforesaid at paragraph 6.5, on the contrary, NSO was not worthless at the outset and the Fund's acquisition did not take place at less than market value. NOAL GP's mishandling of the investment caused any loss.

8.    The Claimants' primary case is under English law. It is admitted for the purposes of these proceedings and in order to reduce the issues in dispute that English law applies to the claims brought. However, insofar as the Claimants intend to allege that one of the supposed unlawful means founding the claim in unlawful means conspiracy was a civil wrong in respect of bribery—as is the case per paragraph 28 of the Response to D3's RFI—the law applicable to any such supposed civil wrong is Israeli, not English, law with the consequences pleaded in paragraphs 189 below.

9.    Mr Kowski does not plead separately to paragraph 1 as it purports to be a summary of the matters pleaded elsewhere in the PoC. Paragraphs 2 and 3 are noted.

**The parties**

10.    As to paragraph 4:

10.1.    It is denied that NOAL GP validly replaced Novalpina GP as the manager and general partner of the Fund on 27 August 2021 (or at all). Such removal was purportedly carried out pursuant to clause 20.2 of the LPA (removal "*without Cause*"). However, clause 20.3.1.2 of the LPA provides that such removal does not take effect unless and until payment in full is made to the General Partner of the compensation specified in clause

20.3.1.1 of the LPA. No such payment has been made either within the period specified in clause 20.3.1.2 of the LPA or at all.

10.2.     It is admitted that NOAL GP purported to act as the manager and general partner of the Fund. Specifically, on 27 August 2021 NOAL GP registered itself as the new general partner of the Fund in place of Novalpina GP. In February 2022, Novalpina GP, Group GP Sarl and Novalpina Capital Partners I FP SCSP ("**Novalpina CIP**") brought the Luxembourg Proceedings seeking a declaration that NOAL GP had not been validly appointed, seeking the annulment of all decisions taken by NOAL GP on behalf of the Fund since 27 August 2021, and seeking the reinstatement of Novalpina GP as general partner pending payment of the sums due to it under the LPA in the event of a removal without cause. Those proceedings are ongoing.

11. Paragraph 5 is admitted.

12. As to paragraph 6:

12.1.   The first sentence is denied. The purported fourth, fifth, and sixth amendments to the LPA were made without the knowledge or consent of Novalpina GP, Group GP, and Novalpina CIP and were ineffective under Luxembourg law (and the validity of these amendments is in issue in the Luxembourg Proceedings). Accordingly, the third amended and restated LPA is the effective version.

12.2.   The second and third sentences are admitted. Novalpina GP remains a party to the most recent effective version of the LPA.

13. As to paragraph 7, the first sentence is admitted. The second sentence is noted.

14. As to paragraph 8, it is admitted that the Fund can only act through its manager from time to time, and that the said manager is entitled to bring claims for and on behalf of the Fund. For the reasons given at paragraph 10 above, it is denied that NOAL GP is the Fund's manager and it is denied that it is entitled to bring claims on its behalf. Accordingly, there is no valid claim by either NOAL GP or the Fund in these proceedings. As aforesaid, the validity of NOAL GP's appointment as general partner is denied. The question of invalidity will be determined in due course in the Luxembourg Proceedings. Mr Kowski reserves his right to apply for a stay of the present proceedings until that juncture.

15. The first sentence of paragraph 9 is admitted (and as to the second sentence, paragraph 21 is pleaded to separately below). The persons purporting to act as managers of Northpole Holdco, at present and at the time the Claim was brought, were not validly appointed to their offices.  It

is accordingly denied that the decisions by those persons on behalf of Northpole Holdco to bring the Claim were made with the authority of the company. The general meeting of Northpole Holdco's parent company, LuxCo, on 16 August 2021 was null and void, and accordingly the appointments of Gaëtan Dumont and Allen Foley as managers of LuxCo at that purported meeting were invalid. Not being validly appointed managers of LuxCo, Mr Dumont and Mr Foley lacked authority to participate and vote, on behalf of LuxCo, in the general meeting of Northpole Holdco on 19 August 2021, at which they were purportedly appointed managers of Northpole Holdco. Their appointments at Northpole Holdco were thus also invalid.

16. As to paragraph 10:

16.1.  It is admitted that Mr Kowski is an investment professional and that he and the other Defendants were investment professionals at all material times.

16.2.  As to paragraph 10.1, Novalpina GP and Group GP established the Fund, acting through their managers and in accordance with their governing documents. Mr Kowski did not establish Novalpina GP or Group GP. To the best of Mr Kowski's knowledge, Mr Peel, alone among the Defendants, established Novalpina Topco and subsequently sold it to Yana Peel. Mr Lueken and Mr Kowski thereafter each purchased a one third interest in Novalpina TopCo on 2 January 2018. To the best of Mr Kowski's knowledge, the Novalpina IAs were established not by Defendants collectively, but by Mr Peel and SMP Policy Innovation Ltd, a company Mr Peel controlled. Save as aforesaid paragraph 10.1 is denied.

16.3.  As to paragraph 10.2, each of the Defendants was a designated member of the Novalpina IAs at all material times. They were not the only designated members: Mark Tiner was also a designated member of the IAs, and Novalpina Topco was a designated corporate member. Each of the Novalpina IAs had a management committee which consisted of the Defendants and made decisions unanimously. As such, it is admitted that the Defendants together controlled the Novalpina IAs (albeit that none of the Defendants individually controlled them).

16.4.  As to paragraph 10.3, it is admitted that the Defendants indirectly owned the shares in Novalpina GP. As to the Defendants' alleged control or influence over the managers of Novalpina GP, this is pleaded to below in response to paragraph 18.

16.5.  Save as aforesaid, no admissions are made as to paragraph 10.

17. As to paragraph 11, it is admitted that Mr Kowski was domiciled and resident in England and Wales at all material times (and up to May 2023). No admissions are made in respect of the domicile or residence of the other Defendants. To the extent that Mr Kowski exercised any control as alleged, it is admitted he did so from London.

### *The relationship between the Defendants, the Novalpina IAs, the AIFM and Fund investments*

18. Paragraphs 12 to 14 are admitted. More particularly as to paragraph 14:

   18.1. Under the applicable regulatory regime, i.e. the AIFM Directive as implemented in Luxembourg, key management functions in respect of the Fund were at all material times the responsibility of Sanne.

   18.2. Clause 10.1.1 of the LPA provides that "*[t]he Partnership shall be managed and operated, and portfolio risk management undertaken, by an authorised AIFM*". Appendix 1 of the AIFM Agreement, under the heading "*AIFM Services*" and the sub-heading "*Portfolio Management*" provides that "*[u]pon review and analysis of certain documents (e.g. investment memorandum, investment due diligence reports, etc.), [Sanne] will implement decisions to invest into target investments as advised by Novalpina Capital. [Sanne] will instruct/authorize either the Advisor, the Board of the Fund, or a local agreed party to execute the transaction*". Further under the same sub-heading, Portfolio Management was to include "*[a]ssessment of the proposed investment/divestment selection, based on investment/divestment memorandum (including Due diligence documentation)*".

   18.3. In the premises, it was Sanne, not Novalpina GP, which made investment decisions on behalf of the Fund, and it was obliged to consider due diligence documentation (amongst other documents) in doing so. Further, under Clause 2.5 of the AIFM Agreement, Sanne was obliged to "*exercise all of the skill, care and attention that might reasonably be expected of a professional provider of services substantially similar to the Services*".

19. As to paragraph 15:

   19.1. Paragraphs 15.1, 15.2, and 15.3 are admitted. Further as to paragraph 15.3, it is noted that the Glossary at the end of the PoC wrongly gives the date of the Investment Advisory Agreement (in its second amended and restated form) as 23 October 2018. The actual date was 14 November 2018, as is pleaded in paragraph 15.3.

19.2. As to paragraph 15.4, the Novalpina IAs had their registered office at 10 Bruton Street, London W1J 6PX until 10 March 2019, and at The Caxton Building, 1 Brewers Green, London SW1H 0RH from 11 March 2019.

20. As to paragraph 16:

20.1. As to paragraph 16.1, clause 2.2 of the Investment Advisory Agreement provided that the Novalpina IAs should, in supplying the "*Investment Advisory Services*", have "*regard to the Investment Guidelines set out in the LPA*" and "*any instructions given to the Adviser by the Client [i.e. Sanne] from time to time*". It further provided that "*[t]he Advisers shall provide the Investment Advisory Services to the Client and/or the General Partner as applicable for the benefit of the Partnership only*". Accordingly, as to the first sentence of paragraph 16.1, it is denied that there was an obligation on the Novalpina IAs to "*assist*" Sanne and/or Novalpina GP. The obligation was to provide the services as specified. As to the second sentence, it is embarrassing for its lack of particularity. However, the meaning of the provision that the Novalpina IAs should provide investment advice to Sanne and/or Novalpina GP for the ultimately benefit of the Fund only was to the effect that the advice should be for the benefit of the Fund, not any other party (for instance Sanne or Novalpina GP, as the recipients of the advice, personally).

20.2. Further to paragraph 16.1, paragraph 18.3 above is repeated. While the Investment Advisory Agreement provided for the Novalpina IAs to advise the general partner, it did not follow that Novalpina GP would be taking decisions in respect of investment management on the Novalpina IAs' advice; that role was limited to Sanne pursuant to the AIFM Agreement in conjunction with the LPA.

20.3. Paragraphs 16.2 and 16.3 are admitted.

20.4. By clause 12.1.6 of the Investment Advisory Agreement each Adviser warranted, in broad summary, that as of the date of the agreement it did not pay and was not paid any fee or commission other than (i) a fee or commission paid to or by either the Fund or a person acting on behalf of the Fund; (ii) a fee or commission paid to or by a third party, in circumstances where the Adviser could demonstrate that fee or commission was clearly disclosed to the investors in the Fund in a manner that was comprehensive, accurate and understandable prior to the provision of the relevant service, and that the fee was designed to enhance the quality of the relevant service and not impair compliance with the Adviser's duties; or (iii) proper fees necessary for the provision of

the relevant service which by its nature did not give rise to conflicts with the Adviser's duties. By clause 12.2.1 each Adviser undertook to notify Sanne in writing as soon as possible if the warranty given pursuant to clause 12.1.6 ceased to apply during the term of the agreement. Save as aforesaid, no admissions are made as to paragraph 16.4.

20.5.  Paragraphs 16.5 and 16.6 are admitted, except that, in the case of paragraph 16.6, the obligation at schedule 1, paragraph 12.2 arose only where the Fund invested "*in assets of limited liquidity*".

21. The Investment Advisory Agreement also provided as follows.

21.1.  Clause 2.3 provided that, except as specifically agreed otherwise, "*[n]one of the Advisers shall have the power or authority to make any investment or other decision on behalf of the Client, the General Partner, or the Partnership… The Client and/or the General Partner as applicable shall make all such decisions and, in doing so, shall not be bound to act in accordance with any advice or recommendation provided to it by an Adviser under this Agreement.*"

21.2.  Clause 2.4 provided that "*portfolio and risk management… shall remain the sole responsibility of [Sanne]*" and "*[t]he appointment of the Advisers… is not, and shall not be construed as, a delegation by [Sanne] of portfolio management or risk management*".

21.3.  Paragraph 1 of Schedule 1 provided that "*[t]he Advisers shall… make investment or divestment recommendations to [Sanne] and/or the General Partner… using a substantially similar form to that set out… in the investment recommendation letter… at schedule 4*".

21.4.  Paragraph 2.1 of Schedule 2 provided that "*Novalpina UK will provide investment advice to [Sanne] … (i) in a manner consistent with the Investment Guidelines; and (ii) in the context of the investment strategies to be pursued by the Partnership. Details of these strategies, and of the risks associated with making investments in accordance with those strategies, are described in the Private Placement Memorandum.*"

21.5.  Paragraph 2.2 of Schedule 2 provided that "*Subject to paragraph 2.1… there are no restrictions or limits on the investments on which Novalpina UK may advise [Sanne]*".

21.6.  Paragraph 3 of Schedule 2 provided that "*Novalpina UK expect that the investments and transactions on which they will advise [Sanne] under this agreement will predominantly be complex and bespoke. In advising [Sanne] on those types of investment, Novalpina UK will be relying on the fact that [Sanne] is a 'professional client' and … will assume*

*that [Sanne] has the necessary level of experience and knowledge to understand fully the risks involved in such investments and transactions.*"

21.7.   Schedule 4 set out the form of the "*Investment Recommendation Letter*". It provided for the letter to annexe, as "*Exhibit A*", an "*Investment Summary*" giving more information on the recommended investment above and beyond that included in the letter itself. It also envisaged, as "*Exhibit B*", an "*Investment Compliance Checklist*" (the "**Checklist**").

22. So far as the relationship between Sanne and the Novalpina IAs was concerned, clause 10.2.1 of the LPA provided that "*[t]he General Partner shall procure that the Investment Advisors are appointed to provide non-discretionary investment advice to the AIFM in respect of the Fund*". As such, decisions as to which investments the Fund should pursue were to be only in Sanne's discretion, and not the Novalpina IAs'.

23. As to paragraph 17:

23.1.   The first sentence is embarrassing for its lack of particularity. So far as concerns the allegation regarding Novalpina GP, it is noted that the Claimants do not in terms allege that the matters in paragraph 18 are the only particulars relied upon in support of the allegation. To the extent that the allegation can be understood, it is denied in respect of Novalpina GP on account of the matters set out in paragraph 24 below. While it is admitted as aforesaid that the Defendants together exercised control of the Novalpina IAs through the respective management committees, it was inevitably the case, as a practical matter, that members or employees of the Novalpina IAs provided information to Sanne without the specific knowledge of the Defendants.

23.2.   The allegation in the second sentence is also embarrassing for its lack of particularity and cannot be pleaded to. However, the Novalpina IAs, not the Defendants, provided investment advice to Sanne and Novalpina GP (as applicable) pursuant to the Investment Advisory Agreement. Sanne, not the Defendants, managed and operated the Fund, and undertook portfolio risk management, pursuant to the AIFM Agreement. In respect of the acquisition of NSO, the expert advisers which undertook due diligence on the instruction of the Novalpina IAs undertook that work independently and presented their own conclusions.

24. As to the first two lines of paragraph 18, it is denied that the Defendants had "*day-to-day effective practical control or influence over Novalpina GP*". Paragraphs 18.1-18.3 are admitted. As to paragraph 18.4, the first sentence is admitted. The managers of a Luxembourg private limited

company are required to take independent decisions in accordance with their duties to the company. Paragraphs 18.4(1) and 18.4(2) are also admitted. More particularly, each of the Defendants was an "A" manager, and not a "B" manager, of Group GP and Novalpina Topco. Any board resolution by Group GP or Novalpina Topco required the support of a majority of managers, including at least one "A" manager and at least one "B" manager. None of the Defendants was at any time a manager of Novalpina GP, and nor did he hold any other office in respect of it.

25. As to paragraph 18.5:

25.1.   The first sentence is admitted. It is accordingly admitted that Group GP had the power to remove the managers of Novalpina GP and that Novalpina Topco had the power to remove the managers of Group GP. It is denied that the Defendants were therefore able to remove the managers of Novalpina GP. That was a matter for Group GP acting through its own managers. A resolution of Group GP to remove the managers of Novalpina GP would have required the support of a majority of Group GP's managers, including at least one "A" manager and at least one "B" manager. None of the Defendants was at any point in time a "B" manager of Group GP. Moreover, the "B" managers of Group GP were at all material times the same persons as the managers of Novalpina GP.

25.2.   In any event, each manager of each company, regardless of the circumstances of his appointment or the possibility of his removal, was duty-bound to act independently in the best interests of the company.

25.3.   Further, in accordance with the principle of legal allocation of powers under Luxembourg law, a shareholder may not purport to provide instructions to the managers of the relevant company. Group GP was accordingly precluded from giving instructions to Novalpina GP, Novalpina Topco was precluded from giving instructions to Group GP, and the Defendants were precluded from giving instructions to Novalpina Topco (and Mr Kowski never purported to give such instructions).

25.4.   The principle of legal allocation of powers under Luxembourg law further forbids a third party (including the shareholder of a company's parent company) from interfering in the management of a company. The Defendants were accordingly precluded from giving instructions to Group GP or Novalpina GP (and Mr Kowski never purported to do so) and Novalpina Topco was precluded from giving instructions to Novalpina GP.

25.5.   As such, any power to remove the managers of Group GP and/or Novalpina GP would not have enabled the Defendants to control Novalpina GP.

26. Paragraph 18.6 (which is embarrassing for its lack of particularity) is denied. There was no such shareholders' agreement or other governance arrangement or contract.

27. As to paragraph 18.7, the first sentence is admitted. As to the second sentence, while the managers of Novalpina GP sought the input of the Defendants from time to time, it is denied that they were accustomed to seek approval for Novalpina GP's actions from the Defendants. The managers of Novalpina GP took their own decisions and took actions on occasion which were contrary to the views expressed by one or more of the Defendants.

28. Paragraph 18.8 is admitted.

29. Paragraph 19 is admitted.

30. As to paragraph 20:

  30.1.   As to the main body of paragraph 20, it is admitted that it was Sanne, not Novalpina GP, which decided on behalf of the Fund whether to acquire and/or continue to hold an investment.

  30.2.   Paragraph 20.1 is admitted.

  30.3.   As to paragraph 20.2, the allegations set out therein are contradicted by the case advanced by NOAL GP and the Fund in a pleading (the "**Hippocrate APOC**"), signed by a statement of truth, in the Hippocrate Claim. In paragraph 5.1 of the Hippocrate APOC, NOAL GP and the Fund allege that "*[a]lthough certain management functions of the Fund were formally vested in [Sanne], as a matter of fact and practical reality, the recommendations made by [the Defendants] to [Sanne] (whether through the IAs… or otherwise) were always followed*". In accordance with Appendix 1 to the AIFM Agreement as pleaded at paragraph 18.2 above, Sanne was obliged to conduct a "*review and analysis of certain documents*" including as applicable the "*investment memorandum, investment due diligence reports, etc.*", before deciding to follow any recommendation. Given that Sanne (i) was so obliged, and would have been liable for losses caused by a failure to fulfil its obligations; (ii) was an independent professional services provider with its own management; and (iii) formed part of a larger group with an excellent business reputation, it is to be inferred that Sanne complied with its obligations. Save as aforesaid the first sentence is not admitted. As to the second sentence:

    30.3.1.   If it be alleged that Sanne would typically (or ever) rely on any recommendation as being full, fair and truthful without reference to the

investment memorandum and investment due diligence reports (where available), the contrary is to be inferred on the basis set out in paragraph 30.3 above. Thus, it is to be inferred that Sanne would consider the underlying materials for itself.

30.3.2.  It is admitted in the premises that the proper inference is that Sanne would typically rely on the investment memorandum and investment due diligence reports in the course of carrying out its independent consideration of the proposed investment pursuant to its obligations under the AIFM Agreement, and that it would have considered them to be fair and true; it is denied that Sanne would have necessarily considered the contents of the reports to be "*full*"—this was a matter for Sanne to consider on reading the document in question.

30.3.3.  As to the allegation that Sanne would typically follow a recommendation from the Novalpina IAs, this is admitted, but in the premises Sanne's obligations were such that the proper inference is that it would only follow such a recommendation if, after independent consideration, it regarded that course as appropriate (and not otherwise).

30.4.  As to paragraph 20.3:

30.4.1.  As to the allegation that it would be expected or likely that Sanne would decide to follow a recommendation having received it from one or other of the Novalpina IAs, paragraph 30.3 above is repeated.

30.4.2.  As to the allegation that Sanne would convey to the Fund (via Novalpina GP), any decision to follow a recommendation, it is admitted that Sanne, being the decision-maker in respect of investments by the Fund, would relay its decision to Novalpina GP in parallel with causing the decision to be implemented. It is denied if alleged that Sanne would make any representation to Novalpina GP, intending for Novalpina GP to rely on it, in respect of Sanne's decision. As the decision-maker, Sanne would be informing it of a decision already made.

30.4.3.  It is admitted that the decision would be conveyed to the underlying companies, but denied that Novalpina GP would make a representation to the relevant underlying companies, intending for them to rely on it, in respect of Sanne's decision. It is likewise denied that Novalpina GP would relay to the underlying

companies, intending for them to rely on it, any representation originally made to Sanne as part of the recommendation.

31. As to paragraph 21:

    31.1.   The first sentence is admitted, but LuxCo was not a new subsidiary created as a vehicle for any specific investment. Rather, it was the central holding company for most of the respective holding companies of the Fund's various individual portfolio investments.

    31.2.   Paragraphs 21.1 and 21.2 are admitted.

    31.3.   As to paragraph 21.3, the first sentence is admitted. While the second sentence is an oversimplification of how the Transaction was structured, and to that extent denied, it is admitted that as a result of the Transaction the shares in Northpole BidCo ultimately came to be held in the way alleged. On completion of the SPA, Northpole BidCo (then 100%-owned by Northpole Holdco) acquired c. 80% of Triangle. Then, in April 2019, Northpole Holdco's shares in Northpole BidCo were contributed to Square 2, in exchange for a 68.5% shareholding in Square 2 (the remainder of the shares in Square 2 being held, indirectly, by the founders of NSO). Then, in 2020, there was a reorganisation by which Northpole Holdco transferred its 68.5% shareholding in Square 2 to Triangle, in exchange for a c. 70.33% shareholding in Triangle (with the founders and management of NSO holding the remaining c. 29.67% shareholding in Triangle). This reorganisation constituted a slight increase in Northpole Holdco's indirect interest in the NSO business relative to that of NSO's founders and management; that change gave effect to the decision, pleaded further at paragraph 87 below, that the minority shareholders should bear approximately 30% of the costs of the Success Fee paid by Northpole BidCo to Dahbash Assets.

32. As to paragraph 22, the annexing of the structure chart is noted. It is denied that the structure chart depicts the structure as existed at all material times. Rather, it depicts the position as it stood from the time of the reorganisation in 2020.

**The Fund and NSO prior to February 2019**

***The LPs' investment in the Fund***

33.    Paragraph 23 is admitted. By clause 4.5 of the Subscription Agreement, each LP warranted that it had not subscribed to the Fund on the basis of any information other than that in the LPA, the Subscription Agreement, the PPM, and as relevant any bespoke Side Letter entered into by the individual LP pursuant to clause 4.2 of the Subscription Agreement. By clause 4.3 of the

Subscription Agreement, each LP warranted that investment in the Fund involved substantial risks, and that it had—based on the documents specified—nevertheless determined that the Fund was "*suitable*" for it.

34.  Novalpina GP and Sanne raised €1.03 billion in commitments in late 2017 and early 2018. The largest investor in the Fund was OPERF, which invested €200 million. Other significant investors include Compagnie Nationale à Portefeuille ("**CNP**"), which invested €60 million; Centrica Combined Common Investment Fund Ltd ("**Centrica**"), which invested €56 million; Alaska Permanent Fund ("**APF**"), which invested €50 million; ATRF (CB INTL) Ltd ("**ATRF**"), which invested €50 million; South Yorkshire Pension Fund, which invested €30 million; and MDC Capital Partners, a subsidiary of Mubadala, a sovereign investment fund based in the UAE, which invested €50 million ("**Mubadala**"). Generali Group became a significant LP of the Fund with a €60 million investment after the Fund's investment in NSO was publicly known. In accordance with clause 3.1 of the LPA, more than €75m was invested by way of "Sponsor Commitment", consisting of €15.8 million from Group GP (which was indirectly owned in equal shares by the Defendants) and €60 million from Mr Peel's wife, Yana Peel.

35.  As to the Fund's deployment of investor capital, the LPA provided as follows.

35.1.  Clause 2.3.1 provided that the principal purpose of the Fund was to identify, make, hold, and realise investments, subject only to the "*Investment Guidelines*". Clause 2.3.4 empowered the general partner to do everything necessary for carrying out that purpose. Further, clause 10.3 empowered the general partner to "*have full power and authority, exercisable in its discretion, to manage and operate the Partnership [i.e. the Fund] and to undertake portfolio management and risk management with respect to the Partnership*", and thereby bind the Fund without consulting the LPs. Clause. 10.3 was expressly subject to the other provisions of the LPA. In that regard, Clause 10.1 provided that an authorised AIFM (which in the event was Sanne) should be responsible for management and operation, and for portfolio management and risk management. Clause 10.1.3 empowered the general partner to remove and replace the AIFM.

35.2.  By Schedule 1, the Investment Guidelines provided:

35.2.1.  By the "*General*" guidelines at paragraph 1, that the Fund (i) was to invest primarily in established businesses either headquartered in, or having substantial sales or operations in, Europe, and (ii) was to make equity investments with the aim of gaining control of the companies targeted. There

were no general guidelines as to the range of industries in which the Fund was to invest, or as to ESG.

35.2.2. As to the "*Restrictions*" guidelines at paragraph 3, there were various rules in paragraph 3.1 against (without the approval of the Advisory Committee) (i) investing more than 20% of the Fund's capital in one company, (ii) making speculative investments in commodities, and (iii) investing in real estate. Paragraph 3.2 set out in full the only restrictions based on ethical considerations. It provided that the Fund "*shall not invest in any Portfolio Company that is engaged in: [3.2.1] the financing of the production of, or trade in, land mines and cluster bombs; and [3.2.2] financial speculation relating to food commodities*".

35.2.3. Paragraph 6 was titled "*No other restrictions*" and provided that except for the restrictions explicitly set out in Schedule 1 and the wider LPA there was "*no restriction … on the type of Investment in which the Fund may invest*".

36. Each LP was entitled to seek to agree a Side Letter with Novalpina GP, and could, by this means, stipulate an Agreed Policy restricting the types of investments in which it would participate. Notwithstanding that the LPs could have sought such restrictions, none of the LPs, by any Side Letter, stipulated an Agreed Policy precluding participation in investments which raised ESG or reputational concerns. If they had been concerned about such investments or unwilling to participate in them, they would have required such an Agreed Policy.

37. Moreover, at the time of its investment in the Fund, OPERF was the largest single investor in Francisco Partners, i.e. the then ultimate majority owner of NSO. OPERF was accordingly well aware of NSO, of the targeted surveillance industry, and the potential concerns regarding its business (with the "*main reports and articles…expressing criticism of and concern about NSO*" referred to by the Claimants at schedule 1 of the PoC dating back to 2016) and yet continued to be comfortable with its investment in NSO.

38. As for CNP, it forms part of Groupe Frère-Bourgeois ("**GFB**"), a Belgian investment Group. GFB has held various controversial and ESG-sensitive investments which have attracted public criticism, in particular in the French cement manufacturer Lafarge which, during the civil war in Syria, continued to operate, and is reported to have paid millions of euros to armed groups, including ISIS/Daesh, to facilitate such operations. During the discussions between the Novalpina IAs and CNP in respect of CNP's potential investment in the Fund, CNP raised concerns as to whether Sanne's intended strategy of buying stakes in businesses in complex

situations would involve a focus on distressed investments. By contrast, it raised no concerns in respect of reputational risks or ESG. To the contrary, CNP was particularly enthusiastic about the prospect of investments in the gambling industry.

39. ATRF was also particularly enthusiastic about the investments in the gambling sector that formed part of the Fund's pipeline as of November 2017.

40. Accordingly, none of the LPs raised substantial concerns about ESG or reputational risk in the course of subscribing to the Fund, and OPERF was already invested in NSO itself. Ultimately, OPERF, CNP, and Ms Peel supported the acquisition of NSO in June 2018, as is pleaded further below at paragraph 61.

*The Claimants' allegations as to the LPs' investment in the Fund*

41. As to paragraph 24, it is admitted that the PPM was dated 15 November 2017. Novalpina GP marketed the Fund to prospective investors (including those who ultimately became LPs) outside the EEA. Sanne marketed the Fund to prospective investors (including those who ultimately became LPs) within the EEA. The Fund was marketed as a vehicle for investing primarily in businesses headquartered in Europe, or with substantial sales or operations mainly in Europe. Paragraph 24 is otherwise denied.

42. The PPM made clear in section 1 that the proposal was for a "*contrarian approach to investing*" to be adopted, which included the valuation of "*regulatory risk…and other difficult issues which… are generally shunned by other private equity firms*". This was stated to be "*a disposition that Novalpina believes is critical to generate attractive risk-adjusted returns in today's economic environment*". Section 6.3.4 reiterated that the Defendants had a "*Contrarian Investment Philosophy*", and a belief "*that the best investment opportunities are typically in situations and industries where other investors may have overlooked critical facts or where sentiment has swung too far in the negative direction*". It also stated that the Fund would "*aim to find value in transactions where competition is reduced, particularly where due to the complexity of the situation and/or the business*".

43. In addition, the section on "*Investment Limitations*" in section 8 set out various limitations on the scope of the Fund's investments but made no reference to any limitations based on (i) ESG principles, (ii) reputational risks, or (iii) the exclusion of specific industries or commercial domains (other than speculative activities in relation to commodities or currency).

44. As to paragraph 25:

44.1.   It is denied that section 6.2.1 of the PPM purported to identify those industries and markets of particular interest for potential investment by the Fund. Rather, section 6.2.1 explained the manner in which it was intended that potential deals might be sourced. It identified certain general themes (not specific industries or markets) that the Fund would track and research. The list of themes was expressly merely illustrative, and was non-exhaustive, being "*among others*".

44.2.   As to the second sentence, it is admitted that the Defendants screened the cyber-security industry for investments in 2017, but before around spring 2018, the Defendants were focussing on potential investments only in the development and supply of defensive (as opposed to offensive) software. At the time the PPM was issued, Mr Kowski had no material knowledge of offensive spyware products of the kind developed by NSO, and was not aware of NSO as a potential investment. It is also admitted that the PPM did not include the cyber-security industry on the illustrative and non-exhaustive list of themes. Such non-inclusion is a matter of no significance.

44.3.   As to the third sentence, it is admitted that the PPM did not specifically identify interest in the Fund investing in the offensive spyware industry. Mr Kowski (and, he believes, the other Defendants) had no such specific intention or interest at the date of the PPM. The Claimants have now admitted in their response to Mr Kowski's Part 18 request that they have "*no details*" of the Defendants in fact looking into any offensive spyware investments at the relevant time. No such research was in fact undertaken until around spring 2018.

44.4.   It is, however, denied that the PPM identified no intention or interest in the Fund investing in areas that would potentially give rise to significant ESG or reputational concerns. The PPM repeatedly referred to the "*contrarian*" approach, and, moreover, the list of themes at section 6.2.1 referred to (i) the gaming and leisure industry, which included the gambling industry; (ii) commodity-exposed conglomerates, which included mining companies; and (iii) the automotive sector. The examples given of the Founding Partners' prior investments in the PPM included several investments in the alcohol industry. In any event, as aforesaid, the PPM, like the Investment Guidelines in the LPA, made no reference to ESG or reputational risk and there was nothing in the PPM to suggest that investments with ESG or reputational concerns would be excluded (as would have been stated if that was intended to be part of the strategy).

44.5. Further and in any event, clause 10.3.1 of the LPA gave the general partner (or as appropriate the AIFM pursuant to clause 10.1) the power to formulate the investment policy of the Fund, subject to the Investment Guidelines, and by clause 10.3.36, to communicate with the LPs in that and other regards "*whenever it shall think fit*".

45. As to paragraph 26, is admitted that the PPM referenced a "*Rigorous Underwriting Approach*" and "*detailed due diligence*". In addition, the entry in section 9 on "*Due diligence*" made clear that *"the Investment Advisors' investment professionals will use publicly available information, as well as information from their relationships with former and current management teams, consultants, competitors and investment bankers."* The PPM stated in terms that (as would in any event have been apparent), *"Such level of due diligence may not, however, reveal all matters and issues, material or otherwise, relating to prospective investments.*"

46. As to paragraph 27, it is not admitted that the LPs or any of them subscribed to the Fund in reliance on the PPM. Page 3 of the PPM stated that, "*Prospective investors must rely on their own examination of the legal, taxation, financial and other consequences of an investment in the Fund, including the merits of investing and the risks involved. Prospective investors should not treat the contents of this Memorandum as advice relating to legal, taxation, or investment matters and are strongly advised to conduct their own due diligence.*" Page 4 of the PPM stated that, "*all views expressed… regarding future events… represent the General Partner's own assessment and interpretation of information available to it*", and *"Prospective Investors must determine for themselves what reliance (if any) they should place on such statements, beliefs, views, projections or forecasts and no responsibility is accepted by the General Partner in respect thereof*". Moreover, each LP confirmed in clause 4.2.3 of the Subscription Agreement that the PPM did not form part of the agreement with the Fund. The second sentence is admitted.

47. As to paragraph 28, the paragraph up to the semi-colon is admitted. The remainder is denied. The risk appetite of any institutional investor or family office will vary from one investor to another. The LPs who invested were not "*naturally sensitive*" (insofar as the term can be understood) to investments raising "*significant ESG and/or reputational concerns*". Pursuant to clause 4.5.6 of the Subscription Agreement, each LP warranted that it had not, in subscribing to the Fund, relied on any information other than that in the LPA, the PPM, the Subscription Agreement itself or any relevant Side Letters; none of which made provision in respect of ESG. No admission is made as to whether each LP in fact relied upon the LPA, the PPM, the Subscription Agreement and any relevant Side Letters. The LPs were all aware of the facts that the Fund (i) was held out as having a contrarian investment strategy, (ii) had Investment Guidelines permitting investment in almost any industry, (iii) made no provision for ESG or

reputational concerns in the LPA or the PPM, and (iv) allowed LPs (a) no operational role in making investment decisions, (b) limited input into such decisions only at the general partner's discretion, and (c) very limited scope for abstaining from particular investments or withdrawing from the Fund. In any event, as pleaded further below, the three LPs who had made the largest Commitments specifically voiced support for the acquisition of NSO, and Generali Group (via its subsidiary Lion River NV), another large investor which subscribed €60 million and became a member of the Advisory Committee, made its investment after the transaction with NSO had been announced.

48. As to paragraph 29:

48.1. The first sentence is admitted. Clause 12.1 of the LPA obliged the general partner to establish an Advisory Committee, but empowered the general partner, as its own discretion, to select which LPs were invited to nominate members of the Advisory Committee.

48.2. As to the second sentence, clause 12.2 of the LPA provided that the Advisory Committee would be "*available*" to "*provide guidance*" to the general partner, the AIFM, and the Novalpina IAs. The LPA (at clause 12.2.1) required the general partner only to consult the Advisory Committee in respect of actual or potential conflicts of interest referred to the Advisory Committee; and (at clause 12.2.3) merely provided that the Advisory Committee "*may*" be consulted on other "*matters relating to the Fund*". Moreover, by clause 12.3, the Advisory Committee would not take part in the operation or management of the Fund, including by undertaking portfolio or risk management or providing investment advice. There was accordingly no obligation to consult the Advisory Committee, save in respect of conflicts of interest referred to it, and no obligation to seek its consent. Even in supplying or withholding consent when asked, the Advisory Committee would merely be providing guidance, and was expressly precluded from participating in actual decision-making. As the Claimants admit in paragraph 20 of their Response to D3's RFI, there was no duty to consult the LPs prior to an investment and the LPs had no legal right to prevent an investment. The second sentence is, save as consistent with the foregoing, otherwise denied.

49. Paragraph 30 is denied. Paragraphs 7 and 40 above are repeated. Moreover, as aforesaid, OPERF was already invested in NSO at the time of its investment in the Fund. Further, as pleaded further below, the three LPs who were the largest investors in the Fund were specifically consulted on the potential acquisition of NSO and expressed support for that

proposed transaction in June 2018. In any event, a significant majority of the LPs represented on the Fund's Advisory Committee provided in 2020 their consent to the Fund's investment in NSO exceeding 20% of the Fund's capital (they would not have done so if they had been opposed to the investment), and provided additional consents for follow-on investments in NSO on two further occasions in October 2021 and July 2022 (after Novalpina GP had been replaced as general partner of the Fund).  In any case:

49.1.    Even had the majority of LPs been opposed to such investments, investment decisions were a matter for the general partner acting via the AIFM, and there was no obligation to consult the LPs or seek their consent. There was accordingly no question of "*proper consultation*", and no lack of the same regardless - and the Claimants now accept in paragraph 19 of the Response to D3's RFI that there was no obligation to consult the LPs.

49.2.    Even had a majority of LPs been opposed to such investments, and been minded to take all steps available to them to prevent the investment, they would not have been able to do so. As pleaded further below, removal of the general partner without cause required a super-majority of LPs representing 75% of the total contributions made to the Fund. As pleaded further below, such a removal would not in any event have been possible until November 2019, long after the acquisition of NSO.

50. As to paragraph 31, it was for Novalpina GP (acting as appropriate via Sanne) to decide how the best interests of the Fund should be pursued, not the LPs. In any regard, it is denied that there were "*such*" LPs for the reasons pleaded above, and it is further denied that "*such*" LPs formed the largest investors by asset volume in the fund. The majority of the LPs were not and could not reasonably have been opposed to investments such as the acquisition of NSO. As pleaded further below, the three LPs which had made the largest investments in the Fund expressed support for the acquisition of NSO; Generali Group invested into the Fund after the Fund's investment in NSO had been made public; and the Advisory Committee provided written consent for the Fund's investment in NSO to exceed 20% of the Fund's capital on three separate occasions (in 2020, 2021 and 2022). In any event, the interests of the Fund were best served by the maximisation of the returns on the capital invested in it, regardless of any ESG-related or reputational concerns harboured by individual LPs (if, which is not admitted, such concerns in fact existed). Save as aforesaid, paragraph 31 is denied.

51. Paragraph 32 is therefore denied.

52. Paragraph 33 is accordingly denied. There was no reason to think that most or any LPs would be opposed to the acquisition of NSO, and the Defendants certainly did not "know" that they were. In any event, as pleaded further below, the risk of adverse publicity in respect of the acquisition of NSO was a risk obvious at the time of the acquisition, including to the LPs.

53. As to paragraph 34, the alleged inference is baseless, and is denied.

   53.1.    The Defendants had made no inquiries in respect of the offensive spyware industry by the time of the First Closing Date, such that there was no deliberate decision to exclude the possibility of investing in an offensive spyware company from the PPM. In any case, for the reasons set out above, the PPM was explicitly stated to be non-exhaustive and illustrative only.

   53.2.    In any case, the Defendants would (on the Claimants' premise, which is denied) have had no reason to avoid alerting potential pension and institutional investors to the possibility of an investment in a company such as NSO. The largest investor in the Fund already held a substantial investment in NSO, the key investors all specifically supported the investment in NSO once it came to be considered, and all of the investors in the Fund subscribed to the Fund on the basis that it would follow a contrarian investment strategy without any specific ESG restriction.

   53.3.    The Defendants spoke freely about their pipeline when investing and included NSO in that pipeline once it became a realistic prospect for the Fund.

## _NSO_

54. Paragraphs 35 and 36 are admitted as a partial but incomplete description of the NSO corporate structure. NSO's holding company was Triangle., which owned Square 2, which in turn owned OSY, which in turn owned Q Cyber, which in turn owned NSO Group. The development of offensive spyware products is and at all material times has been the core of NSO's business and a key part of its commercial proposition. While, as of the time of the Transaction, Pegasus represented a significant portion of NSO's revenues, NSO had other products, such as Landmark and Pixcell, that also contributed substantially to its revenues. In the years following the Transaction NSO expanded successfully into other related domains, including counter-drone technology.

55. Paragraph 37 is admitted, save that prior to the Fund's investment in NSO, NSO founders and management held less than 20% of the shares in NSO. As aforesaid, OPERF was a major investor in Francisco Partners, which owned NSO.

*__Novalpina's approach to Francisco Partners__*

56. As to paragraph 38, until in or around early spring 2018 Mr Kowski (and as far as he is aware the other Defendants) and the Novalpina IAs only considered the possibility of investment in the defensive cyber-security sector. They were alerted to the possibility of investment in the offensive spyware sector, and in NSO in particular, only when Mr Dahbash approached Mr Kowski in around spring 2018. Mr Dahbash stated to Mr Kowski that NSO was an exciting business with great performance and prospects for growth. He told Mr Kowski that he would send him a short memorandum on NSO, with information on its financials, and did so on 10 April 2018. The Novalpina IAs began to take steps to pursue a potential investment in NSO shortly thereafter. Save as aforesaid, paragraph 38 is denied.

57. Paragraph 39 is admitted.

58. As to paragraph 40, the first and second sentences are admitted. "LI", or "*lawful interception*", involves service providers and network operators providing access to communications in compliance with warrants or other lawful authority. Offensive spyware provides solutions in circumstances where LI is not feasible. As such, Novalpina International did not represent to NSO that it had spent considerable time evaluating NSO's own business or immediate sector.

59. In response to the letter dated 2 May 2018, Francisco Partners said that the price proposed was below its reserve valuation, and expressed concerns about how quickly the Fund would be able to execute any transaction, and how much certainty the Fund could provide.

60. On 3 May 2018, following approval being given by Francisco Partners, Q Cyber Technologies Sarl, a Luxembourg holding company in the NSO structure, signed a confidentiality agreement (the "**Confidentiality Agreement**") with Novalpina International, pursuant to which Novalpina International would receive information from Francisco Partners Management LP ("**FP**") and NSO in connection with a potential purchase of NSO. FP further approved Novalpina International having direct communications with Mr Hulio and Eran Gorev of NSO, concerning the possible transaction.

61. Having received Francisco Partners' response to its letter of 2 May 2018, and with Francisco Partners having approved the signing of the Confidentiality Agreement, Novalpina International consulted the three LPs who had made the largest Commitments, namely OPERF, CNP, and Mrs Peel.

    61.1.   OPERF was consulted at a meeting in London on 15 June 2018 between the Defendants and Michael Langdon, the Senior Investment Officer for Oregon State Treasury

overseeing private equity for OPERF. Mr Langdon commented that NSO was one of the best businesses he had ever seen, and expressed support for the idea of the Fund investing in NSO.

61.2.    CNP was also consulted in the week of 11 June 2018. On 21 June 2018, Benoit Robertz of CNP wrote to the Defendants by email. He said that the Fund's "*pipeline definitely illustrates the fund mandate for complex and creative transactions*". He added that "*[a]lthough the sports-related opportunity will be too small a coinvest as a single event, we would be keen to remain in the loop on the other 2 opportunities (cyber/Eagle) if/when they progress further. We like the thesis and understand the coinvest tickets could be more significant*" (emphasis added). The reference to "*cyber*" was to the NSO transaction. As such, CNP took such a favourable view of the NSO acquisition that it had an interest in co-investing, i.e. acquiring a stake for itself directly alongside its investment via the Fund.

61.3.    Mr Peel consulted Mrs Peel, who was extremely supportive of the proposed investment.

62. Therefore, as to paragraph 41, while it is admitted that on 24 June 2018 Novalpina International sent a non-binding offer letter to Francisco Partners in the terms the Claimants' quote, the statements were true, as OPERF, CNP, and Ms Peel had been consulted about the acquisition of NSO, and had expressed support for purchase or co-investment.

63. For the same reasons, as to paragraph 42, while the basis on which the Claimants intend to put their case is noted, it is denied that the Claimants' assertions are correct. There were no false representations in in the 24 June 2018 letter. In any case, points (i) to (v), which proceed on the premise that the institutional LPs would not support the potential acquisition of NSO and that Mr Kowski and Mr Peel knew this, are false for the reasons stated above. Further, and in any event, as to point (iv), the opposition of one or more LPs (even if there had been any such opposition, which there was not) did not determine whether an investment would or should be pursued or continued for the reasons set out above.

64. As to paragraph 43:

64.1.    Matt Spetzler of Francisco Partners emailed Mr Kowski on 13 July 2018, granting Novalpina International permission to visit the NSO offices in Israel, meet some of the team and (if approved for compliance purposes, as it ultimately was) view some of the product. While Mr Spetzler said that Francisco Partners was not "*willing to jump into a due diligence session or process now*", he said that he was open to "*deal related discussions*" and "*process asks*" so long as they were addressed to him rather than

NSO's management. Mr Spetzler indicated that there was the potential for a collaborative deal with the Fund. On 18 July 2018 members of Novalpina International——to the best of Mr Kowski's recollection, Chris Backes, Juliette Sourisse, Mickael Betito, Mr Peel and Mr Kowski himself—visited NSO's offices in Israel, saw a demonstration of some of NSO's products, and conducted several sessions with NSO's research and development personnel. Following this visit, on 23 July 2018, Novalpina International sent a further offer letter to Francisco Partners.

64.2.   On 13 August 2018, Mr Peel met with Dipanjan Deb, the co-founder and CEO of Francisco Partners. Mr Deb indicated to Mr Peel that Francisco Partners wished to take some time to decide whether to sell its stake in NSO in the short term. From this conversation, it was clear that the putative acquisition of NSO by Verint would not proceed. On 14 August 2018, Mr Peel emailed Mr Deb, acknowledging Francisco Partners' preference to wait but seeking to persuade him to proceed with a sale to the Fund immediately. Later on 14 August 2018, Mr Deb emailed Mr Peel stating that "*we are not prepared to move forward at this time*" but that "*[y]ou guys [i.e. Novalpina International] will certainly get a call if we decide to transact*".

64.3.   Save as it is consistent with the aforesaid, paragraph 43 is denied.

65. Paragraph 44 is admitted. The new offer in January 2019 was made in the context of Francisco Partners' engagement with Novalpina International's earlier offers and a call from Mr Hulio to Mr Kowski on around 4 January 2019 to say that Francisco Partners had decided to pursue a sale of its investment in NSO.

### *Novalpina's due diligence in respect of NSO*

66. The Novalpina IAs arranged for thorough due diligence in respect of NSO in January 2019 from highly-regarded specialist firms. More particularly, they commissioned: (1) Hakluyt Cyber ("**Hakluyt**") to conduct a "*market and technical assessment*" of NSO and its products and the demand for those products; (2) Deloitte LLP ("**Deloitte**") to conduct a tax and financial assessment of NSO, covering the quality of its earnings, its historical trading, its balance sheet and net debt, its working capital and cash flow, its accounting policies, and its tax position; (3) Weil, Gotshal & Manges LLP ("**Weil**") to undertake legal due diligence, covering NSO's corporate structure, its material commercial arrangements, the financing of the proposed acquisition, NSO's IP position, NSO's employment and incentive programmes, NSO's regulatory and compliance position, litigation, and real estate. As pleaded further below, Weil's work on regulatory and compliance involved a detailed assessment of NSO's adherence to

export rules, its customer vetting processes, and its processes for identifying and addressing customer misuse. In late January 2019, Hakluyt, Deloitte, and Weil produced full reports (the "**DD Reports**") setting out their respective findings. In addition to formal technical, financial, and legal due diligence, Novalpina International commissioned Weil and Gunter Schmid to conduct a separate ESG review of NSO (the "**ESG Review**").

67. Weil's report on its legal due diligence work (the "**Legal Report**") found as follows in relation to compliance:

67.1. Firstly, NSO had a "*Rigorous New Deal Approval-Process … ensuring that only vetted government agencies are approved to use the Target Group's technology for legitimate and legal purposes in an ethical manner. This five-step-process goes far beyond legal requirements and can be classified best-in class.*" As to this five step process:

67.1.1. The first step was due diligence and approval by management. In 2018, management declined to pursue business opportunities worth US$168 million.

67.1.2. The second step was initial approval from the BEC, a committee reporting to the board and comprising, along with senior executives and board members, four experienced independent Israeli and American advisers from the legal, diplomatic, and national security domains. Weil set out the BEC's voting procedure in deciding on approval: "*The presence of a majority of the members constitutes a quorum, provided that such majority includes at least the Chief Executive Officer, the General Counsel and three of the independent advisors. Decisions to approve an application must be taken unanimously*"—i.e. unanimously among the quorate members present. Weil also noted that in taking its decisions, the BEC took account of "*[i]nformation from international/domestic NGOs, think tanks, academics organizations*" and "*[r]eputational risk ... concerned with the external view of the supply of a particular solution to a customer, notwithstanding the legality and propriety of the proposed sale*".

67.1.3. The third step involved imposing obligations on the prospective customer to ensure regulatory compliance. Weil stated that "*[f]or the process to move forward, the customer needs to accept very strict compliance obligations*".

67.1.4. The fourth step was applying for export licences, with the relevant licensing authority—the Defense Export Control Division of the Israel Ministry of

Defense ("**IMOD**")—adding an additional layer of control to NSO's internal controls.

    67.1.5.  The fifth step was final BEC approval after receipt of an export licence, with the BEC reviewing recent developments before deciding which course to take.

67.2.  Second, NSO had a "*well-developed process to prevent misuse of the products once the customer has been provided access to the product*". On being alerted to "*a suspected misuse of its products, it immediately launches a formal process including both the Target Group's management and the BEC to investigate the allegation*". Further, "*[d]epending on the (preliminary) findings of such investigation, the Target Group typically suspends and shuts down its products until the investigation is finalized*". Moreover*, "should management's or the BEC's investigation, or any other official investigation by the customer itself or supervising governmental institutions, such as parliament, find the customer to be in breach with such obligations or to have used the product in any other unethical manner, access to the Target Group's products will remain suspended*".

67.3.  Third, NSO had a "*firm*" anti-bribery and corruption compliance structure "*implemented throughout the Target Group*" which had "*proven to be very effective*". Weil concluded that "*[a]ccording to our experience, the Target Group's compliance efforts can be classified as world-class*".

67.4.  There was no indication that NSO had received any complaints in respect of non-compliance with data protection laws, and in any event did not itself process personal data on behalf of customers.

67.5.  Weil explained that the NSO "*obtains defense export licenses pursuant to Art. 15 DEC Law [the relevant Israeli legislation]… before exporting security equipment/security knowledge/training*". Weil added that NSO had "*adopted a comprehensive export control policy… designated to ensure compliance with all applicable export control laws and regulations*".

68. In respect of these five issues—approval of new customers, monitoring of existing customers, anti-corruption, data protection, and compliance with export licensing—Weil assessed the first four as green, i.e. raising no concerns and warranting inclusion "*for information purposes only*". Weil assessed the fifth issue as yellow, i.e. an "*important commercial item*" but not a red "*deal-critical item*".

69. In addition to setting out its findings, Weil noted certain limits on the material it had been able to review. They included that the Legal Report was "*solely based*" on (i) documents and information made available in a data room by NSO (via Novalpina Capital) and (ii) "*oral information provided by certain representatives of the Target Group, certain shareholders of the Target Group and their respective advisors*" at a "*Legal Expert Session*" in Tel Aviv on 20 January 2019. Weil noted that "*The accuracy of this Report is necessarily dependent on the documents and information provided to us being true, complete and not misleading.*" Weil added: "*This applies in particular to those agreements which were provided to us only in redacted form, i.e. in which the relevant commercial information was redacted.*" Weil also stated that "*we were not provided with the existing export licenses due to the Target Group's strict confidentiality obligations towards the customer*", and, as to end-user agreements ("**EUAs**") with customers, that, "*We have only been provided with forms of the end-user/reseller agreement since the information on the customers are highly sensitive and subject to comprehensive confidentiality obligations towards the customers.*"

70. However, Weil explained that its findings were robust despite those limits, and in particular despite the fact that it had not been able to review actual export licences or customer agreements. Specifically:

   70.1. As to export licences, Weil stated that NSO had "*adopted a comprehensive export control policy*", which had been available for review. It also stated that "*in the Legal Expert Session, the Target Group's management confirmed to be in full compliance with the export laws applicable to the Target Group.*"

   70.2. Further as to export licences, Weil stated that "*the IMOD carries out periodic audits of NSO's facility to ensure compliance with its rules and record keeping requirements. We are not aware of adverse findings from those audits*".

   70.3. As to customer agreements, Weil stated that, as a result of the information NSO provided during the Legal Expert Session, 85% of actual customer agreements reflected the form provided via the data room and "*[t]he remaining 15% were subject to limited negotiations, in particular, regarding (i) governing law and (ii) the prerequisites under which the Target Group may cancel a customer's product license (e.g. (a) already based on suspecting a breach or (b) only with proof of a breach)*". Weil also indicated that the provisions in customer agreements designed to prevent misuse had been effective in practice. As explained in the Legal Expert Session, NSO had shut down a customer's access to the product for material breach of compliance representations under an EUA

on four separate occasions. Meanwhile, in practice, "*[t]he potential shut down mechanisms allowed in favor of the Target Group under the EUA are oftentimes a sufficient stimulus for the end-users to show a certain degree of cooperation with the Target Group in situations where the Target Group intends to carry out further investigations based on receipt of allegations of misuse*". Weil added that "*management has confirmed in the Legal Expert Session that in the past, all customers subject to an investigation have fully cooperated with the Target Group*".

71. The ESG Review found that NSO had a "*good*" overall rating of 76%, with a particularly high score (90%) in "*governance*" and a 77% score in "*social*" (defined to include "*[r]esponsible use of the applications*"). The review noted that NSO would benefit from a more transparent approach to human rights impact assessments and reputational risk management, and that it should address adverse media coverage more effectively in order to prevent reputational risks.

72. In the premises:

72.1.   Novalpina International commissioned experts who carried out a high standard of financial, legal, and tax due diligence, in compliance with the Investment Advisory Agreement, in respect of all transactions ultimately recommended to Sanne as AIFM.

72.2.   The Novalpina IAs conducted (through instructed experts) detailed due diligence consistent with a rigorous underwriting approach, in accordance with the PPM.

72.3.   The Novalpina IAs' due diligence was extensive, as set out in the Notice of Acquisition issued by Novalpina Capital to the LPs on 14 February 2019.

72.4.   In any case, Mr Kowski believed all of the matters in paragraphs 67 to 72.3 above to be the case.

73. Following the preparation of the DD Reports, the Novalpina IAs produced a "Final Investment Memorandum" which (amongst other matters) distilled the findings of the due diligence work. The Final Investment Memorandum accurately reflected the Legal Report. It stated that, "*There are no material red flags and the due diligence confirmed our initial thesis.*" Further, in general terms, NSO had a "*best-in-class legal, compliance & ethical framework*". As to the decision-making of the BEC in particular, "*[a]pprovals will only be given where there is unanimous agreement <u>from all the members present</u>*" (emphasis added.)

74. The Final Investment Memorandum also made clear that, nevertheless, there was a risk that "*[r]eputational issues could deteriorate and impact performance*". Moreover, it explained that "*[v]irulent public attacks against NorthPole and its alleged customers may be perceived as a*

*breach of deniability by customers*", "*[r]epeated bad press could also draw employees away from the company*", and "*[r]eputational issues could impact Novalpina*". Further, "*[c]ompany sector and reputation may limit exit options*". It was noted that "*[r]eputational issues have prevented several financial sponsors from acquiring the business in the past (eg. Blackstone, Permira)*".

75. On 25 January 2019, Juliette Sourisse of Novalpina Capital sent final drafts of the DD Reports to Sanne, a step consistent with Sanne's obligations under the AIFM Agreement to review due diligence documents themselves and to exercise all of the skill, care and attention that might reasonably be expected of it.

76. On 31 January 2019, Matt Harrison of Novalpina Capital wrote to Sanne and Novalpina GP. He explained that "*as part of the deal dynamics*" the Novalpina IAs wished in short order to provide to a Francisco Partners, via NSO's management, an equity commitment letter signed by Novalpina GP on behalf of the Fund (among other documents). He added that "*as I understand i[t] to follow the process fully the equity commitment… should only be signed by the GP after*" the Novalpina IAs had issued the Investment Recommendation Letter to Sanne, accompanied by the Checklist, and Sanne had directed Novalpina GP to issue the equity commitment letter. Mr Harrison noted that the equity commitment letter and other documents would only be used in the first instance "*to gauge potential for the deal*", and in light of this state of affairs asked: "*does the Board [of Novalpina GP] and LIS [i.e. Sanne] view there to be flexibility in the need to adhere to the various stages before the signing of the equity commitment letter?*" In substance, Mr Harrison wished for Sanne to approve the transaction to Novalpina GP, and Novalpina GP to act on this step by signing the equity commitment letter, before the Novalpina IAs issued the Checklist (albeit on the basis that the equity commitment letter would be non-final).

77. Later on 31 January 2019, Allen Foley, one of the managers of Novalpina GP, replied to confirm that: "*On behalf of Gaetan and I as managers of the GP, we are comfortable to move ahead with the documents on a pre-approval basis due to the level of information we have received on the management buyout….*". On 1 February 2019, a representative of Sanne confirmed that: "*we need to have an investment recommendation by the IA as prerequisite for any investment decision that LIS [i.e. Sanne] takes and to perform a proper DD… In order to proceed we will need to receive the signed Investment recommendation and respective investment documents to take the respective decision. The equity commitment letter cannot be signed under the Funds name before the investment is approved by the AIFM.*"

78. Later on 1 February 2019, Samir Patel of Novalpina Capital sent to Sanne and Novalpina GP the following documents (amongst others) in accordance with Schedule 4 of the Investment Advisory Agreement: (i) the Investment Recommendation Letter; (ii) the Investment Summary in the form of the Final Investment Memorandum ,which itself enclosed the final DD Reports; (iii) the Checklist; and (iv) the draft Share Purchase Agreement ("**SPA**").

79. Paragraph 45 is admitted.

## The alleged conspiracy to use unlawful means

80. Paragraph 46 is denied. The respective elements of the conspiracy are pleaded to (and denied) further below. However, there was no intent on the part of the Defendants, as of 15 November 2017 or at any of time, to harm the interests of the Claimants or any of them. Not only were the Defendants unaware of and not considering an investment in NSO at that time, but far from intending to injure the Claimants, the Defendants' interests were entirely aligned with the Claimants' interests in respect of the transaction, given the Defendants' own, significant, investment.

81. As to paragraph 47, the first sentence is admitted. As to the second sentence, it is denied that the Defendants could have had an intention to harm persons which did not yet exist at the time the intention was allegedly formed or in fact did so. In any event, it is denied that the Defendants intended to harm any entity associated with the Fund for the reasons set out herein.

### *The alleged combination and the steps allegedly taken to implement it*

82. As to paragraph 48, it is denied that there was a combination as alleged, and, further, it is denied that the matters relied on properly support such an inference. The assertions made by the Claimants are either incorrect or amount to no more than setting out the normal and unobjectionable workings of a fund of this sort.

    82.1.   As to paragraph 48.1, paragraph 52 above is repeated. Far from keeping any potential investment in NSO hidden, the Defendants were up front with investors about the potential investment once it was in fact in the pipeline. The PPM did not mention the possible investment in the offensive spyware industry because it was not being considered at the time and the PPM did not by its terms exclude such an investment.

    82.2.   As to paragraph 48.2, it is admitted that the Defendants in the exercise of their management role in Novalpina International caused it to recommend the acquisition of NSO. It is denied that the acquisition was not a suitable investment for the Fund and it is accordingly denied that the Defendants were aware of that purported fact. The

acquisition did not violate the Investment Guidelines or conflict with the PPM. The LPs with the largest Commitments supported the acquisition when consulted, and the LP with the largest Commitment of all—OPERF—was already invested in NSO. In any event Mr Kowski believed the investment to be suitable and believed the stated matters to be true.

82.3.   As to paragraph 48.3, the Defendants as aforesaid collectively controlled the Novalpina IAs through the respective management committees. To this extent, the Defendants can be said to have put together and controlled the Deal Team which acted on behalf of the Novalpina IAs. However, the members of the Deal Team acted individually in accordance with general guidelines from the management committees; and the Defendants did not exercise close practical control over the actions of the members of the Deal Team. Save as aforesaid the first sentence is denied. The second sentence is admitted. It is denied that such matters evidence a conspiracy; they are part and parcel of the everyday work of a fund of this sort.

82.4.   As to paragraph 48.4, the first sentence is admitted. The second sentence is admitted, but the recommendation was not a sufficient condition for the Transaction taking place. As to the third sentence, the allegation as to control is admitted only insofar as is consistent with the above, and is otherwise denied. It is admitted that any investment recommendation required the consent of the Defendants.

82.5.   The first sentence of paragraph 48.5 is admitted. As aforesaid, the Checklist was sent to Sanne along with the Final Investment Memorandum and the DD Reports (amongst other documents). As to the second sentence, the allegation as to control is admitted only insofar as is consistent with the above, and is otherwise denied. It is admitted that Mr Kowski was aware of and consented to the Checklist being included in the investment recommendation.

82.6.   Paragraph 48.6 is noted. It is denied that the alleged representations contained within the 1 February 2019 recommendation were false, and it is accordingly denied that the Defendants were aware of their falsity and/or reckless as to their truth. It is admitted that Mr Kowski was aware of the alleged representations.

82.7.   As to paragraph 48.7:

82.7.1.   The first sentence is denied. The Defendants' interests in respect of the transaction were fully aligned with the Fund's and if the investment were inadvisable then that would be directly detrimental to their own interests. Mr

Kowski's only relevant interest was in considering and passing on the findings of the Legal Report to Sanne. The Legal Report stated that NSO's policies in respect of its customers were best-in-class and indicated that NSO's implementation of those policies had been effective. On the basis of (amongst other matters) the DD Reports, the Defendants and Novalpina International formed the view that Sanne should approve the investment and that the Fund should acquire NSO. It is denied if alleged that it was necessary for the Defendants to persuade the LPs that the rumours and allegations in respect of NSO lacked a credible basis. It was Novalpina GP via Sanne, and not the LPs, who made investment decisions in respect of the Fund. It is also denied that the Defendants had an interest in persuading the Fund of anything: the Fund is not an entity which can coherently be said to be persuadable.

82.7.2.  The second sentence is therefore denied. As pleaded further below, the Defendants and the Novalpina IAs in any event made no representations to the Fund.

82.7.3.  As to the third sentence, it is admitted that the Defendants signed the Notice of Acquisition and thereby made the statements contained in it. As pleaded further below, it is denied that any such statements were misrepresentations. It is further denied that the Notice of Acquisition and any alleged representations therein were addressed to the Fund; they were addressed to the LPs only.

82.8.  As to paragraph 48.8, in respect of the first sentence paragraphs 16.3 and 23.1 above are repeated. As to the second sentence, it is admitted that Novalpina International entered into the Engagement Letter on 10 May 2018. Save as aforesaid the second sentence is denied on account of the matters pleaded further below.

82.9.  As to paragraph 48.9, it is admitted that Mr Kowski agreed for Mr Dahbash to be paid the Success Fee by Northpole BidCo shortly after 18 March 2019 pursuant to the Assumption Agreement.

83. Paragraph 49 is therefore denied.

### *The alleged intention to harm*

84. As to paragraph 50, it is admitted that each of the Defendants knew that NSO was within the offensive spyware industry. This fact would have been obvious to anyone who was aware of NSO—including the LPs, Sanne, and Novalpina GP—and had been widely reported. Moreover:

84.1.   As to point (i), this is denied. Paragraphs 52 and 61 above are repeated.

84.2.   As to point (ii), this is denied. In any case, insofar as the acquisition of NSO gave rise to serious ESG and reputational concerns, that fact would have been obvious to Sanne, Novalpina GP, and the LPs regardless of any representations made by the Defendants. In particular, any reputational concerns caused by the potential acquisition of NSO would have been caused by the existing and ongoing public and media controversy around the company.

84.3.   Point (iii) is denied (and it is in any case denied that the Defendants knew this). Neither the Investment Guidelines nor the PPM precluded investments which might give rise to ESG or reputational concerns. Various of the LPs which had made the largest commitments held such investments (including, in OPERF's case, in NSO itself). The three LPs with the largest commitments voiced their support for the acquisition of NSO in June 2018. Generali Group made a substantial investment in the Fund after the Fund's investment in NSO had been made public. In any event, the ESG Review indicated that NSO's ESG status was good, and the Legal Report stated that NSO's compliance processes were best-in-class. Point (iv) is denied in the premises (and it is in any case denied that the Defendants knew this). Point (v) lacks particularity. Insofar as it is alleged that representations in the Notice of Acquisition were knowingly or recklessly false, this allegation is denied on account of the matters pleaded herein.

85. As to paragraph 51:

85.1.   The first sentence is denied in the premises (and it is denied, in any event, that there was any deliberate decision to mislead).

85.2.   Further as to the first sentence, it is denied in any event that the Defendants' conduct in respect of the acquisition of NSO could constitute an intention to harm the Fund. As aforesaid, the Defendants and their associates invested more than €75 million in the Fund. The Defendants' interests and the Fund's interests were fully aligned, rather than being opposite sides of the same coin.

85.3.   Further as to the first sentence, it is denied that allegedly recklessly running the risk of harm to the Fund constitutes an intention to harm for the purposes of the tort of unlawful means conspiracy. In any event, it is denied in the premises that the Defendants did recklessly run any risk of harm to the Fund. The Defendants reasonably believed, including on the basis of the detailed due diligence work, that the investment could

prove very profitable for the Fund (and hence also for the providers of the Sponsor Commitment) whilst (for obvious reasons) not being able to guarantee a positive return.

85.4. The second sentence is denied. On any view, there was no intention to harm. In any event, the Defendants' belief that the acquisition of NSO could be a very profitable investment for the Fund was not an ill-conceived hope but entirely reasonable (and justified by subsequent events, as pleaded further below). It is also denied that the Defendants considered that there would be "*initial harm*" from the transaction (such assertion being wholly unparticularised).

86. As to the main body of paragraph 52, it is denied (on account of the matters pleaded below) that the Defendants procured Novalpina International to agree to pay a bribe or corrupt payment to Mr Dahbash. In any event, even had the Defendants so acted (which they did not) that action would not establish an intention to harm the Claimants. Any such wrong would only have been committed against Francisco Partners and/or NSO's other shareholders in their capacity as counterparties to the transaction and (purported) principals of Mr Dahbash, and to the benefit of the Fund as the party gaining an advantage from Mr Dahbash's services.

87. As to paragraph 52.1, it is admitted that Mr Dahbash's Success Fee was ultimately accounted for in the books of Northpole BidCo. Approximately 30% of the cost of the Success Fee was in fact borne by the members of the NSO founders and management who participated in the Transaction, and this arrangement was given effect by way of Northpole Holdco acquiring more shares in Triangle than it would otherwise have done. It is therefore denied that the payment to Mr Dahbash entailed an illegitimate extraction of funds from Northpole BidCo.

88. As to paragraph 52.2, it is admitted that bribery may depending on the specific circumstances give rise to potential legal liability and in certain circumstances loss of reputation. Whether or not an act of bribery will have a negative financial impact will depend on the specific factual circumstances. However, such matters are irrelevant because the payment to Mr Dahbash was not a bribe. In any case, the assertion that any alleged bribery "*involves*" the LPs invested in the Fund in the relevant conduct, is denied.

89. As to paragraph 53, this consists of inappropriate legal argument and is liable to be struck out. To the extent it can be understood, it is denied. There was no intention to harm (whether deliberate or reckless). Moreover, it is denied, if it be alleged, that recklessness as to harm constitutes intention to harm for the purposes of the tort of unlawful means conspiracy. In any event: (1) the person in a position to sanction the proposed investment in NSO was Sanne, and, insofar as the Defendants can be said to have targeted any unlawful conduct by means of the

representations on 1 February 2019 at Sanne (which is denied for the reasons set out herein), the Claimants would have no cause of action. It is denied that the LPs or any of the Claimants was in a position to sanction the investment, *de iure* or *de facto*. (2) The contents of the Notice of Acquisition were addressed to the LPs. Any unlawful conduct by means of these representations (which is denied) was thus directed at the LPs, not the Claimants. (3) In respect of the alleged breaches of the LLP duties (which in any event are denied), any unlawful means could only have been targeted at the Novalpina IAs, not the Claimants. (4) In respect of the alleged bribe or corrupt payment to Mr Dahbash (which is denied) any unlawful means could only have been targeted at Francisco Partners, not the Claimants.

### *The alleged unlawful means*

90. Paragraph 54 is denied in the premises and on account of the matters pleaded below. As to paragraph 54.4, it is noted that the Claimants rely on the allegation of bribery only to found a claim in unlawful means conspiracy, and they advance no free-standing claim in the tort of bribery. The Defence therefore proceeds on that basis. Further as to paragraph 54.4, it is noted that the unlawful means in respect of bribery on which the Claimants rely in the PoC is the criminal offence of bribery (under whatever law is applicable), but in paragraph 28 of the Response to D3's RFI the Claimants indicate that they will seek also to rely, for the purposes of founding the unlawful means conspiracy, on the civil tort of bribery. This Defence accordingly addresses both of these matters.

### *The alleged loss*

91. Paragraph 55 is denied, except that the price of the acquisition paid by Northpole BidCo was €218.5m. In particular:

91.1. The allegation that "*the Claimants*" acquired NSO is denied. Northpole BidCo acquired shares in Triangle pursuant to the Share Purchase Agreement. The funds Northpole BidCo applied to complete on the Share Purchase Agreement comprised (i) US$510 million of syndicated debt borrowed pursuant to the Credit Agreement and (ii) an equity commitment of €218.5 million pursuant to an "Equity Commitment Letter" dated 10 February 2019 executed by Novalpina GP on behalf of the Fund. The Equity Commitment Letter explained that the funds would be provided "*directly or through one or more holding companies of the buyer*". In the event, the Fund acting through Novalpina GP supplied the funds to LuxCo, which supplied them to Northpole Holdco, which supplied them to Northpole BidCo.

40

91.2.  Accordingly, the Fund had no direct exposure to the Transaction, but merely invested in the central holding company for all its investments. Had the Transaction not gone ahead or had it never been contemplated, the Fund's deployment of its own capital would have been the same: it would have invested the funds it had raised from LPs in LuxCo, and those funds would have been deployed by LuxCo to finance whichever investments Sanne did decide to pursue. Accordingly, the Fund on any view suffered no loss as a result of the transaction.

91.3.  In any case, even if the Fund suffered any loss (which is denied), this was merely reflective loss. Accordingly, it would not be recoverable by the Fund.

91.4.  Further, in the premises, Northpole Holdco on any view suffered no loss as a result of the Transaction either. Any diminution in the value of its shares in Northpole BidCo was likewise a mere reflective loss.

92.  Moreover, in any event, Northpole BidCo ultimately realised no value for its shares in Triangle only because of intervening acts which broke the chain of causation linking back to the original acquisition of NSO, and/or because of its failure to mitigate its loss.

93.  After the Transaction completed on 18 March 2019, the Fund's investment continued to be valuable and indeed substantially increased in value.

93.1.  In the following years, NSO's targeted surveillance technology business continued to be highly profitable, its compliance and regulatory procedures were further strengthened, and it successfully expanded its operations into new areas with high upside (in particular counter-drone technology).

93.2.  From October 2020, there were various third-party offers to make large equity investments in NSO on the basis of enterprise values substantially higher than that on which the Fund's acquisition had been based.

93.3.  In particular, from May to summer 2021, the Fund had the opportunity to realise approximately half of its investment in NSO for around 2.4 times the price that it had originally paid. In accordance with the term sheet signed on 20 May 2021, the new investor would have acquired shares in NSO from the Fund and NSO management for $187.5 million (hence at a 2.4x uplift). This transaction would have in effect enabled the Fund to return half of its initial investment amount in NSO to the Fund's investors, while still holding 65% of its original investment in NSO. The transaction would also have substantially strengthened NSO's position and thus the remaining Fund investment

(by establishing a close relationship with another government, in addition to NSO's existing relationship with the Israeli government).

93.4.    To the best of Mr Kowski's knowledge (based on what Mr Hulio told him at the time), in August 2021 the Fund had the opportunity to sell its entire interest in NSO to the said new investor.

93.5.    Meanwhile, on 6 August 2021, EY independently valued the Fund's investment in NSO as of 30 June 2021 at €998.3 million, or roughly 4.6 times the amount that the Fund had paid for its investment in 2019.

93.6.    The Fund, via NOAL GP, made at least two follow-on investments in NSO after Novalpina GP was removed without cause as general partner in August 2021: one in October 2021 and one in July 2022. NOAL GP obtained approval for each of these investments from the 10 largest investors who were represented on the LPAC.

94.    That a substantial part, or all, of the Fund's investment in NSO was not realised in 2021 was the result of the actions of persons other than Mr Kowski, including (after Novalpina GP's removal without cause on 27 August 2021) NOAL GP. More particularly:

94.1.    From 2020 onwards, Mr Peel provoked a dispute among the Defendants by seeking to revise the terms of the relationship between him, Mr Kowski, and Mr Lueken in his favour, and to take sole control of Novalpina Topco and the Novalpina IAs.

94.2.    Supported in particular by Mr Langdon of OPERF, Mr Peel sought to co-ordinate and enter into an agreement with the LPAC with the aim of the LPs removing Novalpina GP as general partner of the Fund and replacing it with a general partner solely owned by Mr Peel (albeit that in the event, the LPs removed Novalpina GP without cause and appointed, in NOAL GP, a general partner not connected with any of the Defendants). On 9 July 2021 the LPs voted to remove Novalpina GP (without cause) pursuant to clause 20.2 of the LPA. On 27 August 2021 the LPs purported to appoint NOAL GP as general partner in place of Novalpina GP.

94.3.    The efforts by the LPAC and LPs to remove Novalpina GP in July and August 2021 coincided with negotiations with an investor. The prospect of the replacement of the general partner of the majority owner of the NSO disrupted the negotiations with the investor. On 21 June 2021 Mr Kowski and Mr Lueken wrote to the LPAC informing the LPAC that there was an accretive partial sale process of NSO underway, warning the LPAC that a removal of Novalpina GP could jeopardise the partial NSO exit process,

and asking the LPAC to refrain from removing the Novalpina GP for a period of six to eight weeks, to, among other things, allow the partial NSO exit process to positively conclude. On 28 June 2021, Mr. Kowski and Mr. Lueken wrote to all LPs in the Fund to inform them of the partial NSO exit process that was underway, highlighting that the partial NSO exit valued NSO at around 2.4x the original price paid in 2019, and would result in the Fund returning more than €100 million to investors in the very near term, and reiterating the request to refrain from removing Novalpina GP for six to eight weeks to permit this partial exit process to conclude.  However, the LPs proceeded with the removal. The LPs' vote of 9 July 2021 to remove Novalpina GP without cause, immediately became public.  Following that, the bidder temporarily withdrew. On 9 August 2021, Mr Hulio spoke by telephone with Mr Langdon. According to Mr Langdon's email of the same day to Finbarr O'Connor of NOAL GP, Mr Hulio informed Mr Langdon that the investor had resumed its interest and was ready to proceed with the transaction, and asked for the green light to proceed. Mr Langdon wrote to Mr O'Connor that he had told Mr Hulio to wait, and then discuss the opportunity with Mr O'Connor once NOAL GP was appointed.

94.4.    Meanwhile, the LPAC, and NOAL GP once purportedly appointed in Novalpina GP's place, had an ulterior financial incentive to refrain from realising the NSO investment both before and for a substantial period after Novalpina GP's replacement.

94.4.1.    Pursuant to clause 20.3.1 of the LPA, on being removed without cause pursuant to clause 20.2, Novalpina GP was entitled to "*a payment by way of compensation from the Partnership equal to the Priority Profit Share allocated to the General Partner*". The Priority Profit Share was defined in clause 7.1 by reference to the "*Net Income*" and "*Capital Proceeds*" of the Fund, and "*Capital Proceeds*" was defined in clause 1.2 as "*all cash or other proceeds received by the Partnership in relation to the disposal or partial disposal of an Investment and determined by the General Partner to be in the nature of capital*". Had the sale of part of the Fund's interest in NSO been completed before Novalpina GP was removed without cause, the Priority Profit Share due would have been substantially higher than in the absence of a transaction.

94.4.2.    Pursuant to clause 20.3.3 of the LPA, on being removed without cause pursuant to clause 20.2 Novalpina GP was further entitled to the "*Removal Entitlement*" calculated by reference to the value of the Fund as determined by a "cliff-edge" valuation. Meanwhile the new general partner was obliged to buy out the

Sponsor Commitment, the value of which also depended on the total value of the Fund. During and after the effort to remove Novalpina GP, the LPAC was determined to minimise the value of the Fund for the purposes of calculating the Removal Entitlement and the Sponsor Commitment, and took various steps to this end (including opposing the appointment of EY as valuer and unsuccessfully pressuring Novalpina GP to agree that the value of the Removal Entitlement should be based on the value of the Fund's investments at the time they had been acquired). Certain of the largest LPs represented on the LPAC—including OPERF and Centrica—specifically discussed the concern that a disposal in respect of the interest in NSO would result in a higher cliff-edge valuation.

94.5.    Had it not been for the campaign to remove Novalpina GP, and absent the ulterior considerations pleaded above, a transaction with the investor would very likely have completed.

95. The eventual appropriation of the Fund's equity interest in NSO in February 2023 by Wilmington Trust (London) Ltd ("**Wilmington**") on behalf of the Credit Agreement lenders under clause 9 of the Share Pledge Agreement was the result of NOAL GP's mishandling of the investment after its purported appointment as general partner. In the months after NOAL GP's purported appointment as general partner, its relations with the NSO management broke down. In late 2021 and early 2022, NOAL GP caused NSO management to be deprived of their c. 30% indirect minority ownership of a subsidiary of NSO, Convexum, then separated it from NSO and rebranded it as "Sentrycs". That entity is still held as an investment in a separate subsidiary of the Fund.

96. The breakdown in relations between NOAL GP and NSO management resulted in complex litigation between the Claimants (and/or entities and individuals connected with them) and NSO management in Luxembourg and in Israel. The breakdown in relations between NOAL GP and NSO's management came in short order to involve NSO's creditors, who sided with NSO's management. The equity interest appropriated by Wilmington in February 2023 was transferred, with the support of the creditors, to Omri Lavie, one of the NSO co-founders who had held a minority stake during the period of the Fund's investment and who was among the senior NSO managers who had fallen out with NOAL GP. As such, it was the Claimants' own actions that caused that part of the investment to be lost.

97. As aforesaid, Convexum (now Sentrycs) remains an asset of the Fund derived from the Fund's investment in NSO, unencumbered by the debt which helped fund the Transaction. According to

NOAL GP's own forecasts as of 14 July 2022, Convexum was expected to have earnings before interest, tax and depreciation ("**EBITDA**") of $45 million in 2025. In the premises, the Fund continues to hold an asset of very substantial value as a result of its acquisition of NSO (and the Claimants are required to give credit in relation thereto). Mr Kowski reserves the right to further particularise the value of Sentrycs in due course (and to rely on expert evidence as appropriate), but to the best of his knowledge the value of Convexum may well exceed the €218.5 million invested in NSO which forms the basis of the Claimants' damages claim, such that the Claimants have therefore suffered no loss.

98. Paragraph 56 is accordingly denied.

99. As to paragraph 57:

99.1. As to the main body, the first sentence is not admitted. That the expenses referred to are losses consequent on any wrongdoing by Mr Kowski is denied. The second sentence is noted, and the Claimants' entitlement to any such costs is denied in the premises. The third sentence is noted.

99.2. As to paragraphs 57.1 to 57.3, the purported losses claimed are embarrassing for their lack of particularity and liable to be struck out. No admissions are made in respect of any of the alleged costs, and Mr Kowski reserves the right to plead further to them if proper particulars are provided. In any case, it is denied that these costs were the result of wrongdoing by Mr Kowski or properly recoverable.

100. As to paragraph 58, the Claimants have not suffered any loss for the reasons set out above. In any case, no admissions are made as to the alleged return in relation to a Counterfactual Investment, which allegation is entirely devoid of any particulars.

**The alleged breach of LLP duties**

101. As to paragraph 59, it is admitted that each of the Defendants had more than 25%, and less than 50%, of the voting rights of each of the Novalpina IAs. The Defendants' obligations to the Novalpina IAs were set out in clause 9 of the respective LLP agreements. It is admitted that among the obligations therein were certain fiduciary duties. Paragraph 59.1 is admitted. As to paragraph 59.2, it is admitted that each of Defendants was obliged to disclose all facts and matters which might have given rise to a conflict between his personal interests and the interests of each of the LLPs. That the Defendants had any wider duty to disclose information material to the business of the LLPs is denied.

102. As to paragraph 60, it is admitted that Mr Kowski (and he believes the other Defendants) knew the matters alleged.

103. Paragraph 61 and its subparagraphs are denied. Moreover, most of the plea at paragraph 61.1 has now been abandoned by the Claimants by paragraph 9 of the Response to D1's RFI, and the remainder is denied on account of the matters pleaded in paragraphs 107 to 151 below. Given the Claimants' concession, it is noted that the Claimants accept that the Defendants did not withhold any relevant matters from others within either of the Novalpina IAs. The allegation of a corrupt payment in paragraph 61.2 is denied on account of the matters pleaded in paragraphs 189 to 206 below.

104. Paragraph 62.1 is inconsistent with paragraph 20.2 such that the Claimants' position is not understood. Regardless, it is denied that the Defendants knew the matters stated in paragraph 62.1. Sanne took independent decisions in respect of recommendations pursuant to its obligations under the AIFM Agreement, with the benefit of the documents the Novalpina IAs were obliged to provide under the Investment Advisory Agreement. Moreover, the AIFM, not the General Partner, was responsible for investment decision-making (subject only to the General Partner's power to remove the AIFM). As such, Sanne directed Novalpina GP to proceed with the investment, and Novalpina GP complied.

105. As to paragraph 62.2, it is denied that NSO was not a suitable investment for the Fund. It is further denied that the Engagement Letter ensured that Northpole BidCo would acquire NSO. Rather, it merely ensured that Mr Dahbash would provide the legitimate services specified therein. It is denied that the Defendants conducted themselves knowing the alleged matters (which were not in fact the case).

106. Paragraph 63 is accordingly denied. The response to paragraphs 55-58 is repeated.

**The alleged 1 February 2019 Representations**

107. Paragraph 64 is noted. The Claimants' case is baseless for the reasons set out herein.

*The alleged representations*

108. As to paragraph 65, it is denied that the Defendants made any representation to Novalpina International. Novalpina International, in its role as investment advisor, and on the basis in part of the DD Reports, reached the conclusion that NSO was suitable for an acquisition itself. Furthermore, the decision to make a recommendation was made by Novalpina International acting by its management committee, namely the Defendants. In the circumstances, the Claimants' case that Novalpina International relied on representations made to it by the

Defendants is unsustainable. That Novalpina International represented to Sanne that NSO was in fact suitable for an acquisition is denied; Novalpina International merely represented that this was its opinion based on the available information. Regardless, it is denied that the alleged representation was false or fraudulent.

109. As to paragraph 66, it is denied that the Defendants caused any assertions in respect of the BEC to be represented to Novalpina International. The relevant alleged representation is said (at paragraph 72 of the PoC) to have been made to the Investment Committee of Novalpina International via the Final Investment Memorandum. The members of the Investment Committee were the Defendants; it is denied that they can have made, or did make, a representation to themselves. Further and in any event, and as pleaded further below, the basis for the comments in the Final Investment Memorandum about the BEC was the Legal Report, which the Novalpina IAs (not the Defendants personally) had commissioned, such that it is denied that the relevant comments were conveyed to the Novalpina IAs in representations by the Defendants. Subject to the matters pleaded below in respect of the terms of the statements made in respect of the BEC, it is admitted that these statements were made by Novalpina International (as controlled by the Defendants) to Sanne.

110. As to the alleged terms of the representations, Mr Kowski pleads here to paragraphs 71-72 of the PoC (and the remainder of the Defence should be read accordingly).

111. Firstly, as to paragraph 71, it is denied save as expressly admitted below:

111.1. It is denied that the Investment Recommendation Letter warranted the accuracy of the Checklist. Rather, it confirmed that the Checklist constituted a summary of the basis on which Novalpina International believed that the transaction complied with the terms of the PPM and the LPA.

111.2. The Checklist formed part of a suite of documentation, including in particular the Final Investment Memorandum and the final DD Reports, which was provided to Sanne and which Sanne was obliged to consider in performing its services under the AIFM Agreement. As such, any statement in the Checklist was reviewed and understood (and, if need be, corrected) in the context of all of the information provided in that suite of documents.

111.3. As to paragraph 71.1, it is admitted that the Checklist stated that Novalpina International (and not the Defendants) represented that "*the Transaction is suitable for the Fund and is in line with its investment guidelines and strategy as detailed in the [PPM], the [LPA]*". As to this:

111.3.1. This was a statement of opinion and not fact and could not constitute an actionable representation.

111.3.2. In any event any such statement was too uncertain to constitute an actionable representation.

111.4. As to the second sentence of paragraph 71.1, even if there was a representation:

111.4.1. It is denied that Novalpina International represented, or intended to represent, to Sanne (whether acting by Mr Lhuillier or otherwise) that the proposed investment was in an industry mentioned in the PPM, or that Sanne so understood. The statement related to the guidelines and strategy in the PPM. In any event, as aforesaid, the themes identified in the PPM were merely illustrative and non-exhaustive. Further, it would have been obvious to Sanne that NSO's business was not one of the examples listed in section 6.2.1 of the PPM and it is denied that Sanne understood otherwise.

111.4.2. Likewise, it is denied that Novalpina represented or intended to represent, that the proposed investment, "*was not one which might arguably give rise to very significant ESG and reputational concerns and/or which might involve the Fund in an international offensive spyware scandal*" or that Sanne so understood.

111.4.3. The statement in the Checklist was simply that the investment was suitable for the Fund in the sense of an investment complying with those provisions of the LPA, PPM, and Side Letters summarised in the Checklist itself, in the light of the available information. Moreover, the Investment Guidelines and the PPM did not rule out investments of the alleged descriptions.

111.5. In any event, any reputational concerns associated with NSO would have been obvious to Sanne, given the widely reported public criticisms of NSO and the plain fact that its business was offensive spyware.

111.6. Accordingly it is denied that Sanne understood as alleged in paragraph 71.1

111.7. As to paragraph 71.2, it is admitted that Novalpina International stated that it had "*conducted a thorough review of the relevant information to identify material risks…*". This statement accurately reflected Novalpina International's (and Mr Kowski's) opinion as to the nature of the due diligence performed (rather than being a statement of fact). It also accurately reflected the actual nature of the due diligence. In any event, the

reference to a "*thorough*" review was too uncertain to constitute an actionable representation. Regardless, Sanne was provided with all the due diligence reports, and in the premises was obliged to consider these in deciding whether to approve the proposed investment. Sanne was accordingly able and obliged to consider for itself the thoroughness of the review which had been undertaken. In any regard, Novalpina Internation did not represent or warrant that there were no other risks, or that difficulties with the investment would not emerge in future.

112. As to paragraph 72, it is denied (for the reasons set out herein) that any representations in the Final Investment Memorandum were made to Novalpina International. It is admitted that the Final Investment Memorandum was sent to Sanne. Regardless, as to the alleged BEC Unanimity Representation:

112.1. The basis for the comments in the Final Investment Memorandum about the BEC was the Legal Report, which the Novalpina IAs (not the Defendants personally) had commissioned, such that it is denied that the relevant comments were conveyed to the Novalpina IAs in representations by the Defendants.

112.2. The statements reflected the legal advice provided.

112.3. As to slide 36 of the Final Investment Memorandum, it stated that "*Approvals will only be given where there is unanimous agreement <u>from all the members present</u>*" (emphasis added) such that no representation was made that the approval of each and every BEC member was required.

112.4. Further, the statements in this regard in the Final Investment Memorandum were to be read in the context of the more detailed assessment in the DD Reports, which were enclosed with the Final Investment Memorandum and which Sanne was obliged to review. In the Legal Report, Weil stated: "*The BEC meets at least four times a year. The presence of a majority of the members constitutes a quorum, provided that such majority includes at least the Chief Executive Officer, the General Counsel and three of the independent advisors. Decisions to approve an application must be taken unanimously.*"

112.5. Save as admitted aforesaid, paragraph 72 is denied.

113. Paragraph 73 is denied.

***The alleged intention that the alleged representations be relied on by Novalpina International and, in turn, Sanne***

114. As to paragraph 67, save as specified in the sub-paragraphs below it is denied that the Defendants knew and intended what the Claimants allege. Mr Kowski avers that the matters below are correct, but in any event, even if that were wrong, he believed them to be correct:

    114.1. As to paragraph 67.1, it is denied that the Novalpina International would rely on the said alleged representations by repeating the same to Sanne. No representation was made to Novalpina International, which was itself the source of the alleged relevant representations and no reliance would be (or was) placed by Novalpina International on any such statements.

    114.2. As to paragraph 67.2, it is denied that the Defendants knew or intended that Novalpina GP, Northpole Holdco, and/or Northpole BidCo would rely on any representation by Novalpina International as relayed by Sanne to them. Pursuant to the AIFM Agreement and the LPA, Sanne, not Novalpina GP or the underlying transaction companies, was the decision-maker in respect of the Fund's investments. As such, there was no reliance by Novalpina GP on any representation. Likewise, Sanne simply directed Northpole Holdco to act in a certain way, and Northpole Holdco in turn directed Northpole BidCo to do the same. There was no reliance on any representations allegedly relayed onwards.

***The alleged reliance***

115. As to paragraph 68, it is admitted that on 1 February 2019 Novalpina International sent the Investment Recommendation Letter to Sanne, along with the Investment Checklist signed by Mr Kowski and the Final Investment Memorandum (and, amongst other documents, the final DD Reports). It is denied in the premises that in doing so Novalpina International relied on or repeated any representations by the Defendants.

116. As to paragraph 69:

    116.1. Even if made, the alleged BEC Unanimity Representation was a marginal matter that was not relied on in any event.

    116.2. It is denied that Sanne recommended the acquisition of NSO to the Claimants. Sanne directed Novalpina GP and the underlying companies to take steps pursuant to Sanne's decision.

117. As to paragraph 70, it is accordingly denied that any of the Claimants relied on any representations of the Defendants or Sanne (or that the Defendants intended the same to be done).

### *The alleged falsity of the alleged Suitability Representation*

118. Paragraph 74 is denied. More particularly, even if, which is denied, the alleged representation was made as alleged:

118.1. The LPA and PPM did not preclude an investment of the sort proposed.

118.2. In any event, based on the Legal Report, Mr Kowski (and he believes the other Defendants) reasonably believed that NSO's processes in respect of approving its customers and monitoring their subsequent conduct as customers were world-class and effective. Insofar as a representation to this effect was implicit in the Suitability Representation (which is denied) it was not false and the Defendants were not reckless as to its truth.

118.3. As to point (i), the mere fact that NSO operated in the offensive spyware sector and had been the subject of various allegations by the media and NGOs did not make it an unsuitable investment. In any case, these facts were well known.

118.4. As to point (ii), the Legal Report indicated not only that NSO had world-class policies in respect of vetting and then monitoring customers, but also that its policies had been effective in practice. Paragraph 70 above is repeated. As such, Novalpina International (and the Defendants) had a (more than) reasonable basis for concluding that the misuse allegations were unjustified (albeit that the alleged Suitability Representation did not entail any claim to this effect). In addition, the Checklist was provided alongside the Final Investment Memorandum and the Legal Report, and the statements within it fall to be understood in that wider context. The Final Investment Memorandum noted the reputational risks associated with acquiring NSO. The Legal Report emphasised the understandable limits of the information Weil had been able to review in respect of NSO's compliance status: paragraph 69 above is repeated. As such, any statements made were not, on any view, false.

118.5. As to point (iii), it is denied that the LPs' risk and reputational profile rendered the investment unsuitable. The three LPs with the largest contributions expressly supported the investment, despite the well-known public criticisms of NSO. In any case, no LPs had sought to restrict their own participation in ESG-sensitive or reputationally risky

investments. The largest investor in the Fund, OPERF was already invested in NSO at the relevant time.

119. Paragraph 75 is denied in the premises. As aforesaid, the alleged Suitability Representation was not made by the Defendants, but in any case was accurate (if it was made). In any event, Novalpina International and Mr Kowski (and, he believes, the other Defendants) reasonably believed it to be accurate, given (amongst other matters) (i) the DD Reports, (ii) the provisions of the LPA, the PPM, and the relevant Side Letters, and/or the (iii) Defendants' engagement with the LPs.

120. As to paragraph 76, it is noted that the Claimants will seek to rely on the matters pleaded. It is denied that they have any good basis for so doing, for the reasons set out herein. As to the final sentence, this is likewise denied.

### _The alleged falsity of the alleged Risk Review Representation_

121. As to paragraph 77, the first sentence is admitted. As aforesaid, this fact would have been obvious to the Claimants and the LPs. The second sentence is noted.

122. As to paragraph 78, it is admitted that the Defendants were aware in general terms that NSO had been the subject of public and media criticism, and were aware of various specific instances of the said criticism. It is denied if alleged that Mr Kowski was aware of all instances of such criticism, or of all the instances listed in Schedule 1 of the PoC.

123. As to paragraph 79:

123.1. As to (i), it is denied that the issue of whether the concerns were well-founded was critical to the suitability of NSO as a Fund investment. It is also denied that this supposed fact was known by or obvious to the Defendants. As to (ii), it is admitted that ensuring that NSO was acting lawfully and in a manner that did not damage customer demand (i.e. demand from governmental agencies such as law enforcement and intelligence services), was important to NSO's long-term success. Save as aforesaid point (ii) is denied.

123.2. As to (iii), the Final Investment Memorandum explicitly identified the risk that "_Company sector and reputation may limit exit options_". At the time of the transaction, however, NSO was already owned by highly reputable, US-regulated investors: Francisco Partners, the majority shareholder, was such an investor, and as aforesaid Francisco Partners' own investors included OPERF. In these circumstances, it was

reasonable for the Defendants to infer that the human rights and reputational concerns in issue were not a barrier to investment in NSO. Save as aforesaid point (iii) is denied.

124. As to paragraph 80:

124.1. It is denied in the premises that the Defendants knew NSO to be an unsuitable investment for the Fund. It was not unsuitable and in any event Mr Kowski (and, he believes, the other Defendants) believed it to be suitable.

124.2. It is denied that "*a thorough review of the relevant information to identify material risks...*" and/or a "*high standard [of]...legal... due diligence*" required the steps set out in paragraphs 80.1 to 80.3. The steps the Novalpina IAs took constituted appropriate due diligence and in any case Mr Kowski believed this to be so. More particularly:

124.2.1. The Novalpina IAs instructed a highly regarded international law firm with appropriate expertise in (amongst other matters) the compliance and regulatory issues around NSO's business, and commissioned that firm to undertake the due diligence exercise it considered necessary in order to confirm that there were no material red flags in respect of NSO. Weil's Legal Report was the result: it was reasonable for Novalpina International to rely on it, and the report was in any event detailed and robust.

124.2.2. In producing the Legal Report, Weil undertook what it considered to be (and in fact was) a rigorous investigation of NSO's compliance processes and made favourable findings. Paragraph 67 above is repeated.

124.2.3. Weil further identified the limitations of what it had been able to establish, and still explained that it was able to make robust findings about the effectiveness of NSO's processes, despite the limitations it had identified: paragraph 70 above is repeated.

124.3. As to paragraph 80.1, Weil did not consider this approach to be necessary. It was reasonable of Weil to take that view, and as aforesaid reasonable for the Novalpina IAs to rely on Weil's view. In any event, Weil's direct investigation of NSO via the data room and Legal Expert Session was more informative than investigating NSO indirectly via media reports or allegations made by third parties.

124.4. As to paragraph 80.2:

124.4.1. As to point (i), the Novalpina IAs did engage credible external experts in respect of NSO's compliance procedures, namely Weil.

124.4.2. As to point (ii), the second sentence of paragraph 124.3 above is repeated.

124.4.3. As to point (iii), Weil did undertake an exercise of this description, i.e. the Legal Expert Session. Among the attendees of the Legal Expert Session was Daniel Reisner, a member of the BEC, and members of NSO's management team also attended.

124.4.4. As to point (iv), it is denied that obtaining clearance to review export licences issued to NSO by Israel's Defence Export Control Agency—these being the documents for which clearance would have been required—was a necessary part of undertaking an appropriate due diligence exercise.

124.4.4.1. Weil, as the due diligence specialists, were satisfied that they could produce the Legal Report without seeing the underlying licences.

124.4.4.2. As explained in paragraphs 70.1 and 70.2 above, Weil was given confirmation by NSO's management that it had not violated any export licences, and Weil corroborated that confirmation via the lack of adverse findings by the IMOD.

124.4.4.3. The legal advice Novalpina Capital received—from Mr Reisner himself, in his capacity as a lawyer at Herzog Fox & Ne'eman— made plain that it would be difficult for a potential investor or its advisers to secure clearance. Mr Reisner explained that the confidentiality of licences was routinely invoked to prevent disclosure to Courts, international investigations, and situations where Israeli banks sought the relevant information for the purpose of AML checks. In his advice, Mr Reisner explained that maintaining the strict confidentiality of the licences was a key obligation of a licence-holder such as NSO. As such, NSO's refusal to provide the underlying licences was itself consistent with a rigorous compliance framework.

124.4.4.4. Later, in July 2021, NOAL GP itself represented to the LPs that clearance from the IMOD, and thus the right to review the export licences, was not necessary for the ongoing supervision of the

investment in NSO. As a matter of logic, the same must apply to the original due diligence exercise.

124.5. As to paragraph 80.3:

124.5.1. So far as is material, the Novalpina IAs' obligation under clause 9.4 of the Investment Advisory Agreement, read alongside their obligation under paragraph 12 of Schedule 2, was to provide Sanne with the DD Reports, including the Legal Report. In the premises, Novalpina International complied with this obligation.

124.5.2. The DD Reports, including the Legal Report, were (more than) adequate and appropriate due diligence reports. Weil and the Novalpina IAs indicated the limitations of the exercise and the risks associated with NSO transparently and neutrally, and paragraphs 69 and 74 above are repeated.

124.5.3. It is denied that it was or ought to have been any purpose of the due diligence exercise to enable Novalpina GP or the boards of Northpole BidCo or any Fund SPV to take properly informed decisions. The DD Reports as sent to Sanne, and any representations therein, were addressed to Sanne.

124.5.4. In any event, the Legal Report did enable anyone reading it to develop a proper appreciation of the risks of past and future customer misuse.

125. The main body of paragraph 81 is therefore denied. In any event it is denied that the due diligence was required to meet the "*standards*" set out in paragraph 80. In any case it is denied that the Defendants knew that the due diligence fell below reasonable or appropriate standards.

126. As to paragraph 81.1, it is denied that (i) and (ii) are a fair summary of the very extensive material Weil reviewed from the data room or of the exchanges (involving Mr Reisner of the BEC as well as NSO management). It is noted that by paragraph 16 of the Response to D1's RFI the Claimants appear to admit that the allegation at (ii) in paragraph 81.1 is wrong, as it overlooks Mr Reisner's participation. Further:

126.1. It is denied that the management of NSO were likely to be unreliable. The Claimants, by paragraph 17.2 the Response to D1's RFI, state that they do not allege dishonesty against any NSO manager or Mr Reisner, and do not allege that any individual at the Legal Expert Session gave misleading answers to questions. In any event, Weil's analysis necessarily was provided taking into account the fact that the answers given by NSO management were given by individuals who were working for the business.

126.2.  In any case, Weil considered that the due diligence exercise it was able to undertake was adequate, and the Novalpina IAs reasonably relied on that assessment.

126.3.  In any event, the Legal Report sets out what Weil did and did not do. Novalpina International sent the Legal Report to Sanne, and Sanne was obliged under the AIFM Agreement to review the Legal Report in making its decision. Accordingly, Sanne well knew the extent of the due diligence.

127.  Paragraph 81.2 is denied. Weil took various steps to investigate and verify the implementation of NSO's compliance and management procedures. Paragraph 70 above is repeated.

128.  As to paragraph 81.3, It is admitted that Weil did not review specific EUAs. Paragraph 70.3 above is repeated. Weil reviewed forms of EUAs, confirmed at the Legal Expert Session that 85% of actual end-user agreements corresponded with these forms, and obtained details of how the remaining 15% of agreements departed from the forms. Weil explained this in the Legal Report. It is admitted that Weil did not review copies of issued export licences. This was not feasible for the reasons set out in paragraph 124.4.4 above. Weil received confirmation at the Legal Expert Session that NSO was in full compliance with its export licensing obligations, and Weil corroborated this via the apparent lack of adverse findings against NSO in IMOD's auditing processes. Again, Weil explained this in the Legal Report.

129.  As to paragraph 81.4, it is admitted that Weil did not know the identity of NSO's customers. Weil was aware, and explained in the Legal Report, that as part of NSO's rigorous five-step new customer approval process, the BEC divided countries into four categories, A to D, according to various World Bank indices and US, EU, and Israeli sanctions lists. Countries in category D were excluded from consideration entirely as potential customers; and countries in category C were subjected to particularly strict scrutiny. Weil set out in the Legal Report which countries were in Category D, and was accordingly able to rule out any problems associated with such high-risk customers. In any event, Weil set out in the Legal Report that it had not been able to review the identities of the actual customers. That finding was itself part of Weil's due diligence, which Novalpina International relayed to Sanne.

130.  As to paragraph 81.5, it is admitted that Weil did not review minutes of BEC meetings. It is denied that this fact supports any allegation of inadequate due diligence (and, as above, Mr Kowski relied on Weil's opinion as to what was appropriate and required). As aforesaid, Weil interviewed a member of the BEC, Mr Reisner, as part of the Legal Expert Session. Weil also established via the Legal Expert Session that NSO turned down US$168 million of business in 2018.

131. Paragraph 81.6 is denied for the reasons given herein.

132. Paragraph 82 is therefore denied. It also proceeds on a false premise, as no representation was made that the misuse allegations were, as a matter of fact, unjustified.

133. As to paragraph 83, as aforesaid, the due diligence exercise was commissioned and overseen by the Novalpina IAs, not the Defendants personally. Point (i) is denied: the Defendants had considerable experience of overseeing due diligence exercises as investment professionals, but they were not themselves experts in due diligence. The purpose of commissioning highly-regarded firms with expertise in due diligence, including Weil, was to ensure that those firms used their expertise to confirm which particular steps were necessary to make the due diligence exercise sufficiently robust. The Novalpina IAs reasonably relied on Weil's expertise in this regard. Point (ii) is admitted. Sanne was also fully aware of the same. As to point (iii), there was no difference between the two and in any event the Defendants did not know that there was any difference (if, which is denied, there was one). The last sentence is accordingly denied.

### *The alleged consequential loss to the Claimants*

134. Following completion of the SPA on 18 March 2019, Northpole BidCo acquired a 70.33% stake in Triangle. The Fund thereby became the indirect majority owner of NSO (subject always to the matters set out in paragraph 91 above).

135. As to paragraph 84, it is denied that Sanne's decision to recommend the investment was a direct result of the alleged representations (even if they were made). Sanne received from Novalpina International not merely the Checklist, but the Final Investment Memorandum and the DD Reports themselves. Sanne therefore on any view knew the correct position and/or decided to pursue the investment on the basis of the underlying material.

136. Paragraph 84.2 is admitted. It is denied that Sanne relayed any relevant representations to Novalpina GP or that Novalpina GP relied on any alleged representation. It is accordingly denied that the Fund or NOAL GP would have any cause of action in deceit against the Defendants or Novalpina International, even if the relevant representations had been made and were fraudulent (which they were not).

137. Paragraph 84.3 is admitted. It is denied that Northpole BidCo's decision was the result of a chain of representations from Novalpina International to Sanne, Sanne to Novalpina GP, and Novalpina GP (by various intermediary companies or otherwise) to Northpole BidCo. As such, it is denied that Northpole BidCo would have any cause of action in deceit against the

Defendants, even if the relevant representations had been made and were fraudulent (which they were not).

138. Paragraph 84.4 is admitted insofar as it is consistent with paragraph 91 above. Further:

138.1. Of the €200m which is said to have been derived from the LPs' commitments, in fact approximately €16m was provided by the Defendants and their families.

138.2. As to the €18.5m originally advanced as a bridging loan, the Advisory Committee explicitly agreed to make that investment in NSO permanent in mid-2020 (consistent with the fact that the largest LPs of the Fund knew about and supported the investment).

138.3. Save as aforesaid paragraph 84.4 is denied. The only step the Fund (via Novalpina GP) took was to invest money in LuxCo, which it would have done in any event regardless of whether the acquisition of NSO took place.

139. Paragraphs 84.5 to 84.7 are admitted.

140. Paragraph 85 is admitted, except that it is noted that the Claimants will seek to rely on the SPA in full at trial.

141. Paragraph 86 is denied.

141.1. For the reasons set out herein, it is denied that representations were made in the terms alleged, that they were relied on or that they were false. In any event, it is denied that the true market value of NSO was lower than that implied by the transaction. Paragraph 92 above is repeated. Further and in any event, the sum paid for NSO took into account the well-publicised allegations concerning misuse. It is therefore denied that NSO was valueless from the outset.

141.2. It is denied that "*the Claimants*" ever had an interest in NSO. Northpole BidCo alone had an (indirect) interest in NSO.

142. As to paragraph 87, the main body is denied in the premises.

143. Paragraph 87.1 is admitted.

144. Paragraph 87.2 is not admitted pending disclosure. It is noted that the Claimants do not suggest that NSO failed to collect cash from existing customers, or from sales of its other products, in the period in question. The majority of NSO's sales were recurring (Pegasus software being sold on annual licences). Sales to new customers represented a small portion of NSO's sales.

145. As to paragraph 87.3, the first sentence is not admitted. It is admitted that Northpole BidCo (not the other Claimants) was requested to provide a capital injection in October 2021. The second sentence is otherwise not admitted. The Advisory Committee was consulted on the proposed cash injection pursuant to clause 12.2 of the LPA, and approved it, in full knowledge of the reputational risks stated to them by NOAL GP (which was by this time purporting to act as general partner).

146. Paragraph 87.4 is admitted.

147. Paragraph 87.5 is denied for the reasons given herein.

148. As to paragraph 87.6, as to (i), paragraph 10 above is repeated. It is not admitted that NOAL GP reached the conclusion alleged. If it did, it was wrong. It is denied that NSO was valueless in July 2021 or before, for the reasons given herein. In any event, the Fund had no equity interest in NSO; Northpole BidCo did.

149. Paragraph 87.7 is admitted, except that the Fund did not have an equity interest in NSO. Northpole BidCo did.

150. Paragraph 87.8 is admitted, except that it is denied that the Fund made any investment directly in NSO (such that it has on any view suffered no loss). It is denied in the premises that any loss was caused by any wrongdoing by the Defendants (as there was no wrongdoing) and, in any case, the Claimants caused their own loss (if they did in fact suffer loss). Regardless, for the reasons pleaded above, the Claimants could have mitigated that loss and thereby reduced it to zero, but failed so to do. In any case, the valuable ownership of Sentrycs has been retained (which outweighs the alleged loss).

### *The deceit claim in respect of the alleged 1 February 2019 Representations*

151. As to paragraph 88, the main body is noted. Such claim is denied for the reasons given here.

### **The alleged 14 February 2019 Representations**

### *The alleged representations to the LPs in the Notice of Acquisition*

152. As to paragraph 89, it is admitted that the Fund's investment in NSO was announced to the LPs by way of the Notice of Acquisition dated 14 February 2019. It is admitted and averred that this announcement followed Northpole BidCo's entry into the binding SPA. It is denied that the Notice of Acquisition "*immediately*" followed the execution of the SPA: Northpole BidCo signed four days earlier. It is admitted that all three Defendants signed the Notice of Acquisition.

It is also admitted that the notice was issued on paper headed Novalpina Capital (because it was Novalpina Capital that issued the notice).

153.  As the Notice of Acquisition indicates, the agreed transaction was announced to the public via a press release on the same day.

154.  Paragraph 90 is admitted as a partial but misleading quotation of a paragraph in the Notice of Acquisition. The full paragraph reads as follows: "*A particular focus of our extensive due diligence has been the quality of the company's processes for vetting the suitability of customers, especially in the light of past reports from an NGO alleging certain governments illegally used its technology to target political dissidents. Our work has found that the specific claims about the misuse of the technology by its customers in these reports are substantially incorrect. The company's business ethics committee conducts a long and rigorous due diligence process on all potential customers; a process that takes several months. The committee only approves a customer after receiving unanimous consent from all its members, which include four highly qualified independent directors, and after taking into account the views of US, European and Israeli governments. The business ethics committee has not approved potential contracts worth over $150 million in the past three years due to customer risk concerns. We consider the firm's business ethics practices, put in place by Francisco Partners, to be best-in-class. Further, the firm re-evaluates each customer on an annual basis and investigates all reports alleging misuse of its technology, exercising its right to audit the use of the system. After such investigation, if it still suspects any actual misuse, it terminates the customer's use of the technology.*"

155.  As to paragraph 91:

155.1.  In respect of paragraph 91.1, it is admitted that the Defendants represented that Novalpina International had conducted a due diligence exercise, which had included NSO's vetting processes within its scope. It is otherwise denied.

155.2.  Paragraph 91.2 is denied.

155.2.1.  The Notice of Acquisition referred only to specific claims by a single (unidentified) NGO. It did not refer to other claims.

155.2.2.  In any event, the statement was to be understood in the context of the rest of the relevant paragraph of the Notice of Acquisition, which made clear that it was a statement as to the conclusion reached in the due diligence carried out. See further paragraph 160.1 below.

155.2.3. In any event, NSO management had made oral representations to Novalpina International during the due diligence process that the allegations made against NSO by Citizen Lab were substantially incorrect.

155.3. Paragraph 91.3 is denied. The Defendants made a statement of opinion, not of fact, that "*they consider*" the business ethics practices to be best in class. That was an accurate representation.

155.4. As to paragraph 91.4, it is denied that there was any such implied representation, and no basis is alleged for the same.

155.5. As to paragraph 91.5, the statement in the Notice of Acquisition was as to the decision-making process that had previously been followed by BEC and was made in the context of identifying what the due diligence had disclosed in this regard.

155.6. As to paragraph 91.6, this is denied. The relevant wording in the Notice of Acquisition identified what the due diligence process had disclosed in this regard, and accurately reflected the Legal Report, which said: "*In case the Target Group learns about a suspected misuse of its products, it immediately launches a formal process including both the Target Group's management and the BEC to investigate the allegation*." It is further denied that the Notice of Acquisition contained the representation identified at (ii). The statement was that the due diligence report had identified that NSO exercised its right to audit the system when appropriate in response to an allegation. This statement accurately reflected the Legal Report.

155.7. Paragraph 91.7 is denied.

155.8. Paragraph 91.8 is denied. The statement was as to what the due diligence reflected. Moreover, the statement meant what it said: the due diligence showed that NSO would terminate the customer's use of the technology if after the investigation NSO suspected any actual misuse. This accurately reflected the Legal Report.

### *The alleged materiality of the representations*

156. Paragraph 92 is denied. It rests on misconceptions as to (i) the decision-making structure of the Fund; (ii) the very limited rights of LPs to opt out of particular investments, withdraw from the Fund, or remove the general partner; and (3) the fact that the key LPs had all been supportive of the investment in NSO. More particularly:

156.1. Paragraph 35 above is repeated. Under clause 4.10.1 of the LPA, an LP was entitled to opt out of advancing sums for a particular investment in only two sets of circumstances. The first was where the investment would violate an Agreed Policy, i.e. (by clause 1.2 of the LPA and further to paragraph 36 above) "*a binding investment policy or investment restriction applicable to that Investor*" designated in writing as such by the general partner before the investor subscribed as an LP. No LP had an Agreed Policy precluding participation in the acquisition of NSO. The second set of circumstances was where the investment would breach a law, regulation, permit or licence to which the LP was subject, and the LP gave written notification to that effect supported by an opinion from legal counsel.

156.2. By clause 18.3 of the LPA, the general rule was that no LP was entitled to withdraw from the Fund. The only exception was for "*Regulated Partners*", defined in clause 1.2 as, in broad summary, certain US employee pension schemes.

156.3. The circumstances in which a Regulated Partner was entitled to withdraw from the Fund were very limited. By clause 22.14.1 of the LPA, it could seek to do so if it obtained counsel's opinion, reasonably satisfactory to the general partner, that (in broad summary) the operation of the Fund, including as to the making of its investments, entailed that there was a reasonable likelihood that the Regulated Partner would violate an applicable law, rule, or regulation by continuing to participate in the Fund. In this scenario, the general partner would have the option of taking various steps to remedy the issue, but if it remained unremedied after 45 days the Regulated Partner's withdrawal would take effect.

156.4. By clause 20.1.1, LPs whose contributions to the Fund constituted a majority of such contributions could remove the general partner for "*Cause*", defined in broad summary as fraud, wilful misconduct, or criminal conviction under financial services or securities regulations, in circumstances where (i) the default was connected with the person's duties to the Fund or associated vehicles, (ii) the default had been established as such by a court, and (iii) the default caused the Fund material financial or reputational disadvantage (or, in the cause of fraud, uncompensated financial disadvantage, material or otherwise).

156.5. By clause 20.1.2, LPs whose contributions to the Fund constituted a super-majority of 75% of such contributions could remove the general partner without Cause, and only after the second anniversary of the First Closing Date, i.e. from November 2019 (around

six months after the Transaction completed and seven months after the Notice of Acquisition).

157. Accordingly, the LPs' assessment of whether the acquisition of NSO was a suitable investment for the Fund did not affect and would not have affected whether the investment went ahead. As of 14 February 2019, Northpole BidCo had already executed the binding SPA, and in any event the Fund's investments were a matter for Sanne, not the LPs.

158. The Notice of Acquisition was a mere announcement of the investment on the same day it was made public to the world at large through a press release. It was for information only and not intended to cause the LPs to act in any particular way (still less was it intended to injure the LPs). The LPs would have understood this, and accordingly would have assigned very limited (if any) weight to any statements in the Notice of Acquisition. Still less was there any intention to injure the Fund.

159. More fundamentally, as aforesaid, OPERF was already invested in NSO prior to the transaction. It and the other key LPs were already well aware of the potential acquisition and had had the opportunity to request any information that they considered material, and they still continued to support the acquisition. It is therefore denied that their opinion as to the suitability of NSO as an investment (and thus of the investment) would have been materially affected by the Notice of Acquisition.

160. Without prejudice to the foregoing, as to the specific conclusions the Claimants allege the LPs would have reached on the strength of the Notice of Acquisition:

160.1.  As to point (i), it is admitted that the terms of the Notice of Acquisition were liable to lead the recipient to understand that the due diligence work carried out on Novalpina's behalf had concluded that the specific claims by an NGO about the misuse of technology were substantially incorrect (albeit that this conclusion would have been of limited significance given that the Notice of Acquisition did not identify the NGO). Save as aforesaid point (i) is denied.

160.2.  As to point (ii), at most, the recipient of the document might have concluded that the due diligence had found that NSO had best-in-class processes for precluding misuse, and that those processes had in the past led to effective action. That conclusion would have accurately reflected the Legal Report and the ESG Review. Save as aforesaid, point (ii) is denied.

160.3.  As to point (iii) is admitted that the terms of the Notice of Acquisition were liable to lead the recipient to conclude that the due diligence had concluded that NSO had robust processes for preventing or if necessary responding to customer misuse. That conclusion would have accurately reflected the Legal Report and the ESG Review.

160.4.  Point (iv) is denied.

161.  As to paragraph 93, this is denied. It is further denied that any LPs had or were to any substantial extent sensitive to the alleged concerns, and in any view Mr Kowski and (he believes) the other Defendants did not consider them to be so. The Notice of Acquisition merely summarised the Defendants' views as to the findings of the due diligence process, by way of information only. It was not intended by either Mr Kowski or (he believes) the other Defendants that the LPs would rely on any statement therein.

## *The alleged falsity of the alleged 14 February Representations*

162.  Mr Kowski repeats his case as to what representations were in fact made, as set out above at paragraph 155. All of the statements were accurate. The remainder is without prejudice to the foregoing. In any case, even on the Claimants' (incorrect) premise, all of the alleged representations were accurate.

163.  Paragraphs 94 and 95 are denied in the premises.

164.  The main body of paragraph 96, and paragraph 96.1, are denied in the premises. Paragraph 155 above is repeated. Paragraph 96.2 is denied (but its relevance is in any event denied). Weil's conclusion was that NSO's business ethics practices were best in class and it is inferred that Weil, as the highly regarded firm with expertise in legal due diligence, genuinely held that opinion. Weil had good grounds for its opinion and it was correct. Regardless, that opinion was one on which the Novalpina IAs and Mr Kowski could and did reasonably rely.

165.  As to paragraph 97:

165.1.  It is denied that the charter of the BEC was amended in or before January 2019.

165.2.  The statement made was an accurate reflection of the Legal Report, and as to the position in relation to past allegations of misuse.

165.3.  The statement made was also an accurate reflection of Mr Kowski's understanding at the time: as of the issuing of the Notice of Acquisition, he was not aware of any change in the charter of the BEC, and had no reason to be so aware.

165.4. In any event, the new decision-making rules of the BEC, once ultimately adopted, did not provide for simple majority voting. The general rule continued to be that a unanimous vote of those present at a quorate meeting was required. The only exception introduced was that, if all the members of the BEC were present (or had, as was now provided for, submitted a vote in advance), a minority of one could be overridden.

165.5. Further in any event, after the amendment, on 4 April 2019, it was represented to Mr Peel and Mr Kowski by Kevin Wilson of OSY that it was expected that the BEC would in practice continue to make all decisions unanimously. In reality, the BEC did continue to vote unanimously, with all members present, throughout the period in which Novalpina GP was general partner of the Fund.

166. As to paragraph 98.1:

166.1. The ESG Review—which was based (amongst other matters) on interviews with the CFO, Chief Product Officer, and Chief People Officer of NSO–stated that NSO "*thoroughly investigates all reports of alleged misuse*". Further, the Legal Report set out that when "*any*" allegation was received, the BEC convened to discuss the matter. If the allegation was considered credible, NSO's management then took further investigatory steps. The possibility of a shutdown of the product then provided an incentive to the customer to co-operate with the investigation. If the BEC determined that a suspension of the product was appropriate pending completion of the investigation, that step was then taken. If at the end of the investigation the BEC considered a permanent shutdown appropriate, that step was also then taken. In the premises, the ESG Review and the Legal Report indicated that NSO did investigate all allegations of misuse.

166.2. The allegation in paragraph 98.1 that NSO had as of 14 February 2019 investigated only a small fraction of allegations of misuse, and the supplementary allegation in paragraph 24 of the Response to D1's RFI that NSO had as of 2 July 2019 only carried out 3 or 4 investigations, appear to be based on the false premise that investigations which ultimately resulted in a customer's access to a product being shut down, or a contract being terminated, were the only investigations which NSO undertook. To the contrary, such investigations were only a subset of the investigations undertaken.

166.3. In any event, it was reasonable of Weil and Dr Schmid to rely (as they did) on a combination of NSO's ongoing compliance policies and the confirmation of NSO's management that those policies were fully and effectively implemented by way of all allegations of misuse being investigated. In any event, in the premises, it was reasonable

for the Novalpina IAs and Mr Kowski to rely on Weil, as a highly regarded firm with expertise in legal due diligence, and on Dr Schmid as an expert in ESG.

166.4. Save as aforesaid paragraph 98.1 is not admitted.

167. As to paragraph 98.2, the quoted statement indicated no more than that NSO did not (as Weil correctly explained in the Legal Report) process data generated by the customer's use of the product. As aforesaid, and as set out by Weil in the Legal Report, NSO's policies required it to impose onerous end-user obligations on the customer and then investigate any reports of misuse as they arose, not to monitor directly which persons the customer was surveilling.

168. Paragraph 98.3 is denied. As the Legal Report explains, NSO had various sources of information and means of assessing allegations available, including (i) an anonymous whistleblowing hotline, (ii) information based on what agents of customers had said in training sessions with NSO employees (as distinct from what the customer said to NSO in response to an actual investigation), and (iii) media reporting. In any event, as aforesaid, NSO's policy was to terminate use of the technology if it continued to suspect misuse: there was no requirement that the allegation of misuse be verified. As such, the onus was on the customer to dispel concerns.

169. Paragraph 98.4 is therefore denied in the premises.

170. Paragraph 99 appears to rest on a misunderstanding of NSO's customer base. NSO did not enter into contracts with countries, but rather with agencies within countries. Regardless, nothing alleged in paragraph 99 undermines the fact of Weil's conclusions or the Defendants' reasonable reliance on them. In any event, it is denied that Novalpina (or as far as Mr Kowski is aware, NSO) had continuing suspicions of misuse in relation to any customer.

171. The first sentence of paragraph 100 is accordingly denied.

171.1. Paragraph 100.1 is denied in the premises.

171.2. As to paragraph 100.2, the Legal Report and the ESG Review themselves acknowledged the limits on the information provided by NSO. It is accordingly admitted that the Defendants knew that information had been withheld from Novalpina on grounds of confidentiality / security. If it is alleged that the grounds of security and/or confidentiality were spurious and/or that the Defendants should have appreciated as much, that allegation is denied. Paragraph 124.4.4.3 above is repeated. Further, it is denied in the premises that, on account of the limits of the information provided, the due diligence was not appropriate or that the Defendants appreciated the same. In this regard,

the ESG Review stated that although "*[c]ertain documents and information have been requested but not supplied … and our due diligence review is therefore qualified in that regard*", "*all material requests for information and questions arising from our Due Diligence that we deem material have been answered by NorthPole's management*".

171.3.   As to paragraph 100.3, it is admitted that the Defendants—like the Claimants and Sanne—were aware of various allegations of misuse. It is admitted that Morgan Stanley mentioned CitizenLab's allegations in January 2019. It is denied in the premises that it follows that the representations in the Notice of Acquisition were false or that the Defendants knew them to be false.

171.4.   As to paragraph 100.4, paragraphs 69 and 171.2 above are repeated. As aforesaid, Mr Reisner, an independent member of the BEC, attended and participated in the Legal Expert Session; it is accordingly denied that there was no independent verification of what Novalpina had been told by NSO management. In any event, it is an inevitable feature of buyer-side due diligence that the prospective investor must rely to an extent on representations from the target company (and all the more so where genuine confidentiality and security constraints apply to a business). NSO's founders and management invested $114 million alongside the Fund in the acquisition of NSO and increased their percentage ownership from less than 20% to c. 30% of NSO. The financial interests of NSO's founders and management was therefore aligned with those of the Fund. Further, in any event, Weil considered that the information it received was sufficient for the purposes of the Legal Report, and it was reasonable for the Defendants to rely on Weil's judgment.

171.5.   As to paragraph 100.5, it is denied that these were "*specific and detailed questions that investors in NSO would want to know*". The largest LPs had well known about the proposed acquisition and had not requested such information. Further, and in any event:

171.5.1.   The body of the paragraph rests on a false premise. The Notice of Acquisition was not intended (and could not reasonably be taken) as the beginning of a dialogue with the LPs. The LPs were not responsible for deciding on investments and were expressly debarred from making such decisions, with only very limited rights to withdraw from the Fund or refrain from participating in specific acquisitions, as pleaded at paragraph 156 above.

171.5.2.   As to subparagraphs (1) and (2), it is admitted that the banks mentioned had raised questions in the course of their own due diligence (as was routine). It is

denied that the Novalpina IAs (who were responsible for liaising with the potential lenders) were unable to or failed to provide any answers.

171.5.3. As to paragraph 100.5(3), two reputable banks, Credit Suisse and Jefferies, agreed to lend. It is denied that the rate of interest was unduly high or that the rate of interest was unusually high on account of reputational concerns. It is admitted that certain banks declined to provide financing on reputational grounds; it is denied in the premises that this fact has the implication alleged in the main body of paragraph 100.5.

171.6. As to paragraph 100.6, it is denied that Mr Kowski knew by January 2019 that the BEC did not require unanimous voting (of the quorum present) to approve customers. As of January 2019 such unanimous voting was required. In any case, paragraph 165 above is repeated.

### _The alleged continuing representations_

172. Paragraph 101 is denied. Even if they were made as alleged (which is denied), the Defendants did not continue impliedly to make the alleged NoA Representations thereafter, let alone _"at all times until the summer/autumn of 2021"_ (and no basis is pleaded by the Claimants for that assertion).

173. As to paragraph 102, it is accordingly irrelevant. Without prejudice to that position:

173.1. It is denied that Mr Kowski became aware of any representation being untrue. Paragraphs 102.1 and 102.2 pertain to matters that are the subject of strict Israeli secrecy laws. As such, Mr Kowski is not able to plead further thereto except that, as is relevant, and as stated aforesaid, the allegation that he became aware of a false representation is denied.

173.2. As to paragraph 102.3 in particular, it is admitted that Mr Bash resigned from the BEC in March 2020 (almost a year after April 2019). It is denied that Mr Bash's resignation was caused by any suspicions on Mr Bash's part that any customer of NSO would misuse its products. Rather, Mr Bash envisaged taking up a post in the Biden administration if Mr Biden won the US presidential election in November 2020, and withdrew from his role in anticipation of so doing. In the event, Mr Bash ultimately served in the Biden administration as an intelligence adviser. When he resigned, Mr Bash sent Mr Kowski an email stating, "_Getting to work with you again was a real_

*pleasure. I learned a lot from you. Please reach out if you ever need anything in DC*". If, contrary to the foregoing, Mr Bash did in fact resign due to concerns regarding customer misuse, Mr Kowski was unaware of this. Save as admitted aforesaid paragraph 102.3 is denied.

### *Alleged reliance by the LPs*

174. Paragraph 103 is embarrassing for its lack of particularity. The Claimants failed in the PoC to give particulars of the basis on which it is alleged that each LP was so induced or to identify any individual acting on behalf of each LP who was allegedly induced. Further, the Claimants have refused without good reason to provide such information in answer to the Request for Further Information made by Mr Kowski on 24 October 2024. Without prejudice to the foregoing, it is denied for the reasons set out herein that the Defendants had the intention alleged or that the LPs were induced by the alleged NoA Representations, even if they were made.

175. Paragraph 104 is denied for the reasons set out herein. Moreover, even if Mr Kowski were wrong on all those points, then, in any event, the appropriate counterfactual (supposing for the sake of argument that there was wrongdoing which would lead to an assessment of loss, which is denied) is a scenario in which no relevant representations were made at all. Alternatively, insofar as the previous sentence does not reflect the correct position, the relevant passage of the Notice of Acquisition was a broad summary of the findings of the Novalpina IAs' due diligence, and in particular the Legal Report. The appropriate counterfactual would accordingly be that the Notice of Acquisition gave an accurate summary of the Legal Report (on the premise, which is denied, that it did not do this) or that the LPs were supplied with the Legal Report itself (though they had no entitlement to see it).

176. Paragraph 105 is noted. It is denied that the matters set out therein support the Claimants' counterfactual plea:

   176.1. As to paragraph 105.1, statements quoted from the PPM do not bear on what material Novalpina entities would provide to LPs once a given transaction had been executed.

   176.2. As to paragraph 105.2, the matters set out therein are not relevant. The LPA provided for the general partner (if necessary in conjunction with an AIFM) to make decisions on investments regardless of the size of those investments.

   176.3. As to paragraph 105.3, it is denied that private equity "*industry norms*" (which are not particularised) required Novalpina Capital to act in the manner alleged.

177. Paragraph 106 is therefore denied in the premises.

178. Paragraph 107 is denied in the premises and on account of the matters particularised below in response to paragraph 108. It is noted that by paragraph 73 of the Response to D3's RFI the Claimants abandon the allegation that the LPs or a majority of them would have taken the relevant action, and instead plead only that a significant proportion of them would have done so. The matters pleaded in paragraph 179 below, and in particular in paragraph 179.4.2, apply all the more to what remains of the Claimants' case in this regard.

179. As to paragraph 108, it is denied that the LPs would and/or could have taken any of these steps, or that the steps would have been effective in forestalling the Transaction. More particularly:

179.1. As to paragraph 108.1, it is denied that the LPs would have demanded further assurances of the kind described:

179.1.1. The three LPs with the largest contributions had expressed significant enthusiasm in advance for the acquisition of NSO. They had done so despite the public criticisms of NSO which were well-known by that time, and they had not caveated their support. Further, none of the LPs had expressed any concerns as to investments raising ESG-sensitive or investment issues, or opted to protect themselves from participation in such investments via their Side Letters.

179.1.2. The LPs understood that decision-making in respect of investments was a matter for Sanne and Novalpina GP under the LPA. The LPs likewise understood that the Investment Guidelines and the PPM did not preclude investments in ESG-sensitive or controversial industries. They had subscribed to the Fund on these bases.

179.1.3. The LP with the largest contribution, OPERF, was already an invested in NSO.

179.1.4. Had any LP made demands of the sort the Claimants describe (which none would have), Novalpina GP, the Novalpina IAs and the Defendants had no obligation to provide such further assurances and could have chosen not to do so.

179.2. As to paragraph 108.2, neither of these forms of action could have been taken by any LP, or have been effective in changing the Fund's course in respect of the investment: see the matters pleaded below in response to paragraphs 109 and 110. In any event, none of the LPs would have wished to take such a course of action.

179.3. As to paragraph 108.3:

179.3.1. As to (a), the SPA had already been executed by the time the Notice of Acquisition was issued. Northpole BidCo could not have failed to complete the transaction without substantial financial loss—and thus substantial indirect loss to the Fund, along with serious reputational damage to the Fund. These consequences would have run contrary to the interests of all LPs, and thus none of the LPs would have sought to bring them about. Even had an LP made the request pleaded, Novalpina GP could and would not have complied (and indeed would have been bound not to comply, given its obligations to the LPs in general under the LPA).

179.3.2. As to (b), had it not been possible to re-sell the Fund's interest in NSO without incurring a loss, the matters pleaded in the previous sub-paragraph would apply *mutatis mutandis*. Insofar as it would have been possible to re-sell the Fund's interest at a profit, it would follow that the investment was not an unsuitable one for the Fund.

179.4. As to paragraph 108.4

179.4.1. As to the threat of removal for cause, such removal would in the premises have required a Court finding of fraud, gross negligence, criminal conduct, etc. There would have been no such finding, and accordingly that route would not have been available, and no LPs would have sought to pursue it.

179.4.2. As to the threat of removal without cause, as the Claimants admit that option would not have been available until November 2019—more than six months after completion of the transaction (and hence, far too late). In any event, it would have required a 75% majority by size of Contribution, in circumstances where investors making up well over 25% of the total pool of contributions—namely OPERF, CNP, and the providers of the Sponsor Commitment—had expressly supported the Transaction (and in any event, the other LPs would have supported the Transaction).

179.4.3. In any event, paragraphs 179.1.2 to 179.1.3 above are repeated: the LPs would have been content with the transaction absent the Notice of Acquisition, and would have accepted, having subscribed on that basis, that the investment strategy of the Fund was a matter for those managing it.

179.5. As to paragraph 108.5, for the reasons set out above, the LPs (or a material proportion of them) would not have chosen to do this. In any event, (i) the Investment Period of the

Fund was five years, such that no immediate pressure could have been brought to bear in respect of any successor funds, and (ii) the Defendants would have had access to a wider market of potential investors, of whom the LPs in the Fund were only a small minority. The final sentence is admitted, but paragraph 108.5 is otherwise denied.

180.   As to paragraph 109, in paragraph 39 of the Response to D1's RFI, the Claimants admit that OPERF was the only LP which was entitled to invoke clause 22.14.1 of the LPA and hence in respect of which paragraph 109 is even potentially relevant. Subject to the foregoing:

180.1.   Paragraphs 109.1 to 109.3 are admitted, save that clause 22.14.1 requires that the opinion that the Regulated Partner would need to obtain under that clause would need to be reasonably satisfactory to the general partner.

180.2.   Paragraph 109.4 is denied. As aforesaid, OPERF was already invested in NSO and on any view was supportive of the transaction. It continued to support the transaction in 2019 and 2020, and in October 2021 and January 2022 the Advisory Committee consented to and paid a share of a follow-on investment in NSO. In any case, even if OPERF might have wished to utilise clause 22.14.1 (which it would not have done) the acquisition of NSO did not entail that the continued investment of OPERF in the Fund would result "*in a violation of ERISA or other applicable law or applicable state law, rules or regulation*", and any opinion asserting a violation would not have been reasonably satisfactory.

180.3.   Paragraph 109.5 is therefore irrelevant, but in any event it is denied that the provisions in question under the O.R.S would have applied. The provisions pleaded in paragraph 109.5 are generic. OPERF would have been entitled to rely on the reasonableness of the investment-management decisions of Novalpina GP and/or Sanne as the relevant decision-makers under the LPA. O.R.S. §293.726 did not require OPERF to take its own independent decision on the wisdom of each investment made by the general partner of a private equity fund in which it was invested. Mr Kowski reserves the right to rely on expert evidence in due course.

181.   As to paragraph 110:

181.1.   Paragraph 110.1 is admitted as a quotation of clause 4.10.1 of the LPA.

181.2.   As to paragraph 110.2(1), it is denied in the premises that OPERF would have fallen within clause 4.10.1.2 in connection with the Fund's acquisition of NSO.

181.3. As to paragraph 110.2(2), while the provisions of the Alaska Uniform Prudent Investor Act are admitted, it is likewise denied in the premises that APF would have fallen within clause 4.10.1.2 in connection with the Fund's acquisition of NSO. The matters pleaded in paragraph 180.3 above in respect of OPERF apply equally to APF, *mutatis mutandis*.

181.4. As to paragraphs 110.2(3) and 110.2(4), it is denied that the Fund's acquisition of NSO would have caused any LP to breach its obligations under FSMA (or, pending proper particulars as to the jurisdictions in question, any equivalent legislation in other jurisdictions. It is not admitted that the duties in other jurisdictions would be the same as under FSMA, and it is denied that the Claimants are entitled to rely on the presumption of similarity). It was consistent with the LPs' regulatory obligations to subscribe to the Fund, as they did, on the basis that pursuant to the LPA the general partner (via the AIFM) would make investment decisions. It is denied that the LPs' duties of care and skill required them to second-guess every or any investment decision of Sanne as AIFM.

182. Paragraph 111 is denied in the premises.

183. As to paragraph 112, it is admitted that had the Fund liquidated its indirect interest in NSO shortly after Northpole BidCo purchased the Triangle shares, the Fund would have realised value for its investment: contrary to the Claimants' allegations, NSO was of significant value. It is denied in the premises that there was any loss to the Fund as a result of wrongdoing by the Defendants in this regard, whether on a loss of a chance basis or otherwise.

### *Alleged loss to the Fund arising from the alleged false representations to the LPs*

184. Paragraph 113 is denied in the premises.

185. As to paragraph 114, it is denied in the premises that the Fund has suffered any loss as a result of any alleged representations in the Notice of Acquisition. Without prejudice to the generality of that denial, paragraphs 91 and 97 above are repeated. Further, and in any event, it is not explained by the Claimants on what basis they contend that there would be any claim in relation to the alleged NoA Representations, which were not directed to the Claimants and plainly had no intention to injure them (and such a contention would be denied). Such losses would, in any event, be too remote.

### *The purported deceit claim (the alleged NoA Representations)*

186. Paragraph 115 is noted. It is denied that there is any basis for the Claimants' claim in deceit.

187. As to paragraph 116, it is embarrassing for its lack of particularity, and liable to be struck out. Without prejudice to the foregoing:

187.1. Paragraph 116.1 is denied. The Fund is not a proper claimant on behalf of the LPs. In any event, the Notice of Acquisition was addressed to the LPs as individual investors, not as a unit with "*collective action and identity*". Likewise, the various actions the Claimants (wrongly) allege the LPs would have taken to resist the completion of the transactions are actions they would have taken as individual LPs. Various of those actions—such as demands for withdrawal under clause 21.14.1—are actions that would only have been open, even on the Claimants' case, to certain individual LPs.

187.2. Paragraph 116.2 is denied. To the extent any representation was made, it was to an individual LP. The Notice of Acquisition was addressed to the LPs, not the Fund. Insofar as the Fund itself is an entity which can be addressed, it must be addressed via its general partner (at the time Novalpina GP).

187.3. Paragraph 116.3 is denied. There was no such intention.

188. Paragraph 117 and its subparagraphs are denied in the premises. Further:

188.1. As to paragraph 117.3, there was no intention for the Fund to do anything whatsoever in reliance on the alleged NoA representations.

188.2. As to paragraph 117.4, it is denied that the Fund in fact relied on the alleged NoA representations. The only particular given in support of that assertion by the Claimants is liable to be struck out. The mere alleged fact (which is denied) that a third party might have taken action that would have caused the Fund to take certain steps, would be insufficient to mean that the Fund had itself relied on any alleged representations.

**The alleged payment of a bribe or secret commission to Mr Dahbash**

189. As noted in paragraph 90 above, the Claimants have indicated in paragraph 28 of their Response to D3's RFI that they will seek to amend paragraph 54.4 of the PoC to plead the tort of bribery as one of the unlawful means purportedly used by the Defendants. Given that Mr Dahbash and Dahbash Assets were resident in Israel and operated from Israel, and given that it is alleged that the supposed bribe induced Mr Dahbash to breach his duties to NSO (a group of companies that had its business in Israeli, and several members of which, including the principal operating company, were incorporated in Israel), from all the circumstances, the alleged tort is manifestly more closely connected with Israel than any other jurisdiction such that such that any alleged bribery would fall to be considered under Israeli law. Israeli law does not recognise the tort of

bribery such that no claim in unlawful means conspiracy could arise based on the alleged tort in question. Further and in any event, no claim in unlawful means conspiracy arises where the alleged unlawful means is a breach of a foreign law provision.

### *The payment pursuant to the Engagement Letter*

190. As set out above, Mr Dahbash alerted Mr Kowski to the possibility of investing in NSO in or around spring 2018. Mr Dahbash then provided Mr Kowski with a one-page summary of NSO's business, and told him that he would like to advise the Fund on any transaction it sought to pursue in connection with NSO. Shortly thereafter, and in parallel with the negotiation of the Engagement Letter (as to which see further below), Mr Dahbash introduced the Novalpina IAs to Mr Hulio, who met with members of the Novalpina IAs. Following the meeting, Mr Hulio debriefed Francisco Partners and provided the Novalpina IAs with Mr Spetzler's contact details.

191. As set out above, following this introduction, Novalpina International sent a letter of interest to Francisco Partners dated 2 May 2018. This letter was sent on 3 May 2018 and copied to Mr Hulio and Q Cyber Technologies Sarl.

192. On 3 May 2018, Novalpina International and Q Cyber Technologies Sarl executed the Confidentiality Agreement. The Confidentiality Agreement set out that: (1) Novalpina International had requested information as part of its consideration of the Fund's possible purchase of NSO; (2) Q Cyber Technologies Sarl would furnish Novalpina International with such information; (3) in consideration for receiving the information, Novalpina International would treat it confidentially; (4) Novalpina International would be entitled to provide the information to various persons, including its "*professional advisors*" (and within that category its "*financial advisors*"); and (5) Q Cyber Technologies Sarl approved communication between Novalpina International and Eran Gorev (the chairman of NSO) and Mr Hulio.

193. Accordingly, as of 3 May 2018 Francisco Partners had consented to Novalpina receiving confidential information for the purposes of considering an acquisition; had approved Novalpina's future efforts to engage with Mr Hulio as CEO of NSO; and envisaged the provision of information, confidential to Q Cyber Technologies Sarl and/or Francisco Partners, to professional advisors (including financial advisors).

194. Before the Engagement Letter was executed by the parties to it Mr Kowski spoke with Mr Spetzler on either 3 or 4 May 2018 and informed Mr Spetzler that Novalpina International was working with Mr Dahbash on the potential acquisition of NSO. In the premises, Francisco Partners was aware from the outset of Novalpina International's engagement with Mr Dahbash.

195. As to paragraph 118:

    195.1. As to the first sentence, it is admitted that Mr Dahbash is an Israeli PR consultant. He is one of the two founding partners of, and owns a shareholding in, a consultancy company in Israel called Shalom Tel Aviv. Mr Dahbash's specialisms included strategic communications in the context of mergers and acquisitions. It is denied to the best of Mr Kowski's knowledge that he ever personally acted as a spokesperson for NSO, albeit Shalom Tel Aviv may have played that role (albeit this is not admitted). To the best of Mr Kowski's knowledge, at no material time did Mr Dahbash act as an agent of Francisco Partners or owe fiduciary duties to it. On 19 February 2019, after the SPA was executed, Mr Spetzler sent a WhatsApp message to Mr Kowski which confirmed that Mr Dahbash had not acted as an agent of Francisco Partners, or owed fiduciary duties to it, with respect to the Transaction. In particular, Mr Spetzler's message to Mr Kowski read: "*Zamir not terribly happy with me/us as I told him we are not going to pay him a deal fee. I offered to talk to you about it on his behalf as he should get one from the party he helped but he did not want that help ;)*" Mr Spetzler thereby relayed that Mr Dahbash had sought a success fee from Francisco Partners (in parallel to the one provided for by the Engagement Letter as novated), and that Francisco Partners had refused this request, on the basis that Mr Dahbash should be rewarded by the party which he had helped— i.e. Novalpina, not Francisco Partners.

    195.2. The second sentence is based on a false premise for the reason set out in the previous sub-paragraph.

196. As to paragraph 119, the first sentence is admitted. As to the second sentence, Novalpina International promised to pay, or alternatively procure the payment of, the Success Fee of US$5 million for services from Mr Dahbash and only in the event that a Transaction (as defined) was Consummated (as defined)—in broad summary, if the Fund acquired 64% or more of the shares in NSO. Moreover, the size of the Success Fee was conditional on the size of the shareholding in the NSO which the Fund acquired: if the Fund acquired less than 64% of the shares, the Success Fee was to be reduced *pro rata*. Save as aforesaid the second sentence is denied. The third sentence is noted.

197. Paragraph 120 is admitted.

198. Paragraph 121 is admitted. Clause 2.2 also stated that Mr Dahbash's "*Concurring Engagement*" with NSO "*will not conflict with the Services*".

199. Paragraph 122 is admitted. The purpose of clause 5, however, was to preclude Mr Dahbash from publicising information about the proposed transaction or Novalpina entities unless authorised by Novalpina International. In any event, as aforesaid, by the time the Engagement Letter was executed, Mr Kowski had informed Francisco Partners that Novalpina International was working with Mr Dahbash.

200. As to paragraph 123, the first sentence is admitted. As to the second sentence, as a result of the novation, Northpole BidCo was the party that was liable for the payment to Dahbash Assets and which in fact made the payment.

201. Paragraph 124 is admitted. The Success Fee was due and owing under the novated agreement.

202. As to paragraph 125, it is admitted that Mr Kowski procured the payment of the Success Fee by Northpole BidCo. It is denied in the premises that this fact supports the allegation that the payment of the Success Fee constituted a bribe.

203. Paragraph 126 is denied. The Engagement Letter was a classic "*finder's fee*" arrangement, and the payment of the Success Fee was pursuant to that arrangement. As explained above, Francisco Partners was aware of Novalpina International's engagement of Mr Dahbash and raised no objection to it. On or around 9 or 10 January 2019, i.e. shortly before the Transaction was executed and in the course of its negotiation, Mr Kowski made clear to Mr Hulio that Mr Dahbash was working for Novalpina. Mr Hulio raised no objection thereto at that time. In July 2019, after the Transaction closed, Novalpina Capital sent to NSO the invoice from Dahbash Assets and the Engagement Letter, after NSO had requested them (along with a variety of other invoices and contracts) for VAT purposes as part of its review of debt issuance costs relating to the Transaction. Having reviewed the Engagement Letter, NSO raised no objection to it. Further, and in any event, Mr Hulio and other senior members of the NSO management subsequently agreed to pay part of the Success Fee—an arrangement reflected economically by Northpole BidCo receiving more shares than previously envisaged in Triangle.

204. The inference in paragraph 127.1 is denied. To the best of Mr Kowski's knowledge, Mr Dahbash had no role acting on behalf of Francisco Partners, and no duties to Francisco Partners.

205. The inference in paragraph 127.2 is also denied. Mr Hulio and the NSO management team were opposed to a transaction with Verint long before Novalpina International engaged Mr Dahbash. To the best of Mr Kowski's understanding, Mr Hulio and his colleagues disliked the professional culture at Verint, did not want to report to senior management at Verint, and did not believe in the financial prospects of the other businesses of Verint. Had Verint acquired a majority shareholding in NSO, the existing NSO management team would have had to work

with Verint as a senior partner, and the future upside of any equity stake they retained in NSO, and/or acquired in Verint, would have been dependent on Verint's management of NSO's business and the prospects of Verint's other businesses. It was in light of NSO management's resistance to the putative Verint deal that Francisco Partners encouraged the Fund to consider a joint acquisition of NSO in partnership with existing NSO management, after Novalpina International had first expressed an interest. It was against this backdrop that the Confidentiality Agreement provided for Novalpina International to speak freely to Mr Hulio in order to evaluate an investment in NSO by the Fund in a buyout of NSO led by NSO management.

206. As to paragraph 128, it is denied that the Court should draw the inference alleged.

206.1. As to paragraph 128.1, it is denied that the size of the Success Fee was disproportionate and therefore suspect. More particularly:

206.1.1. The Success Fee was c. 0.5% of the transaction enterprise value. A finder's fee or success fee of that scale is not unusual in transactions of this kind, as will be a matter of expert evidence if necessary in due course. The fee was also in-keeping with the sorts of fees being charged in relation to the deal generally. For example, Francisco Partners' legal counsel in the transaction, Simpson Thatcher, charged US$ 10 million in fees.

206.1.2. In any event, the transaction was a highly complex one and the dynamics between the Fund, Francisco Partners, and the NSO management team were not straightforward. Mr Dahbash was closely involved for a number of months.

206.2. Paragraph 128.2 is therefore misconceived.

206.3. As to paragraph 128.3, it is denied that the definition of the Services provided or to be provided was vague. The definition accurately reflected what Mr Dahbash was expected to do (and in fact did).

206.4. As to paragraph 128.4, Mr Dahbash's relevant expertise was in strategic communications in the context of corporate transactions. As the Claimants aver, NSO's business had been the subject of significant media criticism. The strategic insights which Mr Dahbash was expected to supply were those within his domain of expertise relating to media strategy, which Novalpina International expected (correctly) would be relevant.

206.5. As to paragraph 128.5, as explained above, to the best of Mr Kowski's knowledge, Mr Dahbash owed no relevant duties; and in any event Francisco Partners' knew and

approved of Mr Dahbash's involvement on Novalpina International's behalf. The allegation that Mr Dahbash had knowledge of Mr Hulio's duties is embarrassing for its lack of particularity and is liable to be struck out, and so cannot be pleaded to. The relevance of any such allegation is also denied.

206.6.  As to paragraph 128.6, it is admitted that Mr Dahbash was entitled to continue in any then present role in relation to NSO and to assist in promoting discussions and agreements for a sale, but only on the basis that those continuing services would not conflict with the services he would provide Novalpina International and, by clause 2.3, only on the basis that he complied with the Bribery Act 2010 and Novalpina's anti-corruption and bribery policies. In any case paragraph 205 above is repeated. Save as admitted aforesaid, paragraph 128.6 is denied.

206.7.  As to paragraph 128.7:

206.7.1.  As to point (i), the fact of Novalpina International's engagement of Mr Dahbash was disclosed to Francisco Partners at the time it was being finalised.

206.7.2.  As to point (ii), Mr Hulio was made aware that Mr Dahbash was working for Novalpina International before the Transaction completed. Further, copies of the Engagement Letter and the invoice from Dahbash Associates were disclosed to NSO in July 2019. Ultimately, Mr Hulio and the other NSO management shareholders agreed to co-pay the Success Fee.

206.7.3.  As to point (iii), it is admitted that the Engagement Letter was not disclosed to the LPs when entered into. There is no reason why it ought to have been. Pursuant to the LPA it was for Novalpina GP, in conjunction with Sanne as appropriate and with the advice of the Novalpina IAs, to make agreements as part of pursuing the Fund's investment strategy. Once the Success Fee was paid, the payment was disclosed to the Advisory Committee—as the Claimants are forced to acknowledge.

206.7.4.  As to point (iv), it is denied that Novalpina International had any obligation to disclose the arrangement to Sanne. Paragraph 20.4 above is repeated. The Success Fee was a commission paid to a person acting on behalf of the Fund: Mr Dahbash was acting on behalf of Novalpina International in performing the Services in respect of the transaction, and Novalpina International was in turn acting on behalf of the Fund. Further or alternatively, the Success Fee was a proper fee necessary for the provision of the relevant service which by its

nature did not give rise to conflicts with the Adviser's duties—the relevant service in this instance being the Services.

206.7.5. As to point (v), there was no requirement for Novalpina International to disclose the payment to NOAL GP years after the event, in circumstances where it has already been disclosed to the Advisory Committee and, in any event, NOAL GP's status as general partner of the Fund was and is not accepted.

206.8. As to paragraph 128.8:

206.8.1. As to the first sentence, the Success Fee was disclosed in the way such fees were ordinarily disclosed in the operation of the Fund (and is common in financial organisations of this sort). The description used was in any event accurate. It is accordingly denied that the Success Fee was only partially disclosed.

206.8.2. As to the second sentence, there was no requirement that the Advisory Committee know about the Success Fee in advance or consent to it. As aforesaid, by clause 2.3.4 of the LPA, Novalpina GP (acting as appropriate through its agents, including the Novalpina IAs) had the power to enter into such agreements on behalf of the Fund as it thought necessary and advisable. So far as any alleged obligation to disclose on the part of Novalpina International is concerned, paragraph 206.7.4 above is repeated.

206.9. Paragraph 128.9 is denied. Francisco Partners was well aware of Mr Dahbash's engagement by Novalpina International. Mr Hulio was made aware of the Engagement Letter before the Transaction executed and later agreed to co-pay the Success Fee. In any event, Mr Dahbash owed no "*indirect*" duty of loyalty as alleged (and no particulars of that allegation have been provided). Mr Dahbash expressly acknowledged, by the Engagement Letter, that there would be no conflict between the Services thereunder and any services he provided to relevant NSO companies or Mr Hulio.

206.10. As to paragraph 128.10, it is denied for the reasons given herein that Novalpina knew about NSO well before 2018. It is accordingly denied that the service in question lacked a sound basis and/or that Novalpina International had no need for it. As to the alleged particulars of knowledge:

206.10.1. Point (1) is denied for the reasons given herein.

206.10.2. The first sentence of point (2) is admitted. The second sentence is denied, at least so far as Mr Kowski's knowledge was concerned. He learned of NSO only from Mr Dahbash. In any case, that Francisco Partners had contemplated entering into a specific transaction with Blackstone prior to August 2017 did not mean that Francisco Partners was looking to sell NSO more generally, or that it necessarily continued to wish to proceed after the failed Blackstone transaction. In any event, that transaction would only have involved Blackstone acquiring a 40% minority stake in NSO; the Defendants intended for the Fund to acquire control of NSO in partnership with NSO's co-founders and management (as it ultimately did) and engaged Mr Dahbash with that aim in mind.

206.10.3. As to point (3), as above, Mr Kowski was not aware of NSO as a potential investment prior to Mr Dahbash's involvement. The issue of whether a potential investor in the Novalpina International's position would have known of NSO's existence is irrelevant.

### *The alleged losses*

207. It is denied that any claim properly lies with the Claimants. If there was a bribe or corrupt payment, which is denied, a claim would lie with the party to whom Mr Dahbash owed his fiduciary duties, not the Claimants. The remainder is without prejudice to the foregoing.

208. As to paragraph 129:

208.1. It is denied that Mr Dahbash's provision of the Services pursuant to the Engagement Letter was causally determinative of the transaction. While Mr Dahbash's services were valuable, other factors—including the willingness of Mr Hulio and other key figures in NSO's management to partner with the Fund, and Francisco Partners' willingness to sell—were more important to the occurrence of the Transaction.

208.2. In any event, it is denied for the reasons set out herein that the payment of the Success Fee to Mr Dahbash, or the execution of the Engagement Letter in the first place, was a wrong of any description.

208.3. It is further denied in any event that the Claimants suffered loss from entering into the transaction. Paragraphs 92 and 97 above are repeated.

208.4. It is denied in the premises that there was any conspiracy as alleged.

209. Paragraph 130 is noted. That the payment of the Success Fee was an unlawful act, that there was a conspiracy by which the Defendants intended harm to the Claimants, and that there was any loss resulting from the payment of the Success Fee are all denied for the reasons set out herein.

210. As to paragraph 131:

    210.1. It is denied in the premises that there has been any such loss to Northpole BidCo. It received the Services in full consideration for the payment of the Success Fee under the novated agreement.

    210.2. In any event, the economic cost of the Success Fee to Northpole BidCo was not in fact US$ 5 million. The founders and executives of NSO who became minority shareholders in Triangle as a result of the transaction agreed to pay part of the fee, and this arrangement was given effect by allotting a higher proportion of Triangle shares (worth an additional US$1.4835 million) to Northpole BidCo than would otherwise have been the case.

    210.3. In any event, paragraph 131 fails to specify the cause of action under which the Claimants claim the US$ 5 million sum.

211. Paragraph 132 is denied in the premises.

**The claim under Luxembourg law**

212. Paragraph 8 above is repeated. Mr Kowski pleads further to Luxembourg law to cover the event that the Court determines that Luxembourg law is the applicable law. Mr Kowski reserves the right to rely on expert evidence as to Luxembourg law in due course.

213. Paragraphs 133 and 134 are admitted.

214. Paragraph 135 is admitted. Further in relation to causation, Luxembourg law applies a test of "*adequate causation*", meaning that "*only the proof of a causality link between the fault and the damage triggers the liability of the author of the fault*" (Cour d'appel, 11 December 2002, Pas. 32, p.313) and "*it is not enough to justify a liability, that a fault was committed, this fault must also have caused the damage whose reparation is requested*" (Tribunal d'arrondissement, 20 February 1936, Pas.14, p.89). Where the supposed wrong is done to one person and loss is supposedly suffered by another person who then seeks to bring a claim, the requirement of a direct causal link will generally not be satisfied.

215. Paragraphs 136 and 137 are admitted.

216. As to paragraph 138:

    216.1. Paragraph 138.1 is admitted. However, (1) dishonesty is a necessary element of the offence under Article 310 and (2) the act in return for which the benefit is promised must be an act contrary to the interests or expectations of the offeree's principal.

    216.2. Paragraph 138.2 is admitted. However, in order to commit an offence under Article 310-1 the offeror must offer or make the relevant payment with the intention of corrupting the payee, i.e. inducing him to act contrary to the interests of his principal and/or to act in an unlawful or unethical manner.

217. Paragraph 139 is admitted.

218. As to paragraph 140:

    218.1. Paragraph 140.1 is admitted.

    218.2. As to paragraph 140.2, the requirement for a direct causal link will only be satisfied if there is an unbroken sequence of events, in which each individual event is a predictable outcome of the wrongful act. Save as aforesaid, paragraph 140.2 is denied.

    218.3. As to paragraph 140.3, it is admitted that one situation in which the requirement for a direct causal link will not be satisfied will be as specified. It is denied if alleged that that is the only such situation. As aforesaid, any event which is not a predictable consequence of the wrongful act will break the direct causal link.

219. Paragraphs 141 and 142 are admitted.

### *The alleged breach of the LLP duties*

220. As to paragraph 143, it is admitted that the alleged breaches of their duties to Novalpina International would constitute a wrongful act for the purposes of Luxembourg law had they been committed (which is denied in the premises). In any event, it is denied that there is a sufficient causal link between the purported wrongful act and any loss of the Claimants.

### *The alleged false representations to Sanne and the alleged representations to the Fund / Novalpina GP*

221. Paragraph 144 is noted. It is denied that the relevant paragraphs support the Claimants' claim.

222. As to paragraph 145, the main body is denied in the premises. It is admitted that if there were a wrongful act as alleged (which is denied), Mr Kowski would, in principle, be responsible for it on the basis alleged in paragraph 145.1.

223. As to paragraph 146:

    223.1. Paragraphs 146.1 and 146.2 are denied for the reasons set out herein

    223.2. Paragraph 146.3 is embarrassing for its lack of particularity and is liable to be struck out. It is not specified in relation to whom the Defendants are alleged to have had a general obligation to act diligently and prudently, and Mr Kowski reserves the right to plead further thereto following disclosure. To the extent the paragraph can be understood, it is denied.

### *Alleged false representations to the LPs*

224. Paragraph 147 is noted. Paragraph 148 is denied for the reasons given herein.

### *Agreement to pay under the Engagement Letter*

225. As to paragraph 149, it is denied that the Engagement Letter and Dahbash Payment were wrongful for the reasons set out herein.

    225.1. More particularly as to point (i), it is denied that there was an offence of bribery pursuant to the Bribery Act 2010. In this regard, it is noted that, per paragraph 28 of the Response to D3's RFI, the Claimants allege that the Engagement Letter and the Dahbash Payment fall within the category of case set out in section 1(2) of the Bribery Act 2010. It is denied that the Defendants intended either to induce Mr Dahbash to perform improperly a relevant function or activity, or to reward Mr Dahbash for the improper performance of such a function or activity. In any event Mr Dahbash did not perform a "*relevant function or activity"* since (as far as Mr Kowski is aware) he was not subject to any relevant obligation of good faith, was not expected to perform impartially, and was not in a position of trust.

    225.2. Further as to point (i), so far as Luxembourg law is concerned, the relevant ingredients of the offence of bribery are pleaded in paragraph 216 above, and in the premises none of them is, on any view, met. The offences relating to bribery under Israeli law, which are set out in Articles 290-297 of the 1977 Penal Law, criminalise only the bribing of Israeli public officials, the bribing of foreign public officials, and the giving of bribes to influence the results of sporting or other competitions. Even if the Dahbash Payment had been a bribe—which is denied in the premises—the Defendants would have committed no offence under Israeli law.

225.3.  Further as to point (i), and in any event, insofar as the Engagement Letter or the Dahbash Payment involved an offence under the law of Luxembourg, Israel, or any other foreign law—which is denied in the premises—any such foreign-law offence would not suffice to found an English-law action in unlawful means conspiracy.

225.4.  Points (ii) to (v) are denied in the premises.

226.  As to paragraph 150, it is denied in the premises that Mr Kowski committed any wrongful act in respect of the payment of the Success Fee to Mr Dahbash. As to the level of the payment made by Northpole BidCo, paragraph 203 above is repeated.

227.  Paragraph 151 contains no allegation against Mr Kowski, and so he does not plead to it.

228.  Paragraph 152 is noted. It is denied that the Claimants are entitled to any damages.

**Interest**

229.  As to paragraphs 153 and 154, the Claim to interest is noted. It is denied that the Claimants are entitled to interest as claimed or at all.

ALAN GOURGEY KC

BOBBY FRIEDMAN

BENJAMIN SLINGO

**Statement of truth**

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:  …………………………………

STEFAN EMANUEL KOWSKI

Date: 24 January 2025